IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

------------------------------------------------------------------x

MANI KUMARI SABBITHI, JOAQUINA QUADROS,
and GILA SIXTINA FERNANDES

Index No.

Plaintiffs,

against -

**COMPLAINT**

MAJOR WALEED KH N. S. AL SALEH,
MAYSAA KH A. O. A. AL OMAR, and STATE OF
KUWAIT

Defendants.

JURY TRIAL DEMANDED

------------------------------------------------------------------x

Mani Kumari Sabbithi, Joaquina Quadros and Gila Sixtina Fernandes, by and for

their Complaint in the above-captioned matter, allege as follows:

## PRELIMINARY STATEMENT

1.    Plaintiffs are Indian women who were trafficked to the United States by

Defendants Major Waleed KH N. S. Al Saleh ("Defendant Al-Saleh") and Defendant Maysaa

KH A. O. A. Al Omar ("Defendant Al Omar") and forced to work as domestic employees and

childcare providers against their will.  They were subjected to exploitative work conditions and

received wages in violation of federal wage and hour laws.

2.    Plaintiffs seek damages from Defendant Al Saleh and Defendant Al Omar

(together "Individual Defendants") for trafficking them into the United States under false

pretenses and for subjecting them to slavery-like conditions through physical and psychological

abuse.  They further seek their agreed-upon pay for their labor and the statutory minimum

payment for such labor.  They also seek damages for breach of contract and various state torts.

1

3.      Plaintiffs also seek damages from the State of Kuwait.  Defendant State of Kuwait knowingly played a significant role in and provided material and practical assistance and encouragement to Individual Defendants in their trafficking of Plaintiffs and their placing them in conditions of forced labor.  Moreover, at all relevant times, the State of Kuwait employed Defendant Al Saleh.  The State of Kuwait, therefore, is responsible for the tortious conduct of its agent, Defendant Al Saleh, which was committed within the scope of his employment.  The State of Kuwait is also responsible for the tortious conduct of Defendant Al Saleh's wife, Defendant Al Omar, because Defendant Al Saleh approved of Defendant Al Omar's day-to-day management of her household duties.

## JURISDICTION AND VENUE

4.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1330, 1331, 1351, and 1367.  In particular, this Court has exclusive subject matter jurisdiction pursuant to the Foreign Sovereign Immunities Act of 1976.  28 U.S.C. § 1330. Further, this Court also has subject matter jurisdiction pursuant to 29 U.S.C. § 216(b), which permits employees to bring civil actions in courts of appropriate jurisdiction to recover damages for an employer's failure to pay the minimum wage and overtime wages, and 18 U.S.C. § 1595, which permits civil actions for violations of the forced labor and trafficking provisions of the Victims of Trafficking and Violence Protection Act of 2000.

5.      Venue is proper in this district pursuant to 28 U.S.C. § 1391(d) and (f)(4), because Defendants are a foreign state and citizens of a foreign state.

## PARTIES

### PLAINTIFFS

6.      Plaintiff Mani Kumari Sabbithi is a citizen of India who currently resides in the State of New York.  At the time of the events that give rise to this Complaint, Ms. Sabbithi was legally residing in the United States by virtue of a duly issued A-3 visa.  Ms. Sabbithi worked for the Individual Defendants in the United States from approximately July 1, 2005 to October 31, 2005.

7.      Plaintiff Joaquina Quadros is a citizen of India who currently resides in the State of New York.  At the time of the events that give rise to this Complaint, Ms. Quadros was legally residing in the United States by virtue of a duly issued A-3 visa.  Plaintiff Quadros worked for the Individual Defendants in the United States from approximately July 1, 2005 to January 18, 2006.

8.      Plaintiff Gila Sixtina Fernandes is a citizen of India who currently resides in the State of New York.  At the time of the events that give rise to this Complaint, Ms. Fernandes was legally residing in the United States by virtue of a duly issued A-3 visa.  Ms. Fernandes worked for the Individual Defendants in the United States from approximately August 26, 2005 to January 18, 2006.

### DEFENDANTS

9.      Upon information and belief, Defendant Major Waleed KH N. S. Al Saleh is a citizen of Kuwait who currently resides in the State of Virginia.  At all times relevant hereto, Defendant Al Saleh was stationed in Washington, D.C. as an Attaché to the Embassy of Kuwait.

He resided, along with his wife, Defendant Al Omar, and their four children at 7027 Elizabeth

Drive, McLean, Virginia 22101-2624.

      10.    Upon information and belief, Defendant Maysaa KH A. O. A. Al Omar is

a citizen of Kuwait who currently resides in the State of Virginia.  At all times relevant hereto,

Defendant Al Omar lived in McClean, Virginia and resided, along with her husband, Defendant

Al Saleh, and their four children at 7027 Elizabeth Drive, McLean, Virginia 22101-2624.

      11.    Defendant State of Kuwait (hereinafter "Kuwait") is a foreign state as that

term is defined in 28 U.S.C. § 1602, *et seq.* (the Foreign Sovereign Immunities Act of 1976).

Kuwait maintains a diplomatic presence in the United States through its Embassy ("Kuwait

Embassy") located at 2940 Tilden Street NW, Washington, D.C. 20008-1149.

## INTRODUCTION

**STATUTORY BACKGROUND FOR THE**
**TRAFFICKING IN PERSONS AND FORCED LABOR CLAIMS**

      12.    Plaintiffs are survivors of forced labor and human trafficking as defined

by the Victims of Trafficking and Violence Protection Act of 2000 (TVPA), Pub. L. No. 106-

386, 114 Stat. 1464 (2000), a federal statute passed by Congress to prevent and protect against

modern-day slavery and the trafficking of human beings and as a means to punish their abusers.

      13.    As defined by the TVPA, "severe forms of trafficking in persons" is "the

recruitment, harboring, transportation, provision, or obtaining of a person for labor or services"

through the use of force, fraud, or deception to perform labor exacted through physical, mental or

legal coercion. 22 U.S.C. §7102(8)(b).  Traffickers coerce their victims into performing labor

through a variety of means, including, *inter alia*, physical abuse, psychological abuse and threats,

and isolation and confinement.

14.    In 2003, the United States Department of State estimated that 18,000 to

20,000 individuals are trafficked into this country each year.  United States Department of State,

*Trafficking in Persons Report, 2003*, available at:

http://www.state.gov/g/tip/rls/tiprpt/2003/21262.htm.  According to Congress, "traffickers

primarily target women and girls, who are disproportionately affected by poverty, the lack of

access to education, chronic unemployment, discrimination, and the lack of economic

opportunities in countries of origin."  22 U.S.C. 7101(b)(4).  As recognized in the annual reports

released by the State Department and the United States Department of Justice, a significant

numbers of victims are trafficked into domestic work.  *Trafficking in Persons Report, 2003*,

*available at*: http://www.state.gov/g/tip/rls/tiprpt/2003/21262.htm; *Report on Activities to*

*Combat Human Trafficking, 2001-2005*, *available at*: http://www.usdoj gov/crt/crim/trafficking

_ report _2006.pdf.

## FACTUAL ALLEGATIONS

### RECRUITMENT INTO FORCED LABOR

15.    Plaintiffs are all women from severely impoverished families in rural

India.  During the period Plaintiffs were employed by Individual Defendants, they each bore

significant financial responsibilities to provide necessary support to their children, husbands,

parents and/or extended families.

### PLAINTIFF MANI KUMARI SABBITHI

16.    Plaintiff Mani Kumari Sabbithi was born in Chinchinada, Andhra Pradesh,

India.  Ms. Sabbithi was educated in India in the Telegu language through the seventh grade and

during the period of her employment by Individual Defendants spoke only a few words of
English and no Arabic. Ms. Sabbithi could not read or write in English.

17.    On or about October 18, 2004, Ms. Sabbithi began working as a domestic
servant for the Individual Defendants in Kuwait.

18.    Ms. Sabbithi worked in Kuwait for Individual Defendants for
approximately eight and a half months. During this time, Individual Defendants paid Ms.
Sabbithi a monthly salary of 40 Kuwaiti Dinars ("KD") (approximately $138 U.S.) and required
her to work extremely long hours, seven days a week.

