**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| MANI KUMARI SABBITHI, JOAQUINA , QUADROS, and GILA SIXTINA FERNANDES, | ) ) ) Case No.: 07-CV-00115-EGS |
| Plaintiffs, | ) ) |
| vs. | ) ) |
| MAJOR WALEED KH N. S. AL SALEH, MAYSAA KH A. O. A. AL OMAR, and STATE OF KUWAIT, | ) ) ) ) |
| Defendants. | ) ) ) |

**O R D E R**

AND NOW, this _____ day of _____ 2007, upon consideration of the

Motion of Defendants Major Waleed Kh. N. Al Saleh and Maysaa Kh. A. O. A. Al Omar's

Motion to Dismiss and Quash Service ("Motion"), and the responses thereto, it is hereby

ORDERED and DECREED that the Motion is DENIED.

_____
Hon. Emmet G. Sullivan

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| MANI KUMARI SABBITHI, JOAQUINA , QUADROS, and GILA SIXTINA FERNANDES, | ) ) ) | Case No.: 07-CV-00115-EGS |
| Plaintiffs, | ) ) | |
| vs. | ) ) | |
| MAJOR WALEED KH N. S. AL SALEH, MAYSAA KH A. O. A. AL OMAR, and STATE OF KUWAIT, | ) ) ) | ORAL ARGUMENT REQUESTED |
| Defendants. | ) ) ) | |

PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES
IN OPPOSITION TO DEFENDANTS MAJOR WALEED KH N. S. AL SALEH AND
MAYSAA KH A. O. A. AL OMAR'S
MOTION TO DISMISS AND QUASH SERVICE

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ............................................................................... 1

STATEMENT OF FACTS ..................................................................................... 2

ARGUMENT ........................................................................................................ 7

I.   DIPLOMATIC IMMUNITY CANNOT BAR PLAINTIFFS' CLAIMS
     CHALLENGING DEFENDANTS' CONDUCT IN VIOLATION OF THE
     THIRTEENTH AMENDMENT ................................................................... 7

     A.   The Thirteenth Amendment Prohibits Defendants' Conduct ............... 8

     B.   Neither A Federal Statute Nor A Treaty May Nullify a Right Guaranteed
          By The Constitution .......................................................................... 12

     C.   The Constitution Requires The Existence Of A Judicial Forum And A
          Remedy For Violations Of The Rights It Guarantees ........................ 13

II.  DEFENDANTS' TRAFFICKING OF PLAINTIFFS FALLS WITHIN THE
     COMMERCIAL ACTIVITIES EXCEPTION TO IMMUNITY UNDER THE
     VIENNA CONVENTION ON DIPLOMATIC RELATIONS ...................... 18

     A.   The Act Of Human Trafficking Is A Commercial Activity Engaged In For
          Personal Profit ................................................................................. 19

     B.   Human Trafficking Falls Outside The Scope Of A Diplomat's Official
          Functions And Is Not Incidental To A Diplomat's Daily Life ........... 23

     C.   Although The Court Need Not Reach The Issue To Decide Defendants'
          Motion, Tabion Was Wrongly Decided ............................................. 26

     E.   According To Long-Standing Principles Of Statutory Construction, The
          Commercial Activities Exception Must Be Interpreted In A Manner
          Consistent With Similar Exceptions To Consular And Foreign Sovereign
          Immunities ....................................................................................... 29

III. DIPLOMATIC IMMUNITY CANNOT BAR PLAINTIFFS' CLAIMS
     BECAUSE DEFENDANTS' ACTIONS WERE SO EGREGIOUS THEY
     VIOLATE *JUS COGENS* NORMS PROHIBITING SLAVERY AND
     SLAVERY-LIKE PRACTICES .................................................................. 31

     A.   Slavery And Slavery-Like Practices Are Prohibited By International Law ........ 31

     B.   The *Jus Cogens* Obligation To Hold Accountable Perpetrators Of Slavery
          Trumps Any Claims To Diplomatic Immunity Under The Vienna
          Convention On Diplomatic Relations Or The Diplomatic Relations Act .......... 34

IV.  ACCORDING TO THE SUBSEQUENT IN TIME RULE, PLAINTIFFS'
     CLAIMS UNDER THE TRAFFICKING VICTIMS PROTECTION ACT
     PREVAIL OVER DEFENDANTS' CONFLICTING CLAIMS OF
     DIPLOMATIC IMMUNITY ...................................................................... 36

CONCLUSION ................................................................................................... 39

Plaintiffs Mani Kumari Sabbithi, Joaquina Quadros and Gila Sixtina Fernandes (collectively, "Plaintiffs") respectfully submit this Opposition to Defendants Major Waleed KH N. S. Al Saleh and Mayaa KH A. O. A. Al Omar's Motion to Dismiss and Quash Service of Process, filed March 30, 2007 ("Def.'s Mot. Dismiss").

## PRELIMINARY STATEMENT

Plaintiffs are domestic workers from India who were trafficked to the United States and enslaved by Defendants Major Waleed KH N. S. Al Saleh ("Mjr. Al Saleh") and Maysaa KH A. O. A. Al Omar ("Ms. Al Omar") (together, "Defendants") in their home in McLean, Virginia. Mjr. Al Saleh is a military attaché to the Kuwaiti government posted at the Kuwait Embassy in Washington, D.C.  Ms. Al Omar is Mjr. Al Saleh's wife; she is not a diplomat and, Plaintiffs believe, is not employed in the United States.  Defendants trafficked Plaintiffs to the United States and forced Plaintiffs to work as domestic servants and childcare providers against their will.  Defendants kept Plaintiffs in slavery-like conditions, subjecting them to physical and psychological abuse and paying them meager wages in violation of federal and state statutory law, the United States Constitution and international law.  In fact, under the cloak of purported diplomatic immunity, Defendants have comported themselves with absolute disregard of United States law and of Plaintiffs' rights.  This Court should not – and cannot – allow Defendants' actions to go unpunished, and Plaintiffs' injuries to go uncompensated.

As a result of Defendants' abusive treatment of Plaintiffs, on January 17, 2007, Plaintiffs filed a complaint in this Court against Defendants and the State of Kuwait for violations of federal and state law, including violations of the Victims of Trafficking and Violence Protection Act of 2000 ("Trafficking Victims Protection Act" or "TVPA") and the Thirteenth Amendment to the United States Constitution ("Complaint").  In response, Defendants assert immunity under the Diplomatic Relations Act of 1978, 22 U.S.C. § 254d ("Act"), which Congress enacted to

implement the Vienna Convention on Diplomatic Relations, 23 U.S.T. 3227, T.I.A.S. 7502 (1961). Def.'s Mot. Dismiss at 1, 5.

This Court should reject Defendants' assertion of diplomatic immunity and deny Defendants' motion to dismiss for the following four separate and independent reasons. First, Defendants held Plaintiffs in involuntary servitude and slavery-like conditions as prohibited under the Thirteenth Amendment to the United States Constitution. Defendants' cannot invoke diplomatic immunity to shield themselves from liability for infringing upon Plaintiffs' rights to be free from bondage and the United States government's obligation to ensure the continued eradication of slavery and involuntary servitude. Second, because Defendants' enslavement and trafficking of Plaintiffs into the United States constitute "commercial activities," neither the Act nor the Vienna Convention on Diplomatic Relations shelters Defendants from liability. Third, international norms aimed at eradicating slavery and requiring states to hold perpetrators of slavery accountable for their transgressions trump any claim of diplomatic immunity. Fourth, Defendants' claims of immunity from criminal prosecution and civil actions impermissibly conflict with the specific provision of the Trafficking Victims Protection Act that guarantees all trafficking victims the ability to pursue civil remedies. 18 U.S.C. § 1595(a). Accordingly, this Court should deny Defendants' Motion to Dismiss and Quash Service.

## STATEMENT OF FACTS

The relevant facts are set forth in the Complaint and are as follows:

Plaintiffs are women from severely impoverished families in rural India. Compl. ¶ 15. Before coming to the United States, Plaintiffs worked as domestic servants in Defendants' home in Kuwait. Compl. ¶¶ 17, 29, 38. Defendants hired Ms. Fernandes in July 1997 to care for their then-infant son. Compl. ¶ 38. Ms. Fernandes worked for Defendants until December 2002,

when she returned to her home and started her own family.  Compl. ¶ 40.  In May 2003, after the departure of Ms. Fernandes, Defendants hired Ms. Quadros to work as their domestic servant.  Compl. ¶ 29.  In October 2004, in the wake of the birth of triplets, Defendants hired Ms. Sabbithi to work as their domestic servant.  Compl. ¶ 17.

While working in Defendants' Kuwaiti home, all three Plaintiffs were forced to work extremely long hours, seven days a week, for little pay.  Compl. ¶¶ 48, 51.  Moreover, Ms. Al Omar severely restricted Ms. Quadros' and Ms. Sabbithi's contact with the external world and verbally abused and threatened them.  Compl. ¶¶ 48-49.  In Kuwait, Ms. Al Omar also physically assaulted Ms. Sabbithi, and Ms. Sabbithi believed that if she ran away or sought help, Defendants would harm her.  Compl. ¶¶ 57-65.  Ms. Quadros and Ms. Sabbithi feared Defendants, and with good reason.  Compl. ¶¶ 65-67, 88.  Rape, physical assault, involuntary servitude, and mistreatment of South Asian domestic workers is all too common in Kuwait.  *See* Human Rights Watch, *Global Report on Women's Human Rights*, *available at* http://www.hrw.org/about/projects/womrep/.

In early 2005, Defendants decided to relocate their entire family to the United States and take Plaintiffs with them to the United States to work as their domestic servants.[1]  At the time that Defendants decided to move to the United States, Ms. Quadros and Ms. Sabbithi were still working in Defendants' home in Kuwait.  Compl. ¶¶ 21-24, 30-35.  At that time, Ms. Fernandes was living in India and was no longer in Defendants' employ.  Compl. ¶ 40.  However, in or

---

[1]     Mjr. Al Saleh relocated to the United States in advance of his wife and children. According to the State Department Certification of Diplomatic Status filed in conjunction with Defendants' Motion to Dismiss, "the Embassy of Kuwait notified Major Waleed Kh. N.S. Al Saleh to the Department of State on August 4, 2004."  See Def.'s Mot. to Dismiss, Exh. 2.

about May 2005, Ms. Al Omar contacted Ms. Fernandes to request that she relocate to the United States to work for Defendants.  Compl. ¶ 41.  After Ms. Al Omar promised Ms. Fernandes improved working conditions and a higher salary – and based upon Ms. Fernandes' understanding that United States law would protect her from any abuses by Defendants – Ms. Fernandes agreed to work for Defendants in the United States.  Compl. ¶¶ 42-43.

