IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

MANI KUMARI SABBITHI, JOAQUINA QUADROS,
and GILA SIXTINA FERNANDES,

                    Plaintiffs,

      v.

MAJOR WALEED KH N. S. AL SALEH,
MAYSAA KH A. O. A. AL OMAR, and
STATE OF KUWAIT,

                    Defendants.

Case No.: 07-CV-00115-EGS

**REPLY IN SUPPORT OF DEFENDANTS'
MOTION TO DISMISS AND TO QUASH SERVICE OF PROCESS**

Thomas B. Wilner (D.C. Bar # 173807)
Perry S. Bechky (D.C. Bar # 442632)
Amanda E. Shafer (D.C. Bar # 497860)
Justin Harrison (D.C. Bar # 502069)
Shearman & Sterling LLP
801 Pennsylvania Avenue, N.W., Suite 900
Washington, D.C. 20004-2634
Telephone:  (202) 508-8000
Facsimile:  (202) 508-8001

*Attorneys for Defendants*
*Waleed KH N. S. Al-Saleh and*
*Maysaa KH A. O. A. Al-Omar*

# TABLE OF CONTENTS

**Page**

INTRODUCTION .................................................................................................................... 1

ARGUMENT .......................................................................................................................... 2

I.      DIPLOMATIC IMMUNITY IS A LONGSTANDING AND
FUNDAMENTAL RULE OF BOTH INTERNATIONAL AND U.S. LAW ....... 2

II.     PLAINTIFFS CANNOT AVOID THE EFFECT OF DIPLOMATIC
IMMUNITY BY PLEADING CONSTITUTIONAL OR INTERNATIONAL
LAW CLAIMS ................................................................................................ 4

        A.     Plaintiffs Cannot Avoid the Effect of Defendants' Immunity by
Pleading a Thirteenth Amendment Claim .................................................. 5

        B.     A Claim Based on *Jus Cogens* Does Not "Trump" Diplomatic
Immunity .................................................................................................. 10

III.    NO EXCEPTION TO IMMUNITY APPLIES BECAUSE THIS ACTION
DOES NOT "RELAT[E] TO ANY PROFESSIONAL OR COMMERCIAL
ACTIVITY" BY THE DEFENDANTS OUTSIDE THEIR "OFFICIAL
FUNCTIONS" ................................................................................................ 14

        A.     Hiring Domestic Employees Is Not "Professional or Commercial
Activity" .................................................................................................. 14

        B.     The "Professional or Commercial Activity" Exception to Diplomatic
Immunity Uses Different Language and Serves a Different Purpose
than Do Exceptions to Foreign Sovereign Immunity and Consular
Immunity .................................................................................................. 18

IV.    PLAINTIFFS MISCONSTRUE THE "SUBSEQUENT IN TIME" RULE ........ 21

CONCLUSION .................................................................................................................... 23

Waleed KH N. S. Al-Saleh and Maysaa KH A. O. A. Al-Omar ("Defendants") respectfully submit their Reply in Support of Defendants' Motion to Dismiss and to Quash Service of Process.  For the reasons presented below and in their opening brief, Defendants respectfully request that this Court grant their Motion, quashing service of process and dismissing this case.

## INTRODUCTION

The United States, along with 178 other nations, is a party to the Vienna Convention on Diplomatic Relations.[1]  Article 31.1 of the Convention provides:

> *A diplomatic agent shall enjoy immunity from the criminal jurisdiction of the receiving State.  He shall also enjoy immunity from its civil and administrative jurisdiction, except in the case of [three limited exceptions].*

The Diplomatic Relations Act of 1978, the U.S. statute implementing the Convention, provides: "Any action or proceeding brought against an individual who is entitled to immunity with respect to such action or proceeding under the Vienna Convention on Diplomatic Relations . . . *shall be dismissed*."  22 U.S.C. § 254(d) (emphasis added).

Defendants are an accredited diplomat and his wife.  Subject to the few narrow exceptions enumerated in the Vienna Convention, they are entitled to immunity from suit in this Court.  Because none of the enumerated exceptions applies here, Defendants are entitled to immunity and this suit must be dismissed.

Plaintiffs attempt to avoid this result by characterizing their claims as grave violations of the Constitution and of international law – arguing, essentially, that their allegations are so important that they simply "trump" diplomatic immunity.  No matter how sympathetically pled, however, Plaintiffs' private claims for money damages cannot overcome the vital national

---

[1] 23 U.S.T. 3227, T.I.A.S. 7502 (Apr. 18, 1961) (hereinafter, the "Vienna Convention" or "Convention").

interests secured by the longstanding principle of diplomatic immunity.  As the State Department

has explained:

> [D]iplomatic immunities can prevent persons allegedly wronged by those entitled
> to such immunities from obtaining court review of their allegations. . . .  However,
> even in the face of potential adverse effects, the diplomatic immunities . . . must be
> respected because they are vital to the conduct of peaceful international relations.
> Respecting diplomatic obligations is a fundamental component of harmony and
> comity in the international community.[2]

## ARGUMENT

## I.     DIPLOMATIC IMMUNITY IS A LONGSTANDING AND FUNDAMENTAL RULE OF BOTH INTERNATIONAL AND U.S. LAW

"It has long been a settled rule of law that foreign diplomatic representatives are exempt

from all local processes in the country to which they are accredited."  *Carrera v. Carrera*, 174

F.2d 496, 498 (D.C. Cir. 1949).  Diplomatic immunity is "one of the oldest elements of foreign

relations," with a history dating back to ancient Greece and Rome.  *See* United States

Department of State, *Diplomatic and Consular Immunity: Guidance for Law Enforcement and

Judicial Authorities* at 1 (Dept. of State Pub. 10524, revised May 1998).  Blackstone observed

that the immunities of ambassadors were recognized by English common law and adopted by the

United States.  *See* Blackstone, 5 *Commentaries with Notes of Reference to the Constitution and

Laws of the Federal Government of the United States and of the Commonwealth of Virginia* 70

(1969 ed.).  As far back as 1790, U.S. law provided for "a broad grant of immunity which

extend[ed] even to private servants in the household of a diplomat."  S. Rep. No. 95-958, 95th

Cong., 2d Sess., *reprinted at* 1978 U.S.C.C.A.N. 1935-36 (1978).  Indeed, Chief Justice Marshall

once declared:  "It is impossible to conceive . . . that a Prince who sends an ambassador or any

---

[2] Statement of Interest of the United States, *Begum v. Saleh*, No. 99-11834 (RMB) (S.D.N.Y.), docket no. 9,
("*Begum* Statement of Interest"), at § III; *accord Tachiona v. Mugabe*, 169 F. Supp. 2d 259, 317 (S.D.N.Y. 2001),
*aff'd in part and rev'd in part*, *Tachiona v. U.S.*, 386 F.3d 205 (2d Cir. 2004) ("If there is a larger end here to be
served, for which accusations of grave misconduct as between particular individuals may be momentarily set aside,
it is in the interest of comity among nations – to safeguard friendly relations among sovereign states.").

other minister can have any intention of subjecting him to the authority of a foreign power." *The Schooner Exchange v. McFaddon*, 11 U.S. (7 Cranch) 116, 143 (1812).

