# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

|  |  |  |
|---|---|---|
| **MANI KUMARI SABBITHI, JOAQUINA QUADROS, and GILA SIXTINA FERNANDES,** | ) ) ) | |
| **Plaintiffs,** | ) ) | **Case No.: 07-CV-00115-EGS** |
| **v.** | ) ) | |
| **MAJOR WALEED KH N. S. AL SALEH, MAYSAA KH A. O. A. AL OMAR, and STATE OF KUWAIT,** | ) ) ) ) | |
| **Defendants.** | ) ) | |

_____)

## <u>MOTION OF BREAK THE CHAIN CAMPAIGN, CASA OF MARYLAND, INC., ASIAN AMERICAN LEGAL DEFENSE AND EDUCATION FUND, GLOBAL RIGHTS, AND BOAT PEOPLE SOS, INC., _AMICI CURIAE_, FOR LEAVE TO FILE A MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS AND QUASH SERVICE OF PROCESS</u>

Break The Chain Campaign, CASA of Maryland, Inc., Asian American Legal Defense and Education Fund, Global Rights, and Boat People SOS, Inc. respectfully move, pursuant to LCvR 7, for leave to file as _amici curiae_ the attached memorandum of law in support of plaintiffs' memorandum of points and authorities in opposition to defendants' motion to dismiss and to quash service of process.  _Amici curiae_ are organizations that represent the interests of domestic workers in the United States on special visas.

Break the Chain Campaign ("BTCC"), a project of the Institute of Policy Studies, works with domestic workers who are victims of trafficking in persons and/or labor exploitation in the Washington, D.C. area.  BTCC has worked with exploited and abused domestic workers since

1997.  BTCC provides direct legal and support services to abused workers, assists on cases nationally, and advocates for policy reform regarding human trafficking and labor exploitation. Over the years, numerous domestic workers exploited by diplomats have sought assistance at BTCC.

CASA of Maryland, Inc. ("CASA") has worked for more than twenty years to advance the rights of low-wage workers, especially immigrant workers.  CASA attorneys have represented sixteen women who served as domestic workers for diplomats in the Washington D.C. metropolitan area, including four cases where the diplomats had engaged in human trafficking. CASA has also represented more than a hundred domestic workers in cases not hindered by the barrier of diplomatic immunity.  CASA has negotiated on behalf of the domestic employees of diplomats, engaged the workers in public advocacy, and worked with the U.S. Department of State and foreign embassies in Washington, D.C. to improve the treatment of domestic workers.

Founded in 1974, the Asian American Legal Defense and Education Fund ("AALDEF") is a national organization that protects and promotes the civil rights of Asian Americans by combining litigation, advocacy, education, and organizing.  AALDEF focuses on critical issues affecting Asian Americans, including the abolition of human trafficking, as well as immigrant rights, civic participation and voting rights, economic justice for workers, language access to services, Census policy, affirmative action, youth rights and educational equity, and the elimination of anti-Asian violence and police misconduct.  AALDEF finds it essential to protect the rights of trafficked persons and has provided direct legal assistance to trafficking survivors, including domestic workers who have been exploited and abused by diplomats.

Global Rights is a Washington, D.C.-based human rights advocacy group with offices and programs around the world.  Its programs on human trafficking and racial discrimination in the United States have engaged in advocacy for many years to combat the trafficking and abuse of migrants, especially domestic workers.  Global Rights has been deeply involved in advocacy in the United States and abroad for legislative and policy responses that recognize and address the tremendous human rights violations suffered by immigrants such as domestic workers.  One particular focus of its racial discrimination program has been the immunity of diplomats in the United States who exploit and abuse their domestic workers.

Boat People SOS, Inc. ("BPSOS") is a non-profit, community-based organization serving underprivileged, low-income immigrants and refugees and provides comprehensive legal and case management services to victims of human trafficking.  Over the past several years, BPSOS has served hundreds of victims of human trafficking, dozens of whom were held in involuntary servitude by members of the diplomatic community.

*Amici*'s mission in serving domestic workers is seriously threatened by the possibility that an erroneous application of diplomatic immunity would bar suits against diplomats for abuses similar to the facts of this case.  *Amici* advocate for the rights of domestic workers admitted to the United States on special visas.  If these workers are unable to seek justice against their employers in U.S. courts, *amici*'s mission would be severely hampered.

Like the plaintiffs, *amici* believe that the commercial exception to diplomatic immunity under the Vienna Convention on Diplomatic Relations should apply to these circumstances. They submit this brief not to repeat plaintiffs' arguments, but to provide the Court with more context on the mechanisms and profitability of human trafficking and to emphasize the

- 3 -

potentially devastating effects of applying diplomatic immunity in cases where domestic workers trafficked into the United States seek to obtain justice.

Plaintiffs consent to the filing of a memorandum by *amici*. Defendants Major Waleed KH N.S. Al Saleh and Maysaa KH A. O. A. Al Omar do not consent. A proposed order granting *amici* leave to file is attached.

Date: June 29, 2007

Respectfully submitted,

Kimberly A. Parker (DC Bar No. 462495)
Katherine A. Gillespie (DC Bar No. 480013)
Therese Lee*

WILMER CUTLER PICKERING
    HALE AND DORR LLP
1875 Pennsylvania Avenue, N.W.
Washington, D.C. 20006
Tel: (202) 663-6000
Fax: (202) 663-6363

*Attorneys for Amici Curiae*
*Not admitted in the District of Columbia

- 4 -

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

_____
                                                    )
**MANI KUMARI SABBITHI, JOAQUINA**    )
**QUADROS, and GILA SIXTINA FERNANDES,**)
                                                    )
                 **Plaintiffs,**                    )          **Case No.: 07-CV-00115-EGS**
                                                    )
            **v.**                                  )
                                                    )
**MAJOR WALEED KH N. S. AL SALEH,**     )
**MAYSAA KH A. O. A. AL OMAR, and**     )
**STATE OF KUWAIT,**                    )
                                                    )
                 **Defendants.**                    )
_____)

## MEMORANDUM OF LAW OF
## BREAK THE CHAIN CAMPAIGN, CASA OF MARYLAND, INC.,
## ASIAN AMERICAN LEGAL DEFENSE AND EDUCATION FUND,
## GLOBAL RIGHTS, AND BOAT PEOPLE SOS, INC., *AMICI CURIAE*,
## IN SUPPORT OF
## PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES
## IN OPPOSITION TO DEFENDANTS MAJOR WALEED KH N. S. AL SALEH AND
## MAYSAA KH A. O. A. AL OMAR'S
## MOTION TO DISMISS AND QUASH SERVICE OF PROCESS

Kimberly A. Parker (DC Bar No. 462495)
Katherine A. Gillespie (DC Bar No. 480013)
Therese Lee*
WILMER CUTLER PICKERING
   HALE AND DORR LLP
1875 Pennsylvania Avenue, N.W.
Washington, D.C.  20006
Tel: (202) 663-6000
Fax: (202) 663-6363

*Attorneys for Amici Curiae*
*Not admitted in the District of Columbia

June 29, 2007

# TABLE OF CONTENTS

INTEREST OF *AMICI CURIAE* ................................................................................. 1

SUMMARY OF ARGUMENT ................................................................................... 1

FACTUAL BACKGROUND ....................................................................................... 3

I.     INTRODUCTION ............................................................................................... 3

II.    HUMAN TRAFFICKING IS A WIDESPREAD AND WELL-DOCUMENTED
PHENOMENON IN THE UNITED STATES AND ABROAD ................................... 5

ARGUMENT ............................................................................................................ 8

I.     DIPLOMATS WHO ENGAGE IN HUMAN TRAFFICKING CANNOT CLAIM
DIPLOMATIC IMMUNITY, BECAUSE HUMAN TRAFFICKING IS A
PROFITABLE AND COMMERCIAL ENTERPRISE ........................................... 8

    A.    Congress' Broad Definition of Trafficking Encompasses the Defendants'
Conduct In This Case ............................................................................10

    B.    The Defendants' Acts Constitute Human Trafficking ...........................12

    C.    The Commercial Activity Exception Applies to the Conduct of Defendants
in This Case, Because Trafficking Was Profitable for Defendants, Was
Not Part of Defendants' Official Duties, and Was Not Incidental to
Defendants' Daily Lives .......................................................................14

II.    TO THE EXTENT *TABION* AND *GONZALEZ* ARE APPLICABLE, IT IS
UNCLEAR WHETHER THE EXCEPTION IN ARTICLE 31(1) IS AS NARROW
AS THE STATE DEPARTMENT ARGUES ..................................................... 17

CONCLUSION ..................................................................................................... 23

# TABLE OF AUTHORITIES

## CASES

**Page**

*Cal. Dental Ass'n v. FTC*, 526 U.S. 756 (1999) .......................................................16

*Coplin v. United States*, 6 Cl. Ct. 115 (Cl. Ct. 1984)................................................22

*The Civil Rights Cases*, 109 U.S. 3 (1883) ...............................................................3

*Fonseca v. Larren*, Boletim do Ministério da Justiça, Portugal (1991).........................21

*Gonzalez Paredes v. Vila*, 479 F. Supp. 2d 187 (D.D.C. 2007)............................ *passim*

*Iceland S.S. Co.-Eimskip v. U.S. Dep't of Army*, 201 F.3d 451 (D.C. Cir. 2000).........................22

*Jeremiah v. Richardson*, 148 F.2d 17 (1st Cir. 1998)..................................................15

*Oktibbeha County Sch. Dist. v. Coregis Ins. Co.*, 173 F. Supp. 2d 541
  (N.D. Miss. 2001) ....................................................................................15

*Princeton Univ. Press v. Mich. Doc. Serv.*, 99 F.3d 1381 (6th Cir. 1996) ....................................15

*S. New England Tel. Co. v. Dept. of Pub. Util. Control*, 874 A.2d 776 (Conn. 2005) .................15

*Tabion v. Mufti*, 73 F.3d 535 (4th Cir. 1996)....................................................... *passim*

*United States v. Evans*, 476 F.3d 1176 (11th Cir. 2007) ..........................................1, 9

*United States v. Veksler*, 862 F. Supp. 1337 (E.D. Pa. 1994).......................................15

## STATUTES

Trafficking Victims Protection Act, 22 U.S.C. § 7101 et seq. (2000).................................. *passim*

## MISCELLANEOUS

Stefanie Balogh, *Action Needed on Slave Trade: Foreign Worker Rules Attacked*, Herald
  Sun (Austl.), June 14, 2004..............................................................................7

David Batstone, Not for Sale: The Return of the Global Slave Trade—And How We Can
  Fight It (2007) .....................................................................................6, 14

