IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MANI KUMARI SABBITHI, JOAQUINA QUADROS, and GILA SIXTINA FERNANDES,<br><br>    Plaintiffs,<br><br>    v.<br><br>MAJOR WALEED KH N. S. AL SALEH, MAYSAA KH A. O. A. AL OMAR, and STATE OF KUWAIT,<br><br>    Defendants. | Case No.: 07-CV-00115-EGS |

**DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN RESPONSE TO THE MEMORANDUM OF LAW OF BREAK THE CHAIN CAMPAIGN *ET AL.***

In accordance with this Court's order of July 18, 2007, Defendants Waleed KH N.S. Al-Saleh and Maysaa KH A.O.A. Al-Omar ("Defendants"), through their undersigned attorneys, file this Memorandum of Points and Authorities in Response to the Memorandum of Law submitted by *Amici Curiae*, Break the Chain Campaign, *et al.*[1]

As discussed in Defendants' Opposition to *amici*'s motion for leave to file its Memorandum, these *amici* organizations joined together with counsel for Plaintiffs recently in filing an *amicus curiae* brief in a very similar case in this Court. (*See* Memorandum of Law of The American Civil Liberties Union, Break the Chain Campaign *et al.*, *Gonzalez Paredes v. Vila*, No. 06-CV-00089, docket no. 25 ("*Gonzalez Amicus*").) Not surprisingly, therefore, their Memorandum ("Mem.") here makes many of the same arguments already made by Plaintiffs in their Opposition to Defendants' Motion to Dismiss and to Quash Service of Process. In addition, their Memorandum contains certain inaccuracies and misstatements that are addressed here.

---

[1] In filing this Memorandum, Defendants do not submit to the jurisdiction of this Court. They expressly reserve all privileges and immunities, as well as all objections to jurisdiction and service of process.

I.      **Defendants Did Not Engage in "Professional or Commercial Activity"**

*Amici*'s central argument is that Defendants have been stripped of their diplomatic immunity by engaging in conduct that fits within a narrow exception in the Vienna Convention on Diplomatic Relations (the "Vienna Convention") for civil suits relating to "professional or commercial activity exercised by the diplomatic agent in the receiving State outside his official functions." The Vienna Convention, U.S.T. 3227, T.I.A.S. 7502, 1961, art. 31.1(c); (Mem. at 8-9.) To be stripped of their diplomatic immunity, Defendants must be shown to have engaged in a "professional or commercial activity."

*Amici* essentially attempt to get around that requirement by detailing in great length the abhorrent practice of human trafficking and explaining that trafficking is a commercial enterprise. (*See* Mem. at 5-8; 10-12; 14-15.) But they cannot bring Defendants' alleged conduct within an exception to diplomatic immunity simply by labeling the conduct as trafficking and pointing out the uncontroversial proposition that trafficking networks are money-making operations. (*See, e.g.,* Mem. at 14 ("the FBI in 2006 calculated annual profits from human trafficking at $9 billion").) For example, they describe trafficking on a global scale. They attempt to place the conduct alleged within the commercial framework of trafficking by stating "[h]uman trafficking is not a uniform business" and that "[t]rafficking networks vary in their size . . . ." (Mem. at 10) (internal quotation omitted). They further state that trafficking operations may range from "a large criminal network" to "small informal networks [that] include impoverished families who sell their children . . . ." (Mem. at 11.) Here, however, there are no allegations of a network or business of any kind. All three Plaintiffs worked for Defendants in Kuwait and traveled to the United States to work for them in the same capacity here. (Compl. ¶¶

2

17, 26, 29, 36, 38, 46.)  There is simply no suggestion that Defendants have engaged in a "professional or commercial activity."