19.    In Kuwait, Defendant Al Omar physically assaulted and verbally abused
and threatened Ms. Sabbithi. Defendant Al Omar also restricted Ms. Sabbithi's contact with the
external world, only allowing her to leave the premises of the home to attend church once a
month.

20.    Ms. Sabbithi feared Defendant Al Omar and felt compelled to work in
Individual Defendants' home. Ms. Sabbithi believed that if she ran away or sought help,
Individual Defendants would harm her.

21.    In or about April 2005, Defendant Al Omar directed Ms. Sabbithi to
accompany her to an office. Defendant Al Omar did not inform Ms. Sabbithi of the destination
or the purpose of the visit, but merely instructed Ms. Sabbithi not to wear her uniform and to tell
anyone at the office, if asked, that she was paid "320" for her labor and that Individual
Defendants treated her well. Defendant Al Omar wrote the figure "320" on a piece of paper for
Ms. Sabbithi so that she would remember it.

6

22. Upon information and belief, Defendant Al Omar then took Ms. Sabbithi to the United States Embassy in Kuwait. Ms. Sabbithi only understood that she was inside the building of the United States Embassy once an agent took her fingerprints. Defendant Al Omar never told Ms. Sabbithi that the family was moving to the United States and that they planned to take her with them. Only after this visit to the Embassy did Ms. Sabbithi understand Individual Defendants intended to take her to the United States.

23. Defendant Al Omar accompanied Ms. Sabbithi at all times in the United States Embassy. An official at the United States Embassy spoke almost exclusively with Defendant Al Omar. The only time he spoke to Ms. Sabbithi was when he asked her where her husband lived.

24. Upon information and belief, Defendant Al Omar sought an A-3 visa for Ms. Sabbithi at the United States Embassy. Upon information and belief, in order to encourage the United States government to issue an A-3 visa to Ms. Sabbithi, Defendant Al Omar represented to the Embassy official that Individual Defendants would provide Ms. Sabbithi with employment compliant with United States law. Upon information and belief, Defendant Al Omar produced and submitted an employment contract for Ms. Sabbithi's labor to the United States Embassy because it is a document required by the United States government for A-3 visa applications. On the basis of Defendant Al Omar's representations, the United States Embassy issued Ms. Sabbithi an A-3 visa authorizing her to work as a live-in domestic worker for Individual Defendants.

25. Upon information and belief, Defendant Al Omar never intended to carry out the verbal or contractual representations she made to the United States government.

7

26.     On or about July 1, 2005, Ms. Sabbithi traveled to Washington, D.C. with Individual Defendants, their four children and Plaintiff Quadros. Ms. Sabbithi remained under Individual Defendants' control until on or about October 31, 2005, when she fled their home.

27.     During the time Ms. Sabbithi was employed by Individual Defendants, Individual Defendants and Defendant Kuwait were in possession of Ms. Sabbithi's passport until after she escaped from Individual Defendants' home.

**PLAINTIFF JOAQUINA QUADROS**

28.     Plaintiff Joaquina Quadros was born in Goa, India on July 5, 1966. Ms. Quadros was educated through the tenth grade in India and during the time of her employment spoke basic English and understood a small amount of Arabic.

29.     On or about May 16, 2003, Ms. Quadros began working as a domestic servant for Individual Defendants in Kuwait. While working for Individual Defendants in Kuwait for approximately one year and ten months, Ms. Quadros was paid approximately 40 KD (approximately $138 U.S.) per month. During that time, Defendant Al Omar limited Ms. Quadros' contact with the external world and verbally abused and threatened Ms. Quadros.

30.     In or about January or February 2005, Defendant Al Omar told Ms. Quadros that the family was moving to the United States. On February 7, 2005, Defendant Al Omar directed Ms. Quadros to sign an employment contract that was entitled "Domestic Servant Contract" and subject to the laws of the United States. The contract stated that Individual Defendants agreed to pay her $1,280 U.S. per month for an eight-hour workday.

31.     In or about February 2005, Defendant Al Omar took Ms. Quadros to the United States Embassy in Kuwait. Prior to taking Ms. Quadros to the United States Embassy,

Defendant Al Omar instructed Ms. Quadros to tell the Embassy officials, if asked, that she was treated well.

32.    Upon information and belief, Defendant Al Omar sought an A-3 visa for Ms. Quadros at the United States Embassy.  Upon information and belief, in order to induce the United States government to issue an A-3 visa to Ms. Quadros, Defendant Al Omar presented the signed employment contract, representing to the Embassy official that Individual Defendants would pay Ms. Quadros $1,280 per month and provide her with employment compliant with United States law.  On the basis of these representations, the United States Embassy issued Ms. Quadros an A-3 visa authorizing her to work as a live-in domestic servant for Individual Defendants.

33.    Upon information and belief, Defendant Al Omar never intended to carry out the representations she made to Ms. Quadros and to the United States government.

34.    Defendant Al Omar repeatedly promised improved pay and working conditions to Ms. Quadros if she agreed to work for Individual Defendants in the United States.

35.    Ms. Quadros agreed to go to work for Individual Defendants in reliance on Defendant Al Omar's promises of improved work conditions and better pay.  Ms. Quadros also believed her work conditions would improve because she understood that United States law would protect her from any abuse or mistreatment by Individual Defendants.

36.    On July 1, 2005, Ms. Quadros traveled to Washington, D.C. with Individual Defendants, their four children and Plaintiff Sabbithi.  She remained in Individual Defendants' employ until January 18, 2006, when Ms. Quadros fled their home.

**PLAINTIFF GILA SIXTINA FERNANDES**

37.     Plaintiff Gila Sixtina Fernandes was born in Goa, India on September 1, 1967. Ms. Fernandes was educated through the tenth grade in India and during the time of her employment spoke proficient English and no Arabic.

38.     On or about July 11, 1997, Ms. Fernandes began working for Individual Defendants in Kuwait as a caretaker for Khalid, Individual Defendants' then ten-month-old son.

39.     Individual Defendants paid Ms. Fernandes between 35 KD (approximately $121 U.S.) and 40 KD (approximately $138 U.S.) per month.

40.     Ms. Fernandes worked for Individual Defendants for approximately five and a half years in Kuwait. She was required to work seven days a week and long hours each day. On December 9, 2002, Ms Fernandes returned to India.

41.     In or about May 2005, Defendant Al Omar contacted Ms. Fernandes to request that she relocate to the United States to work for Individual Defendants. Defendant Al Omar promised Ms. Fernandes improved working conditions and a better salary.

42.     In reliance on Individual Defendants' promises of better pay and decent working conditions, Ms. Fernandes agreed to work for Individual Defendants in the United States. On or about August 1, 2005, Ms. Fernandes returned to Kuwait to obtain her travel documents to the United States.

43.     Upon arrival in Kuwait, relatives of Defendant Al Omar instructed Ms. Fernandes to sign a contract that obligated Individual Defendants to pay Ms. Fernandes 380 KD (approximately $1,314 U.S.) per month for an eight-hour workday and to provide her one day of rest per week. Defendant Al Omar's relatives gave Ms. Fernandes an envelope of documents

instructing her to present the envelope to an official at the United States Embassy. Upon information and belief, the envelope contained Ms. Fernandes' employment contract. A friend of Individual Defendants then took Ms. Fernandes to the United States Embassy in Kuwait.

44.    Upon information and belief, in order to induce the United States government to issue Ms. Fernandes an A-3 visa, Individual Defendants represented to the United States Embassy that they would pay Ms. Fernandes $1,314 per month and provide her with conditions of employment compliant with United States law. On the basis of these representations, the United States Embassy issued Ms. Fernandes an A-3 visa authorizing her to work as a live-in domestic servant for Individual Defendants.

45.    Upon information and belief, Individual Defendants never intended to carry out the representations they made to Ms. Fernandes and to the United States government.

46.    On or about August 26, 2005, Ms. Fernandes traveled to Washington, D.C. alone. Ms. Fernandes remained in Individual Defendants' employ until January 18, 2006, when she fled their home.