In furtherance of their scheme to traffic Plaintiffs to the United States under false pretenses, Defendants sought A-3 visas for all three women, which would allow them to accompany Defendants to the United States.[2]  Compl. ¶¶ 24, 32, 44.  On separate occasions, Ms. Al Omar directed Ms. Quadros and Ms. Sabbithi to accompany her to the United States Embassy in Kuwait.[3]  Compl. ¶¶ 22, 31.  To induce the United States government to issue the required A-3 visas, Ms. Al Omar presented signed employment contracts with Ms. Quadros and Ms. Sabbithi to an Embassy official and represented to the Embassy official that Defendants would provide Ms. Quadros and Ms. Sabbithi with employment terms and conditions compliant with United States law.[4]  Compl. ¶¶ 24, 32.  On the basis of these employment contracts and Ms. Al Omar's representations, the United States Embassy issued Ms. Quadros and Ms. Sabbithi A-3

---

[2]     An A-3 visa allows representatives of foreign governments to bring private servants into the United States for employment in their homes during diplomatic assignments.  9 Foreign Affairs Manual (FAM) 41.22 n.4.

[3]     While Ms. Al Omar informed Ms. Quadros that the family was moving to the United States and that they would like her to accompany them, Ms. Sabbithi was unaware of her impending relocation until Ms. Al Omar took her to the United States Embassy. Moreover, Defendants never gave Ms. Sabbithi the option of not accompanying Defendants to the United States.  Compl. ¶¶ 21-22.

[4]     While Ms. Sabbithi does not recall the existence of an employment contract between Defendants and herself, Plaintiffs believe that such a document did exist because it is required by the United States government for A-3 visa applications.  9 FAM 41.21 n.6.2; see also U.S. Dep't of State, Circular Diplomatic Note (June 19, 2000), *available at* http://www.state.gov/documents/organization/32298.pdf.

visas authorizing them to work as live-in domestic servants for Defendants.  Compl. ¶¶ 24, 32.

Despite their representations to the United States government, Defendants never intended to

abide by the terms of their employment contracts or United States law.  Compl. ¶¶ 25, 33.

On or about July 1, 2005, Ms. Quadros and Ms. Sabbithi traveled to Washington, D.C.

with Defendants and their four children.  Compl. ¶¶ 26, 36.  Upon their arrival in the United

States, Defendants confiscated Ms. Quadros' and Ms. Sabbithi's passports and visas.  Compl. ¶¶

27, 49.

In August 2005, Ms. Fernandes returned to Kuwait to obtain her travel documents for the

United States.  Compl. ¶ 42.  Upon her arrival in Kuwait, Defendants' relatives directed Ms.

Fernandes to visit the United States Embassy.  Compl. ¶ 43.  To induce the United States

government to issue the required A-3 visa, Defendants' relatives also directed Ms. Fernandes to

present a signed employment contract to an Embassy official and to represent to the Embassy

official that Defendants would provide Ms. Fernandes with employment terms and conditions

compliant with United States law.  Compl. ¶ 44.  On the basis of this employment contract, the

United States Embassy issued Ms. Fernandes an A-3 visa authorizing her to work as a live-in

domestic servant for Defendants.  Compl. ¶44.  In spite of their representations to the United

States government, Defendants never intended to abide by the terms of their employment

contract with Ms. Fernandes or with United States law.  Compl. ¶ 45.

In August 2005, Ms. Fernandes traveled to Washington, D.C. alone.  Compl. ¶ 46.  Upon

her arrival in the United States, Defendants confiscated Ms. Fernandes' passport and visa.

Compl. ¶49.

From the moment that Plaintiffs stepped onto United States soil, they were treated as

virtual slaves by Defendants.  Compl. ¶¶ 1-2, 48-49.  Plaintiffs were deprived of their legal

documents, forced to work long and strenuous hours against their will, subjected to repeated physical and psychological abuse, and wholly deprived of basic liberties including the freedom to stop working for Defendants or leave the confines of Defendants' house.  Compl. ¶¶ 48-91. Moreover, Defendants paid Plaintiffs next to nothing for their labor – in clear violation of United States law.  Compl. ¶¶ 92-93.

In Defendants' suburban home, Plaintiffs were forced to perform backbreaking work virtually every waking hour of the day.  Compl. ¶¶ 50, 78.  Plaintiffs worked from between 6:30 a.m. or 7:00 a.m. to between 10:30 p.m. or 1:30 a.m. – approximately sixteen to nineteen hours per day – seven days a week.  Compl. ¶ 51.  Plaintiffs' chores included, *inter alia*, caring for a nine-year-old boy and approximately one-year-old triplets, doing the laundry and ironing, cleaning the home, cooking for the family, and cooking for and serving frequent guests.  Compl. ¶¶ 52.  In exchange for Plaintiffs' labor, Defendants sent each of Plaintiffs' families in India between $242 and $346 per month, but paid Plaintiffs themselves absolutely nothing.  Compl. ¶¶ 89-93.

In addition, Defendants completely isolated Plaintiffs from the outside world, making it impossible for Plaintiffs to seek help or to gain the basic information about United States' norms and laws necessary to understand the illegality and impermissibility of Defendants' conduct. Compl. ¶ 82.  Defendants prevented Plaintiffs from speaking to anyone outside the family and restricted Plaintiffs' use of the telephone. Compl. ¶¶ 79-80.  In fact, Defendants went so far as to forbid Plaintiffs from speaking with each other, looking out the windows, opening the door of Defendants' home, or even venturing into Defendants' yard unaccompanied.  Compl. ¶¶ 79, 83.

Defendants coerced Plaintiffs' labor through explicit and implicit threats of severe harm to all three Plaintiffs, as well as repeated physical abuse of Ms. Sabbithi.  Compl. ¶¶ 1-2, 48, 57-

72, 88.  Plaintiffs lived in a constant state of fear and believed that Defendants would kill them if they attempted to leave the house on their own accord or if they made a serious mistake in their work.  Compl. ¶¶ 65-67.  Ms. Al Omar regularly pushed Ms. Sabbithi, pulled her hair, slapped her, and hit her with heavy objects.  Compl. ¶ 57.  Ms. Al Omar struck Ms. Sabbithi on the head several times, and on numerous occasions threatened to kill Ms. Sabbithi and send her defiled body back to India.  Compl. ¶ 62.  A complete recitation of the physical abuses inflicted upon Ms. Sabbithi would be impossible; the following are a few of the abuses Ms. Sabbithi suffered during the four months she was imprisoned in Defendants' suburban home:

- Ms. Al Omar struck Ms. Sabbithi's head against a wall several times.
- Ms. Al Omar hurled a soup spoon at Ms. Sabbithi, and struck Ms. Sabbithi's head with a heavy wooden box.
- Ms. Al Omar pushed Ms. Sabbithi against a wall and slammed Ms. Sabbithi's head against the wall.
- Ms. Al Omar struck Ms. Sabbithi's head several times with a package of frozen chicken.

Compl. ¶¶ 59-61.

These and other almost-daily abuses resulted in Ms. Sabbithi suffering from bruises, painful swelling, and persistent headaches.  Compl. ¶¶ 57, 72.  The routine abuses also led Ms. Sabbithi to become suicidal.  Compl. ¶ 68.  Defendants' torture of Ms. Sabbithi finally came to a head at the end of October 2005, when Ms. Al Omar became enraged with Ms. Sabbithi, pulled Ms. Sabbithi's hair and threatened to cut off Ms. Sabbithi's tongue.  Compl. ¶ 69.  Following Ms. Al Omar's threats, Mjr. Al Saleh violently pushed Ms. Sabbithi to the floor, causing Ms. Sabbithi to strike her head and lose consciousness.  Compl. ¶¶ 70-71.  In the wake of this brutal attack and with a meager three dollars to her name, Ms. Sabbithi fled Defendants' home because of fear for her life and physical safety.  Compl. ¶¶ 96-97.

After Ms. Sabbithi escaped, Defendants threatened Ms. Quadros and Ms. Fernandes with physical harm and the specter of "rotting in jail" should they attempt to leave the confines of Defendants' home.  Compl. ¶ 98.  Defendants' abuse of Ms. Quadros and Ms. Fernandes escalated to such an extent that Ms. Quadros and Ms. Fernandes realized that they, too, needed to escape in order to preserve their own lives and physical well-being.  Compl. ¶ 101.  Accordingly, in January 2006, Ms. Quadros and Ms. Fernandes gathered what little belongings they had and escaped Defendants' home to safety.  Compl. ¶ 102.

## ARGUMENT

## I.    DIPLOMATIC IMMUNITY CANNOT BAR PLAINTIFFS' CLAIMS CHALLENGING DEFENDANTS' CONDUCT IN VIOLATION OF THE THIRTEENTH AMENDMENT.

In their Complaint, Ms. Sabbithi, Ms. Quadros and Ms. Fernandes allege that Defendants trafficked them to the United States and enslaved them in McLean, Virginia.  Imprisoned inside Defendants' home, Plaintiffs were compelled to work under continuous threats and acts of violence.  Having finally escaped, Plaintiffs now seek redress for these abuses.

Defendants' conduct directly violates the Thirteenth Amendment of the United States Constitution.  In their motion to dismiss, however, Defendants argue that they cannot be held liable for these constitutional violations because they are immune from suit pursuant to the diplomatic immunity provisions of the Vienna Convention on Diplomatic Relations, 23 U.S.T. 3227, T.I.A.S. 7502 (1961) and the Diplomatic Relations Act of 1978, 22 U.S.C. § 254d ("Act").  Defendants contend that diplomatic immunity entitles them to an automatic dismissal of this suit.  Defendants' argument incorrectly elevates the treaty-based and statutory grant of diplomatic immunity above the prohibitions and guarantees of the U.S. Constitution.  Even if Defendants were entitled to diplomatic immunity, which, as Plaintiffs argue below they are not, such

immunity would not deprive this Court of jurisdiction to hear Plaintiffs' claims alleging conduct in violation of the Thirteenth Amendment.

Defendants assert immunity under the Diplomatic Relations Act of 1978, which Congress enacted to implement the Vienna Convention on Diplomatic Relations. Def.'s Mot. to Dismiss at 1, 5. The Act provides, in relevant part:

> Any action or proceeding brought against an individual who is entitled to immunity with respect to such action or proceeding under the Vienna Convention on Diplomatic Relations, under section 3(b) or 4 of this Act [22 USCS §§ 254b or 254c], or under any other laws extending diplomatic privileges and immunities, shall be dismissed.