It was well recognized that diplomatic immunity would deprive aggrieved parties of the ability to bring suit. But the principle of immunity has been adopted around the world to enable diplomats to carry out their functions, free from harassment through litigation in the courts of their host countries.[3] As the U.S. State Department recently explained in a very similar case:

> *By necessity, diplomats must carry out their work in a foreign – sometimes even hostile – environment. Jurisdictional immunity ensures their ability to function effectively by insulating them from the disruptions that would be associated with litigation in that environment.[4]*

Diplomatic immunity does not, however, insulate diplomats from all redress. Rather, it only grants them immunity from litigation in the courts of their host countries. They may still, of course, be sued or prosecuted in the courts of their home countries. Vienna Convention, art. 31.4. But in the country where they are assigned to work as a diplomat, allegations of transgressions are to be dealt with not by the judiciary, but diplomatically. In other words, allegations against diplomats must be resolved through intervention by the Executive,[5] who, under our Constitution, is charged with primary responsibility for conducting foreign relations.[6]

---

[3] *See Yearbook of the International Law Commission 1957*, vol. I, p. 2 ¶ 10 (during the debate on the draft articles on diplomatic intercourse and immunities, Sir Gerald Fitzmaurice, Legal Advisor to the British Foreign Office and later Judge of the International Court of Justice, noted that "in the last analysis, it was impossible for a diplomat to carry out his duties unless accorded certain immunities and privileges").

[4] Statement of Interest of the United States, *Gonzalez Paredes v. Vila*, No. 06-0089 (PLF), (D.D.C. 2007), docket no. 18, ("*Gonzalez* Statement of Interest"), at 4.

[5] For example, if misconduct of a serious enough nature is brought to the attention of the State Department, the State Department will request that the sending state waive immunity to allow criminal prosecution. *See* Statement of Interest of the United States, *Ahmed v. Hoque*, No. 01-7224 (DLC) (S.D.N.Y. 2002), docket no. 13, ("*Ahmed* Statement of Interest"), at 29. The State Department also may attempt to mediate a dispute. *Id.* at 30. Furthermore, it can declare a diplomat "*persona non grata*" and expel him from the United States. Vienna Convention, art. 9(1).

[6] *See Ludecke v. Watkins*, 335 U.S. 160, 173 (1948) (recognizing that the President is the nation's "guiding organ in the conduct of our foreign affairs" in whom the Constitution vests "vast powers in relation to the outside world"); *Department of the Navy v. Egan*, 484 U.S. 518, 529 (1988) (recognizing the "generally accepted view that foreign policy [is] the province and responsibility of the Executive").

This nation has a particularly strong interest in safeguarding the principle of diplomatic immunity, as no other nation has as many diplomats serving abroad, or facing such serious threats of harassment.  As the Supreme Court has recognized:

> [I]n light of the concept of reciprocity that governs much of international law in this area . . . we have a more parochial reason to protect foreign diplomats in this country.  Doing so ensures that similar protections will be accorded those that we send abroad to represent the United States, and thus serves our national interest in protecting our own citizens.

*Boos v. Barry*, 485 U.S. 312, 323-24 (1988).  *See also 767 Third Avenue Assoc. v. Permanent Mission of the Rep. of Zaire*, 988 F.2d 295 (2d Cir. 1993) (the reason to respect diplomatic immunity is not "a blind adherence to a rule of law in an international treaty, uncaring of justice at home, but that by upsetting existing treaty relationships American diplomats abroad may well be denied lawful protection of their lives and property").

Were courts to take diplomatic matters out of the hands of the Executive by allowing civil suits against diplomats any time a plaintiff pleads a constitutional or customary international law claim, plaintiffs could circumvent immunity simply by characterizing their allegations as rising to the level of constitutional or international law violations.  Thus, the exception would swallow the fundamental rule established by the Vienna Convention and the Diplomatic Relations Act – that diplomats are immune from judicial process in the host state – to the detriment of the ability of the United States and its allies to conduct foreign relations.

## II.      PLAINTIFFS CANNOT AVOID THE EFFECT OF DIPLOMATIC IMMUNITY BY PLEADING CONSTITUTIONAL OR INTERNATIONAL LAW CLAIMS

Plaintiffs argue that, because they have alleged constitutional and "*jus cogens*" claims, their allegations should somehow prevail over Defendants' diplomatic immunity.  Plaintiffs' Opposition ("Opp.") at 7-17, 31-35.  There is simply no legal basis for this argument.  The diplomatic immunity provided by Article 31 of the Vienna Convention on Diplomatic Relations

is "nearly absolute,"[7] subject to only "a small number of limited exceptions."[8]  Plaintiffs'

invitation for this Court to create new exceptions to diplomatic immunity must fail.

A.     **Plaintiffs Cannot Avoid the Effect of Defendants' Immunity by Pleading a Thirteenth Amendment Claim**

1.   A constitutional claim does not trump immunity

Plaintiffs can cite to no case in which a U.S. court has held that a constitutional claim

"trumps" the diplomatic immunity of a defendant, subjecting the defendant to judicial process

where he otherwise would be immune.  No court has ever embraced this novel theory.

In fact, the one court that has decided the exact argument advanced by Plaintiffs here –

whether a Thirteenth Amendment claim trumps a defendant's diplomatic immunity – soundly

rejected it.  In *Ahmed v. Hoque*, the Southern District of New York held that "plaintiff has cited

no authority to suggest that a constitutional claim trumps the applicability of diplomatic

immunity."  2002 WL 1964807, at *7.  The *Ahmed* court so held in the context of allegations

remarkably similar to those at bar – the alleged abuse and underpayment of a domestic worker

who invoked many of the same legal theories raised by Plaintiffs here, including a claim under

the Thirteenth Amendment.