President George W. Bush, Address to the U.N. Gen. Assembly (Sept. 23, 2003)....................1, 6

Centre pour l'égalité des chances et la lutte contre le racisme, *Plaidoyer Pour Une Approche Integree*, Belgium (2003) ................................................................22

Complaint, *Sabbithi v. Al* Saleh, No. 07-CV-00115-EGS (D.D.C. filed Jan. 18, 2007)..................................................................... *passim*

Defendants' Motion to Dismiss, *Sabbithi v. Al Saleh*, No. 07-CV-00115-EGS (D.D.C. filed Jan. 18, 2007)........................................................................9

Jamie Etheridge, *Gulf Region's Newest Pipeline: Human Trafficking*, The Christian Science Monitor, July 19, 2005 ..............................................................7

Daan Everts, *Human Trafficking: The Ruthless Trade in Human Misery*, 10 Brown J. World Aff. 149 (2003) ...........................................................................6

Federal Bureau of Investigation, *Human Trafficking: An Intelligence Report* (June 12, 2006)....14

*Global Trends in Trafficking and the "Trafficking in Persons Report": Hearing Before the Subcomm. On Int'l Terrorism, Nonproliferation and Human Rights of the H. Comm. on Int'l Relations*, 108th Cong. 61 (2003).............................................9, 10, 15

Inst. of Social Sciences, Nat'l Human Rights Comm. & UNIFEM, *A Report on Trafficking in Women and Children in India 2002-2003*....................................17

Colbert I. King, *The Slaves in Our Midst*, Wash. Post, Dec. 23, 2006...........................................2

Ernesto Londono, *Ex-Worker Sues Envoy of Tanzania*, Wash. Post, May 2, 2007.......................2

Matt Kelley, *Some Embassy Workers Enslave Domestic Help, Enjoy Immunity*, The New Standard, June 28, 2005 ..................................................................2

Alan B. Nichols, *The Washington Diplomat*, March 2007 ............................................................20

Sec'y of State Condoleezza Rice, Remarks at the Release of the Seventh Annual Trafficking in Persons Report (June 12, 2007)....................................................8

Jennifer Robison, *Employers Better Beware*, Las Vegas Review-Journal, May 13, 2007.............7

Statement of Sen. Paul Wellstone, 146 Cong. Rec. S10164-02 (daily ed. Oct. 11, 2000) ...........11

Statement of Sen. Sam Brownback, 146 Cong. Rec. S10166 (daily ed. Oct. 11, 2000) ................5

Lena Sun, *"Modern-Day Slavery" Prompts Rescue Efforts: Groups Target Abuse of Foreign Maids, Nannies*, Wash. Post, May 3, 2004 ............................................................2

Thanh-Dam Truong, *Human Trafficking and Organised Crime*, Working Paper 339
(July 2001) ........................................................................................................11

United Nations Conference on Diplomatic Intercourse and Immunities: Official Records
(1962).........................................................................................................16, 20

United Nations Conference on Diplomatic Intercourse and Immunities:  Summary of
Observations Received from Governments and Conclusions of the Special
Rapporteur........................................................................................................17

United Nations, *Documents of the Eighth Session Including the Report of the Commission
to the General Assembly* (1956).........................................................................16

United Nations, *Documents of the Ninth Session Including the Report of the Commission
to the General Assembly* (1957).........................................................................16

United Nations, *Documents of the Tenth Session Including the Report of the Commission
to the General Assembly* (1958).........................................................................16

United Nations, *Protocol to Prevent, Suppress and Punish Trafficking in Persons*
(2001) .....................................................................................................1, 10, 19

United Nations, *Report Submitted by A.E.F. Sandstrom, Special Rapporteur* (1955) ..................16

United Nations, *Summary Records of Plenary Meetings and of Meetings of the
Committee of the Whole* (1961) .........................................................................16

United Nations, *Summary Records of the Ninth Session* (1957) ..................................16

United Nations, *Summary Records of the Tenth Session* (1958) ..................................16

United Nations Office on Drugs and Crime, *Frequently Asked Questions: How is
"Trafficking in Persons" Different from the Smuggling of Migrants?*..............................7

United Nations Office on Drugs and Crime, *Trafficking in Persons: Global Patterns*.................14

United Nations Office on Drugs and Crime, *Trafficking in Persons: The New Protocol* ............6

U.S. Dep't of Health and Human Serv., *Fact Sheet: Human Trafficking* ...............................12, 14

U.S. Dep't of State, Office to Monitor and Combat Trafficking in Persons, *Fact Sheet:
U.S. Government Anti-Trafficking in Persons Obligated Project Funding (Fiscal
Year 2006)* (Apr. 23, 2007).................................................................................8

U.S. Dep't of State, *Trafficking in Persons Report* (2006)..................................................6, 9, 11

U.S. Dep't of State, *Trafficking in Persons Report* (2007)..................................................... *passim*

Vienna Convention on Diplomatic Relations, Apr. 18, 1961, 500 U.N.T.S. 95.................... *passim*

## INTEREST OF *AMICI CURIAE*

*Amici curiae* are non-governmental organizations working to combat the abuse of domestic workers by diplomats in the United States.  The individual statements of interest for each *amicus* are listed in Exhibit A.  *Amici* have provided legal and other assistance to dozens of women who were lured to the United States under false promises of well-paid employment and fair treatment by foreign diplomats, only to find themselves trapped in situations of exploitation or forced labor.  *Amici* have brought civil suits similar to that of the Plaintiffs here to enforce the rights of domestic workers exploited by diplomats, or have advocated for reforms to prevent diplomats from engaging in trafficking or exploitation of domestic workers.  *Amici* have developed significant expertise regarding abuses experienced by domestic workers employed by diplomats and seek to share that expertise with the Court.

## SUMMARY OF ARGUMENT

Every branch of the U.S. government and 117 countries have condemned the practice of human trafficking.[1]  Yet a small number of diplomats—believing that their diplomatic status

---

[1] *See* President George W. Bush, Address to the United Nations General Assembly (Sept. 23, 2003) ("Nearly two centuries after the abolition of the transatlantic slave trade, and more than a century after slavery was officially ended in its last strongholds, the trade in human beings for any purpose must not be allowed to thrive in our time."); Trafficking Victims Protection Act of 2000, 22 U.S.C. § 7101 (2000) (hereinafter "TVPA") ("The purposes of this [Act] are to combat trafficking in persons, a contemporary manifestation of slavery whose victims are predominantly women and children, to ensure just and effective punishment of traffickers, and to protect their victims."); and *United States v. Evans*, 476 F.3d 1176, 1179 (11th Cir. 2007) ("While [Plaintiff's] activities may be minor in the national and international market of trafficking children for commercial sex acts, his acts contribute to the market that Congress' comprehensive scheme seeks to stop." (internal quotation marks omitted)).  *See also Protocol to Prevent, Suppress and Punish Trafficking in Persons, Especially Women and Children, Supplementing the United Nations Convention Against Transnational Organized Crime of 2000*, G.A. Res. 55/25, Annex II, U.N. Doc. A/RES/55/25 (Jan. 8, 2001) (hereinafter "*U.N. Trafficking Protocol*"), *available at* http://www.unodc.org/unodc/crime_cicp_signatures_trafficking.html.

shields them against any accountability—intentionally disregard American laws and

international norms by bringing indentured servants into the United States under fraudulent

circumstances and holding them against their will[2]—the very definition of human trafficking.[3]

Defendants in this case have attempted to shield their conduct from judicial scrutiny by claiming

diplomatic immunity.  Their arguments necessarily fail, however, because the Vienna

Convention on Diplomatic Relations (the "Vienna Convention") contains an important statutory

---

[2] *See* U.S. Dep't of State, *Trafficking in Persons Report*, at 15 (2007), *available at* http://www.state.gov/documents/organization/82902.pdf ("Most members of the diplomatic community in the United States respect U.S. law and regulations, and most members of the diplomatic community do not have full immunities from civil and criminal jurisdiction. Yet reports indicate that a small number of members of the diplomatic community abuse domestic workers brought to the United States from other countries.") (hereinafter "2007 *Trafficking in Persons Report*").  Exploitation by diplomats of domestic workers is a well-documented problem in the United States.  *See* Ernesto Londono, *Ex-Worker Sues Envoy of Tanzania*, Wash. Post, May 2, 2007, at B1 (reporting that a Tanzanian woman brought to the United States by a diplomat is suing the envoy, alleging he treated her like a slave for more than four years); Colbert I. King, *The Slaves in Our Midst*, Wash. Post, Dec. 23, 2006, at A21 ("many of today's human traffickers and slavers are diplomats, flaunting U.S. and local laws, under the protective shield of the [State Department's] interpretation of diplomatic immunity"); Lena Sun, *"Modern-Day Slavery" Prompts Rescue Efforts: Groups Target Abuse of Foreign Maids, Nannies*, Wash. Post, May 3, 2004, at A1 (reporting that a Bangladeshi maid working for a Bahraini diplomat in New York was never paid or allowed to leave the apartment until she was rescued by police; an Indian maid for a diplomat in Potomac, Maryland was physically and mentally abused over a period of eleven months; and an Indonesian domestic servant employed by a diplomat at the United Arab Emirates Embassy in Washington, D.C., was physically abused, threatened with death, and underpaid); and Matt Kelley, *Some Embassy Workers Enslave Domestic Help, Enjoy Immunity*, The New Standard, June 28, 2005, http://newstandardnews.net/content/index.cfm/ items/1985 (detailing the plight of an Indian women who was beaten, raped, and verbally abused for four years in the Manhattan home of a Kuwaiti diplomat, as well as an Indonesian teenager who actually paid an employment agency for the opportunity to be chosen as a domestic servant for a Qatari diplomatic family only to be sent to work for twelve to sixteen hours a day, seven days a week).

[3] The U.S. Congress has defined "severe forms of trafficking in persons" as "the recruitment, harboring, transportation, provision, or obtaining of a person for labor or services, through the use of force, fraud, or coercion for the purpose of subjection to involuntary servitude, peonage, debt bondage, or slavery."  TVPA at § 7102(8)(B).

exception to diplomatic immunity.[4/]  According to Article 31(1)(c) of the Convention, diplomatic immunity does not attach to "action[s] relating to any professional or commercial activity exercised by the diplomatic agent in the receiving State outside his official functions."[5/]  Human trafficking is just such an activity.  It is a profitable and commercial enterprise that does not relate to any official function of a diplomat in the United States.  While previous cases of diplomatic malfeasance have affirmed the assertion of the diplomatic immunity defense, those cases centered on labor disputes.  *Amici* are aware of neither any cases that have alleged human trafficking and forced labor nor any in which the facts would have supported such claims as strongly as they do here.[6/]  To the extent that those prior cases are applicable, *amici* argue that the courts' and the State Department's interpretations of the commercial activity exception have been too narrow.  This case presents a ripe opportunity to affirm the long-standing principle "that slavery or involuntary servitude shall not exist in any part of the United States."[7/]  Diplomatic immunity poses no bar to vindicating that principle in this case.