As *amici* argue, "[h]uman trafficking is characterized by its profitable and commercial nature."  (Mem. at 14.)   *Amici*'s only argument that Defendants took part in a profitable and commercial operation, however, is that they supposedly profited by underpaying Plaintiffs.  The *amici* organizations in *Gonzalez* made exactly the same claim.  (*Gonzalez Amicus* at 13-15.)  The Court in *Gonzalez*, however, explicitly rejected this argument, noting that

> [a]*mici* attempt to add a twist to the arguments that are rejected by the Department of State, the court in *Tabion*, and now this Court.  *Amici* attempt to circumvent the logic applied by the court in *Tabion* by asserting that diplomats do, in fact, profit from arrangements for domestic services . . . because they are underpaying for labor and thereby profiting. . . . The Court finds this argument unpersuasive.

*Gonzalez Paredes v. Vila*, 479 F. Supp. 187, 193 n.7 (D.D.C. 2007) (Friedman, J.).  The hiring of domestic workers is an expenditure, not a profit center.  An individual does not *profit* by purchasing services at a lower rate, any more than he would by purchasing goods at a discount.  The cases cited by *amici*, most of which were also cited in the *amicus* brief in *Gonzalez*, for the proposition that underpayment is a profit do not support *amici*'s claim.  These cases generally involved the maximization of profits by non-payment of certain costs in businesses[2], the non-payment of taxes as the purpose of a criminal enterprise[3], and the interpretation of an insurance policy.[4]  Defendants did not operate a business and did not hire Plaintiffs for the purpose of

---

[2] *See Jerimiah v. Richardson*, 148 F.3d 17, 24 (1st Cir. 1998) (discussing a trustee in bankruptcy operating a commercial complex "had an illusory 'profit' . . . achieved only by not making payments on the mortgage" and withholding taxes and other payments); *Princeton Univ. Press v. Mich. Doc. Serv*., 99 F.3d 1381,1386 (6th Cir. 1996) (discussing a "for-profit corporation" maximizing profits by withholding royalties from copyright holders); *Southern New England Tel. Co. v. Dept. of Pub Util. Control*, 874 A.2d 776, 783 (Conn. 2005) (discussing a utility company that charged consumers its full rates despite limited service as the result of a strike).

[3] *See United States v. Veksler*, 862 F. Supp. 1337, 1340 (E.D. Pa. 1994), *aff'd* 62 F.3d 544 (3rd Cir. 1995) (involving a conspiracy to sell diesel fuel without paying the required taxes).

[4] *See Oktibbeha County Sch. Dist. v. Coregis Ins. Co.*, 173 F. Supp. 2d 541, 543 (N.D. Miss. 2001) (interpreting whether the policy holder benefited within the meaning of the policy).

earning a profit. Accordingly, Defendants did not profit from their employment relationship with Plaintiffs—the only remote connection that *amici* argue tied Defendants to the commerce of trafficking.

## II.     Prior Diplomatic Immunity Cases Are Applicable Precedent

As pointed out previously, the existing case law confirms Defendants' position. In prior cases in which household employees sued diplomats and their spouses, courts have consistently found the diplomats and their families immune.

### A.     The Underlying Allegations Are Very Similar to those in Earlier Cases

Like Plaintiffs, *amici* argue that this case is distinguishable from precedent because the earlier cases did not allege trafficking violations. (Mem. at 17-19.) This distinction is one of labeling rather than substance. That the plaintiffs in *Gonzalez* and *Tabion v. Mufti*, 73 F.3d 535 (4th Cir. 1996) did not bring claims for trafficking violations does not affect the analysis of the underlying conduct. At issue is whether Defendants' conduct was a "professional or commercial activity" within the meaning of the Vienna Convention, not which causes of action Plaintiffs elected to plead, or, indeed, which causes of action were available to Plaintiffs. If such pleading tactics were enough to defeat diplomatic immunity, diplomatic immunity would cease to exist.

The underlying conduct in both *Tabion* and *Gonzalez*, found not to trigger an exception to diplomatic immunity in either case, was very similar to that alleged here. In both cases, the defendants were diplomats who hired the plaintiffs while living abroad and then brought them to the United States to work as domestic servants. *Tabion v. Mufti*, 877 F. Supp. 286, 286 (E.D. Va. 1995), *aff'd*, 73 F.3d 535 (4th Cir. 1996); *Gonzalez*, 479 F. Supp. 2d at 189-90. In *Tabion*, a Filipino domestic servant of a Jordanian diplomat and his wife claimed that she was severely underpaid and that the defendants "confiscated her passport and threatened her with dismissal, deportation, and arrest if she attempted to leave their household." *Tabion*, 877 F. Supp. at 286.