## FORCED LABOR AND EXPLOITATION IN THE UNITED STATES

47.    At all relevant times, Plaintiffs resided in Individual Defendants' home at 7027 Elizabeth Drive in McLean, Virginia.

48.    Individual Defendants forced Plaintiffs to work for little pay in violation of United States law and compelled their work through physical, mental and legal coercion, including physical abuse, threats of physical harm, psychological abuse and deprivation of their legal documents.

49.    Specifically, Individual Defendants deprived Plaintiffs of their passports. Ms. Sabbithi's and Ms. Quadros' passports illegally remained in the possession of Individual Defendants upon their arrival in the United States. Individual Defendants confiscated Ms. Fernandes' passport shortly after her arrival in the United States. Upon information and belief, in violation of United States law, Individual Defendants took Plaintiffs' passports to the Kuwaiti Embassy where the passports were kept. After Plaintiffs' escaped from Individual Defendants, Plaintiffs' passports were returned to the Indian Embassy.

**WORK RESPONSIBILITIES**

50.    Individual Defendants forced Plaintiffs to perform backbreaking work virtually every waking hour of the day.

51.    Defendant Al Saleh approved of his wife, Defendant Al Omar, running the home and, specifically, the day-to-day management of Plaintiffs. Defendant Al Omar required Plaintiffs to work sixteen to nineteen hours per day, seven days per week. Every single day of the week Individual Defendants required Plaintiffs' to begin work between 6:30 a.m. and 7:00 a.m. Their workdays ended anywhere between 10:30 p.m. and 1:30 a.m.

52.    Defendant Al Omar determined, monitored and regulated Plaintiffs' daily work schedules and chores. As dictated by Defendant Al Omar, Plaintiffs each had different primary responsibilities, including, *inter alia*, caring for a nine-year-old boy and approximately one-year-old triplets, doing the laundry and ironing, cleaning the home, cooking for the family and cooking for and serving frequent guests.

53.    Plaintiffs' childcare responsibilities were numerous and constant. In addition to other tasks, Plaintiffs needed to wake the four children, change the diapers of the

three babies, prepare formula for the three babies, feed and dress the three babies, prepare the older son for school and feed him breakfast.

54.     Only after feeding and dressing the three babies and preparing the older son for school were Plaintiffs able to begin their elaborate and lengthy cleaning routines. Because Plaintiffs were responsible for the care of the three babies, while one cleaned, the others cared for the triplet babies.

55.     Throughout the day, Defendant Al Omar required Plaintiffs to change the diapers of the babies every two hours, whether soiled or not, and feed the babies every two hours.

56.     Defendant Al Omar required Plaintiffs to launder multiple loads of clothing every day and then to iron virtually every piece of clothing that was laundered, including underwear.  Individual Defendants also required Plaintiffs to launder and iron all of the household's bedding and linens on a weekly basis.

**PHYSICAL THREATS AND ABUSE**

57.     Individual Defendants physically abused Ms. Sabbithi.  Defendant Al Omar's unending cruel treatment of Ms. Sabbithi included pushing and slapping her and hitting her with heavy objects.  Defendant Al Omar also pulled her hair, and poked and pushed Ms. Sabbithi on the chest so regularly that Ms. Sabbithi often bore bruise marks.

58.     On one occasion, after bending Ms. Sabbithi's fingers and pushing them back towards Ms. Sabbithi's chest, Defendant Al Omar then struck Ms. Sabbithi's head against a wall several times.

59.     On another occasion, after hurling a soup spoon at Ms. Sabbithi, Defendant Al Omar struck Ms. Sabbithi's head with a heavy wooden box.  As a result, Ms. Sabbithi had a large lump and a painful and swollen forehead for several days.

60.     On another occasion, Defendant Al Omar pushed Ms. Sabbithi against a wall and slammed Ms. Sabbithi's head against the wall.  Ms. Sabbithi's head hurt for days afterwards.

61.     On another occasion, Defendant Al Omar struck Ms. Sabbithi's head several times with a package of frozen chicken.  Ms. Sabbithi had a headache for several days afterwards.

62.     On numerous other occasions, Defendant Al Omar also threatened to kill Ms. Sabbithi and send her defiled body back to India.  Ms. Sabbithi, who was aware of stories of domestic workers who were killed by their employers, believed these threats.

63.     On at least one occasion, Defendant Al Omar told Ms. Quadros that she would kill Ms. Sabbithi.

64.     Repeatedly, Ms. Quadros and Ms. Fernandes found Ms. Sabbithi injured and crying as a result of physical violence inflicted on her by Defendant Al Omar.

65.     By physically abusing and threatening Ms. Sabbithi, Individual Defendants created a work environment filled with violence and implicitly threatened Ms. Quadros and Ms. Fernandes with physical harm.  Ms. Quadros and Ms. Fernandes lived in a constant state of fear.

66.     As a result, Ms. Quadros and Ms. Fernandes feared that if they did not perform their work in the exact manner demanded by Individual Defendants, they would receive the same treatment Ms. Sabbithi received.

67.     Plaintiffs came to believe that Individual Defendants would kill them if they attempted to leave the house on their own accord or if they made a serious mistake in their work. Defendant Al Omar threatened to kill Ms. Quadros in Kuwait when she contemplated leaving Individual Defendants' employ.

68.     As Individual Defendants' abuse of Ms. Sabbithi worsened, Ms. Sabbithi then began to suffer from suicidal ideation.

69.     On or about October 31, 2005, the day that Ms. Sabbithi finally escaped, Individual Defendants' abusive treatment of Ms. Sabbithi finally convinced Plaintiffs that if Ms. Sabbithi did not escape, she would die or be killed. On that day, Defendant Al Omar became enraged with Ms. Sabbithi for incorrectly preparing a meal for the babies. Defendant Al Omar pulled Ms. Sabbithi's hair and threatened to "cut off" Ms. Sabbithi's tongue.

70.     Hearing the commotion, Defendant Al Saleh then entered the kitchen, yelled and berated Ms. Sabbithi, and violently pushed Ms. Sabbithi to the floor, causing Ms. Sabbithi to strike her head on the corner of a table and lose consciousness.

71.     Individual Defendants roused Ms. Sabbithi by pouring cold water over her, soaking her clothing. When Ms. Sabbithi finally regained consciousness, Defendant Al Omar yelled at Ms. Sabbithi for having wet clothes and mocked her for having lost consciousness.

72.     Individual Defendants failed to provide Ms. Sabbithi with any medicine or medical care to treat or examine her head injury. For many days, Ms. Sabbithi had a large lump on the back of her head from the fall and a headache. Ms. Sabbithi continues to suffer from persistent headaches as a result of the head injury.

## PSYCHOLOGICAL ABUSE AND ENFORCED ISOLATION

73.     In addition to inflicting physical harm on Ms. Sabbithi and physical threats on all Plaintiffs, Defendants coerced Plaintiffs' labor through a practice and pattern of psychological abuse, isolation and exploitation.

74.     Individual Defendants required Plaintiffs to work at a strenuous pace for extremely long hours. This pace harmed Plaintiffs' health. For example, on one particularly busy day, Ms. Sabbithi was required by Defendant Al Omar to work at such a difficult pace that she became dizzy and fainted on the stairs.

75.     Defendant Al Omar often timed how long a particular chore took and screamed at Plaintiffs if she thought they were taking too long.

76.     Defendant Al Omar treated Plaintiffs in a demeaning and abusive manner. Defendant Al Omar screamed at Plaintiffs when they made mistakes, had accidents (such as breaking a glass) or slightly deviated from her instructions. Plaintiffs were very fearful that Defendant Al Omar would find an error or shortcoming in their work.

77.     Individual Defendants restricted and sometimes punished Plaintiffs for attending to their own personal needs, such as eating or using the bathroom. For example, Defendant Al Omar often berated Plaintiffs for wasting time when they sat down to eat a meal and demanded that they return to work.