22 U.S.C. 254d (2007). As Defendants contend, the Act requires dismissal of Plaintiffs' suit if Defendants are entitled to immunity under the Vienna Convention on Diplomatic Relations. Under the U.S. Constitution, however, no federal statute or international treaty can be applied in a way that would contravene constitutional rights. Thus, the scope of diplomatic immunity under the Act must exclude cases alleging conduct prohibited by the Thirteenth Amendment. Accordingly, Plaintiffs' claims based on conduct in violation of the Thirteenth Amendment cannot be dismissed on grounds of diplomatic immunity. In order for the Act to pass constitutional muster, however, either the scope of diplomatic immunity under the Act must exclude Thirteenth Amendment claims or the Act must be found unconstitutional as applied to the dismissal of Plaintiffs' Thirteenth Amendment claims. See United States v. Steinberg, 478 F. Supp. 29, 33 (N.D. Ill. 1979) (a "treaty, either by its terms or in its application, cannot run counter to the provisions of the constitution of this country"). Plaintiffs' claims cannot be dismissed on grounds of diplomatic immunity.

### A.    The Thirteenth Amendment Prohibits Defendants' Conduct.

President Abraham Lincoln, on January 1, 1863, proclaimed the following:

> [A]ll persons held as slaves within any State . . . shall be then,
> thenceforward, and forever free; and the Executive Government of
> the United States, including the military and naval authority
> thereof, will recognize and maintain the freedom of such persons,
> and will do no act or acts to repress such persons, or any of them,
> in any efforts they may make for their actual freedom.

12 Stat. 1268, The Emancipation Proclamation (1863).  Two years later, the Thirteenth

Amendment to the United States Constitution was ratified and slavery, in all its forms, was

forever abolished.

The Thirteenth Amendment, Section 1, provides:"[n]either slavery nor involuntary

servitude … shall exist within the United States, or any place subject to their jurisdiction."

U.S. CONST. AMEND. XIII.  This blanket prohibition governs the conduct of private actors.  Terry

Props., Inc. v. Standard Oil Co., 799 F.2d 1523, 1534 (11th Cir. 1986) (citing City of Memphis

v. Greene, 451 U.S. 100, 120 (1981)); see also Humphreys v. Nager, 962 F. Supp. 347, 356

(E.D.N.Y. 1997) ("The Thirteenth Amendment is enforceable against private parties in the

absence of state action.").  A violation of this Amendment entitles an individual to bring a

private cause of action to vindicate this constitutional right.  Terry Props., Inc., 799 F.2d at 1534

(recognizing a private right of action against a private actor under the Thirteenth Amendment).[5]

Plaintiffs here have brought a cause of action under the Thirteenth Amendment for violations of

their constitutional right to be free from involuntary servitude and slavery-like practices.[6]

---

[5]     See Channer v. Hall, 112 F.3d 214, 217 n.5 (5th Cir. 1997) (noting that "suits attacking
compulsory labor arise directly under prohibition of § 1, which is 'undoubtedly self-
executing without any ancillary legislation' and 'by its own unaided force and effect
abolished slavery, and established universal freedom.'") (quoting The Civil Rights Cases,
109 U.S. 3, 20 (1883)).

[6]     Defendants' confinement and abuse of Plaintiffs clearly runs afoul of the Thirteenth
Amendment's prohibition of involuntary servitude.  The Supreme Court in United States
v. Kozminski, defined involuntary servitude under 18 U.S.C. § 1584 as "a condition of
servitude in which the victim is forced to work for the defendant by the use or threat of

The Thirteenth Amendment abolished chattel slavery as it existed before the Civil War.
The Supreme Court, however, has recognized that from its adoption the Amendment applies to
both slavery and all other slavery-like practices.  For example, in The Slaughter-House Cases,
the Court proclaimed that the Thirteenth Amendment:

> **[forbids] any kind of slavery, now or hereafter**.... [I]n any fair
> and just construction of any section or phrase of these
> amendments, it is necessary to look to the purpose which they have
> said was the pervading spirit of them all, the evil which they were
> designed to remedy, and the process of continued addition to the
> Constitution, until that purpose was supposed to be accomplished,
> as far as constitutional law can accomplish it.

83 U.S. 36, 72 (1873) (emphasis added).  The Thirteenth Amendment thus forbids all forms of
compulsory, involuntary service and all of its badges and incidents.  Bailey v. Alabama, 219 U.S.
219, 241 (1911) ("The plain intention [of the Thirteenth Amendment] was to abolish slavery of
whatever name and form and all its badges and incidents; to render impossible any state of

---

physical restraint or physical injury, or by the use or threat of coercion through law or the
legal process."  487 U.S. 931, 952 (1968).  In the Trafficking Victims Protection Act,
Congress broadened the definition of involuntary servitude adopted in Kozminski and
stated in its legislative findings that "involuntary servitude statutes are intended to reach
cases in which persons are held in a condition of servitude through nonviolent coercion."
TVPA, 22 U.S.C. § 7101(13).  In the TVPA, Congress defined involuntary servitude "as
a condition of servitude induced by means of — (A) any scheme, plan, or pattern
intended to cause a person to believe that, if the person did not enter into or continue in
such condition, that person or another person would suffer serious harm or physical
restraint; or (B) the abuse or threatened abuse of the legal process."  TVPA, 22 U.S.C. §
7102(5).  In this case, Defendants forced Plaintiffs to work sixteen to nineteen hours per
day, seven days a week, and confiscated their passports and threatened them with
physical abuse in order to coerce their labor and prevent their escape.  Compl. ¶¶ 57-72.
Plaintiffs reasonably believed that Defendants would kill or physically harm them or
members of their family should they attempt to leave the home or their employment.  Id.,
¶¶ 63, 67, 99.  This court need not reach the merits of Plaintiffs' claims or even assess
whether the allegations in the Complaint are sufficient to state a claim for relief, because
Defendants have not moved to dismiss under Rule 12(b)(6) for failure to state a claim,
but rather have only moved to dismiss on jurisdictional grounds.

bondage; to make labor free, by prohibiting that control by which personal service of one man is disposed of or coerced for another's benefit, which is the essence of involuntary servitude").

As courts have repeatedly made clear, the Thirteenth Amendment prohibits labor that is exacted under compulsion.  For example, in Pollack v. Williams, 322 U.S. 4 (1944), the Supreme Court held that forced labor is unconstitutional under the Thirteenth Amendment and found that "in general the defense against oppressive hours, pay, working conditions, or treatment is the right to change employers.  When the master can compel and the laborer cannot escape the obligation to go on, there is no power below to redress and no incentive above to relieve a harsh overlordship or unwholesome conditions of work.  Resulting depression of working conditions and living standards affects not only the laborer under the system, but every other with whom his labor comes in competition."  322 U.S. at 18.

In fact, courts have applied Thirteenth Amendment protections to cases quite similar to the case at bar.  See United States v. Alzanki, 54 F.3d 994, 1003-05  (1st Cir. 1995) (court found sufficient evidence to convict a Kuwaiti national on an involuntary servitude charge where he had physically assaulted and threatened his Sri Lankan domestic servant and kept her as a prisoner in his home)[7]; Manlinguez v. Joseph, 226 F. Supp. 2d 377, 384-85 (E.D.N.Y. 2002) (court held that a national of the Philippines had a valid claim for involuntary servitude against her former employers where the plaintiff alleged that she was tricked into accompanying the

---

[7]    The Alzanki court considered a claim under Title 18, Section 1584 of the United States Code and construed "involuntary servitude in a way consistent with the understanding of the Thirteenth Amendment that prevailed at the time of § 1584's enactment."  54 F.3d at 1000 (internal quotations omitted).  The victim in Alzanki, similar to Plaintiffs here, was deprived of her passport, forced to toil fifteen hours a day, denied contact with the outside world, physically assaulted by her employers on two occasions, deprived of medical care and adequate nutrition and threatened with deportation, physical harm, and even death.  Id. at 1004.

defendants to the United States, that she was forced to work from 4:00 a.m. until 10:30 p.m.,
seven days a week, and that defendants confiscated her passport, denied her periods of rest,
prohibited her from contact with the outside world, controlled her food supply, denied her the
most rudimentary personal hygiene items, forbade her from leaving the home, monitored her
every movement, and paid her a total of $1,050 for two years' work).  Like the victims in
Alzanki and Manlinguez and countless other vulnerable, poor, immigrant domestic servants,
Plaintiffs in the instant case were forced to live and work under brutal and unconstitutional
conditions of modern-day slavery.  Ms. Sabbithi, Ms. Quadros and Ms. Fernandes were deprived
of their passports, forced to work extremely long days for virtually no pay, isolated from the
outside world, and threatened with physical harm and even death.  See Compl. ¶¶ 62, 65.  As in
Alzanki and Manlinquez, the Thirteenth Amendment prohibits Defendants' abusive and
exploitative treatment of Plaintiffs.

> **B.  Neither A Federal Statute Nor A Treaty May Nullify A Right Guaranteed By
> The Constitution.**

Defendants are not entitled to immunity from this lawsuit because the Thirteenth
Amendment of the Constitution supersedes the Vienna Convention on Diplomatic Relations and
the Diplomatic Relations Act implementing the Convention.  See Reid v. Covert, 354 U.S. 1, 18
(1957).  It is well established that treaties and the laws enacted pursuant to them must comply
with the provisions of the Constitution:

> It would be manifestly contrary to the objectives of those who
> created the Constitution, as well as those who were responsible for
> the Bill of Rights – let alone alien to our entire constitutional
> history and tradition – to construe Article VI as permitting the
> United States to exercise power under an international agreement
> without observing constitutional prohibitions.

Id. at 17; see also United States v. Ni Fa Yi, 951 F. Supp. 42 (S.D.N.Y. 1997) (holding that no treaty can confer power on Congress or any other branch of government that is free from the constraints of the Constitution). Moreover, no treaty or law may nullify a right guaranteed by the Constitution. See United States v. Steinberg, 479 F. Supp. at 32 (the government cannot "choose between respecting the constitutional rights of a citizen and adhering to the provisions of a treaty"). Accordingly, courts have a duty to decline to apply foreign agreements where their application, as here, would violate individuals' constitutional rights. See Colello v. S.E.C., 908 F. Supp. 738 (C.D. Cal. 1995) (granting summary judgment to individuals whose Swiss bank accounts had been frozen by Swiss authorities pursuant to a treaty and at the request of the United States Department of Justice because the asset freeze violated the plaintiffs' constitutional rights).