The *Ahmed* court relied on a vast body of law confirming that a constitutional claim does

not waive, trump, or otherwise overcome the immunity from suit of a variety of defendants.  The

court cited, among other authorities:

- *F.D.I.C. v. Meyer,* 510 U.S. 471 (1994) (no waiver of the sovereign immunity of the United States for constitutional claims);

---

[7] *Tabion v. Mufti*, 73 F.3d 535, 536 (4th Cir. 1996) (holding a diplomat and his wife immune from a suit filed by their domestic employee).

[8] *Gonzalez* Statement of Interest at 5.  As discussed in § III *infra*, this case does not fall within any of those exceptions, three of which are found in Article 31 of the Convention, and the fourth and final in Article 32.

- *Tuck v. Pan American Health Org.*, 668 F.2d 547, 550 (D.C. Cir. 1981) (dismissing suit alleging multiple constitutional claims on the grounds of immunity under the International Organizations Immunity Act, with no suggestion that the constitutional nature of the those claims merited consideration in the immunity analysis);

- *Imbler v. Pachtman*, 424 U.S. 409, 410 (1976) (reaffirming prosecutorial immunity from constitutional claims);

- *Pierson v. Ray*, 386 U.S. 547, 553-54 (1967) (reaffirming judicial immunity from constitutional claims); and

- *Dexter & Carpenter, Inc. v. Kunglig Jarnvagsstyrelsen*, 43 F.2d 705, 710 (2d Cir. 1930) ("the Constitution . . . is necessarily limited by the right of [a] sovereign state to plead immunity").

*Id*.  *See also LaFontant v. Aristide*, 844 F. Supp. 128 (E.D.N.Y. 1994) (dismissing claims under the Constitution on the grounds of head-of-state immunity).

Courts have also addressed – and rejected – Plaintiffs' argument that an Act of Congress providing immunity from constitutional claims is unconstitutional.  *See, e.g.*, *Ahmed*, 2002 WL 1964806, at *6-7 (rejecting plaintiff's argument that the Diplomatic Relations Act unconstitutionally conflicted with his Thirteenth Amendment claim). A D.C. district court rebuffed this argument in *Weinstock v. Asian Development Bank*, No. 105-CV-00174, 2005 WL 1902858 (D.D.C. 2005).  The court rejected the plaintiff's argument that the defendant's immunity under the International Organizations Immunity Act of 1945 should give way in the face of alleged constitutional violations because Congress could not constitutionally grant

immunity where the defendant had denied plaintiff Due Process and his "fundamental right to access to court." *Id.* at *2-3. Judge Collyer explained:

> It is axiomatic that Congress can limit the jurisdiction of the lower federal courts. One method by which it can do so, and which it employs quite frequently, is to provide by statute that the United States, foreign sovereigns, or certain entities are immune from suit in the district courts. The codification of these immunities is not a constitutional violation.

*Id.* at *3 (internal citations omitted).

Plaintiffs' arguments appear to stem from a misunderstanding of *Marbury v. Madison*, 5 U.S. (1 Cranch) 137 (1803). Opp. at 14. That landmark case suggests only that, where a legal right is identified, a corresponding cause of action must *generally* exist to vindicate that right, 5 U.S. at 162-64; it certainly does not mandate redress for each particular plaintiff whose rights have been allegedly violated. Indeed, *Marbury* itself ultimately held that, although the plaintiff there had a right and was entitled to the remedy he sought, the Court lacked jurisdiction to decide the case. 5 U.S. at 174-180. And American law is replete with jurisdictional bars that prevent adjudication of constitutional claims in particular cases, including the array of immunities discussed above, expiration of the statute of limitations,[9] lack of standing,[10] and the political question doctrine.[11]

In the end, Plaintiffs would have this Court invalidate the Vienna Convention and the Diplomatic Relations Act as applied to constitutional claims. But the Constitution does not

---

[9] *See Daniels v. U.S.*, 532 U.S. 374, 381 (2001) ("Procedural barriers, such as statutes of limitations and rules concerning procedural default and exhaustion of remedies, operate to limit access to review on the merits of a constitutional claim"); *Yakus v. United States*, 321 U.S. 414, 444 (1944) ("No procedural principle is more familiar to this Court than that a constitutional right may be forfeited in criminal as well as civil cases by the failure to make timely assertion of the right before a tribunal having jurisdiction to determine it").

[10] *See, e.g., Allen v. Wright*, 468 U.S. 737 (1984) (dismissing for lack of standing where plaintiffs brought, *inter alia*, Fifth and Fourteenth Amendment claims).

[11] *See, e.g., Nixon v. United States*, 506 U.S. 224 (1993) (dismissing claim that a Senate Rule violated the Impeachment Trial Clause as a non-justiciable political question).

mandate this result. To the contrary, the courts have consistently upheld a number of immunities against virtually identical constitutional challenges.

### 2. There is no private right of action under the Thirteenth Amendment

Plaintiffs' argument that the constitutional nature of one of their claims trumps diplomatic immunity also fails for another reason: the Thirteenth Amendment does not create a private right of action against private actors.

Although the Thirteenth Amendment governs the conduct of both states and individuals, it does not give rise to a private cause of action against individuals. In asserting that they may bring such an action, Plaintiffs surprisingly fail to cite any of the numerous decisions holding to the contrary, including cases in this district. In *Bhagawanani v. Howard Univ.*, Judge Bates held that "[t]here is no private cause of action under the Thirteenth Amendment for . . . involuntary servitude." 355 F. Supp. 2d 294, 301 (D.D.C. 2005); *see also Holland v. Bd. of Trustees of the Univ. of the Dist. of Columbia*, 794 F. Supp. 420, 424 (D.D.C. 1992) (Revercomb, J.) ("Plaintiff's Thirteenth Amendment claim . . . must also be dismissed. The Thirteenth Amendment does not give rise to an independent cause of action . . ."). Indeed, the Northern District of California concluded:

> [I]t appears that just about every decision to consider the issue has concluded that there is no private right of action under the Thirteenth Amendment . . . Given that no decision has ever actually upheld a private right of action under the Thirteenth Amendment and many have rejected it, this order likewise will reject it.