## FACTUAL BACKGROUND

### I.    INTRODUCTION

In the summer of 2005, two Indian women, Plaintiffs Joaquina Quadros and Gila Sixtina Fernandes, were brought to the United States with promises of gainful employment, better

---

[4/] *See* Vienna Convention on Diplomatic Relations, Apr. 18, 1961, 500 U.N.T.S. 95 (hereinafter "Vienna Convention").

[5/] *Id*. at art. 31(1)(c).

[6/] *See Tabion v. Mufti*, 73 F.3d 535 (4th Cir. 1996); *Gonzalez Paredes v. Vila*, 479 F. Supp. 2d 187 (D.D.C. 2007).

[7/] *The Civil Rights Cases*, 109 U.S. 3, 20 (1883).

working conditions, and a life free from abuse and mistreatment.[8/]  A third woman, Plaintiff

Mani Kumari Sabbithi, came to the United States with no such hope; she was never promised

improved working conditions and believed she had no choice but to come to the United States

with her employer.[9/]  What all three women found was a living nightmare.  Forced to work as

much as nineteen hours a day, they were kept completely isolated from the outside world.[10/]

Their employers, Defendants Major Waleed KH N.S. Al Saleh and Mayaa KH A. O. A. Al

Omar, prohibited the women from leaving the home without the Defendants, looking out the

windows, opening the door, or speaking to anyone outside the Defendants' family.[11/]  The

Defendants held the women's passports so that they could not leave.[12/]  Nor did the women have

the financial ability to leave, because the Defendants paid wages only to the Plaintiffs' families

in India (and paid just a few hundred dollars a month, less than 20% of what was promised)

rather than to the women themselves.[13/]

Their working conditions included verbal abuse, constant monitoring, and punishments

that deprived them of basic human needs, including access to food, medical care, and

bathrooms.[14/]  Ms. Sabbithi was subjected to shocking physical abuse:  she was slapped, had her

head slammed against a wall, was hit with heavy objects, was pushed, had her hair pulled, had

---

[8/] Complaint, *Sabbithi v. Al Saleh*, No. 07-CV-00115-EGS (D.D.C. filed Jan. 18, 2007)
(hereinafter "*Sabbithi* Complaint") at ¶¶ 30, 34-36, 41-42, 46.

[9/] *Id.* at ¶¶ 22-26.

[10/] *Id.* at ¶¶ 51, 80, 82-83.

[11/] *Id.* at ¶¶ 83, 86.

[12/] *Id.* at ¶ 49.

[13/] *Id.* at ¶¶ 89-93.

[14/] *Id.* at ¶¶ 72, 77-78, 81.

cold water poured over her, and was threatened with death.[15/]  Ms. Quadros and Ms. Fernandes were threatened with death and physical harm and thus, they lived in a constant state of fear.[16/]  Their suffering only ended after all three eventually escaped from the Defendants' home.[17/]

These horrific acts occurred in a private home approximately fourteen miles from the U.S. District Court for the District of Columbia.  Under normal circumstances, those conditions, with all the hallmarks of slavery, involuntary servitude, and human trafficking, undoubtedly would entitle the Plaintiffs to remedies under a variety of federal and state laws.  But these three women may be left without any redress, solely because the Defendants assert diplomatic immunity.  Unlike previous cases involving a diplomat's alleged abuse of a domestic worker, Ms. Sabbithi, Ms. Quadros, and Ms. Fernandes are not engaged in a contract dispute over wages.[18/]  Rather, they are seeking no less than the vindication of their most basic human rights. They are the victims of human trafficking—a phenomenon the U.S. Senate has called "the new slavery of the [modern] world."[19/]

## II.    HUMAN TRAFFICKING IS A WIDESPREAD AND WELL-DOCUMENTED PHENOMENON IN THE UNITED STATES AND ABROAD

Unfortunately, the Defendants' behavior in this case is not an isolated incident of domestic strife.  Rather, their conduct is a manifestation (albeit on a small scale) of a worldwide criminal industry fueled by a global, illicit trade in human beings.  As President George W. Bush noted in a 2003 speech to the United Nations General Assembly, "[E]ach year 800,000 to

---

[15/] *Id.* at ¶¶ 57-63, 69-71.

[16/] *Id.* at ¶¶ 65-67, 99.

[17/] *Id.* at ¶¶ 95-104.

[18/] *See Tabion*, 73 F.3d 535; *Gonzalez Paredes*, 479 F. Supp. 2d 187.

[19/] 146 Cong. Rec. S10166 (daily ed. Oct. 11, 2000) (statement of Sen. Brownback).

900,000 human beings are bought, sold, or forced across the world's borders."[20]  Over 150 countries across the globe "function as a source, a destination, or a transit country for the slave trade," which generates anywhere from $9.5 billion to $32 billion in revenue annually.[21]  The State Department has observed, "[T]rafficking in persons [is] a global market, [in which] victims constitute the supply, and abusive employers … (also known as the buyers) represent the demand."[22]  These market forces set prices on individual human lives.  According to the United Nations Office on Drugs and Crime, Asian women are sold in the United States and Japan for as much as $20,000, and African women are sold for $8,000 each in Belgium.[23]  Women are not the only victims.  In some countries in Central Europe, the number of trafficking cases involving men equals or even exceeds the number of cases of trafficking in women.[24]

The perpetrators of human trafficking are not limited to border smugglers and under-the-table middle men.  Employers who exploit trafficked labor, creating the conditions under which

---

[20] Bush, *supra* note 1.

[21] David Batstone, Not for Sale: The Return of the Global Slave Trade—And How We Can Fight It 4 (2007).

[22] U.S. Dep't of State, *Trafficking in Persons Report*, at 16 (2006) (hereinafter "2006 *Trafficking in Persons Report*"), *available at* http://www.state.gov/documents/organization/66086.pdf.

[23] U.N. Office on Drugs and Crime, *Trafficking in Persons:  The New Protocol*, *available at* http://www.unodc.org/unodc/en/trafficking_protocol_background.html.

[24] Daan Everts, *Human Trafficking:  The Ruthless Trade in Human Misery*, 10 Brown J. World Aff. 149, 151 (2003).

humans are essentially enslaved, are a key piece of the trafficking web.[25]  In fact, the United

Nations Office on Drugs and Crimes writes that a "major difference" between the smuggling of

migrant workers and the trafficking of humans is that "smuggling ends with the arrival of the

migrants at their destination, whereas trafficking involves the ongoing exploitation of the

victims."[26]  Employers are the final critical link in the trafficking chain.

      The magnitude of this problem has prompted the U.S. government to take decisive action.

On October 28, 2000, Congress passed the TVPA, which requires the State Department to

monitor human trafficking around the globe and release annual reports of its findings.[27]  More

recently, in fiscal year 2006 alone, the United States spent over $28.5 million on seventy

---

[25] *See* 2007 *Trafficking in Persons Report*, *supra* note 2, at 13.  In this report, the State
Department detailed the way in which employers of domestic servants held in a state of
involuntary servitude are an intricate part of the trafficking web.  The State Department
highlighted this aspect of the trafficking industry, because it is alarmed that "[l]aws often favor
abusive employers because many countries do not protect domestic servants[;] . . . restrictive
sponsorship laws for foreign domestic workers often give employers power to control their
movements, even requiring the sponsors' permission for the foreign domestic worker to leave the
household or the country. This lack of protection, combined with the inordinate legally-
sanctioned power for employers, renders domestic servants highly vulnerable to abuse." *Id*.  *See
also* Stefanie Balogh, *Action Needed on Slave Trade:  Foreign Worker Rules Attacked*, Herald
Sun (Austl.), June 14, 2007, at News 1 (reporting that Australian labor unions, as well as the U.S.
State Department, have warned the Australian government that "unscrupulous bosses" are taking
advantage of government programs that issue employer-sponsored work permits to temporary
guest workers and allow exploitative employers to bring in workers under the guise of legal
authority); Jamie Etheridge, *Gulf Region's Newest Pipeline:  Human Trafficking*, The Christian
Science Monitor, July 19, 2005, http://www.csmonitor.com/2005/0719/p13s01-wome.htm
(noting that while the lifestyles of many nationals of Arab Gulf states are "built on a foundation
of foreign labor," many of those countries "do little or nothing to stop human trafficking");
Jennifer Robison, *Employers Better Beware*, Las Vegas Review-Journal, May 13, 2007
(reporting that an attorney with the Equal Employment Opportunity Commission predicts the
Commission will target the human trafficking industry by holding liable employers who use
agencies to bring workers into the United States knowing that the agencies abuse the workers).

[26] U.N. Office on Drugs and Crime, *Frequently Asked Questions:  How is "Trafficking in
Persons" Different from the Smuggling of Migrants?*, *available at* http://www.unodc.org/
unodc/trafficking_victim_consents.html#how.

[27] *See* TVPA at § 7101.

domestic anti-trafficking in persons projects and over $74 million on 154 projects that provided anti-trafficking assistance to seventy foreign governments and non-governmental organizations.[28]  The Bush administration has deployed the Departments of State, Justice, Homeland Security, Health and Human Services, and Labor to provide benefits and services to victims of human trafficking in the United States; it also has tasked the Federal Bureau of Investigation, Immigration and Customs Enforcement Agency, and the newly created Human Smuggling and Trafficking Center with the investigation and prosecution of human traffickers.[29]  These initiatives are all part of a concerted effort by the United States to encourage "responsible nations across the globe to stand together to speak with one voice and to say that freedom and security are non-negotiable demands of human dignity and to say [that] no one is fit to be a master and no one deserves to be a slave."[30]

## ARGUMENT

## I.    DIPLOMATS WHO ENGAGE IN HUMAN TRAFFICKING CANNOT CLAIM DIPLOMATIC IMMUNITY, BECAUSE HUMAN TRAFFICKING IS A PROFITABLE AND COMMERCIAL ENTERPRISE

Defendants cannot avail themselves of the protections of the Vienna Convention because they engaged in a profitable commercial enterprise—human trafficking—which falls outside the Convention's scope of immunity.  Defendants assert protection under "[t]he law of diplomatic immunity [a]s set forth in the Vienna Convention on Diplomatic Relations, to which both Kuwait

---

[28] U.S. Dep't of State, Office to Monitor and Combat Trafficking in Persons, *Fact Sheet: U.S. Government Anti-Trafficking in Persons Obligated Project Funding (Fiscal Year 2006)* (Apr. 23, 2007), *available at* http://www.state.gov/g/tip/rls/fs/07/83371.htm.