4

The plaintiff sued not only for labor violations, but also for false imprisonment and racial discrimination. *Id.* at 286-87. Similarly in *Gonzalez*, the plaintiff, a Paraguayan national, claimed she was seriously overworked and underpaid by her Argentine employers after they brought her to the United States on an A-3 visa. *Gonzalez*, 479 F. Supp. 2d at 189-90. Likewise here, Plaintiffs traveled to the United States on A-3 visas and have alleged various harms—all arising out of their domestic employment by Defendants. It is the conduct that must be examined, not the labels which Plaintiffs or *amici* choose to apply to that conduct—and the alleged conduct is no more commercial here than it was in the prior cases.

Further, while *amici* state that the Court in *Gonzalez* "went out of its way to say 'what the allegations in this case are *not*—slavery, human trafficking, war crimes, torture, etc. . . . ,'" they fail to mention that the Court's note was in direct response to the *amicus* brief filed by some of the same organizations joining together as *amici* here. (Mem. at 19.) Although the *amici* in *Gonzalez* provide the disclaimer that "the activity in the instant case did not rise to the level of trafficking," as the Court noted, "[i]n their brief, *amici* spend much time and effort outlining the horrors of slavery and trafficking in persons in the modern world, and they assert that abuse of domestic workers by diplomats in the United States is widespread." *Gonzalez*, 479 F. Supp. 2d at 194; *see also Gonzalez Amicus* at 15-16, 18-21. The clear implication is that *amici* believed the conduct there to be related to trafficking and wanted the Court to consider it in that context. It is somewhat disingenuous, then, to argue the difference in allegations between this case and *Gonzalez*, when these *amici* organizations argued in that case for the application of the "professional or commercial activity" exception in *Gonzalez* in order to combat trafficking.

Finally, *amici* contend that it is significant that Plaintiffs here have sought relief for involuntary servitude and that Plaintiffs have argued their allegations amount to *jus cogens*

5

violations. (Mem. at 19.) This argument also is without merit. In another suit against diplomats by a domestic employee, *Ahmed v. Hoque*, No. 01-7224, 2002 WL 1964806 (S.D.N.Y. Aug. 23, 2002), the plaintiff alleged that the defendants "forced him to work fourteen to seventeen hour workdays, seven days a week, gave him only occasional spending money but no salary, verbally and physically abused him, and refused him access to his travel documents, in violation of the Constitution and federal statutes, New York State labor laws, international law treaties, conventions, and the customary law of nations, as well as the common law." *Id.* at *1. The plaintiff further alleged that prior to agreeing to accompany the Defendants to the United States, the defendants made various promises regarding the plaintiff's treatment, and the plaintiff signed documents, some of which he did not understand. *Id.* The plaintiff left the defendants' home after a physical struggle, following an injury inflicted by one of the defendants. *Id.* While the court did not analyze the commercial activity exception[5], it held that the defendants were immune from suit despite these Constitutional and international law claims. *Id.* at 8.

**B.    The Passage of the TVPA Does Not Affect the Analysis of "Professional or Commercial Activity"**

*Amici* also argue that *Tabion* is different from the case here because it was decided prior to the passage of the Trafficking Victims Protection Act ("TVPA"). (Mem. at 19.) But when the TVPA was enacted has nothing to do with the key issue—whether or not the conduct alleged was professional or commercial and therefore excepted from immunity. The court and the State Department in *Tabion* set out the proper interpretation of what is professional or commercial in the context of the Vienna Convention. That interpretation is not affected by the TVPA.

---

[5] In noting the relevant provisions of the Vienna Convention, however, the only exception to diplomatic immunity that the court listed was Article 31(1)(c)—the "professional or commercial activity" exception. *Ahmed*, 2002 WL 1964806 at *2 n.2.