78.    Moreover, Individual Defendants overburdened Plaintiffs with work such that they frequently had no time to eat or use the bathroom during the day. Individual Defendants also limited Plaintiffs in the amount they could eat and what they were allowed to eat. Similarly, Defendant Al Omar prevented Plaintiffs from using the bathroom at will.

79.    Defendant Al Omar forbade Plaintiffs to speak with each other unless they spoke in English about work. Defendant Al Omar screamed at Ms. Quadros and Ms. Fernandes if she heard them speaking their native language. Plaintiffs were able to speak only when Defendant Al Omar was not present.

80.    Individual Defendants controlled Plaintiffs' use of the telephone.

81.    Individual Defendants failed to adequately provide for Plaintiffs' basic needs. Individual Defendants required Plaintiffs to sleep in spare, overcrowded conditions. All three Plaintiffs were required to share a room. Individual Defendants failed to provide Plaintiffs with access to medical care.

82.    Individual Defendants isolated Plaintiffs from the outside world for the purpose of keeping them in a situation of forced labor and servitude.

83.    Other than allowing Ms. Quadros and Ms. Fernandes to attend church once a month, Individual Defendants prohibited Plaintiffs from leaving the confines of their home without supervision by Individual Defendants. Individual Defendants even forbade Plaintiffs from approaching the windows, looking outside or opening the door.

84.    Individual Defendants did not allow Ms. Sabbithi any rest or breaks from work.

85.    Plaintiffs are Christian.  Individual Defendants limited Ms. Quadros' and Ms. Fernandes' ability to practice their religion and only allowed them to attend church separately once a month for one hour.  Individual Defendants deprived Ms. Sabbithi of the ability to practice her religion and refused to allow her to attend church at all despite her requests.

86.    Defendant Al Omar forbade Plaintiffs from speaking to anyone outside the family, including guests that Individual Defendants invited to the home.

87.    Individual Defendants made representations to Plaintiffs that they or others might suffer physical harm should they escape or attempt to escape.

88.    Plaintiffs believed that if they left the confines of Individual Defendants' home without their permission that Individual Defendants would seriously harm or kill them.

**WAGES**

89.    Plaintiffs received no wages directly.  All wages paid by Individual Defendants were sent abroad to Plaintiffs' families.

90.    Individual Defendants only paid Ms. Sabbithi's family approximately 70 KD (approximately $242 U.S.) per month.  Further, Individual Defendants often failed to send these payments on a timely basis and altogether failed to pay for Ms. Sabbithi's final two weeks of work.

91.    Contrary to their representations to the United States Embassy and to Ms. Quadros, Individual Defendants only paid Ms. Quadros' family between 70 and 75 KD (approximately $242 to $260 U.S.) per month, instead of the agreed upon $1,280 U.S.

92.    Contrary to their representations to the United States Embassy and to Ms.
Fernandes, Individual Defendants only paid Ms. Fernandes' family 100 KD (approximately $346
U.S.) per month, instead of the agreed upon $1,314 U.S.

93.    Individual Defendants never gave Plaintiffs any money or allowance
during the period they resided in Individual Defendants' Virginia home.  Plaintiffs were
completely dependent upon Individual Defendants for food, clothing, shelter and any other
necessities.

94.    Individual Defendants' hiring and employment of Plaintiffs was a
commercial activity.

**ESCAPE FROM DEFENDANTS**

95.    In the late summer of 2005, at a time when Individual Defendants were
away from the house, Ms. Quadros opened the door of the home and saw Individual Defendants'
neighbor, Mr. Hector Rodriguez, in front of his house, which was located across the street from
Individual Defendants' home.  Afraid to approach Mr. Rodriguez, but desperate to get help, Ms.
Quadros stood in front of Individual Defendants' house.  After a few minutes, Mr. Rodriguez
called her over and asked her if she wanted to speak with him.  Seizing this brief opportunity,
Ms. Quadros approached him and told him of the physical abuse that Individual Defendants
inflicted upon Ms. Sabbithi as well as their general mistreatment, including the deprivation of
food, sleep and freedom to leave the house.  Mr. Rodriguez promised to try to help Plaintiffs as
soon as they could safely escape.

96.    On or about October 31, 2005, following the incident in which Defendant
Al Saleh violently rendered Ms. Sabbithi unconscious, Plaintiffs were convinced that Ms.

Sabbithi would be seriously harmed if not killed by Individual Defendants if she did not escape immediately. Ms. Fernandes and Ms. Quadros begged Ms. Sabbithi to escape. They told Ms. Sabbithi that she could possibly save her life by leaving and that they would not allow her to die or be killed in front of them. Ms. Quadros told Ms. Sabbithi she was praying for her and placed the only money she had, three U.S. dollars she had been given in Kuwait, into Ms. Sabbithi's hand. Ms. Quadros instructed Ms. Sabbithi to run to Mr. Rodriguez's house. If Ms. Sabbithi could not find Mr. Rodriguez's house, Ms. Quadros told her to find someone else to help her and to beg if necessary.

97.     Ms. Sabbithi fled from the house and asked Mr. Rodriguez for help. Mr. Rodriguez immediately took in Ms. Sabbithi and called the police.

98.     The police arrived and spoke with Ms. Sabbithi. Upon information and belief, they also went to the Individual Defendants' house and asked for Ms. Sabbithi's passport. Upon information and belief, Individual Defendants responded that they had diplomatic immunity and that Ms. Sabbithi's passport was at the Embassy of Defendant Kuwait.

99.     After Ms. Sabbithi escaped, Defendant Al Omar warned Ms. Quadros and Ms. Fernandes that if they attempted to escape, they would be harmed. Defendant Al Omar told Ms. Quadros and Ms. Fernandes that Ms. Sabbithi was "rotting in jail" and could never return to India because she had escaped. Defendant Al Omar warned Ms. Quadros and Ms. Fernandes that she was prepared to "hunt down" Ms. Sabbithi.

100.     Defendant Al Omar became increasingly controlling of and continued to abuse Ms. Quadros and Ms. Fernandes. When Defendant Al Omar was in a different room, she constantly yelled for them or called them on the intercoms through the house to confirm they were working and that they had not also escaped.

101.    As the conditions in Individual Defendants' house worsened, Ms. Fernandes and Ms. Quadros realized that they also had to escape.  Ms. Fernandes suffered fear, nervousness and anxiety as a result of the unbearable working conditions and her health began deteriorating at an accelerated rate.  She also experienced substantial weight loss.  Ms. Fernandes believed that she would die in the house unless she escaped.

102.    Finally, on or about January 18, 2006, Ms. Fernandes and Ms. Quadros found an opportunity to escape.  Ms. Fernandes gathered their belongings into a dirty laundry basket and pretended to take the laundry to the washing machine on the second floor.  Individual Defendants were in the basement.  When the opportunity presented itself, Ms. Fernandes and Ms. Quadros grabbed their belongings and fled. They ran to the home of Mr. Rodriguez who helped them to safety.

103.    Later that same night, Defendant Al Omar telephoned Ms. Fernandes' husband, who was working in Kuwait.  Defendant Al Omar screamed at and berated Ms. Fernandes' husband for approximately twenty minutes and threatened to have him killed because Ms. Fernandes had escaped.

104.    Afraid Defendant Al Omar's family would harm her husband, Ms. Fernandes insisted that her husband leave Kuwait right away and return to India where he was safe.  Ms. Fernandes' husband returned to India within ten days.

## ADDITIONAL FACTS RELATING TO DEFENDANT KUWAIT

105.    Individual Defendants brought Plaintiffs into the United States pursuant to A-3 visas.  An A-3 visa allows representatives of foreign governments to bring private servants into the United States for employment in their homes during the diplomatic assignment.  The

United States provides diplomats with this privilege so that they may perform their diplomatic functions more effectively.

106.    The United States extended Individual Defendants the privilege of bringing Plaintiffs into the United States on the basis of Defendant Al Saleh's employment by Kuwait.

107.    In order for Individual Defendants to obtain Plaintiffs' A-3 visas, Defendant Kuwait had to authorize the visa application and submit documentation to the United States, including a "diplomatic note" verifying the applicant's status as a diplomat.  Upon information and belief, Defendant Kuwait agreed to and did in fact practically assist Individual Defendants in obtaining Plaintiffs' A-3 visas with knowledge of the misrepresentations made by Individual Defendants to Plaintiffs and officials at the United States Embassy in Kuwait.