Defendants' claims of immunity based on the Act and the Vienna Convention on Diplomatic Relations, if accepted, would result in an impermissible evisceration of Plaintiffs' constitutional right to be free from bondage. The Act's mandatory dismissal of claims brought against individuals with diplomatic immunity, if applied in this case, would present a direct conflict with the Thirteenth Amendment. Application of the Act or the Treaty in this case at bar would lead to the dismissal of Plaintiffs' claims on jurisdictional grounds at the expense of protecting their constitutional right to be free from involuntary servitude. Such a result cannot stand under the Constitution.

### C.    The Constitution Requires The Existence Of A Judicial Forum And A Remedy For Violations Of The Rights It Guarantees.

Defendants characterize the Act as providing "sweeping immunity," entitling them to "extensive protections from the processes of the United States courts." Defs' Mot. Dismiss at 3-4. But if the protections of the Act were as broad as Defendants assert, the Act would foreclose

all possible avenues for Plaintiffs to enforce their constitutional rights.  Such a result, as set forth

below, would violate the Constitution and thus Defendants' argument must be rejected.

Firmly rooted in the Anglo-American system of jurisprudence is the notion that every

right must have a remedy.  Dating back to the Magna Carta,[8] the principle of *ubi jus, ibi*

*remedium*[9] "lies at the very foundation of all systems of law."  United States v. Loughrey, 172

U.S. 206, 232 (1898).  Long before the United States adopted its own Constitution, the Chief

Justice of the King's Bench described this well-established common law principle as follows:

> If the plaintiff has a right, he must of necessity have a means to
> vindicate and maintain it, and a remedy if he is injured in the
> exercise or enjoyment of it; and indeed it is a vain thing to imagine
> a right without a remedy; for . . . want of right and want of remedy
> are reciprocal. . . .  Where a man has but one remedy to come at his
> right, if he loses that he loses his right.

Ashby v. White, 92 Eng. Rep. 126 (K.D. 1703).  The United States Supreme Court imported this

principle into American jurisprudence two centuries ago in Marbury v. Madison:

> It is a general and indisputable rule, that where there is a legal
> right, there is also a legal remedy by suit or action at law,
> whenever that right is invaded. . . .  For it is a settled and invariable
> principle in the laws of England, that every right, when withheld,
> must have a remedy, and every injury its proper redress.
>
> * * *
>
> The very essence of civil liberty certainly consists in the right of
> every individual to claim the protection of the laws, whenever he
> receives an injury.  One of the first duties of government is to
> afford that protection. . . .  The government of the United States

---

[8]    See David Schuman, *Right to a Remedy*, 65 Temp L. Rev. 1197, 1199 (1992) (quoting King Edward's promise that "To no one will we sell, to no one will we refuse or delay, right or justice.").  The Magna Carta also provided that "[n]o freeman shall be taken, imprisoned, . . . or in any other way destroyed . . . except by the lawful judgment of his peers, or by the law of the land."  King Edward, THE MAGNA CARTA (1297 version).

[9]    "Where there is a right, there is a remedy."  Black's Law Dictionary, 1363 (Fifth ed., 1979).

> has been emphatically termed a government of laws, and not of
> men.  It will certainly cease to deserve this high appellation, if the
> laws furnish no remedy for the violation of a vested legal right.

Marbury v. Madison, 5 U.S. (1 Cranch ) 137, 161-66 (1803) (quoting 3 WILLIAM

BLACKSTONE, COMMENTARIES 23).

The Supreme Court has recognized the "serious constitutional question that would arise if

a federal statute were construed to deny any judicial forum for a colorable constitutional claim."

Webster v. Doe, 486 U.S. 592, 603 (1988) (internal quotations omitted); see Bowen v. Mich.

Acad. of Family Physicians, 476 U.S. 667, 681 (1986) ("Congress cannot bar all remedies for

enforcing federal constitutional rights.") (quoting Gunther, Congressional Power to Curtail

Federal Court Jurisdiction: An Opinionated Guide to the Ongoing Debate, 36 Stan. L. Rev. 895,

921, n. 113 (1984)); Johnson v. Robison, 415 U.S. 361, 366-67 (1974) (statutory construction

that would bar federal courts from deciding the constitutionality of legislation "would, of course,

raise serious questions concerning the constitutionality of [the statute]."); Am. Coal. for

Competitive Trade v. Clinton, 128 F.3d 761, 765 (D.C. Cir. 1997) ("To be sure, a statute that

totally precluded judicial review of constitutional claims would clearly raise serious due process

concerns.").

The Court of Appeals for the District of Columbia found that "in the entire history of the

United States, the Supreme Court has never once held that Congress may foreclose all judicial

review of a constitutional question."  Bartlett v. Bowen, 816 F.2d 695, 704 (D.C. Cir. 1987).

"Quite the contrary, on the few occasions when this issue has been considered, courts have

declined to find an intention on the part of Congress to preclude all judicial review of

constitutional claims."  Id.

The "sweeping" nature of the diplomatic immunity asserted by Defendants, if accepted, would clearly infringe upon the Constitution.  Such immunity would wholly shield Defendants' conduct from review for violation of the Constitution's prohibition of slavery because no avenue other than this federal court action exists for Plaintiffs to obtain redress for the violation of their constitutional rights.[10]  Were the Act to provide t an alternative forum within which Plaintiffs

---

[10]     In fact, not only would the immunity sought by Defendants shield them from judicial review of their unlawful behavior, but it would also allow them to act with absolute impunity, safe in the knowledge that the U.S. government cannot interfere *in any form* with their actions. The immunity Defendants seek purports to prohibit law enforcement from liberating individuals held in slave-like conditions by diplomats, prevent federal or state governments from prosecuting diplomats who commit acts of slavery, and bar individuals held in these inhuman conditions from seeking any justice through civil remedies. See Vienna Convention on Diplomatic Relations, 23 U.S.T. at 3241 (Article 31(1) granting immunity to diplomats from criminal jurisdiction).  By asserting that immunity applies to Plaintiffs' claims alleging conduct in violation of the Thirteenth Amendment, Defendants content that they are free to engage in slavery-like practices in the United States without intervention of the U.S. government or accountability to their victims.

This absolute immunity stands to prevent the U.S. government from carrying out its obligations to eradicate slavery under the Thirteenth Amendment.  The all-encompassing protection claimed by Defendants is deeply offensive to the unequivocal guarantees of the Thirteenth Amendment that slavery and slavery-like practices may not exist within United States territories.  Defendants' assertion of immunity directly contravenes the Supreme Court's explanation in Bailey v. Alabama that the "plain intention [of the Thirteenth Amendment] was to abolish slavery of whatever name and form and all its badges and incidents; to render impossible any state of bondage; to make labor free, by prohibiting that control by which personal service of one man is disposed of or coerced for another's benefit, which is the essence of involuntary servitude."  219 U.S. at 241. Diplomatic immunity cannot permit Defendants to do the very thing the Thirteenth Amendment intends to abolish and "render impossible": the keeping of another human being in a state of unfree labor.  If Defendants' assertion of immunity is upheld, individuals may continue to be held in slavery, involuntary servitude, debt bondage and sexual servitude within United States territories as long as the perpetrator of these unconstitutional crimes is a diplomat.  Such an interpretation of diplomatic immunity would clearly frustrate the United States government's ability and obligation to eradicate slavery in this country and prevent it from carrying out the promise of the Constitution "that slavery or involuntary servitude shall not exist in any part of the United States." The Civil Rights Cases, 109 U.S. at 20.

could pursue their claims for violations of their constitutional rights against these foreign diplomats, the availability of such a forum might allow the application of the Act in this case to withstand constitutional scrutiny. Cf. Reno v. American-Arab Anti-Discrimination Comm., 525 U.S. 471, 482 (1999) (construing the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 to permit judicial review of certain deportation claims to avoid the "absurd result" of "cut[ting] off federal jurisdiction over all deportation decisions"); Singh v. Reno, 182 F.3d 504, 508-10 (7th Cir. 1999) (construing the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 to permit "direct review in the courts of appeals . . . for aliens wishing to challenge their deportation on constitutional grounds" to avoid "serious constitutional concerns"); Beamon v. Brown, 125 F.3d 965, 970-74 (6th Cir. 1997) (holding that the Veteran's Judicial Review Act did not pose the "constitutional danger of precluding judicial review of constitutional claims" because the act provided for judicial review by the Court of Veteran's Affairs and the Federal Circuit).

Defendants' proposed construction of the Act, however, provides no alternative forum. It would be manifestly unjust to allow diplomatic immunity to be applied here to obstruct Plaintiffs' constitutional claims of having been imprisoned and enslaved on American soil in violation of the Thirteenth Amendment. Thus, the Act must be construed to permit Plaintiffs' claims alleging violations of Thirteenth Amendment guarantees to proceed . Accordingly, this Court should reject Defendants' assertion of diplomatic immunity and deny Defendants' Motion to Dismiss.[11]

---

[11]    Moreover, if construed to foreclose all federal judicial review of Plaintiffs' Thirteenth Amendment claims, such an application of the Act would conflict with Article III of the Constitution. The Supreme Court has observed that the vesting of federal judicial power under Article III "is manifestly designed to be mandatory upon the legislature. Its

## II.    DEFENDANTS' TRAFFICKING OF PLAINTIFFS FALLS WITHIN THE COMMERCIAL ACTIVITIES EXCEPTION TO IMMUNITY UNDER THE VIENNA CONVENTION ON DIPLOMATIC RELATIONS.

In addition to implicating constitutional questions, Defendants' claims of diplomatic

immunity fail for the independent reason that the Vienna Convention on Diplomatic Relations

does not apply to claims arising out of a diplomat's commercial activities.  The "commercial

activities" exception of Article 31(1)(c) of the Vienna Convention on Diplomatic Relations strips

immunity from diplomats for civil actions "relating to any professional or commercial activity

exercised by the diplomatic agent in the receiving State outside his official functions."  23 U.S.T.

at 3241.  In the present case, Defendants engaged in a commercial activity by trafficking

Plaintiffs into this country and enslaving them.  Having obtained Plaintiffs' labor at illegal and

drastically substandard wages, Defendants yielded substantial profits of approximately

$58,215.[12]  The profitable and commercial nature of Defendants' activities, which was clearly

outside Defendant Al Saleh's official functions, brings their conduct squarely within the

commercial activities exception.  Accordingly, Defendants are not immune, on ground of

---

obligatory force is so imperative, that congress could not, without a violation of its duty, have refused to carry it into operation.  Martin v. Hunter's Lessee, 14 U.S. (1 Wheat) 304, 328-331 (1816).  The Court of Appeals for the District of Columbia reaffirmed, holding that if a case "arises under the Constitution, laws or treaties of the United States, . . . jurisdiction to entertain it is in some district court by compulsion of the Constitution itself."  Eisentrager v. Forrestal, 174 F.2d 961, 966 (D.C. Cir. 1949), *reversed on other grounds sub nom.* Johnson v. Eisentrager, 339 U.S. 763 (1950).  Accordingly, Article III requires this Court to provide a forum for Plaintiffs' constitutional claims.