*Doe v. Reddy*, No. C 02-5570, 2003 WL 23893010, at *10 (N.D. Cal. 2003).[12]

---

[12] *See also Del Elmer v. Metzger*, 967 F. Supp. 398, 402 (S.D. Cal. 1997) ("Plaintiff has pointed to no authority, and the court knows of none, allowing a plaintiff to proceed directly under the Thirteenth Amendment against private parties such as the defendants here."); *Doe v. Keane*, 658 F. Supp. 216, 220 (W.D. Mich. 1987) (no private right of action under the 13th Amendment); *Westray v. Porhole, Inc.*, 586 F. Supp. 834, 838-39 (D. Md. 1984) (same); *Vietnamese Fishermen's Assoc. v. Knights of the Ku Klux Klan*, 518 F. Supp. 993, 1012 (S.D. Tex. 1981) (same); *Turner v. Unification Church*, 473 F. Supp. 367, 373-74 (D.R.I. 1978), *aff'd*, 602 F.2d 458 (1st Cir. 1979) (same).

Even the two authorities that Plaintiffs do cite as recognizing a private right of action under the Thirteenth Amendment, *Terry Properties, Inc. v. Standard Oil Co.*, 799 F.2d 1523 (11th Cir. 1986), and *Channer v. Hall*, 112 F.3d 214 (5th Cir. 1997), do not stand for that proposition. *Terry Properties* merely stated that a corporate appellee "*may* also be liable directly under the Thirteenth Amendment." *Id.* at 1534 (emphasis added). It did not decide the issue, finding only that the plaintiffs there did not suffer a "badge or incidence of slavery" or anything comparable to the practices prohibited by the Thirteenth Amendment. *Id.* at 1536. In *Channer*, the court only stated that it would "assume, *arguendo*, that the Thirteenth Amendment directly gives rise to a cause of action for damages," so as to more easily dispose of the case on the ground that the conduct at issue was not involuntary servitude. 112 F.3d at 217, 219.[13] Neither case held that an individual has a private right of action under the Thirteenth Amendment against private actors. They "merely so assumed in order to reach a firmer legal ground upon which to deny a claim." *Reddy*, 2003 WL 23893010, at *9.[14]

Absent a valid constitutional claim against the Defendants, there is no need for this Court to reach Plaintiffs' argument that constitutional claims trump immunity.

---

[13] Plaintiffs appear to suggest that suits alleging compulsory labor are unique in giving rise to a private cause of action because they arise out of § 1 of the Thirteenth Amendment. Opp. at 9 n.5 (citing *Channer*). In fact, however, many of the cases declining to find a private cause of action under the Thirteenth Amendment involved allegations of compulsory labor. *See, e.g., Bhagawanani v. Howard Univ.*, 355 F. Supp. 2d 294 ; *Doe v. Reddy*, 2003 WL 23893010; *Del Elmer v. Metzger*, 967 F. Supp. 398; *Doe v. Keane*, 658 F. Supp. 216; *Turner v. Unification Church*, 473 F. Supp. 367.

[14] Additionally, while Plaintiffs cite two cases as "similar to the case at bar" where "courts have applied Thirteenth Amendment protections," Opp. at 11-12, those cases cannot bear the weight Plaintiffs place on them. *United States v. Alzanki* was a criminal case in which the court looked to the Thirteenth Amendment to inform its interpretation of the statute criminalizing involuntary servitude, 18 U.S.C. § 1584. 54 F.3d 994, 1000-09 (1st Cir. 1995). No civil claim was at issue, and there was no suggestion that a private right of action under the Thirteenth Amendment might exist. *Manlinguez v. Joseph*, 226 F. Supp. 2d 377 (E.D.N.Y. 2002), is also inapposite. The court there allowed a civil claim for involuntary servitude to proceed, but it did so under § 1584 alone, not the Thirteenth Amendment. Furthermore, in *Bhagawanani*, this Court (per Judge Bates) rejected *Manlinguez*, finding "more persuasive the reasoning of the courts that have declined to find a blanket implied cause of action for violations of the Thirteenth Amendment through section 1584." *Bhagawanani*, 355 F. Supp. 2d at 301 n.5. And, Plaintiffs do not actually cite *Manlinguez* for the proposition that a private right of action under the Thirteenth Amendment exists, but only for its purported factual similarity. Opp. at 11-12.

**B.    A Claim Based on *Jus Cogens* Does Not "Trump" Diplomatic Immunity**

Plaintiffs argue similarly that that their claims trump Defendants' diplomatic immunity because they have alleged conduct contrary to a *jus cogens* norm.  Opp. at 31-36.  As with Plaintiffs' constitutional theory, the courts that have addressed this type of argument have firmly rejected it.  Furthermore, the conflict Plaintiffs attempt to create between Defendants' immunity and other fundamental norms of international law is a false one.

1.    Plaintiffs' proposed exception to diplomatic immunity is contrary to precedent

Several courts have addressed and rejected the suggestion that a plaintiff's reliance on a *jus cogens* norm – that is, a fundamental norm of international law from which no derogation is permitted[15] – could trump the defendant's diplomatic immunity.

In *Aidi v. Yaron*, 672 F. Supp. 516, 518 (D.D.C. 1987), Judge Holloway Johnson rejected the argument that the defendant's violation of international law norms "removes the cloak of [diplomatic] immunity granted to him."  The defendant in *Aidi*, a military officer turned diplomat, was alleged to have committed war crimes of grand proportions – the massacres of civilians at the Sabra and Shatilla refugee camps in Lebanon.  *Id.* at 516-18.  Even so, the court declined to hold that such allegations overcame the defendant's diplomatic immunity.  *Id.*  The court stated that, even "[a]ssuming arguendo," that there might be principles of international law that create exceptions to immunity where such crimes were alleged, such exceptions would only apply in a criminal tribunal, not a civil case.  *Id*. at 518.  Moreover, the court expressed doubt that allegations of international law violations could ever overcome immunity, stating: "This premise in and of itself is troubling.  The Court doubts that an additional exception to diplomatic immunity would be created in such a manner."  *Id.* at 519 n.3.  As diplomatic immunity remains

---

[15] *See* Vienna Convention on the Law of Treaties, art. 53, 8 I.L.M. 679 (May 23, 1969); American Law Institute, Restatement of the Law (Third), Foreign Relations Law of the United States ("Restatement") § 702 (1987).

intact where the defendant is alleged to have massacred civilians – conduct that unquestionably violates a *jus cogens* norm[16] – then surely it does not give way here.[17]