[29] U.S. Dep't of Justice, *Attorney General's Annual Report to Congress on U.S. Government's Activities to Combat Trafficking in Persons, Fiscal Year 2006 3-18* (2007), *available at* http://www.usdoj.gov/ag/annualreports/tr2006/agreporthumantrafficing2006.pdf.

[30] Sec'y of State Condoleezza Rice, Remarks at the Release of the Seventh Annual Trafficking in Persons Report (June 12, 2007) (transcript available at http://www.state.gov/secretary/rm/2007/06/86323.htm).

and the United States are parties."[31]  Under Article 31(1) of the Vienna Convention, "a

diplomatic agent shall enjoy immunity from the criminal jurisdiction of the receiving state.  He

shall also enjoy immunity from its civil and administrative jurisdiction."[32]  However,

Article 31(1)(c) precludes the assertion of diplomatic immunity for "action[s] relating to any

professional or commercial activity exercised by the diplomatic agent in the receiving State

outside his official functions."[33]  Trafficking falls under this exception.

All three branches of the U.S. government consistently describe human trafficking as the

modern manifestation of slavery.[34]  Like the historical slave trade, human trafficking is both

highly profitable[35] and global in scope.[36]  Like the individual slave trader, "human traffickers

prey on the most vulnerable and turn a commercial profit at the expense of innocent lives."[37]

---

[31] Defendants' Motion To Dismiss and To Quash Service of Process (Motion to Dismiss) at 3-4, *Sabbithi v. Al Saleh*, No. 07-CV-00115-EGS (D.D.C. Jan. 18, 2007).  Ironically, the State Department recently listed Kuwait as one of eight (out of a total of 151) "Tier 3" countries, the category reserved for those countries where human trafficking is most prevalent yet the governments put forth the least effort to combat the problem.  *See* 2007 *Trafficking in Persons Report*, *supra* note 2, at 10-15, 42, 130-31.

[32] Vienna Convention, *supra* note 4, at art. 31(1).

[33] *Id*. at art. 31(1)(c).

[34] *See, e.g.*, Sec'y of State Condoleezza Rice's Introduction to 2007 *Trafficking in Persons Report*, *supra* note 2 ("Trafficking in persons is a modern-day form of slavery, a new type of global slave trade."); TVPA at § 7101(a) ("The purposes of this chapter are to combat trafficking in persons, a contemporary manifestation of slavery."); *Evans*, 476 F.3d at 1179 (agreeing with Congress' determination that human trafficking "is a modern form of slavery").

[35] *See Global Trends in Trafficking and the "Trafficking in Persons Report":  Hearing Before the Subcomm. on Int'l Terrorism, Nonproliferation and Human Rights of the H. Comm. on Int'l Relations*, 108th Cong. 61 (2003) (statement of Louise Shelley, Professor and Dir., Transnational Crime and Corruption Ctr., American Univ.) (hereinafter "*Trafficking Hearings*") (testifying that the "profits of the trafficking business are enormous").

[36] *See* 2007 *Trafficking in Persons Report*, *supra* note 2, at 10 (noting that "trafficking likely extends to every country in the world").

[37] Sec'y of State Condoleezza Rice's Introduction to 2006 *Trafficking in Persons Report*, *supra* note 22.

Trafficking networks vary in their size, organizational structure, and recruitment methods, but the "common denominator of trafficking scenarios is the use of force, fraud, or coercion to exploit a person for profit."[38/]  Diplomats who traffic other humans are part of this global, commercial, and highly profitable industry.  By engaging in such commercial activity, which is neither part of a diplomat's official functions nor incidental to a diplomat's everyday life—the test articulated by the two courts that have considered this exception to immunity—diplomat-traffickers forfeit their diplomatic immunity from civil jurisdiction in U.S. courts.

### A.    Congress' Broad Definition of Trafficking Encompasses the Defendants' Conduct In This Case

The U.S. Congress has defined "severe forms of trafficking in persons" as "the recruitment, harboring, transportation, provision, or obtaining of a person for labor or services, through the use of force, fraud, or coercion for the purpose of subjection to involuntary servitude, peonage, debt bondage, or slavery."[39/]  Such a broad definition recognizes the diversity of human trafficking schemes in operation throughout the world and clearly encompasses the actions of Defendants in this case.

Human trafficking "is not a uniform business."[40/]  The size and sophistication of human trafficking operations range from large, highly organized transnational networks—which often have linkages to organized crime—to small, informal networks involving only a handful of

---

[38/] 2007 *Trafficking in Persons Report*, *supra* note 2, at 8.

[39/] TVPA at § 7102(8)(B); *see also U.N. Trafficking Protocol*, *supra* note 1, at art. 3(a) (defining "trafficking in persons" as "the recruitment, transportation, transfer, harbouring or receipt of persons, by means of the threat or use of force or other forms of coercion, of abduction, of fraud, of deception, of the abuse of power or of a position of vulnerability or of the giving or receiving of payments or benefits to achieve the consent of a person having control over another person, for the purpose of exploitation").

[40/] *See Trafficking Hearings*, *supra* note 35, at 53, 57 ("Far from being a homogeneous phenomenon, trafficking ranges from small networks to a highly organized trade by large crime groups that delivers individuals across continents.").

individuals.[41]  For example, a large criminal network may centralize its recruitment methods through the use of the media, Internet, or an employment agency, and transport its victims with the complicity of travel agents and border control officials.[42]  In contrast, examples of small, informal networks include impoverished families who sell their children to relatives or other adults "who promise education and opportunity—but sell the children into exploitative situations instead";[43] or powerful individuals, such as diplomats, who make false promises of increased wages or improved working conditions to entice servants to move to another country, only to subject them to involuntary servitude upon arrival.[44]  According to the State Department, and as illustrated by the Plaintiffs' plight in this case, common practices of abuse that are hallmarks of human trafficking include:  "confiscating and holding travel documents (passports, airline tickets, and alien resident identification cards); confinement; threatening physical force; and withholding wages."[45]

As these examples suggest, deception is a key component of trafficking.  Though some trafficking involves the forcible abduction or kidnapping of individuals, that is, in fact, relatively rare.  Far more common—and insidious—is the trafficker's use of "false promises of decent working conditions at relatively good pay" to "lure women and girls into their networks."[46]  The State Department has expressed concern about women "eager for a better future" being

---

[41] *Id.*

[42] *See* Thanh-Dam Truong, *Human Trafficking and Organised Crime*, Working Paper 339 (July 2001), at 18, *available at* http://adlib.iss.nl/adlib/uploads/wp/wp339.pdf.

[43] 2007 *Trafficking in Persons Report*, *supra* note 2, at 10; *see also* 146 Cong. Rec. S10164-02 (daily ed. Oct. 11, 2000) (statement of Sen. Wellstone) (noting that many children are sold by their parents directly to traffickers).

[44] *See* TVPA at § 7101(b)(4) ("Traffickers lure women and girls into their networks through false promises of decent working conditions at relatively good pay.").

[45] 2006 *Trafficking in Persons Report*, *supra* note 22, at 9.

[46] TVPA at § 7101(b)(4).

"susceptible to promises of jobs abroad," which are merely a ruse used to ensnare women.[47]

Though some of these women are trafficked for commercial sex, many others are trafficked for

labor, including involuntary servitude, debt bondage, and slavery.[48]  In some cases, trafficking

victims are aware that they will be subject to involuntary servitude, but they are deceived about

the extent to which they will be indebted, exploited, abused, and controlled.[49]

Congress ensured that whatever form a particular trafficking network takes, the victims

will be protected, and the traffickers punished.  Such a result makes public policy sense.

Regardless of the method used to coerce the victim into a position of involuntary servitude, and

regardless of the size of the network through which the victim is transported, the result is the

same:  innocent lives are exploited, and those who are responsible have made the deliberate

business decision to profit from the exploitation.

### B.    The Defendants' Acts Constitute Human Trafficking

Defendants' conduct clearly meets the definition of human trafficking.  Defendants

"recruited" and "transported" Plaintiffs "through the use of …. fraud … [and] coercion for the

purpose of subjection to involuntary servitude, peonage, debt bondage, or slavery."[50]  Plaintiffs

Joaquina Quadros and Gila Sixtina Fernandes were lured to the United States on fraudulent

promises of improved working conditions.[51]  Plaintiff Mani Kumari Sabbithi, in contrast, was

coerced, because she believed she had no choice but to come to the United States with her

---

[47] 2007 *Trafficking in Persons Report*, *supra* note 2, at 10.

[48] *Id.* at 18-19.

[49] *See* U.S. Dep't of Health and Human Serv., *Fact Sheet: Human Trafficking* (hereinafter "HHS *Fact Sheet*"), *available at* http://www.acf.hhs.gov/trafficking/about/fact_human.html (noting that "[trafficking] victims either do not consent to their situations, or if they initially consent, that consent is rendered meaningless by the actions of the traffickers").

[50] TVPA at § 7102(8)(B).

[51] *Sabbithi* Complaint at ¶¶ 30, 34-36, 41-42, 46.

employer.[52]  All three women were subjected to "involuntary servitude, peonage, debt bondage, or slavery."[53]  Involuntary servitude is defined as:

> [A] condition of servitude induced by means of (A) any scheme, plan, or pattern intended to cause a person to believe that, if the person did not enter into or continue in such condition, that person or another person would suffer serious harm or physical restraint; or (B) the abuse or threatened abuse of the legal process.[54]

Here, the Defendants held the women's passports so they could not leave the country,[55] prohibited them from leaving the home unaccompanied by the Defendants,[56] and barred them from looking out the windows, opening the door, or speaking to anyone outside the Defendants' family.[57]  Ms. Sabbithi was physically abused[58] and all three women were threatened with death and physical harm.[59]  Defendants imposed punishments that deprived the women of basic human needs, including access to food, medical care, and bathrooms.[60]  This egregious conduct goes well beyond the ordinary domestic wage disputes that have characterized previous diplomatic immunity cases.  It clearly constitutes human trafficking under both federal law and international standards.

---

[52] *Id.* at ¶¶ 22-26.

[53] TVPA at § 7102(8)(B).

[54] TVPA at § 7102(5).

[55] *Sabbithi* Complaint at ¶ 49.

[56] *Id.* at ¶¶ 83, 86.

[57] *Id.*

[58] *Id.* at ¶¶ 57-63, 69-71.

[59] *Id.* at ¶¶ 62-63, 65-67, 99.

[60] *Id.* at ¶¶ 72, 77-78, 81.