6

To suggest that the passage of the TVPA could alter the interpretation of the Vienna Convention is merely to reconfigure Plaintiffs' erroneous last-in-time argument. (*See* Reply at 21-22.) In their Opposition, Plaintiffs argue that there can be no diplomatic immunity for causes of action created after the Vienna Convention. (Plaintiffs' Opposition, docket no. 18, ("Opp.") 36-38.) As discussed in Defendants' Reply[6], over time such a view "would reduce the Vienna Convention – and the Diplomatic Relations Act of 1978 – to a mere nullity, frustrating the expectations of the United States and the 178 other states party to the Convention." (Reply at 21.) Similarly, by *amici*'s logic, a non-conflicting statute passed after the Vienna Convention could strip diplomats of immunity without explicitly stating such a removal of immunity as its purpose. Indeed, this argument is even farther afield than Plaintiffs' in that it suggests that a subsequent in time statute could not only alter the Vienna Convention but do so by changing the nature of an act—turning it from non-commercial to commercial.

## III.    The State Department Interpretation is Clear and Entitled to Deference

The State Department has stated in two prior cases that the Article 31(1)(c) exception is not applicable in a suit arising out of a domestic employment relationship. *Amici* essentially argue that the Court should ignore those interpretations.

*Amici* opine that "it is unclear whether the commercial activity exception is as narrow as the State Department contends," questioning the correctness of the government's position. (Mem. at 20.) However, the State Department's interpretation is entitled to deference. As the Supreme Court held in *Sumitomo Shoji America, Inc. v. Avaglino*, 457 U.S. 176 (1982), "the meaning attributed to treaty provisions by the Government agencies charged with their negotiation and enforcement is entitled to *great weight*." *Id.* at 184-85 (citing *Kolovrat v.*

---

[6] Defendants' Reply, docket no. 20, ("Reply").

*Oregon*, 366 U.S. 187, 194 (1961)) (emphasis added). *Amici* argue that courts should not follow the State Department's interpretation of international treaties "blindly."[7] (Mem. at 22.) As the State Department has explained:

> Deference is particularly appropriate in the case of the Diplomatic Relations Convention, which forms the framework of the Department of State's conduct of diplomatic relations with virtually every country in the world, and which the Department accordingly interprets and applies on a regular basis, taking into account not only the interests of the foreign states with diplomatic representation in the United States, but the interests of the United States in sending diplomats abroad. The interpretation of the Diplomatic Relations Convention in the United States may affect the treatment of United States diplomats and their family members serving in other countries, including potentially hostile situations. The Convention's protections are to permit diplomats to reside and function in foreign countries free from harassment and litigation.

(Statement of Interest of the United States, *Gonzalez Paredes v. Vila*, No. 06-0089, (D.D.C. 2007), docket no. 23, ("*Gonzalez* Statement of Interest"), at 5-6.) The State Department is the U.S. agency charged with conducting the nation's foreign affairs. Accordingly, its opinion is entitled to deference in matters, such as this one, that impact important issues of international relations.

The opinion of the United States Executive branch with respect to the interpretation of the "professional or commercial activity" exception to diplomatic immunity under the Vienna Convention is very clear. The U.S. government submitted Statements of Interest on this matter in both *Tabion* and *Gonzalez*. In *Tabion*, the government stated that "[i]n the view of the United States, the term 'commercial activity' as used in Article 31(1)(c) focuses on the pursuit of trade

---

[7]*Amici* also state that "[i]t should be noted that courts are generally to give 'somewhat less deference' where an agency and another country disagree on the meaning of a treaty . . . ." (Mem. at 22 n.104) (quoting *Iceland S.S. Co.-Eimskip v. U.S. Dep't of Army*, 201 F.3d 451, 458 (D.C. Cir. 2000) (internal quotations omitted)). In *Iceland S.S. Co.-Eimskip*, however, the government of Iceland directly intervened in the dispute through a diplomatic note sent to the U.S. State Department and submitted an *amicus* brief. *Iceland S.S. Co.-Eimskip*, 201 F.3d at 456, 457. No such intervention has occurred here. Further, the court noted that "where an agency has 'wide latitude in interpreting the [agreement at issue], . . . we will defer to its reasonable interpretation.'" (quoting *Air Canada v. U.S. Dep't of Transp.*, 843 F.2d 1483, 1487 (D.C. Cir. 2000)).