108.    Upon information and belief, work performed by Plaintiffs inured to the benefit of Defendant Kuwait for which Defendant Kuwait failed to compensate Plaintiffs.

109.    If Individual Defendants are entitled to diplomatic immunity it is because Defendant Al Saleh is an agent of the Kuwaiti Government.  This immunity to civil and criminal jurisdiction would have invested Defendant Al Saleh with a heightened level of authority and impunity to accountability under United States law and facilitated his exploitation and abuse of Plaintiffs.

110.    Upon information and belief, Defendant Kuwait confiscated Plaintiffs' passports contrary to United States law.

111.    Upon information and belief, Defendant Kuwait was made aware of previous accusations that its personnel had engaged in severe acts of labor exploitation, through

civil lawsuits filed against it, public denouncements at its embassies and consulates and newspaper reports, among other channels of information.

112.    Upon information and belief, Defendant Kuwait, in response to allegations that its personnel exploited their domestic workers, made no effort to inquire into or address these allegations, but rather has argued in defense of its diplomatic personnel.

113.    Upon information and belief, Defendant Kuwait was in the possession of at least two communications from the United States Department of State that alerted the State of Kuwait to the widespread exploitation of domestic workers by diplomatic personnel and the legal obligations of Kuwait and its personnel to comply with laws in the United States.

114.    In a Circular Diplomatic Note dated May 20, 1996, the United States Department of State notified all foreign states with a diplomatic presence in the United States, including Defendant Kuwait, that "the Department [was] concerned to learn of problems which continue to arise in the working relationships between some members of the diplomatic and consular community and their personal household employees," including "instances where wages have been withheld from personal domestics for undue periods, where the wages actually paid are substantially less than those stipulated at the time of employment, where passports have been withheld from the employee; where the actual number of working hours weekly is substantially more than those originally contemplated and with no additional pay, and where the employee has been forbidden from leaving the employer's premises even though off duty."

115.    In the same May 20, 1996 Circular Diplomatic Note concerning the treatment of domestic workers by diplomats, the State Department informed the Kuwaiti government that the U.S. government would *"hold the Chief of Mission and the sending*

*government responsible* for the conduct of persons sent to the United States as diplomatic representatives or of others entitled to immunity" (emphasis added).

116.    The United States Department of State further informed Defendant Kuwait that it should take affirmative steps to monitor its employees, including "review[ing] each employment contract...[and] keep[ing] a copy on file at the mission and ensure that mission members respect their obligations as employers."

117.    Upon information and belief, Defendant Kuwait failed to take affirmative steps to monitor its diplomats in the United States, as requested by the Department of State.

118.    On June 19, 2000, the Department of State sent a second Circular Diplomatic Note to foreign missions, including Defendant Kuwait, reiterating the legal obligations of diplomats to their domestic workers.  This Circular also communicated the Department of State's new requirement that diplomatic employers execute and include an employment contract in full compliance with United States law in all A-3 visa applications.

119.    Upon information and belief, Defendant Kuwait was aware that a pattern of rape, physical assault, involuntary servitude, and mistreatment of Asian domestic workers exists in the State of Kuwait and takes place largely with impunity.  *See* Human Rights Watch, *Global Report on Women's Human Rights*, *available at*: http://www.hrw.org/about/projects/womrep/.

120.    For at least the past ten years, the Department of State, in its annual human rights reports, has documented the deplorable conditions and treatment of domestic workers in Kuwait.  For example, in its most recent report, the Department of State reported that "foreign workers, mostly female domestics, have been abused by their employers and coerced into

situations of debt bondage or involuntary servitude." It concluded that "the principal traffickers were labor recruitment agencies and sponsors of domestic workers." Bureau of Democracy, Human Rights and Labor, United States Department of State, *Kuwait: Country Reports on Human Rights Practices* - 2005, *available at:* http://www.state.gov/g/drl/rls/hrrpt/2005/61692.htm.

121.    In this same report, the Department of State also documents that South Asian workers live and work "much like indentured servants" in Kuwait. The Department reports that South Asian workers frequently face poor working conditions and labels the "physical or sexual abuse of foreign women working as domestic servants" in Kuwait as a problem. The report also notes that in 2005 "[there] were dozens of reports of domestic workers allegedly committing or attempting suicide because of desperation over poor working conditions or abuse." Bureau of Democracy, Human Rights and Labor, United States Department of State, *Kuwait: Country Reports on Human Rights Practices* - 2005, *available at:* http://www.state.gov/g/drl/rls/hrrpt/2005/61692.htm.

122.    The abuses inflicted on Plaintiffs by Individual Defendants were foreseeable by Defendant Kuwait.

## CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF

## TRAFFICKING IN PERSONS VIOLATION OF THE

## TRAFFICKING VICTIMS PROTECTION ACT OF 2000

### (AGAINST ALL DEFENDANTS)

123.    Plaintiffs reallege and incorporate the averments of the foregoing paragraphs as though set forth fully herein.

124.    Individual Defendants knowingly recruited, transported and harbored the Plaintiffs so as to obtain their labor and services by threats of serious harm, scheme or pattern of behavior and/or abuse of legal process within the meaning of the Trafficking provisions of the Trafficking Victims Protection Act, 18 U.S.C. § 1590.

125.    Plaintiffs are authorized to bring these civil claims against Defendants pursuant to the civil remedies provision of the Trafficking Victims Protection Reauthorization Act of 2003, 18 U.S.C. § 1595.

126.    As a proximate result of Individual Defendants' conduct, Plaintiffs have suffered damages.

127.    Defendant Kuwait knowingly played a significant role in and practically and materially assisted Individual Defendants' trafficking of Plaintiffs.

128.    At the time Individual Defendants engaged in the tortious conduct described herein, Defendant Al Saleh was employed by Defendant Kuwait.  Defendant Kuwait authorized Defendant Al Saleh's employment of Plaintiffs as domestic workers in the United

States and Defendant Al Saleh approved of Defendant Al Omar's day-to-day management of their household duties. Plaintiffs' exploitation occurred in the ordinary course of Individual Defendants' supervision of Plaintiffs and with the intent of furthering Defendant Kuwait's interests. Defendant Kuwait is therefore also vicariously liable for Individual Defendants' conduct under the doctrine of respondeat superior.

129.    Plaintiffs are entitled to recover damages in an amount to be proven at trial, including attorneys' fees.

## SECOND CLAIM FOR RELIEF

## FORCED LABOR VIOLATION OF THE TRAFFICKING

## VICTIMS PROTECTION ACT OF 2000

### (AGAINST ALL DEFENDANTS)

130.    Plaintiffs reallege and incorporate the averments of the foregoing paragraphs as though set forth fully herein.

131.    Individual Defendants knowingly obtained Plaintiffs' labor and services by threats of serious harm, scheme or pattern of behavior and/or abuse of legal process within the meaning of the Forced Labor provision of the Trafficking Victims Protection Act, 18 U.S.C. § 1589.

132.    Plaintiffs are authorized to bring these civil claims against Defendants pursuant to the civil remedies provision of the Trafficking Victims Protection Reauthorization Act of 2003, 18 U.S.C. § 1595.

133.    As a proximate result of Individual Defendants' conduct, Plaintiffs have suffered damages.

134. Defendant Kuwait knowingly played a significant role in and practically and materially assisted Individual Defendants' in subjecting Plaintiffs to conditions of forced labor.

135. At the time Individual Defendants engaged in the tortious conduct described herein, Defendant Al Saleh was employed by Defendant Kuwait. Defendant Kuwait authorized Defendant Al Saleh's employment of Plaintiffs as domestic workers in the United States and Defendant Al Saleh approved of Defendant Al Omar's day-to-day management of their household duties. Plaintiffs' exploitation occurred in the ordinary course of Individual Defendants' supervision of Plaintiffs and with the intent of furthering Defendant Kuwait's interests. Defendant Kuwait is therefore also vicariously liable for Individual Defendants' conduct under the doctrine of respondeat superior.