[12]    This approximation is based on 24 daily hours of work, seven days a week, at the federal minimum wage rate of $5.15 for each Plaintiff minus the wages that Defendants actually paid Plaintiffs.  Because Plaintiffs were not free to leave the premises and were "on call" for the Defendants throughout the night, they are entitled to compensation for those hours.

diplomatic immunity, from suit to redress the constitutional and statutory violations suffered by Plaintiffs on grounds of diplomatic immunity.

### A.    The Act Of Human Trafficking Is A Commercial Activity Engaged In For Personal Profit.

Human trafficking is modern-day slavery.  Like other forms of slavery, it is a lucrative commercial activity that exploits the poor and vulnerable.  The issue before this Court is one of first impression: whether the act of human trafficking is a commercial activity for purposes of the Vienna Convention on Diplomatic Relations.  The profit-seeking purpose and commercial nature of human trafficking – activity that clearly falls outside Defendant Al Saleh's official functions – remove Defendants' conduct from the scope of the Vienna Convention on Diplomatic Relations' immunity for diplomats.

Inapposite to this case are those cases in which defendants have asserted diplomatic immunity to defeat their domestic workers' claims solely for violations of state and federal wage and hour labor laws.  Courts have dismissed those claims on the theory that the hiring of household help is incidental to the daily life of the diplomat and therefore is not commercial for purposes of the exception.  See Gonzalez Paredes v. Vila, 479 F. Supp. 2d 187 (D.D.C. 2007) (applying diplomatic immunity to claims based on wage and hour violations on the grounds that the contract for domestic employment was incidental to the daily life of the diplomat and his wife); Tabion v. Mufti, 73 F.3d 535 (4th Cir. 1996) (same).  In contrast to these situations of voluntary domestic employment, human trafficking and slavery are inherently commercial activities that are not incidental to the daily life of a diplomat.

When Defendants trafficked Plaintiffs into the United States they engaged in a trade or business activity for personal profit.  See Tabion, 73 F.3d at 537 (interpreting the meaning of "commercial activity" in Article 31(1)(c) of the Vienna Convention on Diplomatic Relations as

relating "only to trade or business activity engaged in for personal profit").  Congress has defined

"severe forms of trafficking in persons" as "the recruitment, harboring, transportation, provision,

or obtaining of a person for labor or services, through the use of force, fraud, or coercion for the

purpose of subjection to involuntary servitude, peonage, debt bondage, or slavery."  Trafficking

Victims Protection Act, 22 U.S.C. § 7102(8)(B).  Trafficking in persons is regularly referred to

as a "trade"[13] in slaves, a "business"[14] and an "industry."[15]  Just as African slaves were brought

to the American South through vast transportation networks and lucrative commercial and

trading schemes, so too today, the transnational trafficking of individual laborers is accomplished

through extensive recruitment systems operating to feed a commercial trade in human labor

motivated by the quest for personal profit.

      Trafficking in persons is not only a trade or business activity, but an extremely profitable

one.  Indeed, it is one of the most lucrative illicit businesses worldwide, as a criminal industry

second only to drug trafficking in its scope.  Department of Health and Human Services, Human

---

[13]    See, e.g., Janice Raymond, *Guide to the New U.N. Trafficking Protocol* 1 (2001) ["Raymond, *Guide to Trafficking Protocol*"], *available at* http://action.web.ca/home/catw/attach/un_protocol.pdf (stating that "[t]he Protocol promises to contest the world's organized crime networks and combat the trade in human beings and transnational prostitution"); Amnesty International, Trafficking of Persons: Amnesty International Fact Sheet, *available at* http://www.amnestyusa.org/women/trafficking/pdf/trafficking_of_persons.pdf (describing trafficking as "modern day slave trading").

[14]    See, e.g., Amy O'Neil Richard, *International Trafficking in Women to the United States: A Contemporary Manifestation of Slavery and Organized Crime*, Center for the Study of Intelligence, 13 (1999) ["Richard, *International Trafficking*"], *available at* http://www.vawnet.org/Intersections/OtherViolenceTypes/Trafficking/ciatraffic.pdf (stating that "[t]rafficking in women is a new business and source of strength for organized crime").

[15]    See, e.g., id. (explaining that "the trafficking industry worldwide also is closely intertwined with other related criminal activities, such as extortion, racketeering, money laundering, bribery of public officials, drug use, document forgery, and gambling").

Trafficking Fact Sheet, *available at* http://www.acf.hhs.gov/trafficking/about/fact_human.html; see H. Res. 55, 110th Cong. (2007).  In January 2007, the U.S. House of Representatives noted that "global profits from trafficked forced labor totals an estimated $31.6 billion annually."  H. Res. 55, 110th Cong. (2007).  According to the Congressional findings of the TVPA, "trafficking is the fastest growing source of profits for organized criminal enterprises worldwide," and "[p]rofits from the trafficking industry contribute to the expansion of organized crime in the United States and worldwide."  TVPA § 7101(b)(8).  In the TVPA, Congress derived its constitutional authority to regulate trafficking in persons from the Commerce Clause because trafficking "substantially affects interstate and foreign commerce."  TVPA § 7101(b)(12); see Gonzales v. Raich, 545 U.S. 1, 35 (2005) (stating that legislation regulating economic activity that substantially affects interstate commerce will be sustained).  Congress also found that "[t]rafficking for such purposes as involuntary servitude, peonage, and other forms of forced labor has an impact on the nationwide employment network and labor market."  TVPA § 7101(b)(12).  Moreover, the prevalence of "profitable businesses and fraud schemes that entail the exploitation of foreign women, such as unlicensed mail order bride companies, maid schemes, and domestic servants" contributes to the expansion and profitability of global trafficking in female domestic workers.  Richard, *International Trafficking*, at 13, 27 (1999).

Whether accomplished through vast criminal networks or simply through an individual's acts to recruit and procure a person's involuntary labor, trafficking is a trade or business activity that is personally profitable to individual traffickers.[16]  Similar to drug trafficking, trafficking in

---

[16]    Trafficking does not require an association with an organized syndicate; indeed traffickers often do not operate in large syndicates, but may operate as a family or individuals.  For example, according to a Guide to the U.N. Trafficking Protocol, "husbands and boyfriends of women often recruit, traffic and pimp their female partners

persons is an easy way for individuals to earn quick and substantial amounts of money, in this instance through the illegal exploitation of a person's labor.  Trafficking is profitable to individuals involved at every stage of the supply and demand chain, and most profitable to those individuals at the receiving end of this chain.[17]  For example, while labor recruiters may earn a cut from recruitment fees paid by victims of trafficking, the ultimate employer of the worker is the "master trafficker" who "extracts the maximum gains from the entire bargain"[18] by enjoying the fruits of the worker's labor while failing to fully compensate the worker for work performed. In this way, "master traffickers" ensure long-term exploitation with maximum economic gain.[19] Just as slaveholders in the American South profited enormously from the uncompensated labor of their slaves, which led to the rapid expansion of the United States economy, diplomats who traffic their personal employees profit substantially from their employees' involuntary labor, enriching themselves and their families and creating an underclass economy of slave labor in the United States.

In the present case, Defendants imported Plaintiffs Sabbithi, Quadros and Fernandes from Kuwait for the purposes of imprisoning and enslaving them in the United States to benefit from

---

into prostitution.  They may engage a small group of friends or others to assist in the crime."  Raymond, *Guide to Trafficking Protocol,* 3 (2001).

[17]    For example, the United Nations Working Group on Slavery Practices of the U.N. Sub-Commission on the Promotion and Protection of Human Rights stated, in a resolution discussing trafficking in Eastern Europe, that women were "traded" several times on their way to Europe, with prices increasing at each "transaction."  Secretary-General, *Report of the Secretary-General on Trafficking in Persons,* at 13, U.N. Doc. E/CN.4/Sub.2/AC.2/2001/4 (May 16, 2001).

[18]    Report on Trafficking in Women and Children in India, Nat'l Hum. Rights Comm., UNIFEM & Inst. of Soc. Sciences,139 (2003), *available at* http://www.ashanet.org/focusgroups/sanctuary/articles/ReportonTrafficking.pdf.

[19]    <u>See</u> Richard, *International Trafficking* at 27.

their labor.  By failing to pay Plaintiffs the federal and state minimum wage as required by law

and as stated in employment contracts they signed with Plaintiffs, and by entrapping Plaintiffs in

their home in Virginia for nearly six months, Defendants reaped a personal profit of

approximately $58,215.[20]  By forcing Plaintiffs to labor against their will, Defendants engaged in

a calculated and deliberate business scheme to profit from the exploitation of human labor.

### B.    Human Trafficking Falls Outside The Scope Of A Diplomat's Official Functions And Is Not Incidental To A Diplomat's Daily Life.

The Vienna Convention on Diplomatic Relations does not extend diplomatic immunity to

commercial activities outside the scope of a diplomat's official functions.  Vienna Convention on

Diplomatic Relations, Art. 31(1)(c).  The official functions of a diplomat do not include

commercial activities designed to yield a personal profit.  Id. at Art. 42 ("A diplomatic agent

shall not in the receiving State practice for personal profit any professional or commercial

activity.").  While few courts have considered the scope of a diplomat's official functions, the

Fourth Circuit has construed this scope broadly, finding that the commercial activities exception

was not intended to apply to contracts for services incidental to the life of a diplomat.  Tabion v.