In *Ahmed*, the Southern District of New York rejected the same argument raised by Plaintiffs here, in the context of the same international law norm at issue here – the *jus cogens* prohibition against slavery and slave trafficking. 2002 WL 1964806, at *7. Indeed, the facts alleged in *Ahmed* as rising to the level of slavery or slave trafficking are essentially the same allegations made here: the underpayment and mistreatment of a domestic worker. *Id.* at *1. The court held, however, that "[n]either the [Alien Tort Claims Act] nor international human rights law abrogates properly asserted diplomatic immunity" and therefore declined to reach the question whether the plaintiff's allegations constituted slavery. *Id.* at *8. Likewise, the Second Circuit relied primarily on the defendants' diplomatic immunity in affirming the dismissal of claims against Robert Mugabe and another Zimbabwean official in spite of the plaintiffs' allegations that they had violated the fundamental *jus cogens* prohibitions against murder and torture. *Tachiona v. United States*, 386 F.3d 205, 209, 215-220 (2d Cir. 2002).[18]

Even when dealing with other immunities established by international and domestic law, courts have similarly refused to find a waiver of or exception to immunity based on the *jus cogens* nature of the plaintiffs' claims. For example, in *Ye v. Zemin*, 383 F.3d 620 (7th Cir.

---

[16] *See* Restatement, comment on § 702 ¶ n (identifying "murder" as a *jus cogens* violation); *United States v. Matta-Ballesteros*, 71 F.3d 754, 764 at n.5 (9th Cir. 1995) (same); *Siderman de Blake v. Republic of Argentina*, 965 F.2d 699, 715 (9th Cir. 1992) (same).

[17] Plaintiffs attempt to distinguish *Aidi* by stating that the plaintiffs in that case "did not argue that their claims rose to the level of *jus cogens* violations." Opp. at 35-36 n.27. This argument, however, ignores substance in favor of labels. The term *jus cogens* should not become an alchemic label that plaintiffs can invoke to lift their claims above others where equally or even more serious violations of fundamental norms of international law are alleged.

[18] *See also Doe v. Qi*, 349 F. Supp. 2d 1258, 1280 n.11 (N.D. Cal. 2004) (suggesting, while entering default judgments against certain Chinese officials who had engaged in grave human rights violations, that a different result would have been reached if the defendants had diplomatic immunity).

11

1994), *cert denied*, 544 U.S. 975 (2005), the Seventh Circuit dismissed the plaintiffs' claims of torture, genocide, arbitrary arrest and imprisonment on the ground of head-of-state immunity, despite its recognition that those claims rose to the level of *jus cogens* violations.  Numerous courts, including this Circuit, have rejected a similar argument in the context of foreign sovereign immunity, refusing to read into the Foreign Sovereign Immunities Act an implied waiver or exception based on the *jus cogens* nature of the plaintiffs' claims.  *See, e.g., Princz v. Federal Republic of Germany*, 26 F.3d 1166, 1173-74 (D.C. Cir. 1994).

Thus, not only do Plaintiffs lack support for their novel interpretation of diplomatic immunity, their argument actually flies in the face of significant precedent.

2.    There is no conflict between diplomatic immunity and *jus cogens* here that would require the abrogation of one fundamental norm in favor of another

Plaintiffs argue that there is a direct conflict in this case between diplomatic immunity and other fundamental norms of international law – specifically, the prohibitions against slavery and slave trafficking – that must be resolved in favor of those norms and to the detriment of diplomatic immunity.  Opp. at 31-33.  This is a false conflict.

First, there is no conflict between the Convention and the prohibition of slavery because "[n]othing in . . .  the Vienna Convention authorizes involuntary servitude."  *Ahmed* Statement of Interest at 23.  While a true conflict would be presented by a treaty that allowed the citizens of the nations involved to enslave or trade in persons, and that treaty would consequently be void *ab inicio*, no such conflict is present here.[19]  This absence of conflict is unsurprising, as diplomatic immunity has itself long been a norm of customary international law, and is a core part of the canon.  *Ahmed* Statement at 24.

---

[19] *See United States v. Yousef*, 327 F.3d 56 (2d Cir. 2003), *cert denied*, 540 U.S. 933 (2003) (noting that norms of customary international law can only vitiate a treaty where the treaty directly violates a *jus cogens* norm, and stating "[a] treaty between two nations to engage in the slave trade, for example, would be void").

Moreover, there is no conflict in this case because Plaintiffs have not alleged conduct that rises to the level of "slavery" or "slave trade" as defined by international law. While Plaintiffs argue that slavery is prohibited by international law (Opp. at 31-32) – a proposition that Defendants do not contest – they fail to actually define "slavery" or "slave trade" under international law or explain why their allegations rise to the level of slavery or slave trafficking. The accepted definition remains that set out in the 1926 Slavery Convention.[20] That convention defines slavery as "the status or condition of a person over whom any or all of the powers attaching to the right of ownership are exercised." Plaintiffs notably neglect to mention this definition or how Defendants' alleged conduct might satisfy it.

* * *

Plaintiffs suggest that certain allegations are simply too egregious to be barred by diplomatic immunity. This view may have the initial appeal of allowing justice to be pursued in particular cases. If adopted, however, it would represent an extraordinary departure from the established treatment of diplomatic immunity by U.S. courts and from the intentions of the 179 state parties to the Vienna Convention. It would invite litigation against diplomats in the countries where they are serving, obstructing their efforts to perform their diplomatic duties and disturbing "harmony and comity in the international community." *Begum* Statement of Interest at § III. It would substitute civil actions for the method chosen by the political branches for managing allegations of misconduct by diplomats – namely, diplomacy. The Court should therefore reject Plaintiffs' novel arguments and reaffirm the fundamental principle of diplomatic immunity.

---

[20] *See* Jean Allain, *The Definition of 'Slavery' in General International Law and the Crime of Enslavement within the Rome Statute*, Guest Lecture Series of the Office of the Prosecutor, ICC, The Hague, April 26, 2007; *see also* M. Cherif Bassiouni, *Enslavement as an International Crime*, 23 N.Y.U. J. Int'l L. & Pol. 445, 467-68 (1991) (noting limitations of the definition but also that subsequent instruments have reasserted its validity).