C.    **The Commercial Activity Exception Applies to the Conduct of Defendants in This Case, Because Trafficking Was Profitable for Defendants, Was Not Part of Defendants' Official Duties, and Was Not Incidental to Defendants' Daily Lives**

Under the Vienna Convention, diplomats have no immunity from the civil jurisdiction of their host country when they engage in commercial activities unrelated to their official diplomatic functions.[61] Article 42 of the Vienna Convention also provides that a "diplomatic agent shall not in the receiving State practise for personal profit any professional or commercial activity."[62] Human trafficking is characterized by its profitable and commercial nature. The State Department recently described "the use of force, fraud, or coercion to *exploit a person for profit*" as a defining characteristic of human trafficking.[63] Similarly, both the Department of Health and Human Services and the United Nations have emphasized that human trafficking is characterized by the "ongoing exploitation of the victims in some manner *to generate illicit profits* for the traffickers."[64] This dogged pursuit of profits among traffickers has resulted in a multibillion-dollar global enterprise, second only to the drug trade as the largest criminal industry in the world.[65] Though precise figures are difficult to obtain due to the clandestine nature of the business, the FBI in 2006 calculated annual profits from human trafficking at $9 billion,[66] while other groups place the figure at over $30 billion annually.[67] In order to

---

[61] Vienna Convention, *supra* note 4, at art. 31(1)(c).

[62] Vienna Convention, *supra* note 4, at art. 42.

[63] 2007 *Trafficking in Persons Report*, *supra* note 2, at 8 (emphasis added).

[64] U.N. Office on Drugs and Crime, *Trafficking in Persons: Global Patterns*, 52 (April 2006) (emphasis added), *available at* http://www.unodc.org/pdf/traffickinginpersons_report_2006ver2.pdf; HHS *Fact Sheet*, *supra* note 49 (emphasis added).

[65] HHS *Fact Sheet*, *supra* note 49.

[66] Fed. Bureau of Investigation, *Human Trafficking: An Intelligence Report* (June 12, 2006), *available at* http://www.fbi.gov/page2/june06/human_trafficking061206.htm.

[67] *See* Batstone, *supra* note 21, at 4.

- 14 -

maximize these profits, traffickers frequently utilize pre-existing trade and investment networks (both legitimate and criminal).[68]  In many cases, "legitimate sectors of the economy" are complicit in the actions of traffickers, attracted by the "high level of profits [trafficking] generates."[69]  The TVPA recognizes that due in part to its pervasive linkages to legitimate businesses, as well as to its widespread scope, human trafficking "substantially affects interstate and foreign commerce," and it "has an impact on the nationwide employment network and labor market."[70]  The end-user, in particular, reaps monetary benefits by exploiting the human commodity for personal profit, which includes gains from the failure to pay money owed.[71]

Here, Defendants directly profited by withholding from Plaintiffs their legally required wages.[72]  Specifically, Defendants profited by an approximate amount of $58,215, which reflects the difference between the few hundred dollars a month that Defendants actually paid to Plaintiffs' families in India (the only remuneration they paid at all) and what they were legally

---

[68] *See Trafficking Hearings*, *supra* note 35, at 57; *see also* Everts, *supra* note 24, at 151 (noting that, in choosing among various networks, traffickers focus only on "which profit is higher at any given point in time").

[69] *Trafficking Hearings*, *supra* note 35, at 60.

[70] TVPA at § 7101(b)(12).

[71] *See, e.g.*, *Jeremiah v. Richardson*, 148 F.3d 17, 20, 24 (1st Cir. 1998) (bankruptcy trustee earned "$5,000 per month '*profit*' . . . *by not paying* any debt service . . . real estate taxes, or any payments") (emphasis added); *Princeton Univ. Press v. Mich. Doc. Serv.*, 99 F.3d 1381, 1386 (6th Cir. 1996) (describing how a corporation "decided to *maximize its profits . . . by declining to pay* the royalties" to other copyright holders) (emphasis added); *Oktibbeha County Sch. Dist. v. Coregis Ins. Co.*, 173 F. Supp. 2d 541, 543 (N.D. Miss. 2001) ("The school district gained *profit*, remuneration, or advantage by having its employees perform overtime work for the district and *not paying them* one and one-half times their normal rate of pay.") (emphasis added); *United States v. Veksler*, 862 F. Supp. 1337, 1340 (E.D. Pa. 1994) (explaining that "the *profit gained by not paying the taxes* was divided among the conspirators") (emphasis added), *aff'd* 62 F.3d 544 (3d Cir. 1995); *S. New England Tel. Co. v. Dept. of Pub. Util. Control*, 874 A.2d 776, 783 (Conn. 2005) (deferring to legislature's "concern that a utility not reap *windfall profits, as a result of not paying labor costs*") (emphasis added).

[72] *See Sabbithi* Complaint at ¶ 58.

required to pay based on a minimum wage of $5.15 "for every hour in which Plaintiffs were not free to leave [Defendants'] premises."[73] This difference clearly qualifies as profit. Indeed, the Supreme Court has described as "restrictive" a definition of profit limited to "gain above expenditures."[74] Moreover, this conceptualization of profit does not conflict with the language or drafting history of the Vienna Convention. The text of Article 31 does not mention profit,[75] and the record does not show that the drafters of the Convention ever even discussed—let alone defined—the concept of profit in relation to the commercial activity exception.[76] Subsequent court interpretations have injected a "profit" requirement into the Convention, making a profit motive a defining feature of a commercial activity under its terms.[77] However, profit is

---

[73] *Sabbithi* Complaint at ¶¶ 145-49.

[74] *Cal. Dental Ass'n v. FTC*, 526 U.S. 756, 768 n.6 (1999).

[75] Vienna Convention, *supra* note 4, at art. 31.

[76] A review of the following records shows the lack of consideration given to profit in the context of the commercial activity exception. *Summary Records of Plenary Meetings and of Meetings of the Committee of the Whole*, [1961] U.N. Doc. A/CONF.20/14; *Documents of the Tenth Session Including the Report of the Commission to the General Assembly*, [1958] 2 Y.B. Int'l L. Comm'n 98, U.N. Doc. A/CN.4/SER.A/1958/Add.1; *Summary Records of the Tenth Session*, [1958] 1 Y.B. Int'l L. Comm'n 144-45, U.N. Doc. A/CN.4/SER.A/1958; *Documents of the Ninth Session Including the Report of the Commission to the General Assembly*, [1957] 2 Y.B. Int'l L. Comm'n 138-39, U.N. Doc. A/CN.4/SER.A/1957/Add.1; *Summary Records of the Ninth Session*, [1957] 1 Y.B. Int'l L. Comm'n 94-98, U.N. Doc. A/CN.4/SER.A/1957; *Documents of the Eighth Session Including the Report of the Commission to the General Assembly*, [1956] 2 Y.B. Int'l L. Comm'n 138-39, 164-67, U.N. Doc. A/CN.4/SER.A/1956/Add.1; *Report Submitted by A.E.F. Sandstrom, Special Rapporteur*, [1955] 2 Y.B. Int'l L. Comm'n 16, U.N. Doc. A/CN.4/SER.A/1955/Add.1.

In fact, there was sharp disagreement among the delegates over the relationship between Articles 31 and 42 of the Vienna Convention. While Mr. Ago (Italy) believed they were closely linked, Mr. Tunkin (USSR) argued that "careful examination showed that they were not entirely interdependent," and Mr. El-Erian (United Arab Republic) said "there was a clear distinction" between the two articles. United Nations Conference on Diplomatic Intercourse and Immunities: Official Records, Vol. I at 212-13 (1962), U.N. Doc. A.CONF.20/14.

[77] *See, e.g.*, *Gonzalez Paredes*, 479 F. Supp. 2d at 193 ("[T]he term 'commercial activity' . . . relates only to trade or business activity engaged in for personal profit.") (quoting *Tabion*, 73 F.3d at 537).

---

precisely the diplomat's motivation when he engages in human trafficking:  a diplomat-trafficker seeks to "extract[] the maximum gains from the entire bargain.  It is a purely commercial activity for him."[78]

Thus, human trafficking that imparts an economic benefit on the diplomat falls squarely within the commercial activities exception to the Vienna Convention.  Although the regular employment of domestic workers has been considered by two U.S. courts to be "incidental" to a diplomat's daily life,[79] participation in human trafficking for profit is not.  It is neither an activity that is part of the diplomat's official functions nor a contract for services incidental to the life of a diplomat or his/her family.[80]  As the Special Rapporteur to the United Nations International Law Commission's (ILC) Ninth Session stated, "It would be quite improper if a diplomatic agent, ignoring the restraints which his status ought to have imposed upon him, could, by claiming immunity," escape liability when engaged in activity that was *inconsistent* with diplomatic status.[81]

## II.     TO THE EXTENT *TABION* AND *GONZALEZ* ARE APPLICABLE, IT IS UNCLEAR WHETHER THE EXCEPTION IN ARTICLE 31(1) IS AS NARROW AS THE STATE DEPARTMENT ARGUES

This Court is presented with a question of first impression—whether human trafficking falls under the "commercial activity" exception under the Vienna Convention.

---

[78] Inst. of Social Sciences, Nat'l Human Rights Comm. & UNIFEM, *A Report on Trafficking in Women and Children in India 2002-2003*, at 139 (2004), *available at* http://www.ashanet.org/focusgroups/sanctuary/articles/ReportonTrafficking.pdf.

[79] *See Gonzalez Paredes*, 479 F. Supp. 2d at 193; *see also Tabion*, 73 F.3d at 538-39.

[80] *Id.*

[81] U.N. Conference on Diplomatic Intercourse and Immunities:  Summary of Observations Received from Governments and Conclusions of the Special Rapporteur, U.N. Doc.A/CN.4/116 at 55-56, *available at* http://www.state.gov/documents/organization/28510.pdf.

This exception has been interpreted by two federal courts and the State Department in the context of contract disputes between domestic workers and their diplomat employers.  In *Tabion v. Mufti*, a Philippine national alleged claims of breach of contract, state tort claims, and Fair Labor Standards Act (FLSA) infractions arising out of her employment by Jordanian diplomats in the United States.[82]  Ultimately, the court upheld the defendants' civil immunity from that suit, finding that the commercial activity exception applied only to "trade or business activity engaged in for personal profit,"[83] which is "outside [the diplomat's] official functions"[84] and not akin to "everyday transactions."[85]  In reaching that decision, *Tabion* relied heavily on the interpretation submitted in the State Department's Statement of Interest, which argued that "the term 'commercial activity' [in Article 31(1)(c)] . . . 'does not encompass contractual relationships for goods and services incidental to the daily life of the diplomat and the diplomat's family in the receiving State.'"[86]  The *Gonzalez Paredes* court closely followed *Tabion* and quoted that opinion at length.[87]  Ultimately, it concluded, "[t]he Court finds no reason to disagree … that a contract for domestic services … is not itself a 'commercial activity.'"[88]  Thus, it similarly denied relief to the plaintiff in that case, a domestic worker from Paraguay who

---

[82] *Tabion*, 73 F.3d at 536.