or business activity; it does not encompass contractual relationships for goods and services incidental to the daily life of the diplomat and family in the receiving State." (Statement of Interest of the United States in *Tabion v. Mufti*, No. 94-1481, docket no. 18, ("*Tabion* Statement of Interest"), at 4.)  In *Gonzalez*, the government further stated that "a diplomat is not engaged in a 'commercial activity' under the Diplomatic Relations Convention when he employs a domestic worker." *Gonzalez* Statement of Interest at 2.

In an attempt to cast doubt on the government interpretation, *amici* have misconstrued State Department statements, presenting them as equivocal or mistaken when, in fact, they are neither.  *Amici* describe statements by the U.S. representative to the United Nations Conference on Diplomatic Intercourse about the meaning of "commercial activity" as standing "in stark contrast to the Statement of Interest that the State Department files in *Gonzalez Paredes* . . . ." (Mem. at 20-21.)  The referenced portion of the Statement of Interest, however, is not a discussion of the meaning of "commercial activity."  It is a discussion of whether a requirement in a diplomatic circular note, that diplomats enter into contracts with their domestic workers, could "abrogate diplomatic immunity."  *Gonzalez* Statement of Interest at 14-16.  In the view of the State Department, it could not.  *Id.*  This mistaken comparison does not refute or reduce the importance of the State Department's interpretation of "professional or commercial activity."

Nor do the two cases *amici* cite as taking a different position on diplomatic immunity for suits by household employees.  *Amici* cite these cases, only one of which is reproduced in full, for the proposition that "parties to the Vienna Convention have applied Article 31(1)(c) differently. (Mem. at 21-22.)  Those cases, however, pre-date the State Department view expressed in *Gonzalez* and do not diminish the effect of the Executive opinion.  As discussed, the United States government, in both *Gonzalez* and *Tabion*, has taken the position that the hiring of

9

domestic workers by accredited diplomats does not trigger the "professional or commercial activity" exception. It is these interpretations, not the isolated opinions of a Portuguese court and a Belgian Labor Tribunal, that should guide the Court.

## Conclusion

For all these reasons and those set forth in Defendants' Motion to Dismiss and to Quash Service of Process and in Defendants' Reply, Defendants respectfully request that the Court grant their Motion.

Respectfully Submitted,

SHEARMAN & STERLING LLP

　/s/　Thomas B. Wilner_____
Thomas B. Wilner (D.C. Bar # 173807)
Amanda Shafer (D.C. Bar # 497860)
Justin Harrison (D.C. Bar # 502069)
801 Pennsylvania Avenue, N.W., Suite 900
Washington, D.C. 20004-2634
Telephone: (202) 508-8000
Facsimile: (202) 508-8001

*Attorneys for Defendants*
Waleed KH N.S. Al-Saleh and
Maysaa KH A.O.A. Al-Omar

Dated August 3, 2007

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 3rd day of August 2007, I have caused to be served, via U.S. Mail, a copy of the foregoing Defendants' Memorandum of Points and Authorities in Response to the Memorandum of Law of Break the Chain *et al.*, on the following:

Claudia M. Flores
Lenora M. Lapidus
Jennifer L. Pasquarella
ACLU WOMEN'S RIGHTS PROJECT
125 Broad Street
18th Floor
New York, NY 10004

David A. Kotler
Catherine J. Rosato
Reid K. Weisbord
DECHERT LLP
1775 I Street, N.W.
Washington, D.C. 20006

Steven M. Watt
ACLU FOUNDATION
125 Broad Street
17th Floor
New York, NY 10004

    /s/   Thomas B. Wilner_____
Thomas B. Wilner (D.C. Bar # 173807)
SHEARMAN & STERLING LLP
801 Pennsylvania Avenue, N.W.
Washington, D.C. 20004-2634
Telephone: (202) 508-8000