136. Plaintiffs are entitled to recover damages in an amount to be proven at trial, including attorneys' fees.

## THIRD CLAIM FOR RELIEF

## INVOLUNTARY SERVITUDE (PURSUANT TO THE THIRTEENTH AMENDMENT OF THE UNITED STATES CONSTITUTION AND 18 U.S.C. § 1584)

### (AGAINST ALL DEFENDANTS)

137. Plaintiffs reallege and incorporate the averments of the foregoing paragraphs as though set forth fully herein.

138. The Thirteenth Amendment of the United States Constitution and its enforcing statute, 18 U.S.C. § 1584, prohibit involuntary servitude in private conduct.

139.    Individual Defendants knowingly forced Plaintiffs to work through threats of physical force and legal coercion.  Individual Defendants forced Plaintiffs to work for them under the threat of physical harm and through legal coercion manifested in the confiscation of their passports and threats of harm that would result should Plaintiffs Individual Defendants' residence.

140.    Through the conduct of Individual Defendants alleged herein, acting individually and in concert, Individual Defendants caused Plaintiffs to have and to believe they had no way of avoiding continued service or confinement in violation of the Thirteenth Amendment's prohibition on involuntary servitude.

141.    As a proximate result of Individual Defendants' conduct, Plaintiffs have suffered damages.

142.    At the time Individual Defendants engaged in the tortious conduct described herein, Defendant Al Saleh was employed by Defendant Kuwait.  Defendant Kuwait authorized Defendant Al Saleh's employment of Plaintiffs as domestic workers in the United States and Defendant Al Saleh approved of Defendant Al Omar's day-to-day management of their household duties.  Plaintiffs' exploitation occurred in the ordinary course of Individual Defendants' supervision of Plaintiffs and with the intent of furthering Defendant Kuwait's interests. Defendant Kuwait is therefore vicariously liable for Individual Defendants' conduct under the doctrine of respondeat superior.

143.    Plaintiffs are entitled to recover damages in an amount to be proven at trial, including attorneys' fees.

## FOURTH CLAIM FOR RELIEF

## VIOLATION OF THE FAIR LABOR STANDARDS ACT

## (AGAINST DEFENDANTS AL SALEH AND AL OMAR)

144.    Plaintiffs reallege and incorporate the averments of the foregoing paragraphs as though set forth fully herein.

145.    Individual Defendants employed Plaintiffs within the meaning of the Fair Labor Standards Act, 29 U.S.C. § 203(d).

146.    Pursuant to the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201, *et seq.* and United States Department of Labor regulations, Individual Defendants were obligated to pay Plaintiffs at least the minimum wage of $5.15 for every hour in which Plaintiffs were not free to leave employers' premises.

147.    Individual Defendants willfully refused to pay Plaintiffs minimum wages, in violation of 29 U.S.C. §§ 206(a), (f) and Department of Labor regulations.

148.    As a proximate result of Individual Defendants' conduct, Plaintiffs have suffered damages.

149.    Plaintiffs are entitled to recover the amount of unpaid minimum wages due and an equal amount as liquidated damages, a total amount no less than $116,431.20 for all three Plaintiffs.  Plaintiffs are also entitled to recover attorneys' fees and costs of the action, pursuant to 29 U.S.C. § 216 (b) and Department of Labor regulations, in addition to declaratory relief.

## FIFTH CLAIM FOR RELIEF

## BREACH OF CONTRACT

### (AGAINST DEFENDANTS AL SALEH AND AL OMAR)

150.    Plaintiffs reallege and incorporate the averments of the foregoing paragraphs as though set forth fully herein.

151.    On or about February 7, 2005, Plaintiff Quadros and Individual Defendants entered into a written contract providing, *inter alia*, that Plaintiff Quadros would work for Individual Defendants as a domestic worker in their home for $1,280 per month.  The contract also provided that Plaintiff Quadros would work only eight hours per day.

152.    On or about August 13, 2005, Plaintiff Fernandes and Individual Defendants entered into a written contract, providing, *inter alia,* that Plaintiff Fernandes would work for Individual Defendants as a domestic worker in their home for 380 KD (approximately $1,314) per month.  The contract also provided that Plaintiff Fernandes would work only eight hours per day, would be granted one day of rest per week and would not be deprived of her passport.

153.    Upon information and belief, Plaintiff Sabbithi and Individual Defendants entered into a written contract, providing, *inter alia*, that Plaintiff Sabbithi would work for Individual Defendants as a domestic worker in their home.  Upon information and belief, the written contract set forth wages and employment conditions in accordance with United States law.

154.    Plaintiffs fully performed under their respective contracts by working as domestic workers in the Al Saleh-Al Omar household.

155.    Individual Defendants breached the contracts by failing to pay Plaintiffs for all of the work they performed and by forcing Plaintiffs to work more than eight hours per day, seven days per week.  Individual Defendants also breached their contract with Ms. Fernandes by depriving her of her passport.

156.    As a proximate result of Individual Defendants' conduct, Plaintiffs have suffered damages.

157.    Plaintiffs are entitled to recover damages in an amount to be proven at trial, including attorneys' fees and the cost of this action.

## SIXTH CLAIM FOR RELIEF

## QUANTUM MERUIT

### (AGAINST DEFENDANTS AL SALEH AND AL OMAR)

158.    Plaintiffs reallege and incorporate the averments of the foregoing paragraphs as though set forth fully herein.

159.    Plaintiffs have conferred significant benefits upon Individual Defendants by performing the above-mentioned labor for them.

160.    Individual Defendants have not tendered appropriate payment to Plaintiffs for these services.

161.    Individual Defendants are liable under quantum meruit for the services that Plaintiffs provided.

162.    As a proximate result of Individual Defendants' conduct, Plaintiffs have suffered damages.

163.    Plaintiffs are entitled to recover damages in an amount to be proven at trial, including attorneys' fees and the cost of this action.

## SEVENTH CLAIM FOR RELIEF

## UNJUST ENRICHMENT

## (AGAINST DEFENDANTS AL SALEH AND AL OMAR)

164.    Plaintiffs reallege and incorporate the averments of the foregoing paragraphs as though set forth fully herein.

165.    Individual Defendants have been unjustly enriched because they failed to pay Plaintiffs the value of their labor.

166.    As a proximate result of Individual Defendants' conduct, Plaintiffs have suffered damages.

167.    It would be inequitable for Individual Defendants to be permitted to retain such benefits without paying Plaintiffs the value of the benefits conferred.

168.    Plaintiffs are entitled to restitution and judgment against Individual Defendants in an amount to be proven at trial, including attorneys' fees and the cost of this action.

## EIGHTH CLAIM FOR RELIEF

## FRAUD AND CONSTRUCTIVE FRAUD

## (AGAINST ALL DEFENDANTS)

169.    Plaintiffs reallege and incorporate the averments of the foregoing paragraphs as though set forth fully herein.

170.    Individual Defendants intentionally, knowingly, negligently or innocently misrepresented to Plaintiffs the conditions of Plaintiffs' employment in the United States in order to induce them to come to the United States.

171.    Individual Defendants deceived Plaintiffs with the above-mentioned misrepresentations, including the promise of specified wages and proper working conditions in order to entice Plaintiffs to come to the United States and to force them to work as domestic workers in their household.

172.    Individual Defendants induced Plaintiffs to come to the United States knowing of and intending that their misrepresentations would induce Plaintiffs to travel to the United States in order to receive the promised employment.

173.    Plaintiffs did in fact rely on Individual Defendants' misrepresentations to their detriment and as a result were forced to work as domestic workers for Individual Defendants, thereby enduring physical and psychological abuse that accompanied this employment at great economic, physical and financial detriment.

174.    At the time that Individual Defendants made the foregoing representations and promises to Plaintiffs, they had no intention of carrying out such representations and promises.