---

[20]    Supra, n.13.  Courts have long recognized that the money saved by not paying a sum one is obligated to pay is equivalent to a profit.  See, e.g., Jeremiah v. Richardson, 148 F.3d 17, 20 (1st Cir. 1998) (noting that a bankruptcy trustee "earned approximately $5,000 per month 'profit'…only by not paying any debt service (i.e., the mortgage), any real estate taxes, or any payments on the Center's pre-petition outstanding obligations") (emphasis added); Higgins v. Detroit Educ. Television Found., 4 F. Supp. 2d 701, 710 (E.D. Mich. 1998) (noting that the entity "maximized its profits by not paying any licensing or permission fees" on copyrighted materials) (emphasis added); United States v. Veksler, 862 F. Supp. 1337, 1340 (E.D. Pa. 1994) (describing a "daisy chain" scheme in which "the profit gained by not paying the taxes was divided among the conspirators") (emphasis added), aff'd, 62 F.3d 544 (3d Cir. 1995); S. New England Tel. Co. v. Dep't of Pub. Util. Control, 874 A.2d 776, 783 (Conn. 2005) (warning that a utility should not be permitted to "reap windfall profits, as a result of not paying labor costs") (emphasis added).

Mufti, 73 F.3d 537.  Relying on the United States State Department's interpretation of the commercial activities exception, the Tabion court held that "day-to-day living services such as dry cleaning or domestic help" are services "incidental to daily life" and therefore not commercial activities "outside [a diplomat's] official functions" within the meaning of Article 31(1)(c).  Id. at 538-39.  While Plaintiffs believe that Tabion was wrongly decided (see infra Part IIc), even if the improperly broad interpretation adopted in Tabion were to be applied, the commercial activities of human trafficking and slavery clearly fall outside the official functions of a diplomat.

When Defendants engaged in the trafficking of Plaintiffs for their own personal profit, the employment relationship between Defendants and Plaintiffs ceased to be "incidental" to Defendants' management of their daily lives.  Trafficking Plaintiffs to this country and profiting from their undercompensated, forced labor are acts of a completely different nature than ordinary contracts for "day-to-day living services such as dry cleaning or domestic help."  Id., at 538-39.  Neither are Defendants' commercial acts "'incidental to the ordinary conduct of life in the receiving State.'"  Id. at 538 (quoting Denza, *Diplomatic Law: Commentary on the Vienna Convention on Diplomatic Relations*, 166-67 (1976)).  Indeed, the procurement, transportation, and use of slave labor are far a-field from the realm of "everyday transactions" that the Tabion court immunized as incidental to the daily life of a diplomat.  It would be absurd to cloak Defendants' acts of trafficking and enslaving Plaintiffs with diplomatic immunity under the theory that such conduct falls within the daily, everyday routine of diplomats and is naturally attendant or incidental to a diplomat's official functions.

Moreover, trafficking and forced labor constitute the types of undiplomatic commercial activity that the Vienna Convention on Diplomatic Relations was intended to prohibit.  The

24

negotiating and drafting history of the Convention establish that the term "commercial activity" encompassed those private commercial activities that were "inconsistent" with a diplomat's position.  See Dep't of State, Statement of Interest in Gonzalez Paredes v. Vila, Civil Action No. 06-0089 (D.D.C.), docket no. 23 ["Statement of Interest"].  The commercial activities exception was understood to "'enable persons in the receiving State who have professional or business dealings of a non-diplomatic character with a diplomatic agent to have the same recourse against him in the courts as they would have against a non-diplomatic person engaging in similar activities.'"  Statement of Interest at 11 (quoting U.S. Department of State, 7 Digest of Int'l Law 406 (Whiteman 1970)).  The exception thus ensures that when a diplomat engages in undiplomatic commercial activities for his or her own personal benefit, "'the client should be able to obtain a settlement of disputes arising out of the professional or commercial activities.  It would be quite improper if a diplomatic agent, **ignoring the restraints which his status ought to have imposed upon him**, could, by claiming immunity, force the client to go abroad in order to have the case settled by a foreign court.'"  Statement of Interest at 10 (quoting the *Diplomatic Intercourse and Immunities: Summary of Observations Received from Governments and Conclusions of the Special Rapporteur*, U.N. Doc.A/CN.4.116) (emphasis added).

Human trafficking is a commercial activity that is wholly inconsistent with a diplomat's position.  One hundred and seventeen countries of the world condemn acts of trafficking, see Signatories to the U.N. Trafficking Protocol, *available at* http://www.unodc.org/unodc/crime_cicp_signatures_trafficking.html (last visited May 19, 2007), and it is a serious violation of law in the United States, carrying criminal penalties of up to life in prison.  18 U.S.C. § 1589, 1590.  When a diplomat keeps a domestic servant as a slave in his house, he deliberately engages in conduct to obtain personal profit by "ignoring the restraints

which his status ought to have imposed upon him," just as would be the case if he, for example, opened a retail business and failed to pay his staff.  Statement of Interest at 10 (quoting the Diplomatic Intercourse and Immunities, U.N. Doc.A/CN.4.116).  Such profitable side ventures are decidedly unrelated to a diplomat's official functions and thus individuals aggrieved by such ventures may seek recourse for their economic losses, as they would be entitled to do if the commercial actor were not a diplomat.  See Statement of Interest at 10.  The commercial activities exception was intended specifically to protect those individuals who rely in good faith on the promise of fair commercial dealings in exchanges unrelated to a diplomat's diplomatic obligations.  See id.  Acts of trafficking thus fall within the scope of the commercial activities exception, even as restrictively enunciated in Tabion, and as understood at the time of the drafting and negotiation of the Vienna Convention on Diplomatic Relations.

C.     **Although The Court Need Not Reach The Issue To Decide Defendants' Motion, Tabion Was Wrongly Decided.**

This Court need not reach the issue of whether Tabion was wrongly decided, because, in contrast to the action of defendants in Tabion, the trafficking and enslavement Defendants' engaged in clearly constitute commercial activities.  However, should the Court undertake such an analysis, it is evident that contractual relationships for goods and services can in some instances constitute commercial activities outside the scope of a diplomat's functions under the terms of the Vienna Convention on Diplomatic Relations.  The drafting and negotiating history of the Convention, described in the Department of State's Statement of Interest in Gonzalez Paredes v. Vila, makes clear that the commercial activities exception, working in conjunction with Article 42 (providing that a "diplomatic agent shall not in the receiving State practice for personal profit any professional or commercial activity"), was intended to apply to conduct that a diplomat engages in for personal profit or remuneration and that is a continuous activity.

Statement of Interest at 5, 9-10.  Contractual relationships for services or goods that support a diplomat's daily life can be "commercial activities" if they are continuous and personally profitable.  By suggesting that contracts for domestic services are categorically outside the scope of the commercial activities exception, <u>Tabion</u> wrongly foreclosed inquiry into the continuous and profitable nature of the diplomat's conduct.

Unlike a diplomat's contract with a landscaper for monthly services or with a dry cleaner for laundry services, a diplomat's contractual relationship with a live-in domestic worker is a continuous and, if underpaid, profitable activity.[21]  In this case, Defendants Mjr. Al Saleh and Ms. Al Omar oversaw, supervised, and monitored Plaintiffs' work and whereabouts in a constant manner, seven days a week, twenty-four hours a day.  Defendant Ms. Al Omar was deliberate and unrelenting in her treatment, threatened and abused Plaintiffs daily to force them to work harder and to become too fearful to attempt to escape.  Her conduct served to severely exploit Plaintiffs and rose to the level of trafficking, involuntary servitude and forced labor, violations that were exacted over a lengthy period of time and in a continuous fashion.  As discussed <u>infra</u> Part II(A), such exploitative conduct was extremely personally profitable and remunerative to Defendants.  Although many contractual relationships for goods and services may not constitute "commercial activities" within the terms of the Vienna Convention on Diplomatic Relations, some contractual relationships are distinctly continuous and personally profitable, such as

---

[21]    Indeed, in many instances, an employment arrangement with a landscaper or the engagement of a dry cleaner for laundry services would not even be memorialized in a written contract, in contrast to the requirement of a written and signed contract between a diplomat and a domestic worker as a precondition for obtaining an A-3 visa.  This mandatory contract, as well as the A-3 visa that it supports, demonstrates both the presumed continuous and commercial nature of the domestic worker engagement.

severely exploitative relationships with live-in domestic workers.  As a result, <u>Tabion</u>'s reasoning was improper and should not be followed in this case.

The reasoning of <u>Tabion</u>, if applied here, would lead this Court to draw a distinction where one should not exist.  <u>Tabion</u> suggests that if, for example, a diplomat employer operates a factory sweatshop, he could be sued for his violations of wage and hour laws, but if he subjects a domestic worker in his private home to exploitative sweatshop conditions, he should be immune from suit.  Both jobs, however, constitute economic activities aimed at enhancing the profit margin of the employer.  The fact that a diplomat who exploits a domestic worker has not established an official business should not be relevant, given that under the Vienna Convention on Diplomatic Relations, the definition of "commercial activities" is focused on whether such activities result in remuneration and are continuous.  <u>See</u> Statement of Interest at 9 (quoting <u>Denza</u>) (stating that it is clear, for example, that the speculative activities of a diplomat on the Stock Exchange would come within the commercial activities exception to immunity).

To interpret the commercial activities exception as not applicable to the employment relationships between diplomats and their domestic workers, simply because domestic workers labor inside the diplomats' homes, fails to recognize the economic value of these laborers' work based on racial and gender stereotypes, and has the effect of discriminating against women and minorities, who constitute the vast majority of individuals performing such labor within the home.  In modern society, the employment of live-in maids and childcare providers, far from being "incidental to daily life," is a privilege for those few who can afford to pay them and provide them with lawful working conditions.  Ignoring the economic dimension of these relationships and characterizing them as a natural incident of a diplomat's day-to-day work harkens back to a time when the work of women and minorities was assumed to be valueless

28

simply because women and minorities performed it.  See, e.g., Brief for the Urban Justice Center & Brennan Center for Justice et al. as Amici Curiae Supporting Respondent, Long Island Care at Home, Ltd. et al. v. Evelyn Coke, No. 06-593 (U.S. March 2007)

Furthermore, the decision in Tabion fails to account for the transformed nature of our modern economy, which is increasingly characterized by a burgeoning informal workforce. Employers more and more frequently seek ways to avoid government regulation, cut costs, and improve their profits by, for example, shielding workers from official oversight by employing them in their private homes, in clandestine factories, or in the backrooms of restaurants or retail shops.  This informal economy is an ever-growing, ever more profitable sector.  To ignore such commercial activities as "incidental to daily life" turns a blind eye to the economic impact of this expanding workforce.