III.   **NO EXCEPTION TO IMMUNITY APPLIES BECAUSE THIS ACTION DOES NOT "RELAT[E] TO ANY PROFESSIONAL OR COMMERCIAL ACTIVITY" BY THE DEFENDANTS OUTSIDE THEIR "OFFICIAL FUNCTIONS"**

Among the four limited exceptions to diplomatic immunity that are recognized in the Vienna Convention, Plaintiffs only claim that one applies in this case – they assert that this is a civil action relating to a "professional or commercial activity exercised by the diplomatic agent in the receiving State outside his official functions." Vienna Convention, art. 31.1(c); Opp. at 18-31. This assertion depends on the creative notion that a claim that a diplomat underpaid his household employees somehow relates to a "professional or commercial activity" by the diplomat "outside his official functions."

### A.  Hiring Domestic Employees Is Not "Professional or Commercial Activity"

Plaintiffs do not write on a blank slate. Other household employees of diplomats have sued their employers, arguing that actions concerning their employment fall within the exception to diplomatic immunity for "professional or commercial activity." The courts have rejected this argument.

The Fourth Circuit's decision in *Tabion v. Mufti*, 73 F.3d 535, 539 (4th Cir. 1996), is directly on point. A household employee of a diplomat sued the diplomat, alleging labor violations, breach of contract, false imprisonment, intentional misrepresentations, and racial discrimination. *Id.* at 536. The Eastern District of Virginia dismissed the suit and quashed service on the ground of diplomatic immunity, and the Fourth Circuit affirmed. The Court of Appeals reasoned:

> When examined in context, the term "commercial activity" [as used in Article 31.1 of the Vienna Convention] does not have so broad a meaning as to include occasional service contracts as [plaintiff] contends, but rather relates only to trade or business activity engaged in for personal profit. Accepting the broader meaning fails to take into account the treaty's background and negotiating history, as well as its subsequent interpretation. It also

14

> *ignores the relevance of the remainder of the phrase – "outside his*
> *official functions."*

*Id.* at 537.  The Fourth Circuit concluded, accordingly, that no exception applied and "diplomats are to be immune from disputes arising out of" their employment of domestic employees.  *Id.* at 538-39.  Such services are "incidental to daily life" and not outside a diplomat's official functions.  *Id.* at 539.

This Court (per Judge Friedman) recently followed *Tabion* in *Gonzalez*, holding a diplomat and his wife immune from a similar suit by a domestic employee.  The Court found that "a contract for domestic services such as the one at issue in this case is not itself a 'commercial activity.'"  *Gonzalez*, 479 F. Supp. 2d at 193.

Plaintiffs seek to distinguish *Tabion*, arguing that underpayment of household employees is a "trade or business activity engaged in for personal profit."  Judge Friedman expressly rejected this argument in *Gonzalez*, calling it "unpersuasive."  *Gonzalez*, 479 F. Supp. 2d at 193 n.7.

Plaintiffs also claim that there are material differences in the allegations at issue in *Tabion*, *Gonzalez*, and the present case.  A review of the cases proves this claim to be incorrect:

- In *Tabion*, the plaintiff was a national of the Philippines who had worked for the defendant diplomats in Jordan before accompanying them to the United States.  *Tabion v. Mufti*, 877 F. Supp. 286, 286 (E.D. Va. 1995), *aff'd*, 73 F.3d 535 (4th Cir. 1996).  The plaintiff there claimed that her decision to travel to the United States was made in reliance on promises by the defendants that she would be paid "the minimum wage plus overtime, as well as a reasonable work schedule in a comfortable environment."  *Id.*  She alleged that, while working for the defendants in Virginia, she was required to work "16 hour days at approximately $0.50 per hour, with no increased pay for overtime.  In

15

addition, [she] claims the [defendants] confiscated her passport and threatened her with dismissal, deportation, and arrest if she attempted to leave their household." *Id.*

- In *Gonzalez*, the plaintiff alleged that an Argentine diplomat and his wife hired her in Argentina to perform housework and child care for them. *Gonzalez*, 479 F. Supp. 2d at 189. The plaintiff there further alleged that she signed an employment contract, which the defendants never intended to honor, for the purposes of obtaining an A-3 visa that would allow her to travel to the United States with the defendants and continue to work for them in Washington, D.C. *Id.* at 190. The plaintiff claimed that, once in the United States, she was severely overworked and underpaid and did not received the health insurance promised to her. *Id.*; *Gonzalez Paredes v. Vila*, No. 06-0089, Complaint, docket no. 1, ¶ 27.

- Plaintiffs here make very similar allegations. They allege that they worked in Defendants' home in Kuwait prior to accompanying them to the United States. Opp. at 1. They also allege that Defendants sought A-3 visas for all three Plaintiffs based on employment contracts. *Id.* at 3-4. Further, Plaintiffs allege that upon their arrival at the Defendants' home in the United States, the Defendants confiscated their travel documents, required them to work long hours, and subjected them to abuse. *Id.* at 4-5.

Given these factual similarities, *Tabion* and *Gonzalez* govern here. As was held in those cases, Plaintiffs' allegations simply do not relate to any "professional or commercial activity" by the Defendants. It matters not that Plaintiffs here opt to characterize their allegations as "trafficking" when the actual allegations are so similar to those held insufficient before.

Finally, Plaintiffs argue that *Tabion* (and, implicitly, *Gonzalez*) should be disregarded as "wrongly decided." Opp. at 26-29. Their argument is that *Tabion* improperly distinguishes

between one diplomat who opens a factory and underpays the workers there and another diplomat who underpays domestic employees. Opp. at 28. This argument misses the essential point of the exception for cases relating to "professional or commercial activity" – the one diplomat is engaged in a trade or business "outside his official function," while the other simply is not. This critical distinction is supported by the text and negotiating history of the Vienna Convention, and has been endorsed by the State Department.

Article 42 of the Convention provides: "A diplomatic agent shall not in the receiving State practise for personal profit any professional or commercial activity." This language clearly does not prohibit diplomats from hiring domestic employees. In fact, "private servants" of diplomats are themselves expressly included in the Convention. *See, e.g.*, art. 37.4 (affording "private servants" certain immunities). Reading the phrase "professional or commercial activity" to have a consistent meaning in Articles 31.1 and Article 42, it follows that hiring domestic employees falls outside the exception from diplomatic immunity in Article 31.1.