[83] *Id*. at 537; *see also Gonzalez Paredes*, 479 F. Supp. 2d at 193 (quoting *Tabion*).

[84] *Tabion*, 73 F.3d at 538.

[85] *Id*.

[86] *Tabion*, 73 F.3d at 538 (quoting a Statement of Interest of the United States); *see also Gonzalez Paredes*, 479 F. Supp. 2d at 193 (quoting *Tabion*).

[87] *See Gonzalez Paredes v. Vila*, 479 F. Supp. 2d 187.

[88] *Id.* at 193.

brought suit against her former Argentine diplomat employers under the FLSA and various District of Columbia wage laws.[89]

It is important to note some crucial distinctions between those prior cases and the instant action.  First, the plaintiffs in *Gonzalez Paredes* and *Tabion* sought to recover wages as well as other damages, but did not allege human trafficking violations.  Consequently, the State Department in those cases analyzed diplomatic immunity only within the context of alleged violations of the FLSA and various state laws.[90]

Second, Ms. Sabbithi, Ms. Quadros, and Ms. Fernandes' allegations of human trafficking, involuntary servitude, slavery, and *jus cogens* violations make the present case inherently different from *Tabion* and *Gonzalez Paredes*.  The Fourth Circuit decided *Tabion* more than a decade ago, five years before the enactment of either the TVPA or the United Nations Protocol to Prevent, Suppress and Punish Trafficking in Persons, which the United States has signed and ratified.[91]  Similarly, *Gonzalez Paredes* went out of its way to say "what the allegations in this case are *not*—slavery, human trafficking, war crimes, torture, etc.  Such violations of *jus cogens* are not at issue in this civil action and the Court is not opining thereon."  (Emphasis in original.)[92]

In fact, the State Department specifically highlighted the increasing problem of "involuntary domestic servitude in diplomatic residences" in its latest 2007 Trafficking in Persons Report.[93]  Noting that "most members of the diplomatic community do not have full

---

[89] *Id.* at 188.

[90] *Gonzalez Paredes*, 479 F. Supp. 2d at 193 (quoting Statement of Interest of the United States); *Tabion*, 73 F.3d at 537.

[91] *U.N. Trafficking Protocol*, *supra* note 1.

[92] *Gonzales Paredes*, 479 F. Supp. 2d at 194-95.

[93] 2007 *Trafficking in Persons Report*, *supra* note 2, at 15.

immunities from civil and criminal jurisdiction," the report declared that the United States "will seek to hold foreign persons in the United States, including diplomats, to the same standard in the global effort to curb trafficking in persons."[94]  Moreover, one foreign diplomat has gone even further and publicly stated that countries should waive diplomatic immunity in cases involving abuse of domestic workers.  In March 2007, Bolivia's new ambassador to the United States, Gustafo Guzman said:

> [E]mbassies have a very serious problem of unaccountability. I strongly favor transparency and I don't believe immunity should apply in cases where a diplomat is found to have violated a domestic workers' rights or has subjected those workers to abuse. I know many contracts are not being fulfilled and, if necessary, we have to waive immunity.  Diplomatic immunity often hides bad conduct.[95]

Third, and perhaps most significantly, it is unclear whether the commercial activity exception is as narrow as the State Department contends.  An examination of the Vienna Convention's drafting history reveals that the negotiating parties never reached a common understanding about the term "commercial activity."  In fact, the U.S. representative at the Seventh Plenary Meeting of the United Nations Conference on Diplomatic Intercourse and Immunities before the passage of the Vienna Convention voiced strong concern that "there was no agreed definition of the meaning of 'commercial activity.'"[96]  The U.S. representative remarked that "[h]e had discussed the expression with a number of other representatives who had given many different interpretations."[97]  This stands in stark contrast to the Statement of Interest

---

[94] *Id.*

[95] Alan B. Nichols, The Wash. Diplomat, March 2007, *available at* http://www.washdiplomat.com/March%202007/a4_03_07b.html.

[96] U.N. Conference on Diplomatic Intercourse and Immunities: Official Records, Vol. I, *supra* note 76, at 21.

[97] *Id.*

that the State Department filed in *Gonzales Paredes*, which stated that "any attempt by the United States to abrogate diplomatic immunity [in an employment context] . . . would be an extraordinary departure by the United States from its longstanding interpretation of the Diplomatic Relations Convention that to our knowledge is *uniformly shared by all other parties*."[98/]

Thus, it is unsurprising that parties to the Vienna Convention have applied Article 31(1)(c) differently.  European cases have abrogated diplomatic immunity even in the context of simple contractual disputes between diplomats and their domestic workers.  For example, the highest court of law in Portugal, the Supreme Court of Justice, ruled in favor of a domestic servant who sought compensatory damages after a member of the French diplomatic corps in Portugal terminated her employment without cause.[99/]  The defendants claimed diplomatic immunity, but the court found that the exceptions embodied in Article 31(1) were "intended to exclude all activities outside of the diplomat's diplomatic functions and amongst these is the contracting of a domestic maid to perform services in the diplomat's private residence."[100]  A Belgian Labor Tribunal similarly found that a diplomat's employment of a

---

[98/] Statement of Interest of the United States at 16, *Gonzalez Paredes,* 479 F. Supp. 2d at 193.

[99] *Fonseca v. Larren*, [1991] Boletim do Ministério da Justiça, 403 (Port.).  A certified English translation of the decision is included at Exhibit B to this Brief.

[100/] *Id.*

- 21 -

domestic worker was personal conduct that was not entitled to diplomatic immunity.[101]  That case involved a U.S. diplomat who had unilaterally terminated his two domestic workers' employment contracts, and the court ultimately ordered him to pay damages to the plaintiffs.[102]  A summary of the opinion noted that the court observed that terminating the employment contracts "were acts that the employer committed under the employer's own name and that did not enter into the framework of the employer's function as a diplomatic employee."[103]

Finally, while courts generally owe deference to the State Department's interpretation of international treaties, they should not follow those interpretations blindly.[104]  "Deference . . . is not the same as blind acceptance.  There is no authority for the proposition that a court construing a treaty must follow the interpretation suggested by our government where that interpretation is unreasonable or runs contrary to what the court determines was the intent of the high contracting parties."  *Coplin v. United States*, 6 Cl.Ct. 115, 136 (Cl. Ct. 1984), *rev'd on other grounds*, 761 F.2d 688 (Fed. Cir. 1985), *aff'd sub nom. O'Connor v. United States*, 479 U.S. 27 (1986).  Denying Defendants diplomatic immunity in this case is consistent with the

---

[101] *See* Centre pour l'égalité des chances et la lutte contre le racisme, *Plaidoyer Pour Une Approche Integree* 75, at 77 (2003) (summarizing the initial decision and the result on appeal). A certified translation of an analysis of the decisions is included at Exhibit C to this Brief.  The Labor Tribunal in this instance analyzed the facts under both Articles 31 and 39 of the Vienna Convention, because the diplomat had left Belgium by the time of trial.  Article 39 states, "When the functions of a person enjoying privileges and immunities have come to an end, such privileges and immunities shall normally cease at the moment when he leaves the country, or on expiry of a reasonable period in which to do so, but shall subsist until that time, even in case of armed conflict. However, with respect to acts performed by such a person in the exercise of his functions as a member of the mission, immunity shall continue to subsist."  Vienna Convention, *supra* note 4, at art. 39(2).

[102] *See* Centre pour l'égalité des chances et la lutte contre le racisme, *Plaidoyer Pour Une Approche Integree* at 77.

[103] *Id.*

[104] It should be noted that courts are generally to give "'somewhat less deference' where an agency and another country disagree on the meaning of a treaty . . . ."  *Iceland S.S. Co.-Eimskip v. U.S. Dep't of Army*,  201 F.3d 451, 458 (D.C. Cir. 2000).

Vienna Convention's signatories' intent to achieve the efficient function of diplomatic missions and to foster goodwill among nations. Moreover, denying Defendants of diplomatic immunity would be consistent with the clear policy of the United States to condemn human trafficking and to vigorously prosecute those who engage in trafficking.[105]

## CONCLUSION

For the reasons set forth above and in Plaintiffs' brief, *amici* respectfully urge this Court to deny Defendants' Motion to Dismiss and Quash Service of Process.

Respectfully submitted,

Kimberly A. Parker (DC Bar No. 462495)
Katherine A. Gillespie (DC Bar No. 480013)
Therese Lee*

WILMER CUTLER PICKERING
   HALE AND DORR LLP
1875 Pennsylvania Avenue, N.W.
Washington, D.C. 20006
Tel: (202) 663-6000
Fax: (202) 663-6363

*Attorneys for Amici Curiae*
*Not admitted in the District of Columbia

---

[105] *See* discussion *supra* at 6-7.

- 23 -

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
                                            )
**MANI KUMARI SABBITHI, JOAQUINA**          )
**QUADROS, and GILA SIXTINA FERNANDES,**)
                                            )
        **Plaintiffs,**                     )        **Case No.: 07-CV-00115-EGS**
                                            )
        **v.**                              )
                                            )
**MAJOR WALEED KH N. S. AL SALEH,**         )
**MAYSAA KH A. O. A. AL OMAR, and**         )
**STATE OF KUWAIT,**                        )
                                            )
        **Defendants.**                     )
_____)


## ORDER

Upon consideration of the Motion for Leave to File a Memorandum of Law in Support of

Plaintiffs' Memorandum of Points and Authorities in Opposition to Defendants Major Waleed

KH N.S. Al Saleh and Maysaa KH A.O.A. Al Omar's Motion to Dismiss and Quash Service of

Process, Break The Chain Campaign, CASA Of Maryland, Global Rights, Asian American Legal

Defense and Education Fund, and Boat People SOS, Inc., as *Amici Curiae*, and the record in this

case, it is hereby

        ORDERED, the Court grants said motion.

        SIGNED this _____ day of _____, 2007.