175.    As a direct and proximate result of these actions, Plaintiffs have sustained damages.

176.    At the time Individual Defendants engaged in the tortious conduct described herein, Defendant Al Saleh was employed by Defendant Kuwait.  Defendant Kuwait authorized Defendant Al Saleh's employment of Plaintiffs as domestic workers in the United

States and Defendant Al Saleh approved of Defendant Al Omar's day-to-day management of their household duties. Plaintiffs' exploitation occurred in the ordinary course of Individual Defendants' supervision of Plaintiffs and with the intent of furthering Defendant Kuwait's interests. Defendant Kuwait is therefore vicariously liable for Individual Defendants' conduct under the doctrine of respondeat superior.

177.    Defendant Kuwait intentionally, knowingly, negligently or innocently deceived Plaintiffs by assisting Individual Defendants obtain Plaintiffs' A-3 visas and confiscating and storing Plaintiffs' passports in its embassy.

178.    Plaintiffs are entitled to recover damages in an amount to be proven at trial, including attorneys' fees and the cost of this action.

## NINTH CLAIM FOR RELIEF

## FALSE IMPRISONMENT

### (AGAINST ALL DEFENDANTS)

179.    Plaintiffs reallege and incorporate the averments of the foregoing paragraphs as though set forth fully herein.

180.    Individual Defendants knowingly and intentionally restrained Plaintiffs through threats and coercion so as to deprive Plaintiffs of their liberty and force Plaintiffs to continue laboring for them.

181.    Plaintiffs reasonably believed that they were confined within the boundary of Individual Defendants' home as a result of Individual Defendants' coercion, use of force and threats of force.

182.    As a proximate result of Individual Defendants' conduct, Plaintiffs have suffered damages in an amount to be proven at trial.

183.    Individual Defendants committed these acts maliciously, with the wrongful intention of causing harm to Plaintiffs and in conscious disregard of their rights.

184.    At the time Individual Defendants engaged in the tortious conduct described herein, Defendant Al Saleh was employed by Defendant Kuwait.  Defendant Kuwait authorized Defendant Al Saleh's employment of Plaintiffs as domestic workers in the United States and Defendant Al Saleh approved of Defendant Al Omar's day-to-day management of their household duties.  Plaintiffs' exploitation occurred in the ordinary course of Individual Defendants' supervision of Plaintiffs and with the intent of furthering Defendant Kuwait's interests.  Defendant Kuwait is therefore vicariously liable for Individual Defendants' conduct under the doctrine of respondeat superior.

185.    Plaintiffs are entitled to recover damages in an amount to be proven at trial, including punitive damages, attorneys' fees and the cost of this action.

## TENTH CLAIM FOR RELIEF

## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

### (AGAINST ALL DEFENDANTS)

186.    Plaintiffs reallege and incorporate the averments of the foregoing paragraphs as though set forth fully herein.

187.    Individual Defendants acted with an intent to cause Plaintiffs emotional distress and/or a reckless disregard for the high probability that emotional distress would occur by, among other things, refusing Plaintiffs contact with the world outside Individual Defendants'

home, telling them that they would be harmed if they left the home and subjecting them to abhorrent working conditions.

188.    Individual Defendants' conduct was extreme and outrageous in nature and intolerable in a civilized society.

189.    As a proximate result of Individual Defendants' conduct, Plaintiffs have suffered and continue to suffer severe mental distress, emotional injuries and economic loss.

190.    Individual Defendants committed these acts maliciously and oppressively, with the wrongful intention of causing harm to Plaintiffs, with the motive amounting to malice and in conscious disregard of Plaintiffs' rights.

191.    At the time Individual Defendants engaged in the tortious conduct described herein, Defendant Al Saleh was employed by Defendant Kuwait.  Defendant Kuwait authorized Defendant Al Saleh's employment of Plaintiffs as domestic workers in the United States and Defendant Al Saleh approved of Defendant Al Omar's day-to-day management of their household duties.  Plaintiffs' exploitation occurred in the ordinary course of Individual Defendants' supervision of Plaintiffs and with the intent of furthering Defendant Kuwait's interests.  Defendant Kuwait is therefore vicariously liable for Individual Defendants' conduct under the doctrine of respondeat superior.

192.    Plaintiffs are entitled to recover damages in an amount to be proven at trial, including punitive damages, attorneys' fees and the cost of this action.

## TWELFTH CLAIM FOR RELIEF

## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

### (AGAINST ALL DEFENDANTS)

193.    Plaintiffs reallege and incorporate the averments of the foregoing paragraphs as though set forth fully herein.

194.    Individual Defendants negligently engaged in outrageous conduct toward Plaintiffs and caused Plaintiffs to suffer severe emotional distress.

195.    Individual Defendants owed a duty to Plaintiffs because it was foreseeable that forcing domestic workers to work up to nineteen hours per day, with minimal pay, isolated from the outside world, and subjected to threats of physical harm, would cause Plaintiffs to suffer severe emotional distress.

196.    Individual Defendants breached their duty to the Plaintiffs by negligently engaging in the conduct described herein.

197.    As a proximate result of said conduct, Plaintiffs have suffered and continue to suffer extreme mental distress, humiliation and emotional injuries, as a direct and natural result of which Plaintiffs have suffered physical injuries.

198.    At the time Individual Defendants engaged in the tortious conduct described herein, Defendant Al Saleh was employed by Defendant Kuwait. Defendant Kuwait authorized Defendant Al Saleh's employment of Plaintiffs as domestic workers in the United States and Defendant Al Saleh approved of Defendant Al Omar's day-to-day management of their household duties. Plaintiffs' exploitation occurred in the ordinary course of Individual Defendants' supervision of Plaintiffs and with the intent of furthering Defendant Kuwait's

interests. Defendant Kuwait is therefore vicariously liable for Individual Defendants' conduct under the doctrine of respondeat superior.

199.    Plaintiffs are entitled to recover damages in an amount to be proven at trial, including punitive damages, attorneys' fees and the cost of this action.

## THIRTEENTH CLAIM FOR RELIEF

## ASSAULT

### (PLAINTIFF SABBITHI AGAINST ALL DEFENDANTS)

200.    Plaintiff Sabbithi realleges and incorporates the averments of the foregoing paragraphs as though set forth fully herein.

201.    Individual Defendants' actions and/or words set forth above were intended to cause harmful and/or offensive contact with Plaintiff Sabbithi and/or the apprehension of imminent harmful and/or offensive contact with Plaintiff Sabbithi.

202.    As a direct and proximate result of the actions and/or words of Individual Defendants, Individual Defendants placed Plaintiff Sabbithi in apprehension of imminent harmful and/or offensive physical contact.

203.    As a direct and proximate result of the actions and/or words of Individual Defendants, Plaintiff Sabbithi has endured continuing pain and suffering, in addition to severe emotional distress and loss of income.

204.    At the time Individual Defendants engaged in the tortious conduct described herein, Defendant Al Saleh was employed by Defendant Kuwait.  Defendant Kuwait authorized Defendant Al Saleh's employment of Plaintiff Sabbithi as a domestic worker in the United States and Defendant Al Saleh approved of Defendant Al Omar's day-to-day

management of her household duties. Plaintiff Sabbithi's exploitation occurred in the ordinary course of Individual Defendants' supervision of Plaintiff Sabbithi and with the intent of furthering Defendant Kuwait's interests. Defendant Kuwait is therefore vicariously liable for Individual Defendants' conduct under the doctrine of respondeat superior.

205.    Plaintiffs are entitled to recover damages in an amount to be proven at trial, including punitive damages, attorneys' fees and the cost of this action.

## FOURTEENTH CLAIM FOR RELIEF

## BATTERY

### (PLAINTIFF SABBITHI AGAINST ALL DEFENDANTS)

206.    Plaintiff Sabbithi realleges and incorporates the averments of the foregoing paragraphs as though set forth fully herein.

207.    Individual Defendants engaged in continuous harmful and/or offensive physical contact with Plaintiff Sabbithi, including hitting, pushing and poking Plaintiff Sabbithi on multiple occasions.

208.    At no time did Plaintiff Sabbithi consent to the above harmful and/or offensive physical contact by Individual Defendants.