**D.    According To Long-Standing Principles Of Statutory Construction, The Commercial Activities Exception Should Be Interpreted In A Manner Consistent With Similar Exceptions To Consular And Foreign Sovereign Immunities.**

The commercial activities exception to diplomatic immunity should be interpreted in a manner consistent with established precedent holding that consular and foreign sovereign immunities do not apply to the employment relationship between diplomats and their domestic workers.  See El-Hadad v. Embassy of the United Arab Emirates, 69 F. Supp. 2d 69 (D.D.C. 1999), rev'd in part on other grounds, 216 F.3d 29 (D.C. Cir. 2000); Park v. Shin, 313 F.3d 1138 (9th Cir. 2002).  The employment of laborers by embassies or foreign missions constitutes a commercial activity under the commercial activities exception to the Foreign Sovereign Immunities Act.  El-Hadad, 69 F. Supp. at 74; see also Park, 313 F.3d at 1145.  Therefore, foreign governments are not immune to suit in U.S. courts in civil actions brought by their domestic worker employees.  The United States Department of State has also adopted this

29

interpretation of the application of the commercial activities exception to foreign sovereign immunity in the hiring of employees by U.S. embassies and missions abroad.[22]

Similarly, the Ninth Circuit has found that a consular official's employment of private servants in his home does not constitute a consular function under the Vienna Convention on Consular Relations.  Park, 313 F.3d at 1143.  The consular official in Park was therefore not entitled to immunity for the employment relationship he had with his domestic worker.  Id.  As a result, consular officials do not have immunity with respect to actions brought by their domestic workers where the complained of acts were not performed in the exercise of a consular function.

The commercial activities exception under the Vienna Convention on Diplomatic Relations, incorporated into U.S. law by the Diplomatic Relations Act, should be construed in light of these decisions.  The canons of statutory construction require that laws be read to "avoid absurd results."  See United States v. Schneider, 14 F.3d 876, 880 (3d Cir. 1994).  It would be an "absurd result" for this Court to find that diplomatic immunity prevents a diplomat from being held accountable for the exploitation of domestic workers, when neither sovereign immunity nor consular immunity protect foreign governments or consular officials from being held accountable for the same actions.  Such an inconsistency would result in a domestic worker being denied a remedy if she happens to work for a diplomat, but provided a remedy if she

_____

[22]    Gilda Brancato, Office of the Legal Advisor, U.S. Dep't of State, Letter providing departmental guidance on the applicability of United States labor laws to foreign missions and their non-diplomatic personnel, at 3, Oct. 23, 1990 (stating "[t]he courts of many countries have concluded that the employing of local residents is a commercial activity and that foreign sovereigns are therefore not immune to lawsuits arising out of these employment relationships" and "[e]mployment of local nationals by diplomatic or consular mission is generally deemed to constitute commercial activity, at least to the extent that what is at issue in litigation is benefits provided under terms of employment or under local labor law. . . claims for labor benefits or breach of contract money damages can generally be adjudicated by local courts").

30

happens to work for a consular official or for the embassy directly.  This interpretation would create an illogical gap in the accountability of foreign states and their representatives to the domestic workers they employ in the United States.

**III.    DIPLOMATIC IMMUNITY CANNOT BAR PLAINTIFFS' CLAIMS BECAUSE DEFENDANTS' ACTIONS WERE SO EGREGIOUS THEY VIOLATE *JUS COGENS* NORMS PROHIBITING SLAVERY AND SLAVERY-LIKE PRACTICES.**

**A.    Slavery And Slavery-Like Practices Are Prohibited By International Law.**

Plaintiffs' claims of involuntary servitude, forced labor and trafficking under the Thirteenth Amendment, the Trafficking Victims Protection Act (TVPA) and 18 U.S.C. § 1584, constitute violations of the customary international law prohibition against slavery.  Defendants claim immunity from suit for these violations under the Vienna Convention on Diplomatic Relations, a codification of the customary international law on diplomatic privileges and immunities.

The prohibition against slavery, the first violation of human rights to be banned under international law, has been codified in widely ratified treaties dating back to the nineteenth century.  The norm has evolved to encompass all modern manifestations of slavery, including involuntary servitude, forced labor and trafficking.[23]  M. Cherif Bassiouni, *Enslavement as an International Crime*, 23 N.Y.U. J. Int'l L. & Pol. 445 (1991).

It is well-established that the prohibitions against slavery and these slavery-like practices, have achieved the level of customary international law.  As evidence of this fact, a broad array of treaties, both multilateral and bilateral, contain these prohibitions and proscribe such practices in

---

[23]    See Filartiga v. Pena-Irala, 630 F.2d 876, 881 (2d Cir. 1980) ("courts must interpret international law not as it was in 1789, but as it has evolved and exists among the nations of the world today.") (citing Ware v. Hylton, 3 U.S. (3 Dall.) 198, 1 L.Ed. 568 (1796)).

times of war or peace.  See, e.g., International Covenant on Civil and Political Rights, art. 8, Dec. 16, 1966, G.A. res. 2200A (XXI), U.N. Doc. A/6316, 999 U.N.T.S. 17, *entered into force for the United States* June 8, 1992 ("(1) no one shall be held in slavery; slavery and slave-trade in all their forms shall be prohibited.  (2) no one shall be held in servitude."); Slavery, Security, Forced Labor and Similar Institutions and Practices Convention of 1926, preamble, Sept. 25, 1926, 60 L.N.T.S. 253, *entered into force for the United States* Mar. 21, 1929 ("[abolishing] slavery in all its forms"); Universal Declaration of Human Rights, art. 4, Dec. 10, 1948, G.A. res. 217A(II), U.N. Doc. A/810 ("no one shall be held in slavery or servitude"); Protocol to Prevent, Suppress and Punish Trafficking in Persons Especially Women and Children, supplementing the United Nations Convention against Transnational Organized Crime, Nov. 15, 2000, G.A. Res. 25, annex II, UN Doc. A/45/49, *entered into force for the United States* Dec. 3, 2005; TVPA, 22 U.S.C. § 7101(23) (In passing the TVPA, Congress declared "[t]rafficking in persons [a] modern form of slavery, and [the] largest manifestation of slavery today" and found that "[t]he international community has repeatedly condemned slavery and involuntary servitude, violence against women, and other elements of trafficking, through declarations, treaties, and United Nations resolutions and reports.").

Indeed, so fundamental is the prohibition against slavery that it has attained *jus cogens* status.  See Siderman de Blake v. Rep. of Arg., 965 F.2d 699, 717 (9th Cir. 1992), cert. denied, 507 U.S. 1017 (1993); United States v. Matta-Ballesteros, 71 F.3d 754, 764 n.5 (9 Cir. 1995). *Jus cogens*, or "peremptory norms", are those rules of customary international law that are "accepted and recognized by the international community of States as a whole as a norm from which no derogation is permitted and which can be modified only by a subsequent norm of general international law having the same character."  Vienna Convention on the Law of

32

Treaties, May 23, 1969, art. 53, 1155 U.N.T.S. 332, *entered into force* Jan. 27, 1980; <u>Comm. of U.S. Citizens Living in Nicar. v. Reagan</u>, 859 F.2d 929, 939-40 (D.C.Cir. 1988) ["<u>CUSCLIN</u>"] (citing art. 53); <u>see also</u> Restatement (Third) of Foreign Relations Law of the United States ["Restatement (Third)"] § 102, cmt. k & Reporter's Note 6 (1987).

Moreover, slavery is one of a handful of crimes "to which the law of nations attributes individual liability." <u>Tel-Oren v. Libyan Arab Republic</u>, 726 F.2d 774, 794-95 (D.C.Cir. 1984) (Edwards, J., concurring); <u>Kadic v. Karadzic</u>, 70 F.3d 232, 242-43 (2d Cir. 1995) (finding that like slave trading, genocide and war crimes do not require state action for individual liability to attach); <u>see also</u> Restatement (Third) § 404 (listing slave trade as a crime of international concern that is actionable without state action). The prohibition of slavery and slavery-like practices imposes an affirmative obligation on states to investigate, prosecute and punish perpetrators of slavery,[24] as well as provide remedies for victims.[25]

---

[24]     See, e.g., <u>Prosecutor v. Furundzija</u>, Case No. IT-95-17/1-T, Judgment, ¶ 156 (Dec. 10, 1998), *reprinted in* 38 I.L.M. 317 (1999).

[25]     International law requires states to hold perpetrators accountable for human rights violations not only through criminal punishment, but also through redress to victims. <u>See, e.g.</u>, Universal Declaration on Human Rights, G.A. Res. 217 A(III), U.N. GAOR, 3d. Sess., U.N. Doc. A/810 (1948), art. 8 ("Everyone has the right to an effective remedy by the competent national tribunals for acts violating . . . fundamental rights . . . ."); International Covenant on Civil and Political Rights, art. 2(3), Dec. 19, 1966, 6 I.L.M. 368, 999 U.N.T.S. 171 (requiring states "to develop the possibilities of judicial remedy," and "to ensure that the competent authorities shall enforce such remedies when granted"). The United States has often expressed a commitment to this principle. <u>See, e.g.</u>, Amicus Brief of U.S. State and Justice Departments at 22-23, <u>Filartiga v. Pena-Irala</u>, No. 79-6090, *reproduced in* 19 I.L.M. 585, 604 (1980) (arguing that where a law recognized by the international community has clearly been violated, "a refusal to recognize a private cause of action in these circumstances might seriously damage the credibility of our nation's commitment to the protection of human rights."); <u>see also</u> Torture Victim Protection Act 28 U.S.C. § 1350 stat. note 2(a) (permitting civil suit for torture perpetrated under "color of foreign law.").

**B.     The *Jus Cogens* Obligation To Hold Accountable Perpetrators Of Slavery Trumps Any Claims To Diplomatic Immunity Under The Vienna Convention On Diplomatic Relations Or The Diplomatic Relations Act.**

Diplomatic immunity cannot shield individual defendants from accountability for acts of slavery.  See International Military Tribunal (Nuremberg), Judgment and Sentences (1946), *reprinted in* 41 Am. J. Int'l L. 172, 221 (1947) ("The principle of international law, which under certain circumstances, protects the representatives of a state, cannot be applied to acts which are condemned as criminal by international law.").  The obligation imposed on states to hold perpetrators of slavery accountable, through criminal and civil sanctions, prevails over any claims to diplomatic immunity.