The negotiating history of the Vienna Convention supports this same conclusion. Negotiators "saw the exception contained in Article 31(1)(c) and the ban on commercial activity contained in Article 42 as closely intertwined." Statement of Interest of the United States in *Tabion Mufti*, No. 94-1481, docket no. 18, ("*Tabion* Statement of Interest"), at 11 (citing *United Nations Conference on Diplomatic Intercourse and Immunities: Official Records*, Vol. I at 19-21 (1962)). The Special Rapporteur described the exception in terms of "activity that was *inconsistent* with diplomatic status." *Gonzalez* Statement of Interest at 10 (discussing *Diplomatic Intercourse and Immunities: Summary of Observations Received from Governments and Conclusions of the Special Rapporteur*, U.N. Doc.A/CN.4/116). The Rapporteur further stated in the next session that the exception "applied to cases where a diplomatic agent

17

conducted a regular course of business 'on the side.'" *Id.* (quoting *Summary Records of the 476th Meeting*, [1958] 1 Y.B. Int'l L. Comm'n 244, U.N. Doc. A/CN.4/SER.A/1958). Hiring a household employee does not involve "a regular course of business on the side" and (as mentioned above) is clearly not "inconsistent with diplomatic status" when such employees are affirmatively contemplated by the Vienna Convention.

Finally, the Department of State endorses the conclusion that "'commercial activity' as used in Article 31(1)(c) focuses on the pursuit of trade or business activity . . . ." *Tabion* Statement of Interest at 4. It does not include the employment of a domestic worker by a diplomat. *Gonzalez* Statement of Interest at 2.

*Tabion* and *Gonzalez* are correctly decided. They establish a bright line test between cases relating to a trade or business "on the side," which are subject to an exception from diplomatic immunity, and cases relating to activities ordinarily incident to the daily life of a diplomat, which are clearly immune. And they make clear that suits relating to the employment of domestic workers fall on the immune side of this line.

**B. The "Professional or Commercial Activity" Exception to Diplomatic Immunity Uses Different Language and Serves a Different Purpose than Do Exceptions to Foreign Sovereign Immunity and Consular Immunity**

Finally, Plaintiffs urge that the Court base its interpretation of the "professional or commercial activity" exception to diplomatic immunity on precedent from two separate sources of law, the Vienna Convention on Consular Relations ("VCCR") and the Foreign Sovereign Immunities Act ("FSIA"). Opp. at 29-31. They make this argument despite the different language used in the various legal instruments, despite the different purposes of the various immunity regimes, and even despite their own admission that the FSIA involves "a wholly different immunity regime" than the Vienna Convention. Opp. at 36 n.27.

The VCCR provides for a much more limited immunity for consular officers than the "nearly absolute" immunity provided for diplomats.  Article 31.1 of the Vienna Convention provides that diplomats "enjoy immunity from its civil and administrative jurisdiction, except in the case of [three limited exceptions]."  By contrast, Article 43.1 of the VCCR only shields consular officers from "the jurisdiction of the judicial or administrative authorities of the receiving State *in respect of acts performed in the exercise of consular functions*."  VCCR, art. 43(1) (emphasis added).

Plaintiffs cite to *Park v. Shin*, 313 F.3d 1138 (9th Cir. 2002), for the proposition that consular officials are not immune from suit from their domestic employees and to encourage the Court to construe the Vienna Convention in light of this decision.  Opp. at 30.  *Park* holds that the defendants there were not entitled to *consular* immunity.  Critically, the *Park* court distinguished *diplomatic* immunity.  It noted that *Tabion* did not support the defendant's claim of consular immunity "because it dealt with the Vienna Convention on Diplomatic Relations, a treaty providing almost complete immunity to diplomats."  *Id.* at 1142 n.1.  Far from Plaintiff's effort to construe diplomatic immunity to be as limited as consular immunity, then, *Park* actually stresses that the two immunities each have their own separate scope.  *See also Tachiona*, 186 F. Supp. 2d 383, 391 (S.D.N.Y. 2002) ("differences exist in the scope of privileges and immunities enjoyed by accredited envoys under the Vienna Convention and those accorded to consular officers under the Vienna Convention on Consular Relations") (citations omitted).

Plaintiffs' analogy to the FSIA's "commercial activity" exception for governments is also inapt.  In light of the active participation of governments and government-owned businesses in the global marketplace, the enactment of the FSIA was mainly motivated by Congress' desire to codify an exception to governmental immunity for such commercial conduct.  *See, e.g.,*

*Lafontant v. Aristide*, 844 F. Supp. 128, 137 (E.D.N.Y. 1994) (the FSIA "was crafted primarily to allow state-owned companies . . . to be sued in United States courts in connection with their commercial activities").  The FSIA defines the phrase "commercial activity" to mean "either a regular course of commercial conduct or a particular commercial transaction or act.  The commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose."  28 U.S.C. 1603(d).  This FSIA provision is quite different from the "professional and commercial activity" exception to diplomatic immunity in the Vienna Convention.  The differences reflect the facts that governments are free to engage in commercial activity and regularly do so, while diplomats are barred from "professional and commercial activity" outside the scope of their official conduct and rarely engage in such activity.  The differences also reflect the fact that all states share an interest in protecting their diplomats from individual harassment in the courts of host countries, and that such protection serves to "ensure the efficient performance of the functions of diplomatic missions."  Vienna Convention, Preamble.

Both *Tabion* and *Gonzalez* properly reject the application of case law interpreting the FSIA to the interpretation of the Vienna Convention.  As each court noted, the Vienna Convention was a multilateral treaty negotiated and enacted between many nations as opposed to a U.S. domestic statute; it was implemented long before the FSIA, and hence the drafters could not have drawn on the FSIA; and the FSIA was enacted subject to existing treaties, which would include the Vienna Convention.  *Tabion*, 73 F.3d at 539 n.7; *Gonzalez*, 479 F. Supp. 2d at 193 n.5.

Plaintiffs would have the Court believe that it is absurd to construe the Vienna Convention differently than the VCCR and the FSIA.  In fact, however, this disparate

construction flows necessarily from the plain text of the three legal instruments. That certain individuals enjoy immunity from the jurisdiction of U.S. courts while others do not represents a policy choice made by the political branches, not an illogical gap.

## IV.    PLAINTIFFS MISCONSTRUE THE "SUBSEQUENT IN TIME" RULE

Plaintiffs' argument that their claims under the Trafficking Victim's Protection Act ("TVPA") prevail over Defendants' diplomatic immunity under the "subsequent in time" rule is without merit, as Plaintiffs have seriously misconstrued this rule. Opp. at 36-38.