                                            _____
                                            Emmet G. Sullivan
                                            U.S. District Court Judge

# CERTIFICATE OF SERVICE

The undersigned certifies that on this 29th day of June 2007, a true and correct copy of

the foregoing documents was delivered via U.S. mail to:

Lenora M. Lapidus
Claudia M. Flores
Jennifer L. Pasquarella
AMERICAN CIVIL LIBERTIES UNION FOUNDATION - WOMEN'S RIGHTS
    PROJECT
125 Broad Street, 18th Floor
New York, NY 10004
*Counsel for Plaintiffs*

David A. Kotler
Carolyn M. Welshhans
Catherine J. Rosato
Reid K. Weisbord
DECHERT LLP
1775 I Street, N.W.
Washington, D.C.  20006
*Counsel for Plaintiffs*

Steven Macpherson Watt
AMERICAN CIVIL LIBERTIES UNION FOUNDATION – HUMAN RIGHTS
    PROGRAM
125 Broad Street, 18th Floor
New York, NY 10004
*Counsel for Plaintiffs*

Thomas B. Wilner
Perry S. Bechky
Amanda E. Shafer
Justin Harrison
SHEARMAN & STERLING LLP
801 Pennsylvania Avenue, N.W., Suite 900
Washington, D.C.  20004
*Counsel for Defendants*

Katherine A. Gillespie

# EXHIBIT  A

## EXHIBIT A
## STATEMENTS OF INTEREST OF *AMICI CURIAE*

### BREAK THE CHAIN CAMPAIGN

Break the Chain Campaign ("BTCC"), a project of the Institute of Policy Studies, works with domestic workers who are victims of trafficking in persons and/or labor exploitation in the Washington, D.C. area. BTCC has worked with exploited and abused domestic workers since 1997. BTCC provides direct legal and support services to abused workers, assists on cases nationally, and advocates for policy reform regarding human trafficking and labor exploitation. Over the years, numerous domestic workers exploited by diplomats have sought assistance at BTCC.

### CASA OF MARYLAND, INC.

CASA of Maryland, Inc. ("CASA") has worked for more than twenty years to advance the rights of low-wage workers, especially immigrant workers. CASA attorneys have represented sixteen women who served as domestic workers for diplomats in the Washington D.C. metropolitan area, including four cases where the diplomats had engaged in human trafficking. CASA also has represented more than a hundred domestic workers in cases not hindered by the barrier of diplomatic immunity. CASA has negotiated on behalf of the domestic employees of diplomats, engaged the workers in public advocacy, and worked with the U.S. Department of State and foreign embassies in Washington, D.C. to improve the treatment of domestic workers.

### ASIAN AMERICAN LEGAL DEFENSE AND EDUCATION FUND

Founded in 1974, the Asian American Legal Defense and Education Fund ("AALDEF") is a national organization that protects and promotes the civil rights of Asian Americans by combining litigation, advocacy, education, and organizing. AALDEF focuses on critical issues

affecting Asian Americans, including the abolition of human trafficking, as well as immigrant rights, civic participation and voting rights, economic justice for workers, language access to services, Census policy, affirmative action, youth rights and educational equity, and the elimination of anti-Asian violence and police misconduct. AALDEF finds it essential to protect the rights of trafficked persons and has provided direct legal assistance to trafficking survivors, including domestic workers who have been exploited and abused by diplomats.

## GLOBAL RIGHTS

Global Rights is a Washington, D.C.-based human rights advocacy group with offices and programs around the world. Its programs on human trafficking and racial discrimination in the United States have engaged in advocacy for many years to combat the trafficking and abuse of migrants, especially domestic workers. Global Rights has been deeply involved in advocacy in the United States and abroad for legislative and policy responses that recognize and address the tremendous human rights violations suffered by immigrants such as domestic workers. One particular focus of its racial discrimination program has been the immunity of diplomats in the United States who exploit and abuse their domestic workers.

## BOAT PEOPLE SOS, INC.

Boat People SOS, Inc. ("BPSOS") is a non-profit, community-based organization serving underprivileged, low-income immigrants and refugees and provides comprehensive legal and case management services to victims of human trafficking. Over the past several years, BPSOS has served hundreds of victims of human trafficking, dozens of whom were held in involuntary servitude by members of the diplomatic community.

# EXHIBIT B

## Ruling of the Portuguese Supreme Court of Justice

**Proceeding: 002927**
**Docket No. JSTJ00007650**
**Reporting Judge ROBERTO VALENTE**
**Keywords:**
**FOREIGN STATE**
**JURISDICTIONAL IMMUNITY**
**EMPLOYMENT CONTRACT**
**TERRITORIAL COMPETENCE**
**Document: No. SJ199101300029274**
**Judgment:Date: 01/30/91**
**Vote: UNANIMITY**
**Publication Reference BMJ N403 YEAR 1991 PAGE 267**
**Name of Appeals Court: LISBON APPEALS COURT**
**Appeals Court Proceeding No.: 6319/90**
**Date: 05/30/90**
**Full Text: YES**
**Confidentiality: 1**
**Type of Proceeding APPEAL**
**Decision: APPEAL REJECTED**
**Subject Area:**
**COMPETENCE OF LAW COURTS**
**LABOR LAW – INDIVIDUAL EMPLOYMENT CONTRACT**
**National Legislation:**
**Decree-Law 48925 of 1968/03/27**
**National Jurisprudence:**
**AC STA OF 1961/06/11**
**AC STJ OF 1962/02/27**
**AC STJ OF 1984/05/11**
**AC RL OF 1983/07/06**
**AC RL OF 1988/06/08**
**AC RL OF 1988/11/09**
**AC RP OF 1981/01/05**
**Summary:**

I – Article 31 of the Vienna Convention, approved by Decree-Law number 48925 of March 27, 1968, establishes immunity from civil jurisdiction but made exceptions of the cases of actions in rem relating to the private real property of the diplomat, those referring to the non-diplomatic professional activity of the diplomat and those referring to his commercial activities.

II – In article 31 it was intended to exclude all activities practiced outside of the diplomatic functions of the diplomat and amongst these are contracting of a domestic maid to carry out services in the private residence of the diplomat.

III – As a consequence, Portuguese labor courts have territorial competence to consider an action arising from an individual labor contract in which the defendant is a diplomat.

**Full text of the ruling:**

The social section of the Portuguese Supreme Court of Justice has decided:

I - A, identified in the proceedings, with the support of the Portuguese Justice Department, brought an action in the Lisbon labor court, arising from an individual employment contract, against B and his wife, identified in the proceedings.

The plaintiff alleged that she had worked for the defendants as a domestic servant from Monday to Friday, during the hours of 9 a.m. to 4:15 p.m. with a final salary of 30,000 Portuguese escudos per month, plus lunch and a transport subsidy of 2,500 escudos, from June 19, 1985 onwards, and was dismissed from her employment on May 31, 1988 without just cause. She claims a payment of compensation from the defendants in respect of her dismissal and holiday pay and rights as well as Christmas entitlements proportional to the time she worked in 1988, worth a total of 142,500 escudos.

The defendants have contested, apart from the exception of territorial incompetence, and in respect of facts, that this matter is subject to a contract for services which existed between them and the plaintiff and the lack of any employment contract or consequent dismissal.

The original ruling judged the court incompetent to decide on international matters as the defendants enjoyed immunity from civil jurisdiction, under the terms of article 31 of the Vienna convention, absolving them at these proceedings. The plaintiff made a special appeal [made on grounds other than the merits of the case] against this decision and the Appeals Court ruled to revoke the original decision and judged the court internationally competent to proceed with the case. The defendants made their own special appeal against the ruling of the Appeals Court, alleging that articles 29, 30 and 31 of the

Vienna Convention, approved by Decree-Law no. 48925, of March 27, 1968 had been violated, and that the Appeals Court ruling should be reversed and the court declared internationally incompetent to consider this case.

The plaintiff petitioned for confirmation of the Appeals Court ruling.

His Honor the Attorney General issued a clear opinion in this Court in favor of the competence of the court and rejection of the defendants' appeal.

Now that the legal evidence has been examined, we need to make a ruling.

II – The problem raised in the proceedings is to decide if the contract made between the plaintiff and the male defendant, given that he is a diplomat of the Embassy of France in Portugal, is covered by diplomatic immunity, considering the Vienna Convention, which would make the Portuguese court internationally incompetent to decide the case.

This is the employment contract of a subordinate, for the rendering of domestic services, in the residence of the First Secretary of the Embassy of France, according to the plaintiff. It is a contract for the rendering of domestic services, in the residence of a first Secretary of the Embassy of France, according to the defendants, who are now appealing to this court.

The Vienna Convention, approved by Decree-Law no. 48925, of March 27, 1968, came to regulate the immunity from jurisdiction of a sovereign state in relation to another state.

More recently, the distinction came to be made between absolute immunity, in relation to "jure imperii" acts and relative immunity, referring to "jure gestionis" acts. That is, one should note, in regards to the acts of a sovereign state.

Dr. Geraldes de Carvalho studies this problem in his work "the Jurisdictional Immunity of Foreign States" in Jurisprudence Collection Year X - Volume 4 - page 33 and subsequent and indicates that Jan Brownlie in the 3rd edition of the "Principles of Public Law," after considering a large part of legal doctrine and the jurisprudence of various countries, concludes that the doctrine of Restricted or Relative Immunity, was adopted by Belgium, Greece, Italy, Egypt, Switzerland, Austria, the Federal Republic of Germany, the Netherlands, Ireland, Canada, Pakistan and partly in France. On the other hand, the doctrine of Full or Absolute Immunity was adopted by the United Kingdom, Australia, India, South Africa, Japan, Brazil, Chile, Norway, Luxemburg, the Philippines, Portugal and some Eastern European countries.

This problem was the object of study in several countries, for example by Angol ................Sancho in the Law Review of Complutense University, No. 65 (1982) page 113 and thereafter, by R. Higgins in the Netherlands International Law Review, volume XXIX (1982) and by Leo J. Brucher in the Netherlands Yearbook of International Law, volume X (1979) page 3 and thereafter.

If this problem is discussed in relation to the private acts of a state, it seems, according to the majority of opinion, it should apply to the private acts of diplomats living in a foreign state.

We consider, however, that the question, given the Vienna Convention, is applicable in our country, by approval of Decree-Law no. 48925, of March 27, 1968.

In the preamble to that Convention there is the declaration "the purpose of these privileges and immunities is not to benefit individuals, but to guarantee the effective performance of the functions of diplomatic missions, in their character of representatives of foreign states..."

What is intended with the granting of immunity is to guarantee the reciprocal independence of states, avoiding the situation of making a state a defendant in the courts of another state.

This rule extends to the diplomatic personnel of a state, for acts committed in another state, but when these acts are not practiced in the name of the state that represents them or for the purposes of the mission that in this situation they perform or do not perform the acts of a private nature that they practice.

It was in line with this that the Appeals Court of Paris ruled in the case "................................................," mentioned by the Portuguese District Attorney in the first hearing as did the British Court of Appeals in the case " Trendtex ", mentioned by Dr. Geraldes de Carvalho in the referred to study.