209.    Individual Defendants' physical contact with Plaintiff Sabbithi was inexcusable and unjustified.

210.    As a direct and proximate result of Individual Defendants' physical contact with Plaintiff Sabbithi, Plaintiff Sabbithi has endured continuing pain and suffering, in addition to severe emotional distress and loss of income.

211. At the time Individual Defendants engaged in the tortious conduct described herein, Defendant Al Saleh was employed by Defendant Kuwait. Defendant Kuwait authorized Defendant Al Saleh's employment of Plaintiff Sabbithi as a domestic worker in the United States and Defendant Al Saleh approved of Defendant Al Omar's day-to-day management of her household duties. Plaintiff Sabbithi's exploitation occurred in the ordinary course of Individual Defendants' supervision of Plaintiff Sabbithi and with the intent of furthering Defendant Kuwait's interests. Defendant Kuwait is therefore vicariously liable for Individual Defendants' conduct under the doctrine of respondeat superior.

## FIFTEENTH CLAIM FOR RELIEF

## CIVIL CONSPIRACY

### (AGAINST ALL DEFENDANTS)

212. Plaintiffs reallege and incorporate the averments of the foregoing paragraphs as though set forth fully herein.

213. Defendants agreed to engage in the acts detailed above to accomplish an unlawful purpose and/or accomplish acts by unlawful means.

214. Through their concerted action, Defendants assisted one another in the execution of those acts that resulted in the unlawful treatment of Plaintiffs, described above.

215. As a proximate result of Defendants' agreement to engage in the unlawful acts described above, Plaintiffs have suffered and continues to suffer severe mental distress, emotional injuries and economic loss.

216. Plaintiffs are entitled to recover damages in an amount to be proven at trial, including attorneys' fees and the cost of this action.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a jury trial on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that this Court grant them the following relief on each count above:

1) Compensatory damages;

2) Punitive damages;

3) Attorneys' fees and costs;

4) Such other and further relief as this Court deems just and proper.

Dated:      January 17, 2007
            Washington, D.C.

Carolyn M. Welshhans
D.C. Bar No. 489120
DECHERT LLP
1775 I Street, N.W.
Washington, DC  20006

David A. Kotler
DECHERT LLP
Princeton Pike Corporate Center
997 Lenox Drive
Building #3, Suite 210
Lawrenceville, NJ  08648

Catherine J. Rosato (Admitted in NY only)
Reid K. Weisbord
DECHERT LLP
Cira Centre
2929 Arch Street
Philadelphia, PA  19104-2808

Lenora Lapidus
Claudia Flores
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
WOMEN'S RIGHTS PROJECT
125 Broad Street, 18th Floor
New York, NY  10004

Steven Watt
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
HUMAN RIGHTS PROGRAM
125 Broad Street, 18th Floor
New York, NY  10004

*Counsel for Plaintiffs*

# CIVIL COVER SHEET

JS-44
(Rev.1/05 DC)

**I (a) PLAINTIFFS**
Mani Kumari Sabbithi, Joaquina Quadros, and
Gila Sixtina Fernandes

**DEFENDANTS**
Major Waleed KH N.S. Al Saleh, Maysaa KH A.O.A.
Al Omar, and State of Kuwait

**(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF** New York
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT _____
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
TRACT OF LAND INVOLVED

**(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)**
Dechert LLP
1775 I Street, NW
Washington, D.C.  20006  (202) 261-3300

ATTORNEYS (IF KNOWN)

## II. BASIS OF JURISDICTION
(PLACE AN x IN ONE BOX ONLY)

☐ 1 U.S. Government
Plaintiff

☒ 3 Federal Question
(U.S. Government Not a Party)

☐ 2 U.S. Government
Defendant

☐ 4 Diversity
(Indicate Citizenship of Parties
in item III)

## III CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN x IN ONE BOX
FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) **FOR DIVERSITY CASES ONLY!**

| | PTF | DFT | | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. CASE ASSIGNMENT AND NATURE OF SUIT
(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)

**☐ A. Antitrust**

☐ 410 Antitrust

**☐ B. Personal Injury/ Malpractice**

☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury
☐ 362 Medical Malpractice
☐ 365 Product Liability
☐ 368 Asbestos Product Liability

**☐ C. Administrative Agency Review**

☐ 151 Medicare Act

Social Security:
☐ 861 HIA ((1395ff))
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g)
☐ 864 SSID Title XVI
☐ 865 RSI (405(g)

Other Statutes
☐ 891 Agricultural Acts
☐ 892 Economic Stabilization Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Act
☐ 890 Other Statutory Actions (If Administrative Agency is Involved)

**☐ D. Temporary Restraining Order/Preliminary Injunction**

Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)*

**☒ E. General Civil (Other) OR ☐ F. Pro Se General Civil**

Real Property
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent, Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

Personal Property
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

Bankruptcy
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

Prisoner Petitions
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition

Property Rights
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

Federal Tax Suits
☐ 870 Taxes (US plaintiff or defendant
☐ 871 IRS-Third Party 26 USC 7609

Forfeiture/Penalty
☐ 610 Agriculture
☐ 620 Other Food &Drug
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 RR & Truck
☐ 650 Airline Regs
☐ 660 Occupational Safety/Health
☐ 690 Other

Other Statutes
☐ 400 State Reapportionment
☐ 430 Banks & Banking
☐ 450 Commerce/ICC Rates/etc.
☐ 460 Deportation

☐ 470 Racketeer Influenced & Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Satellite TV
☐ 810 Selective Service
☐ 850 Securities/Commodities/Exchange
☐ 875 Customer Challenge 12 USC 3410
☐ 900 Appeal of fee determination under equal access to Justice
☐ 950 Constitutionality of State Statutes
☒ 890 Other Statutory Actions (if not administrative agency review or Privacy Act

| ☐ G. *Habeas Corpus/ 2255* | ☐ H. *Employment Discrimination* | ☐ I. *FOIA/PRIVACY ACT* | ☐ J. *Student Loan* |
|---|---|---|---|
| ☐ 530 Habeas Corpus-General<br>☐ 510 Motion/Vacate Sentence | ☐ 442 Civil Rights-Employment (criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ☐ 895 Freedom of Information Act<br>☐ 890 Other Statutory Actions (if Privacy Act)<br><br>*(If pro se, select this deck)* | ☐ 152 Recovery of Defaulted Student Loans (excluding veterans) |

| ☐ K. *Labor/ERISA (non-employment)* | ☐ L. *Other Civil Rights (non-employment)* | ☐ M. *Contract* | ☐ N. *Three-Judge Court* |
|---|---|---|---|
| ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt. Reporting & Disclosure Act<br>☐ 740 Labor Railway Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights Act)<br>☐ 443 Housing/Accommodations<br>☐ 444 Welfare<br>☐ 440 Other Civil Rights<br>☐ 445 American w/Disabilities-Employment<br>☐ 446 Americans w/Disabilities-Other | ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholder's Suits<br>☐ 190 Other Contracts<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | ☐ 441 Civil Rights-Voting (if Voting Rights Act) |

**V. ORIGIN**

XX 1 Original Proceeding ☐ 2 Removed from State Court ☐ 3 Remanded from Appellate Court ☐ 4 Reinstated or Reopened ☐ 5 Transferred from another district (specify) ☐ Multi district Litigation ☐ 7 Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)
18 U.S.C. §§ 1584, 1589, 1590 and 1595; 29 U.S.C. § 201, et seq.; and 13th Amendment to the US Constitution: Defendants unlawfully trafficked and subjected Plaintiffs to forced labor and paid Plaintiffs in violation of minimum wage.

**VII. REQUESTED IN COMPLAINT**   CHECK IF THIS IS A CLASS   ☐ ACTION UNDER F.R.C.P. 23   **DEMAND $**   Check YES only if demanded in complaint   **JURY DEMAND:** ☒ YES   ☐ NO

**VIII. RELATED CASE(S) IF ANY**   (See instruction)   ☐ YES   ☒ NO   If yes, please complete related case form.

DATE  1/16/07   SIGNATURE OF ATTORNEY OF RECORD   *Carolyn M. Welshhans*

## INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44
### Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.      COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.    CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.     CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI.     CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII.   RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.