As a *jus cogens* norm, no state can agree to contravene the prohibition against slavery and it "enjoys a higher rank in the international hierarchy than treaty law and even 'ordinary' customary rules."  Furundzija, Case No. IT-95-17/1-T, Judgment, ¶ 153.  In the event of a conflict between such a *jus cogens* norm and any other rule of international law, the former prevails and the conflicting treaty or customary rule is rendered void.  See CUSCLIN, 859 F. 2d. at 940 ("[a] treaty is void if, at the time of its conclusion, it conflicts with a peremptory norm of general international law") (internal quotation marks and citations omitted); United States v. Yousef, 327 F. 3d. 56, 96 (2d. Cir. 2003) (finding that "a treaty between two nations to engage in the slave trade … would be void" if it conflicted with a *jus cogens* norm); Siderman de Blake, 965 F.2d at 716; Restatement (Third) § 102, cmt. K; see also Vienna Convention on the Law of Treaties, art. 53 ("A treaty is void if … it conflicts with a preemptory norm of general international law."); Vienna Convention on the Law of Treaties, art. 64 ("If a new preemptory norm of general international law emerges, any existing treaty which is in conflict with that norm becomes void and terminates"); see also Furundzija at ¶ 153.

Here, there is a conflict between Plaintiffs' right to civil redress for violations of their fundamental rights to be free from slavery and other slave-like practices, a *jus cogens* norm, and defendants' immunity, an "ordinary" rule of treaty and customary international law.[26]  Because, the *jus cogens* norm is hierarchically superior to individual assertions of immunity, Plaintiffs claims for redress in this action must be permitted to proceed.[27]

---

[26]    The text of the Vienna Convention on Diplomatic Relations, since its signing in 1961, read together with developments in international law recognizing increased government accountability for serious violations of international law and a corresponding decline in absolute governmental immunity, demonstrate that diplomatic immunity is not a *jus cogens* norm.  See Vienna Convention on Diplomatic Relations, art. 9 (permitting the host state to declare a member of a foreign mission as no longer "acceptable"), art. 31 (recognizing explicit exceptions to diplomatic immunity), art. 32 (allowing an express waiver of diplomatic immunity by the sending state); see also Rome Statute of the International Criminal Court, art. 27(2), 2187 U.N.T.S. 90, *entered into force* July 1, 2002 ("Immunities or special procedural rules which may attach to the official capacity of a person … shall not bar the Court from exercising its jurisdiction over such a person"); Statute of the International Tribunal for the Prosecution of Persons Responsible for Serious Violations of International Humanitarian Law Committed in the Territory of the Former Yugoslavia since 1991, U.N. Doc. S/25704 at 36, annex (1993) and S/25704/Add.1 (1993), adopted by Security Council on 25 May 1993, U.N. Doc. S/RES/827 (1993); Statute of the International Tribunal for Rwanda, adopted by S.C. Res. 955, U.N. SCOR, 49th Sess., 3453d mtg. at 3, U.N. Doc. S/RES/955 (1994), 33 I.L.M. 1598, 1600 (1994).  U.S. federal statutes also give precedence to accountability of government officials over grants of immunity when egregious violations of international law are alleged.  See, e.g., Torture Victim Protection Act, 28 U.S.C. § 1350 stat. note 2(a) (authorizing suits against government officials for acts of torture perpetrated "under color of foreign law" even when the foreign government official is in office); Foreign Sovereign Immunities Act, 28 U.S.C. § 1605(a) (incorporating a category of non-immune conduct to the limited range of acts committed by nation states designated by the United States as "state sponsors of terrorism" and permitting actions in U.S. courts by a U.S. citizen that allege "personal injury or death [ . . .] caused by an act of torture, [or] extra-judicial killing.").  Significantly, no immunity applies to such conduct when it is "engaged in by an official, employee or agent . . . while acting within the scope of his or her office, employment or agency."  Id. at § 1605(a)(5).

[27]    The present case is distinguishable from this court's decision in Aidi v. Yaron, 672 F.Supp. 516 (D.D.C. 1987).  In Aidi, the court upheld claims of diplomatic immunity by an Attaché at the Israeli Embassy.  However, unlike Plaintiffs in the present case, plaintiffs in Aidi did not argue that their claims rose to the level of *jus cogens* violations.

IV.     **ACCORDING TO THE SUBSEQUENT IN TIME RULE, PLAINTIFFS' CLAIMS UNDER THE TRAFFICKING VICTIMS PROTECTION ACT PREVAIL OVER DEFENDANTS' CONFLICTING CLAIMS OF DIPLOMATIC IMMUNITY.**

It is a long established canon of statutory construction that when a subsequent in time statute is inconsistent with a treaty, "the statute to the extent of the conflict renders the treaty null." Reid v. Covert, 354 U.S. 18; see also Verissimo v. I.N.S., 540 U.S. 1080 (2003); Breard v. Greene, 523 U.S. 371 (1998); Whitney v. Robertson, 124 U.S. 190 (1888) (holding that when an act of Congress conflicts with a prior treaty, the act controls); Guaylupo-Moya v. Gonzales, 423 F.3d 121, 136 (2d Cir. 2005); Bell v. Office of Personnel Mgmt., 169 F.3d 1383 (Fed. Cir. 1999) (holding the Panama Canal Act, adopted by Congress in 1998, superseded the application of the Panama Canal Treaty, which became effective on October 1, 1978).

In Breard, the Supreme Court held that the provisions of the Antiterrorism and Effective Death Penalty Act (AEDPA), enacted in 1996, superseded the Vienna Convention on Consular Relations, Apr. 24, 1963, [1970] 21 U.S.T. 77, T.I.A.S. No. 6820, which was ratified in 1969. Breard, 523 U.S. at 376. The plaintiff in Breard argued that, under the Vienna Convention on

---

Because the Court did not specifically consider whether their claims constituted jus cogens violations, it did not consider whether the nature of a *jus cogens* violation trumps claims of diplomatic immunity. See Aidi, 672 F. Supp. at 519; see also Ahmed v. Hoque, No. 01 Civ. 7224 (DLC), 2002 WL 1964806 (S.D.N.Y. Aug, 23, 2002) (finding diplomatic immunity not abrogated by plaintiff's customary international law claims, but not considering whether such claims had *jus cogens* status). Moreover, the court's finding in Aidi that diplomatic immunity could only be dissolved in criminal proceedings for war crimes is incorrect. Aidi, 672 F.Supp. at 518-19. As Justice Breyer noted in Sosa v. Alvarez-Machain, 542 U.S. 692 (2004), "universal criminal jurisdiction necessarily contemplates a significant degree of civil tort recovery as well." 542 U.S. at 762 (2004) (Breyer, J. concurring). The present case can also be distinguished from Princz v. F.R.G., 26 F.3d 1166 (D.C. Cir. 1994), because there the court was concerned not with the effect of *jus cogens* violations on diplomatic immunity, but the effect of a *jus cogens* violation on foreign sovereign immunity under the Foreign Sovereign Immunities Act, and whether Germany's *jus cogens* violation resulted in an implied waiver of such immunity. Thus, a wholly different immunity regime was at issue.

Consular Relations, he had a right to consular assistance prior to his arrest.  Id.  However, the

Court held that because the AEDPA precludes complainants from raising treaty-based claims,

the plaintiff was precluded from raising claims based on the Vienna Convention on Consular

Relations because AEDPA was enacted later in time.  Id.

      In the present case, the Vienna Convention on Diplomatic Relations, which grants

accredited diplomats immunity from criminal prosecution and civil actions, conflicts with the

specific provision of the Trafficking Victims Protection Act (TVPA), which provides all

trafficking victims with the ability to pursue civil remedies.  18 U.S.C. § 1595(a) ("An individual

who is a victim of a violation of section 1589, 1590, or 1591 of this chapter may bring a civil

action against the perpetrator in an appropriate district court of the United States and may

recover damages and reasonable attorneys fees.").  The Vienna Convention on Diplomatic

Relations also conflicts with the objectives of the TVPA and, by incorporation, the Thirteenth

Amendment to the U.S. Constitution, which seeks to eradicate slavery in all of its forms by

enabling the government to investigate, prosecute and punish individual perpetrators and

affording victims a right to civil redress.  See TVPA, 22 U.S.C. § 7101 (legislative findings).  In

passing the TVPA, Congress also sought to codify U.S. obligations under the Trafficking

Protocol and customary international law, both of which mirror the objectives of the TVPA.  See

Trafficking Protocol, Nov. 15, 2000, G.A. Res. 25, annex II, UN Doc. A/45/49, *entered into

force for the United States* Dec. 3, 2005.

      Congress enacted the TVPA in 2000, thirty-one years after the U.S. ratified the Vienna

Convention on Diplomatic Relations in 1971.  TVPA, 22 U.S.C. § 7101-10 (2000); see

Trafficking Victims Protection Reauthorization Act of 2003, Pub. L. No. 108-193, § 4(a) (4)(A),

117 Stat. 2875 (2003) (amending the TVPA in 2003 to include a private right of action).

The prohibition against trafficking and other forms of slavery mandated by the TVPA and international law, and the concomitant right of victims to seek redress for violations, are so fundamental in the U.S. legal system that they allow no class of perpetrator or victim to be excluded from their reach.  Thus, in so far as Defendants' claims to immunity under the Vienna Convention on Diplomatic Relations conflict with Plaintiffs' right to civil redress under the TVPA, Plaintiffs' claims must prevail.

## CONCLUSION

For all of the foregoing reasons, plaintiffs respectfully request that this Court deny

Defendants' Motion To Dismiss and Quash Service Of Process.

Dated:  May 30, 2007

Respectfully submitted,

/s/ Carolyn M. Welsshans
David A. Kotler*
Carolyn M. Welshhans (D.C. Bar No. 489120)
Catherine J. Rosato*
Reid K. Weisbord*
DECHERT LLP
1775 I Street, N.W.
Washington, D.C.  20006
(202) 261-3300

Lenora M. Lapidus*
Claudia M. Flores*
Jennifer L. Pasquarella*
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION - WOMEN'S RIGHTS
PROJECT
125 Broad Street, 18th Floor
New York, NY  10004
(212) 549-2644

Steven Macpherson Watt*
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION - HUMAN RIGHTS
PROGRAM
125 Broad Street, 18th Floor
New York, NY  10004
(212) 519-7870

*Attorneys for Plaintiffs*
*not admitted in this District

## CERTIFICATE OF SERVICE

I, Catherine J. Rosato, hereby certify that on May 30, 2007, I caused to be served via e-mail a true and correct copy of the foregoing Plaintiffs' Memorandum of Points and Authorities in Opposition to Defendants Major Waleed Kh. N.S. Al Saleh and Maysaa Kh. A. O. A. Al Omar's Motion to Dismiss and Quash Service, and a copy of the proposed Order attached thereto, on the following:

Thomas B. Wilner, Esquire
Perry S. Bechky, Esquire
801 Pennsylvania Avenue, N.W.
Washington, D.C. 20004-2634

                                        /s/ Catherine J. Rosato
                                        Catherine J. Rosato