The nub of Plaintiffs' argument is that there can be no diplomatic immunity for any cause of action created after the Vienna Convention. That view is obviously incorrect. Over time, it would reduce the Vienna Convention – and the Diplomatic Relations Act of 1978 – to a mere nullity, frustrating the expectations of the United States and the 178 other states party to the Convention.

Unsurprisingly, the case law does not necessitate this result. The "subsequent in time" or "last in time" rule is only applicable when there is a direct and unambiguous conflict between a statute and treaty. As the Supreme Court explained in *Whitney v. Robertson*, which is the seminal case on this issue and on which Plaintiffs rely:

> When the two [treaty and statute] <u>relate to the same subject</u>, the courts will always endeavor to construe them so as to give effect to both, if that can be done without violating the language of either; but, if the two are inconsistent, the one last in date will control the other.

124 U.S. 190 (1888) (emphasis added). *See also Kappus v. C.I.R.*, 337 F.3d 1053, 1056 (D.C. Cir. 2003) (where a treaty and statute "relate to the same subject," the last in time prevails) (citing *Whitney*).[21]  The other cases cited by Plaintiffs do not suggest otherwise.[22]

---

[21] Courts have since cautioned against the too-frequent invocation of this rule. *See, e.g., Blanco v. U.S.*, 775 F.2d 53, 61 (2d Cir. 1985) ("Frequent invocations of the [rule] that a later treaty supersedes an earlier federal statute and *vice versa* neglect the Supreme Court's instruction in *Whitney* that courts should endeavor to construe the two so as

Here, the treaty and the statute clearly do not "relate to the same subject." One deals with diplomatic immunity and the other with civil claims for trafficking, and there is no reference in the text of either to the topic addressed by the other document. Thus, there is no conflict to be resolved under the rule of *Whitney*.

Even where a statute and a treaty do address the same subject, the "subsequent in time" rule applies only where Congress has explicitly and unambiguously used subsequent legislation to repeal, replace, or reform a treaty. *See Cook v. U.S.*, 288 U.S. 102, 120 (1933) ("A treaty will not be deemed to have been abrogated or modified by a later statute, unless such purpose on the part of Congress has been clearly expressed."); *Federal-Mogul Corp. v. U.S.*, 63 F.3d 1572, 1581 (Fed. Cir. 1995) (holding that GATT prevailed over subsequent legislation because "absent express Congressional language to the contrary, statutes should not be interpreted to conflict with international obligations").

Here, there is absolutely no evidence – let alone explicit, unambiguous, textual evidence – that Congress sought, in enacting the Torture Victims Protection Act, to repeal, replace, or reform any part of the Vienna Convention on Diplomatic Relations.[23] Thus, Plaintiffs' subsequent in time argument must also be rejected, and Defendants' immunity upheld.

---

to give effect to both - an instruction that incorporates the 'cardinal principle of statutory construction that repeals by implication are not favored'") (citing *United States v. United Continental Tuna Corp.*, 425 U.S. 164, 168 (1976)).

[22] All note that the rule applies only "to the extent" there is actually a conflict. *See Reid v. Covert*, 354 U.S. 1, 18 (1957) (citing to *Whitney* to define the scope of the rule); *Breard v. Greene*, 523 U.S. 371, 376 (1998); *Guaylupo-Moya v. Gonzale*s, 423 F.3d 121, 136 (2d Cir. 2005); *Bell v. Office of Personnel Mgmt.*, 169 F.3d 1383, 1386 (Fed. Cir. 1999).

[23] The cases cited by Plaintiffs where a statute was held to conflict with and supersede a treaty are easily distinguishable when the rule is accurately presented. For example, in *Bell v. Office of Personnel Mgmt.*, 169 F.3d 1383, 1386 (Fed. Cir. 1999), the court noted that the "Panama Canal Act" was plainly in intentional conflict with the earlier "Panama Canal Treaty." As obvious from their titles, there was no question that the two texts addressed the same topic. In *Breard v. Greene*, 523 U.S. 371 (1998), the plaintiff claimed as the basis for his habeas petition that the VCCR conferred a right to consular assistance following his arrest. The court stated that, even if the VCCR did confer such a right, it was subject to the subsequently enacted Antiterrorism and Effective Death Penalty Act ("AEDPA"), which expressly governs the circumstances under which a habeas petitioner can make a claim based

## CONCLUSION

For all the reasons stated above and in their opening brief, Defendants respectfully request that this Court grant their Motion to Dismiss and Quash Service of Process on the basis of Defendants' diplomatic immunity.

Respectfully submitted,

_____/s/_ Thomas B. Wilner_____

Thomas B. Wilner (D.C. Bar # 173807)
Perry S. Bechky (D.C. Bar # 442632)
Amanda E. Shafer (D.C. Bar # 497860)
Justin Harrison (D.C. Bar # 502069)
Shearman & Sterling LLP
801 Pennsylvania Avenue, N.W., Suite 900
Washington, D.C. 20004-2634
Telephone:  (202) 508-8000
Facsimile:  (202) 508-8001

*Attorneys for Defendants*
*Waleed KH N. S. Al-Saleh and*
*Maysaa KH A. O. A. Al-Omar*

Dated: June 22, 2007

---

upon a treaty.  Thus, unlike the TVPA, the AEDPA explicitly addressed the applicability of treaties in the circumstances presented by the case.

## Certificate of Service

I HEREBY CERTIFY that on this 22nd day of June, 2007, I have caused to be served, via U.S. Mail, a copy of the forgoing Reply in Support of Defendants' Motion to Dismiss and to Quash Service of Process, on the following:


Claudia Flores
ACLU WOMEN'S RIGHTS PROJECT
125 Broad Street
18th Floor
New York, NY 10004

David A. Kotler
DECHERT LLP
P.O. Box 5218
Princeton Pike Corporate Center
Princeton, NJ 08543

Lenora M. Lapidus
ACLU WOMEN'S RIGHTS PROJECT
125 Broad Street
18th Floor
New York, NY 10004

Steven M. Watt
ACLU FOUNDATION
125 Broad Street
17th Floor
New York, NY 10004

Reid K. Weisbord
DECHERT LLP
2929 Arch Street
Philadelphia, PA 19104


           /s/ Thomas B. Wilner
          Thomas B. Wilner (D.C. Bar # 173807)
          801 Pennsylvania Avenue, N.W., Suite 900
          Washington, D.C. 20004-2634
          Telephone:  (202) 508-8000
          Facsimile:  (202) 508-8001