The Vienna Convention itself gives this result, as article 31 establishes immunity from civil jurisdiction for diplomatic personnel, but makes exception for the cases of actions in rem relating to the private property of the diplomat, questions of succession, those referring to professional – non diplomatic - activity of the diplomat and those referring to the diplomat's commercial activity.

It was intended to exclude all activities outside of the diplomat's diplomatic functions and amongst these is the contracting of a domestic maid to perform services in the diplomat's private residence.

The fact that article 30 of the Convention guarantees the same inviolability and protection to the diplomat's private residence as the location of the diplomatic mission, is not applicable to this specific case as it does not deal with violation of this residence.

Article 33 of the Convention provides that the diplomat must observe the governing social security provisions in the crediting state, when he has private servants working for him who are nationals of that state.

It does not seem to us that this precept could support any argument, in favor or against the interpretation made in this judgment, as it regulates another matter, that of the social security regulations.

And article 31 certainly speaks of the immunity of civil jurisdiction and the exceptions to it and does not speak of employment jurisdiction, but we make an extensive interpretation of this precept, in keeping with its spirit, going beyond its letter and the "ratio legis" that determined it, within the rules of articles 9 and 11 of the Civil Code.

Reaching the conclusion that we have, that the Vienna Convention does not grant jurisdictional immunity to the defendants

in these proceedings, also, given the provisions of articles 11 of the Labor Code and 65.A of the Civil Code, it is understood that these provisions cover the international competence of Portuguese labor courts.

We know of no jurisprudence contrary to the position taken in this ruling, nor any that is favorable to it, as the decisions that we have seen all refer to the problem of a foreign state being a defendant and not that of diplomat - judgments, from the Supreme Administrative Court of 6/11/61, of the Supreme Court of Justice of 2/27/62 and of 5/11/84, of the Lisbon Appeals Court of 7/6/83, of 6/8/88 and of 11/9/88 and of the Porto Appeals Court of 1/5/81.

III – In conclusion: given the evidence and arguments discussed above, we do not believe that the appeals court judgment appealed against has violated any legal precept and, for this reason, we reject this appeal against it.

Costs shall be paid by the parties appealing the appeals court judgment.

Lisbon, January 30, 1991

Roberto Valente;

Jaime de Oliveira;

Prazeres Pais.

# Language Innovations, LLC™

*Helping businesses communicate worldwide™*

1725 I Street, NW
Suite 300
Washington, DC 20006

tel    202 349.4180
fax   202 349.4182
email  translate@languageinnovations.com

## TRANSLATION CERTIFICATION

This is to certify that the translation of the attached document(s), **Ref.: Valente (Portugal),** was performed by a professional translator and is to the best of our knowledge and ability, a true and accurate translation of the original text delivered to Language Innovations, LLC by our client, **Wilmer Cutler Pickering Hale & Dorr, LLP**. The original document was translated from **Portuguese** into **English** and at completion delivered to the client on **June 15, 2007**.

I hereby declare that all statements made herein are of my own knowledge and are true and that all statements made based on information or belief are believed to be true.

Language Innovations, LLC hereby agrees to keep the content of this translation confidential according to ethical and legal standards of the profession of Translation. Language Innovations, LLC agrees not to discuss, evaluate, distribute or reproduce any material included in or related to the translation of this document.

Date:  June 15, 2007

Signature:    *Brian Friedman*

Brian Friedman, Director
Language Innovations, LLC

# EXHIBIT C

Combating Trafficking in Humans

# PLEA FOR AN
# INTEGRATED APPROACH

*Analysis of Legislation and Judicial Precedent*

**November 2003**

**Center for Equal Opportunity and Combating Racism**

### 3.5.2    Persons Invoking Immunity

### A.    Court of Labor Law of Brussels, April 20, 2001, 4th Section

The plaintiffs, a Philippine couple, summonsed their ex-employers, an American diplomat as well as his wife, before the Court of Labor Law.

The facts were the following:  the diplomat employed the plaintiff as a domestic worker in the framework of a written employment contract for a set duration (two years) for a monthly wage of BEF 30,000.  His wife likewise performed domestic work and cared for the children.

After several months, they were dismissed.  The employment contract was unilaterally broken off by the employers.  During their employment, the workers did not receive any salary or any severance pay, and the employers did not take care of social security tax payment either.  In addition, the working wife was pregnant at the time of dismissal and neither her national health insurance coverage nor her mutual insurance coverage were in order.  Consequently the workers claimed payment of salary, severance pay, lump sum payment for dismissal during pregnancy, damages and interest for arbitrary dismissal in the case of the working wife, and reimbursement of medical expenses.

The employers asserted that they had personal immunity from jurisdiction pursuant to Art. 31 of the Vienna Convention on Diplomatic Relations of April 18, 1961.[1]  They consequently considered that the Court of Labor Law of Brussels did not have jurisdiction to review the case.

---

[1] This article states:

«1. *The diplomatic agent will enjoy immunity from criminal jurisdiction of the state accepting the accreditation.  Such agent will likewise enjoy immunity from civil and administrative jurisdiction, unless the following is involved:*

    a)    *A real action concerning private property situated in the territory of the state accepting the accreditation, unless the diplomatic agent possesses it at the expense of the accrediting state for the purpose of the agent's mission;*

    b)    *An action concerning an estate in which the diplomatic agent is acting as the executor, administrator, heir, or legatee, on a private basis and not in the name of the accrediting state;*

    c)    *An action concerning a professional or business activity of whatever kind, performed by the diplomatic agent in the state accepting the accreditation and outside of the agent's official function.*

2.   *The diplomatic agent is not obligated to provide testimony.*

3.   *No measure of performance can be taken in view of the diplomatic agent except in the stated cases in Clauses (a), (b), and (c) of Paragraph 1 of this Article, and provided the performance could take place without its undermining the inviolability of the agent's person or residence.*

The court rejected this argument—thus following the line of reasoning the working couple developed—for the following reasons:  the conclusion and the termination of the litigious employment contracts were acts that the employer committed under the employer's own name and that did not enter into the framework of the employer's function as a diplomatic employee.

Accordingly the employer should have referred to Art. 39.2 of the Vienna Convention, which stipulates that when the function of a person who enjoys privileges and immunity ends, these privileges and the immunity cease to have effect as far as acts committed in private life are concerned when the person leaves the country.[2]

In the case in point, the function of the defendant as a diplomat in Belgium had come to an end and he had returned to the U.S.  The court therefore found it was competent to review the case.

The court likewise emphasized that immunity from jurisdiction was only a procedural immunity that does not imply that diplomats would be exempt from respecting the laws of the country accepting the accreditation.  Immunity is merely a procedural impediment as long as immunity exists.

The defendants likewise invoked the fact that the court should place itself at the time of the summons to review whether a diplomatic agent enjoys immunity from jurisdiction and not at the time of attending to the case, which the court found contrary to the substance and purpose of the Vienna Convention:  the objective of these privileges and the immunity is not to favor individuals but to ensure that diplomatic missions as they represent states would be able to function effectively.  The court emphasizes that as soon as a summons that is served on defendants at a time when they still have immunity does not as such constitute the exercising of power of jurisdiction and that this does not violate either the immunity or the inviolability of the diplomat.  The court considers that the Vienna Convention moreover implicitly but certainly excludes that a summons constitutes the exercising of the power of jurisdiction and constitutes an undermining of immunity (Arts. 31.1, 31.4, 32).[3]

The court therefore notes in short that it may exercise its power of jurisdiction at the time of attending to the case, given that the diplomatic mission of the defendant had come to an end in Belgium and that the defendants had left Belgium.  The court consequently ordered the defendants to pay the financial sums the plaintiffs claimed.

---

4.  *Immunity from jurisdiction of a diplomatic agent in the state accepting the accreditation could not exempt this agent from the jurisdiction of the accrediting state.»*

[2] When the functions of a person enjoying privileges and immunity come to an end, these privileges and immunity normally cease at the moment that this person leaves the country or when a reasonable time limit that would be accorded this person to this end elapses, although they continue until that time, even in the event of armed conflict.

[3] Art. 32 provides for cases in which immunity from jurisdiction could be waived.

«*1.  The accrediting state may waive the immunity from jurisdiction for diplomatic agents and persons who enjoy immunity by reason of Article 37.*

*2.  Waiving immunity must always be express.*

*3.  If a diplomatic agent or a person enjoying immunity from jurisdiction by reason of Article 37 institutes a proceeding, it is no longer admissible to invoke immunity from jurisdiction with regard to any counterclaim directly related to the principal claim.*

*4.  Waiving immunity from jurisdiction for an administrative or civil proceeding is not presumed to imply waiving immunity regarding measures to enforce a judgment, for which a separate waiver is required.»*

**B.    Court of Labor Law of Brussels, November 25, 2002, and April 28, 2003, 5th Section (Appeal of the Preceding Judgment)**

The employers lodged an appeal of the judgment rendered in the first instance by the Court of Labor Law. In a ruling of November 25, 2002, the Court confirms the position taken by the Court of Labor Law at the level of immunity from jurisdiction and the time at which this should be taken into account and decided to reopen a subsequent discussion to rule on the merits of the case.

In a ruling of April 28, 2003, it confirms the decision rendered in the first instance on the merits of the case, except where lump sum compensation by reason of pregnancy was concerned, which the Court declared unsubstantiated because it was not concurrent with compensation for wrongful dismissal, as well as the amount of the medical expenses, which were slightly reduced.

# Language Innovations, LLC™

*Helping businesses communicate worldwide*[TM]

1725 I Street, NW
Suite 300
Washington, DC  20006

tel     202 349.4180
fax     202 349.4182
email  translate@languageinnovations.com

## TRANSLATION CERTIFICATION

This is to certify that the translation of the attached document(s), **Ref.: Part II:  Analysis of Judicial Precedent 2001-2002 - Section 3.5.2 Persons Invoking Immunity, sections A & B,** was performed by a professional translator and is to the best of our knowledge and ability, a true and accurate translation of the original text delivered to Language Innovations, LLC by our client, **Wilmer Cutler Pickering Hale & Dorr, LLP**. The original document was translated from **French** into **English** and at completion delivered to the client on **June 28, 2007**.

I hereby declare that all statements made herein are of my own knowledge and are true and that all statements made based on information or belief are believed to be true.

Language Innovations, LLC hereby agrees to keep the content of this translation confidential according to ethical and legal standards of the profession of Translation. Language Innovations, LLC agrees not to discuss, evaluate, distribute or reproduce any material included in or related to the translation of this document.

Date:   June 27, 2007

Signature:        *Brian Friedman*
                  Brian Friedman, Director
                  Language Innovations, LLC