## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| **MANI KUMARI SABBITHI, <u>et al.</u>,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No. 07-115 (EGS)** |
| | ) | |
| **MAJOR WALEED KH N.S. AL SALEH,** | ) | |
| <u>et al.</u>, | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

## <u>STATEMENT OF INTEREST OF THE UNITED STATES OF AMERICA</u>

## TABLE OF CONTENTS

INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

BACKGROUND. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

DISCUSSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

I.  The Employment of a Domestic Worker Does Not Constitute "Commercial
    Activity" Under Article 31(1)(c) of the Vienna Convention. . . . . . . . . . . . . . . . . . . . 5

    A.  The United States's view is consistent with the origins and purposes
        of diplomatic immunity. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    B.  The negotiating history of the Vienna Convention confirms the
        United States's view. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

    C.  <u>Tabion</u> and <u>Gonzales Paredes</u> — the only domestic cases to have
        addressed the issue — were correctly decided. . . . . . . . . . . . . . . . . . . . . . . . . 14

    D.  The characterization of Defendants' alleged conduct as constituting
        human trafficking does not change the analysis in this case. . . . . . . . . . . . . . 17

II.  Diplomatic Immunity Extends to Constitutional Claims. . . . . . . . . . . . . . . . . . . . . 18

III.  There Is No <u>Jus Cogens</u> Exception to Diplomatic Immunity. . . . . . . . . . . . . . . . . . 20

IV.  The Trafficking Victims Protection Act Does Not Override Diplomatic
     Immunity. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

V.  Failure of the United States to Respect Diplomatic Immunities Could Have
    Serious Consequences in the International Community. . . . . . . . . . . . . . . . . . . . . . . 24

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

CERTIFICATE OF SERVICE

# INTRODUCTION

The United States of America, by and through undersigned counsel, respectfully submits this Statement of Interest pursuant to 28 U.S.C. § 517[1] and in response to the Court's invitation to the United States Department of State to communicate its views on this case.

This action was brought against a Kuwaiti diplomat, Major Waleed KH N.S. Al Saleh ("Major Al Saleh"), and his wife, Maysaa KH A.O.A. Al Omar ("Ms. Al Omar"), by their former domestic servants. Plaintiffs allege that they were brought into the United States and forced to work under conditions that violate the Thirteenth Amendment, the Trafficking Victims Protection Act, the Fair Labor Standards Act, and common law tort and contract law. Defendants assert that their privileges and immunities under the Vienna Convention on Diplomatic Relations ("Vienna Convention" or "VCDR"), done Apr. 18, 1961, 23 U.S.T. 3227, render them immune to the civil jurisdiction of United States courts. Plaintiffs respond that Defendants should be denied immunity because human trafficking is a "commercial activity" that falls outside the protections of the Vienna Convention. Plaintiffs also argue that diplomatic immunity cannot deprive the Court of jurisdiction over alleged violations of the Thirteenth Amendment, jus cogens norms prohibiting slavery, or the Trafficking Victims Protection Act ("TVPA").

The United States submits the following views because it has important interests in the proper interpretation and application of the Vienna Convention in United States courts. Indeed, any failure to respect the privileges and immunities accorded to diplomats under the Vienna Convention would contravene the United States's established obligations to its treaty partners and jeopardize the

---

[1] 28 U.S.C. § 517 provides that "any officer of the Department of Justice[] may be sent by the Attorney General to any State or district in the United States to attend to the interests of the United States in a suit pending in a court of the United States."

1

protections reciprocally extended by other nations to United States diplomats stationed abroad.

As explained below, a diplomat's employment of a domestic worker is not a "commercial activity" under Article 31(1)(c) of the Vienna Convention but, rather, an activity incidental to the diplomatic assignment, to which immunity attaches notwithstanding the characterization of Defendants' alleged conduct as constituting human trafficking. Moreover, under United States law, diplomatic immunity precludes jurisdiction over constitutional claims, including those that may arise under the Thirteenth Amendment, as well as over alleged violations of <u>jus cogens</u> norms and the TVPA.

## BACKGROUND

According to the Complaint, Plaintiffs are three nationals of India who worked as domestic servants to Major Al Saleh and Ms. Al Omar in Kuwait before accompanying them to the United States, where Plaintiffs lived and worked in the couple's McLean, Virginia, home between July 2005 and January 2006. <u>See</u> Compl. ¶¶ 6-8, 17, 29, 38. Plaintiffs allege that Defendants obtained visas on their behalf by submitting deceptive employment contracts to U.S. officials in Kuwait, <u>see</u> <u>id.</u> ¶¶ 24-25, 30-33, 43-45; confiscated their passports after their arrival in the United States, <u>see</u> <u>id.</u> ¶¶ 49; and abused them psychologically and physically, <u>see</u> <u>id.</u> ¶¶ 57-88. Plaintiffs assert that they were paid unlawfully low wages, which were forwarded to their relatives abroad rather than paid to them directly. <u>See</u> <u>id.</u> ¶¶ 89-93. Plaintiffs also allege that they were rarely permitted to leave Defendants' home without supervision, <u>see</u> <u>id.</u> ¶ 83, and eventually escaped by enlisting the help of a sympathetic neighbor, who contacted the authorities, <u>see</u> <u>id.</u> ¶¶ 96-97, 102.

Plaintiffs filed this action on January 18, 2007, and served Defendants on January 24, 2007.[2]

---

[2] The State of Kuwait is also named as a Defendant but has not been served. As used in this Statement of Interest, "Defendants" refers only to Major Al Saleh and Ms. Al Omar.

The Department of State has certified that Major Al Saleh was notified as a diplomatic agent at the

Embassy of Kuwait on August 20, 2004, and continued to serve in that capacity throughout the

period in which the alleged conduct took place.  See Letter from Gladys Boluda, Assistant Chief of

Protocol, U.S. Department of State (Mar. 15, 2007) (Ex. 2 to Defs.' Motion to Dismiss and to Quash

Service of Process).  At the same time, Ms. Al Omar was notified to the Department of State as a

Kuwaiti national and Major Al Saleh's spouse residing in his household.  Id.  The Department of

State's certification of Defendants' diplomatic status is conclusive, see Carrera v. Carrera, 174 F.2d

496, 497 (D.C. Cir. 1949), and is not in dispute.

The record in this case indicates that Defendants have since returned to Kuwait.[3]  According

to a letter filed by Plaintiffs as an exhibit to their Sur-Reply, following an investigation into Plaintiffs'

allegations, the Criminal Section of the Department of Justice's Civil Rights Division asked the

Department of State to request that Kuwait waive Ms. Al Omar's immunity so that she could be

---

[3] That Defendants are no longer in the United States has no bearing on the central issue now
before the Court — namely, whether Defendants were immune from service of process when it was
attempted in January 2007.  If they were, the attempted service was a nullity, and the Court lacks
personal jurisdiction over them.  See Tachiona v. Mugabe, 169 F. Supp. 2d 259, 302 (S.D.N.Y.
2001) (concluding that "both [defendants] enjoyed diplomatic immunity at the time they were served
and . . . the Court therefore lacks a basis for exercise of jurisdiction over them"), aff'd in relevant part
and rev'd in part, 386 F.3d 205, 220-21 (2d Cir. 2004) (concluding that "diplomatic immunity
rendered the service of process a nullity"); Aidi v. Yaron, 672 F. Supp. 516, 517 (D.D.C. 1987)
(diplomatic immunity "provides protection from the exercise of jurisdiction by a federal court" and
renders "service of process . . . void"); Hellenic Lines, Ltd. v. Moore, 345 F.2d 978, 980 (D.C. Cir.
1965) (concluding that "diplomatic immunity would have been violated by any compulsory service
of process"); Carrera v. Carrera, 174 F.2d 496, 498 (D.C. Cir. 1949) ("It has long been a settled rule
of law that foreign diplomatic representatives are exempt from all local processes in the country to
which they are accredited.") (citation omitted); see generally Omni Capital Int'l v. Rudolf Wolff &
Co., 484 U.S. 97, 104 (1987) ("Before a federal court may exercise personal jurisdiction over a
defendant, the procedural requirement of service of summons must be satisfied.").  Given that the
record does not indicate that service has been effected at a time when Defendants were not immune
from service of process, the United States does not at this time address the separate question whether
Defendants enjoy "residual immunity" under Article 39(2) of the Vienna Convention.  See Defs.'
Resp. to Pls.' Sur-Reply at 2-6.

prosecuted for alleged violations of 18 U.S.C. § 1589 (forced labor).  See Letter from Robert Moossy, Director, Human Trafficking Prosecution Unit, Criminal Section, Civil Rights Division, U.S. Department of Justice to Claudia Flores, Staff Attorney, Women's Rights Project, American Civil Liberties Union (Oct. 31, 2007) (Ex. A to Pls.' Sur-Reply).[4]  Although Kuwait declined to waive Ms. Al Omar's immunity, Defendants departed the United States.  See id.

## DISCUSSION

Under Article 31 of the Vienna Convention on Diplomatic Relations, a diplomatic agent is entitled to immunity from the civil jurisdiction of the receiving State, except, as relevant here, in the case of "[a]n action relating to any professional or commercial activity exercised by the diplomatic agent in the receiving State outside his official functions."  VCDR art. 31(1)(c).  The family members of a diplomatic agent forming part of his household enjoy a similar immunity pursuant to Article 37 of the Vienna Convention.[5]  In an attempt to defeat Defendants' assertion of immunity, Plaintiffs raise four arguments.  They principally argue that (1) Defendants' alleged trafficking activities fall within the Vienna Convention's "commercial activity" exception.  Failing that, they contend that diplomatic immunity cannot shield alleged violations of (2) the Thirteenth Amendment; (3) jus cogens norms prohibiting slavery; or (4) the Trafficking Victims Protection Act.

---

[4] In general, when the Department of State is informed by a prosecutor that, absent immunity, criminal charges would be brought against a diplomat, it is the policy of the Department of State to request that the sending State waive the diplomat's immunity so that the allegations can be fully adjudicated.  See U.S. Dep't of State, Foreign Affairs Manual, 2 FAM 233.3 (Dec. 14, 2006), available at www.state.gov/m/a/dir/regs.  For sufficiently serious offenses, if waiver is declined the Department of State will generally require the diplomat's departure from the United States.  See id.

[5] Article 37(1) provides: "The members of the family of a diplomatic agent forming part of his household shall, if they are not nationals of the receiving State, enjoy the privileges and immunities specified in articles 29 to 36."

I.      **The Employment of a Domestic Worker Does Not Constitute "Commercial Activity" Under Article 31(1)(c) of the Vienna Convention**

In the view of the United States, the employment of a domestic worker by a diplomat is not a "commercial activity" under Article 31(1)(c) of the Vienna Convention. The "commercial activity" exception focuses on the pursuit of trade or business activity that is unrelated to the diplomatic assignment; it does not encompass contractual relationships for goods and services that are incidental to the daily life of the diplomat and his family in the receiving State. As explained below, this position is consistent with the origins and purposes of diplomatic immunity, and is confirmed by the Vienna Convention's negotiating history. See De Geofroy v. Riggs, 133 U.S. 258, 271 (1890) (treaties are "contracts between independent nations" and, as such, should be construed "so as to carry out the apparent intention of the parties"); Tabion v. Mufti, 877 F. Supp. 285, 287 (E.D. Va. 1995) ("[B]ecause the signatories' intent is paramount, courts 'may look beyond the written words to the history of the treaty, the negotiations, and the practical construction adopted by the parties.'") (quoting Air France v. Saks, 470 U.S. 392, 397 (1985)). Moreover, this view has been endorsed by the only United States courts that, to our knowledge, have addressed the issue. See Tabion v. Mufti, 877 F. Supp. 285 (E.D. Va. 1995), aff'd, 73 F.3d 535 (4th Cir. 1996); Gonzalez Paredes v. Vila, 479 F. Supp. 2d 187 (D.D.C. 2007).

A.      **The United States's view is consistent with the origins and purposes of diplomatic immunity**

The Vienna Convention's recognition of the immunity accorded to a diplomat and his family codifies a principle that has long been an integral component of customary international law, and that played an important role in the nation's conduct during and after the time the Constitution was created. See, e.g., The Schooner Exchange v. M'Faddon, 11 U.S. (7 Cranch) 116, 143 (1812) ("[I]t is impossible to conceive . . . that a Prince who sends an ambassador or any other minister can have

5

any intention of subjecting him to the authority of a foreign power . . . .") (quoting Emmerich de Vattel[6]); Blackstone's Commentaries with Notes of Reference to the Constitution and Laws of the Federal Government of the United States and of the Commonwealth of Virginia 70 (1969) (reprint of 1803 ed.) (rights of ambassadors were a matter of universal concern recognized in English common law and were adopted by the United States).  As the preamble to the Vienna Convention explains, diplomatic immunities are accorded "not to benefit individuals but to ensure the efficient performance of the functions of diplomatic missions as representing States."  By necessity, diplomats must carry out their duties in a foreign — sometimes hostile — environment.  Jurisdictional immunities ensure the ability of diplomats to function effectively by insulating them from the disruptions that would accompany litigation in such an environment.  This protection was regarded as so important that for almost two centuries the United States accorded diplomats complete immunity.  See 22 U.S.C. §§ 252–54 (enacted 1790; repealed 1978); S. Rep. 95-958, at 2 (1978), reprinted in 1978 U.S.C.C.A.N. 1936 (1790 statute was "adapted from English statues [sic] dating back to the reign of Queen Anne").  When the United States became a party to the Vienna Convention, it recognized the small number of limited exceptions to diplomatic immunity provided for in the treaty, including Article 31(1)(c)'s "commercial activity" exception.

Consistent with the Vienna Convention's purposes, the term "commercial activity" as used in Article 31(1)(c) focuses on the pursuit of trade or business activity unrelated to diplomatic work.  Such commercial activity is normally undertaken for profit or remuneration and, if engaged in by the diplomat himself (as opposed to a member of his family), is undertaken in contravention of Article 42, which provides that a "diplomatic agent shall not in the receiving State practice for personal profit

---

[6] Emmerich de Vattel was an international jurist who greatly influenced the Framers of the Constitution.  See U.S. Steel Corp. v. Multistate Tax Comm'n, 434 U.S. 452, 462 n.12 (1978).

any professional or commercial activity." Indeed, Article 31(1)(c) works in conjunction with Article 42 to make clear that, if a diplomat does engage in such an activity, he does not have immunity from related civil actions. Conversely, the term "commercial activity" in Article 31(1)(c) does not encompass contractual relationships for goods and services incidental to the daily life of the diplomat and the diplomat's family in the receiving State.

This longstanding interpretation is entitled to great weight. See Sumitomo Shoji America, Inc. v. Avagliano, 457 U.S. 176, 184-85 (1982) ("[T]he meaning attributed to treaty provisions by the Government agencies charged with their negotiation and enforcement is entitled to great weight.") (citation omitted). Deference is particularly appropriate in the case of the Vienna Convention, which forms the framework of the Department of State's conduct of diplomatic relations with virtually every country in the world, and which the Department accordingly interprets and applies on a regular basis, taking into account not only the interests of the foreign states with diplomatic representation in the United States, but the interests of the United States in sending diplomats abroad.

**B.    The negotiating history of the Vienna Convention confirms the United States's view**

The United States's interpretation of Article 31(1)(c) is not only consistent with the purposes of diplomatic immunity, but is confirmed by the Vienna Convention's negotiating history. See Tabion, 877 F. Supp. at 292. The final version of the Vienna Convention evolved from an initial draft developed in a series of meetings of the United Nations International Law Commission ("ILC"), a body of international law experts. The ILC draft was then considered by States at a formal diplomatic conference convened by the United Nations in 1961. In each forum, it was clear that, under the Vienna Convention, diplomats would continue to enjoy their traditional immunities for contracts incidental to everyday life.

The ILC began its work in earnest by considering a draft for the Codification of the Law Relating to Diplomatic Intercourse and Immunities proposed by its Special Rapporteur in 1955.  The draft contained no exception to immunity for commercial activity.  See Report Presented by Mr. A.E.F. Sandstrom, Special Rapporteur, U.N. Doc. A/CN.4/91, reprinted in [1955] 2 Y.B. Int'l L. Comm'n 11-12, 16, U.N. Doc. A/CN.4/SER.A/1955/Add.1.  An amendment providing an exception to immunity for acts "relating to a professional activity outside [the diplomatic agent's] official duties" was first introduced into the Draft Articles at the 402nd meeting of the ILC, during its Ninth Session, on May 22, 1957.  Summary Records of the 402nd Meeting, [1957] 1 Y.B. Int'l L. Comm'n 97, U.N. Doc. A/CN.4/SER.A/1957.  The author of the proposed amendment, Mr. Verdross, based his proposal on Article 13 of the 1929 resolution of the Institute of International Law, which referred only to "professional" activity.  The proposed amendment was also described as being akin to Article 24 of the 1932 Harvard Draft Convention on Diplomatic Privileges and Immunities (the "Harvard Draft"), which referred to "business" as well as "professional" activity as follows:

> A receiving state may refuse to accord the privileges and immunities provided for in this convention to a member of a mission or to a member of his family who engages in a business or who practices a profession within its territory, other than that of the mission, with respect to acts done in connection with that other business or profession.

Id. at 97 (quoting Art. 24, ¶ 2 of the Harvard Draft).  That Mr. Verdross's proposed amendment was not intended to address ordinary contractual relationships for goods and services incidental to daily life is evidenced by his reference to the Harvard Draft and his observation that the cases to which the amendment related were "comparatively rare."  Id.  Indeed, some ILC members suggested that the proposal was unnecessary because it was aimed at activity in which diplomats rarely engaged.  Id. at 97-98.

The provisional draft resulting from the ILC's Ninth Session in 1957 would have eliminated civil and administrative immunity for actions "relating to a professional or commercial activity exercised by the diplomatic agent in the receiving State and outside his official functions." Reports of the Commission to the General Assembly, U.N. Doc. A/3623, reprinted in [1957] 2 Y.B. Int'l L. Comm'n 139, U.N. Doc. A/CN.4/SER.A/1957/Add.1.   This provisional draft was submitted to governments for comment.   See Diplomatic Intercourse and Immunities: Summary of Observations Received from Governments and Conclusions of the Special Rapporteur, U.N. Doc.A/CN.4/116 (1958).   In response to the Australian member's comment that the term "commercial activity" required some definition, the Special Rapporteur explained that "the use of the words 'commercial activity' as part of the phrase 'a professional or commercial activity' indicates that it is not a single act of commerce which is meant, by [sic] a continuous activity." Id. at 56.[7]   When the United States's member commented that the commercial activity exception went beyond existing international law, the Special Rapporteur responded by describing the exception in terms of activity that was

---

[7] Eileen Denza, a leading authority on diplomatic law, described the Vienna Convention's use of "commercial activity" in these terms:

> It is clear that the ideas of remuneration and of a continuous activity are central to the purpose of Article 31(1)(c).   Although the provision is drafted in unnecessarily wide terms it is not intended to cover commercial contracts incidental to the ordinary conduct of life in the receiving State. If one accepts that Article 31(1)(c) is to be interpreted in this sense it becomes clear that whereas the speculative activities of a diplomat on the Stock Exchange would come within the exception to immunity, contracts of personal loan would not, nor would contracts entered into for the purpose of educating the children of a diplomatic agent or otherwise supplying him and his family with any kind of goods or services.

Denza, Diplomatic Law, 166-67 (1st ed. 1976) (emphasis in original).   Indeed, Denza quotes the decision of the Fourth Circuit in Tabion as correctly describing the scope of Article 31(1)(c).   See Denza, Diplomatic Law, 305 (3d ed. 2008).

inconsistent with diplomatic status:

> In case (c), the considerations were as follows.  A condition of the exercise of a liberal profession or commercial activity must be that the client should be able to obtain a settlement of disputes arising out of the professional or commercial activities conducted in the country.  It would be quite improper if a diplomatic agent, <u>ignoring the restraints which his status ought to have imposed upon him</u>, could, by claiming immunity, force the client to go abroad in order to have the case settled by a foreign court.

<u>Id.</u> at 55-56 (emphasis added).

At its Tenth Session in 1958, the ILC adopted a final draft that contained a commercial activity exception to civil and administrative immunity.  As the records from this session show, both the Rapporteur and the ILC Chairman viewed the commercial activity exception as focusing on the pursuit of private trade or business activity.  They responded to a member's comment that he had understood the commercial activity exception to cover even isolated commercial transactions as follows:

> Sir Gerald FITZMAURICE, Rapporteur, doubted the advisability of Mr. Zourek's suggestion.  Paragraph 1(c) of the article applied to cases where a diplomatic agent conducted a regular course of business 'on the side.'  Such isolated transactions as, for instance, buying or selling a picture, were precisely typical of the transactions not subject to the civil jurisdiction of the receiving State.  Annoying as it might be for the other parties to such transactions in the event of a dispute, it was essential not to except such transactions from the general rule for, once any breach was made in the principle, the door would be open to a gradual whittling away of the diplomatic agent's immunities from jurisdiction.

> The CHAIRMAN pointed out that the article referred to 'commercial activity.'  A single transaction would hardly constitute 'commercial activity.'  Of course, even a single plunge in the waters of trade might suffice, but it must be in the waters of trade.

<u>Summary Records of the 476th Meeting</u>, [1958] 1 Y.B. Int'l L. Comm'n 244 U.N. Doc. A/CN.4/SER.A/1958.  The ILC's official Commentary on this provision, as adopted in 1958, also

shows that the term "commercial activity" did not encompass the usual procurement of goods and services needed in the diplomat's daily life, but rather focused on activities that were normally inconsistent with a diplomat's position.  In that Commentary, the commercial activity exception was explained as follows:

> The third exception arises in the case of proceedings relating to a professional or commercial activity exercised by the diplomatic agent outside his official functions.  It was urged that activities of these kinds are normally wholly inconsistent with the position of a diplomatic agent, and that one possible consequence of his engaging in them might be that he would be declared persona non grata.  Nevertheless, such cases may occur and should be provided for, and if they do occur the persons with whom the diplomatic agent has had commercial or professional relations cannot be deprived of their ordinary remedies.

Report of the Commission to the General Assembly, U.N. Doc. A/3859, reprinted in [1958] 2 Y.B. Int'l L. Comm'n 98, U.N. Doc. A/CN.4/SER.A/1958/Add.1.

The ILC's final draft was considered at the United Nations Conference on Diplomatic Intercourse and Immunities in 1961.  The Department of State's instructions to the United States delegation at that Conference expressed the following understanding of the commercial activity exception:

> Although states have generally accorded complete immunity to diplomatic agents from criminal jurisdiction, there has been a reluctance in some countries to accord complete immunity from civil jurisdiction particularly where diplomats engage in commercial or professional activities which are unrelated to their official functions.  While American diplomatic officers are forbidden to engage in such activities in the country of their assignment, other states have not all been so inclined to restrict the activities of their diplomatic agents.  Subparagraph c) of paragraph 1 would enable persons in the receiving State who have professional and business dealings of a non-diplomatic character with a diplomatic agent to have the same recourse against him in the courts as they would have against a non-diplomatic person engaging in similar activities.

> . . . While it may be argued that to permit a diplomat to be subjected to a lawsuit in such a case could interfere with the performance of his functions, that would seem to be a risk the sending State should[] be required to take when it permits its diplomatic agents to engage in commercial or professional activities of a non-diplomatic nature.

7 Digest of Int'l Law 406-07 (Whiteman 1970) (emphasis added).

The United States's view — that the commercial activity exception in Article 31(1)(c) focused on the kind of activity for profit in which diplomats should not be engaging — was borne out in the treatment of the issue at the Conference.  Commercial activity was considered in the context of a new article proposed by the delegate from Colombia, which became Article 42 of the Vienna Convention, and provides that "[a] diplomatic agent shall not in the receiving State practice for personal profit any professional or commercial activity."  The delegates' discussion of Colombia's proposed amendment demonstrates that the delegates envisioned Article 42 as addressing only the pursuit of active trade or business activity.  See U.N. Conference on Diplomatic Intercourse and Immunities: Official Records, Vol. I at 212 (1962), U.N. Doc. A. CONF.20/14 (statement of representative of Ceylon that "the supporters of the proposed new article had in mind a regular professional activity from which a permanent income was derived, and not an occasional activity, particularly of a cultural character"); id. at 213 (statement of representative of Italy favoring the proposal "provided that it was made clear . . . that the intention was to prevent diplomats from engaging in gainful activities such as commerce, industry or a regular profession"); id. at 213 (statement of representative of Malaya that the proposal "should be limited to commercial activity for personal profit").

Moreover, the Conference delegates saw the commercial activity exception in Article 31(1)(c) and the ban on commercial activity in Article 42 as closely intertwined.  Indeed, the delegates from Colombia and Italy proposed deletion of Article 31(1)(c)'s commercial activity exception, viewing

12

is as unnecessary in light of the prohibition in Article 42. However, the Conference voted to retain the exception following a discussion in plenary session in which several delegates pointed out that there could be no assurance that diplomatic agents would not engage in prohibited activities, and that, in any event, Article 42's ban did not apply to diplomats' family members, who would otherwise enjoy immunity for such activities. See U.N. Conference on Diplomatic Intercourse and Immunities: Official Records, supra, at 19-21.[8] All other proposals to provide additional exceptions to immunity for claims for damages caused by a diplomatic agent were rejected. See U.N. Conference on Diplomatic Intercourse and Immunities: Report of the Delegation of the United States of America, Dep't of State Pub. 7289, at 17 (1962).[9]

─────────────────────

[8] Numerous commentators have discussed the commercial activity exception of Article 31(1)(c) in terms that indicate that the scope of the phrase "professional or commercial activity" parallels the prohibition on a diplomat's engaging in private professional and commercial activity that is prohibited in Article 42. See, e.g., B.S. Murty, The International Law of Diplomacy: The Diplomatic Instrument and World Public Order 356 (1989) ("'Professional or commercial' should be interpreted alike in Art. 31(1) and Art. 42."); Grant V. McClanahan, Diplomatic Immunity 130-31 (1989) (although Art. 42 bars diplomats from engaging in commercial or professional activity, Art. 31(1)(c) "covers the few cases where a diplomat's own government and the receiving government waive objections"); Ludwik Dembinski, The Modern Law of Diplomacy 207 (1988) (professional and commercial activity by diplomats is prohibited and the exception is only to make clear that there igovernment immunity); Jonathan Brown, Diplomatic Immunity: State Practice under the Vienna Convention on Diplomatic Relations, 37 Int'l & Comp. L.Q. 53, 76 (1988) (relating "commercial activity" to the activities barred by Art. 42); Satow's Guide to Diplomatic Practice 126-27 (5th ed. 1979) (noting that the exception of Art. 31(1)(c) is "most important" not for diplomats but for their family members who may be employed); Philippe Cahier & Luke T. Lee, Vienna Conventions on Diplomatic and Consular Relations 29 (1989) (Art. 31(1)(c) is "probably redundant" because Art. 42 "forbids the diplomatic agent from engaging in such activities"); Michael Hardy, Modern Diplomatic Law 62 (1968) (discussing Art. 31(1)(c) with reference to Art. 42); cf. also Restatement (Third) of Foreign Relations Law of the United States § 464, Reporters' Note 9, at 468 (1986).

[9] Amici's suggestion that the Vienna Convention's drafting history reveals uncertainty over whether the "commercial activity" exception was intended to embrace a diplomat's employment of a domestic servant is mistaken. See Brief of Break the Chain et al. as Amici Curiae (in support of Plaintiffs) at 20-21 & nn. 96-97. Amici correctly note that, in debating whether the introductory words "In principle" should be retained in Article 40 bis, which later became Article 42, the U.S. representative commented that "there was no agreed definition of the meaning of 'commercial

In sum, as the Vienna Convention's drafting and negotiating history makes clear, diplomats are engaged in "professional or commercial" activity within the meaning of Article 31(1)(c) when they engage in a business, trade, or profession for profit.[10]   When diplomats enter into contractual relationships for personal goods or services incidental to residing in the host country, including the employment of domestic workers, they are not engaged in "commercial activity" as that term is used in the Vienna Convention.   Accordingly, diplomats are immune from suits arising out of such contractual relationships.

### C.   <u>Tabion</u> and <u>Gonzales Paredes</u> — the only domestic cases to have addressed the issue — were correctly decided

The United States's view of Article 31(1)(c) has been endorsed by the only domestic courts that, to our knowledge, have addressed the scope of the "commercial activity" exception.  In <u>Tabion v. Mufti</u>, 877 F. Supp. 285 (E.D. Va. 1995), <u>aff'd</u>, 73 F.3d 535 (4th Cir. 1996), a foreign diplomat and his wife were sued by their former domestic servant for, among other things, alleged violations of the Fair Labor Standards Act, breach of contract, and false imprisonment.  <u>Id.</u> at 286.   The

---

activity.'"  <u>U.N. Conference on Diplomatic Intercourse and Immunities: Official Records</u>, <u>supra</u>, at 21.  By way of example, however, the representative elaborated that he thought it unclear whether a diplomat "who was a stockholder and member of the board of directors of the parent company in the sending State" would be considered to have engaged in "commercial activity" in the receiving State if the company also operated there.  <u>Id.</u>  There is no indication that the representative thought it unclear that a contract for domestic services — or any other contract for goods or services incident to a diplomat's daily life — falls outside the exception.  <u>See id.</u>  This is consistent with the United States's official understanding, as expressed in its instructions to its delegation to that Conference, that Article 31(1)(c) was intended to reach only a diplomat's commercial or professional activities that are inconsistent with his diplomatic character.  <u>See</u> 7 <u>Digest of Int'l Law</u> 406, <u>supra</u>.  In short, even if there was some uncertainty over the outer contours of "commercial activity," the negotiating history makes clear that a diplomat's employment of a domestic servant does not qualify.

   [10] It is immaterial that Article 31(1)(c) does not contain the phrase "for profit" because it is clear from the negotiating history that the drafters understood it in that light.   Treaties are to be interpreted in good faith to fulfill the intent of the parties.  <u>See, e.g.</u>, <u>DeGeofroy</u>, 133 U.S. at 271.

plaintiff, who worked for the defendants in Jordan before accompanying them to the United States, alleged that she was promised a lawful minimum wage and reasonable working hours, but instead had her passport confiscated, was forced to work long hours with little pay, and was essentially imprisoned in the defendants' home.  See id.  Asserting diplomatic immunity, the defendants moved to quash; in response, the plaintiff argued that the defendants' conduct fell within Article 31(1)(c)'s "commercial activity" exception.  Id. at 287.

Relying on both the Vienna Convention's negotiating history and the position proffered by the United States,[11] the district court correctly held that the defendants were immune from suit because their employment relationship with the plaintiff was not "commercial activity."  See id. at 292.  The district court noted that the treaty's negotiating history "points persuasively to the conclusion that Article 31(1)(c) was not intended to carve out a broad exception to diplomatic immunity for a diplomat's daily contractual transactions for personal goods and services."  Id. at 291.  The district court also noted that the United States's view — that the term "commercial activity" focuses on the pursuit of trade or business activity — was "significant" and "add[ed] substantial force" to the court's holding.  See id. at 292.

Finding the district court's opinion "well-reasoned," the Fourth Circuit affirmed, concluding that "the phrase 'commercial activity,' as it appears in the Article 31(1)(c) exception, was intended by the signatories to mean 'commercial activity exercised by the diplomatic agent in the receiving State outside his official functions.'"  73 F.3d at 538 (quoting VCDR art. 31(1)(c)).  The court continued: "Day-to-day living services such as dry cleaning or domestic help were not meant to be

---

[11] The district courts in Tabion and Gonzalez Paredes invited the United States to submit its views on the proper interpretation of Article 31(1)(c).  See Tabion, 877 F. Supp. at 292; Letter to the Hon. John B. Bellinger, III, Gonzalez Paredes v. Vila, No. 06-89 (D.D.C.) (Nov. 1, 2006) [Dkt. #18].  The United States's position in this case is consistent with its position in both prior cases.

treated as outside a diplomat's official functions.  Because these services are incidental to daily life, diplomats are to be immune from disputes arising out of them."  Id. at 538-39.

Similarly, in Gonzalez Paredes v. Vila, 479 F. Supp. 2d 187 (D.D.C. 2007), a foreign diplomat and his wife were sued by their former domestic servant for alleged violations of the Fair Labor Standards Act, various District of Columbia wage laws, and breach of contract.  Id. at 189.  The plaintiff, who was hired in Argentina to provide domestic and childcare services to the defendants in the United States, alleged that the defendants required her to work long hours for low pay and with limited time off.  Id. at 190; see also Compl. ¶ 25, Gonzalez Paredes v. Vila, No. 06-89 (D.D.C.) (Jan. 18, 2006) [Dkt. #1].  In response to the defendants' assertion of diplomatic immunity, the plaintiff in Gonzalez Paredes, like the plaintiff in Tabion, argued that the defendants' employment of her was a "commercial activity" excepted from the protections of the Vienna Convention.  479 F. Supp. 2d at 193.  Notwithstanding the plaintiff's argument that diplomats indirectly profit from such arrangements for domestic services because they are, in effect, underpaying for labor, the Gonzalez Paredes court found "no reason to disagree" with the Fourth Circuit's conclusion in Tabion "that a contract for domestic services such as the one at issue in this case is not itself a commercial activity within the meaning of Article 31(1)(c) of the Vienna Convention."  Id. at 193 & n.7.  In reaching this conclusion, the court found that the United States's view was "entitled to great deference."  Id.[12]

--------

[12] Amici identify two foreign cases as applying a contrary construction of Article 31(1)(c). See Brief of Break the Chain et al. as Amici Curiae (in support of Plaintiffs) at 21-22, nn. 99-103, & Exs. B-C.  Neither case is persuasive.

According to the certified English translation that amici provided to the Court, in the first case, Fonseca v. Larren, Boletim do Ministério da Justiça 403 (1991), Portugal's Supreme Court of Justice concluded that, taken together, the exceptions to immunity contained in Article 31 "were intended to exclude all activities outside of the diplomat's diplomatic functions," including "the contracting of a domestic maid to perform services in the diplomat's private residence" (emphasis added).  However, the court did not address the Vienna Convention's negotiating history, which flatly

### D.   The characterization of Defendants' alleged conduct as constituting human trafficking does not change the analysis in this case

In this case, the characterization of Defendants' alleged conduct as constituting human trafficking does not change the analysis.  For present purposes, the proper inquiry is not whether Defendants have engaged in human trafficking, or the extent to which human trafficking affects the global economy, but whether Defendants have engaged in "commercial activity" as that term is intended in the Vienna Convention.  As explained above, the Vienna Convention's drafting history makes clear that the "commercial activity" exception refers to the ongoing conduct of a commercial business for profit, and does not include a diplomat's employment of a domestic servant, even though such employment may have incidental economic effects.  See Tabion, 73 F.3d at 538.

Legal characterizations aside, the core factual allegations here — namely, that Plaintiffs were mistreated during their tenure as domestic servants to a diplomat and his wife — are remarkably similar to those held not to constitute "commercial activity" in Tabion and Gonzalez Paredes.  In both

---

contradicts this expansive reading of Article 31's exceptions.  Indeed, the Portuguese court's opinion does not specifically construe the "commercial activity" exception at all.  Moreover, in reaching its conclusion, the court incorrectly described the scope of diplomatic immunity as not extending to the acts of a diplomat that "are not practiced in the name of the state that represents them or for the purposes of the mission."  On the contrary, subject to the exceptions set forth in Article 31, "immunity from jurisdiction applies to all acts of diplomats, private as well as official." Cahier & Lee, Vienna Conventions on Diplomatic and Consular Relations 29 (1989).  Thus, the Fonseca court's reasoning runs counter to both the Vienna Convention's negotiating history and widely accepted principles of diplomatic law, and should not be followed.

The second case, from a Belgian labor court, falls even further from the mark.  Although amici have provided the Court with only a translated summary of the case, rather than the text of the case itself, the summary indicates that the Belgian court based its decision not on Article 31, but on Article 39, and the court appears to have made no attempt to construe the meaning of  "commercial activity" as used in Article 31(1)(c).  Moreover, in that case, the American defendants enjoyed diplomatic immunity when service was attempted, and, accordingly, the United States asserted that jurisdiction over them was never properly established.  The United States appealed the trial court's decision to the contrary, and continues to view the case as wrongly decided.

of those cases, as in this one, the plaintiffs alleged that the defendant diplomats hired them outside of the United States; that they accompanied the defendants to the United States to perform domestic services; and that they were ultimately underpaid and mistreated.  See Tabion, 877 F. Supp. at 286; Gonzalez Paredes, 479 F. Supp. 2d at 189.  In Gonzales Paredes, as in this case, in securing A-3 visas for the plaintiffs, the defendants allegedly misled U.S. officials about the proposed terms of employment.  See Gonzalez Paredes, 479 F. Supp. 2d at 190.  And in Tabion, as here, the defendants allegedly confiscated the plaintiffs' passports and prevented the plaintiffs from leaving their home. See Tabion, 877 F. Supp. at 286.

The meaning of "commercial activity" in Article 31(1)(c) of the Vienna Convention, as understood by the international community and consistently interpreted by the Executive Branch, should be unaffected by the application of a different label to these substantially similar facts.  A contrary construction would revise the United States's understanding of its treaty obligations, effectively curtailing the protections historically granted to foreign diplomats residing in the United States and threatening to undermine the protections reciprocally afforded to U.S. diplomats living overseas.

## II.     Diplomatic Immunity Extends to Constitutional Claims

Plaintiffs next argue that diplomatic immunity cannot deprive the Court of jurisdiction to hear constitutional claims.  Because application of the Vienna Convention's diplomatic immunity provisions would leave them without a judicial remedy for their alleged Thirteenth Amendment violations, they argue, those treaty provisions must yield.

In the view of the United States, respecting Defendants' diplomatic immunities does not raise a constitutional concern.  To begin, although Plaintiffs correctly note that treaty provisions are subject to constitutional limitations, see, e.g., Reid v. Covert, 354 U.S. 1, 17-18 (1957), there is no

conflict between the Vienna Convention and the Thirteenth Amendment.  Nothing in the Vienna Convention authorizes involuntary servitude or any other practice forbidden by the Constitution; in fact, Article 41 of the Vienna Convention provides that, despite their immunities, diplomats are obligated to respect the laws of the receiving State.  See Tabion, 877 F. Supp. at 293 (citing VCDR art. 41).

Moreover, courts commonly apply immunity doctrines to preclude jurisdiction over even constitutional claims.  See, e.g., FDIC v. Meyer, 510 U.S. 471, 474-75 (1994) (sovereign immunity bars constitutional claims against the United States absent waiver); Pierson v. Ray, 386 U.S. 547, 554-55 (1967) (absolute judicial immunity from constitutional claims); Imbler v. Pachtman, 424 U.S. 409, 427-28 (1976) (absolute prosecutorial immunity from constitutional claims); Harlow v. Fitzgerald, 457 U.S. 800, 815-18 & n.24 (1982) (qualified immunity from constitutional claims for government officials).  Suits against foreign sovereigns and their representatives are no exception to this principle.  See Dexter & Carpenter, Inc. v. Kunglig Jarnvagsstyrelsen, 43 F.2d 705, 710 (2d Cir. 1930) (constitutional grant of jurisdiction to the federal courts is necessarily limited by the right of a foreign sovereign to plead immunity); Lafontant v. Aristide, 844 F. Supp. 128, 130, 140 (E.D.N.Y. 1994) (dismissing claims arising under the Constitution, federal statutes, and customary international law on the ground of head-of-state immunity).  Cf. Tuck v. Pan Am. Health Org., 668 F.2d 547, 549-50 (D.C. Cir. 1981) (dismissing constitutional and common law claims against an international health organization as barred by the International Organizations Immunities Act).  In fact, at least one court has rejected the precise argument Plaintiffs advance here, finding, in the context of a Thirteenth Amendment claim brought against a diplomat by his former domestic servant, that there is "no authority to suggest that a constitutional claim trumps the applicability of diplomatic immunity." Ahmed v. Hoque, No. 01-7224, 2002 WL 1964806, at *7 (S.D.N.Y. 2002).

19

III.    **There Is No <u>Jus Cogens</u> Exception to Diplomatic Immunity**

In a similar vein, Plaintiffs next argue that diplomatic immunity cannot bar their claims because Defendants' alleged conduct violates <u>jus cogens</u> norms prohibiting slavery and similar practices.[13] Plaintiffs submit that the prohibition of slavery is a <u>jus cogens</u> norm; that the Vienna Convention conflicts with that norm because it immunizes slaveholders from suit; and, therefore, that the Vienna Convention's diplomatic immunity provisions are void under these circumstances.

In the view of the United States, there is no <u>jus cogens</u> exception to diplomatic immunity. Assuming treaty provisions must comply with <u>jus cogens</u> norms, just as they must adhere to constitutional limitations, there is no conflict between the Vienna Convention and <u>jus cogens</u> norms, as nothing in the Vienna Convention authorizes any practice that violates any such norm. <u>Cf.</u> Hazel Fox, <u>The Law of State Immunity</u> 525 (2002) ("State immunity is a procedural rule going to the jurisdiction of a national court.  It does not go to substantive law; it does not contradict a prohibition contained in a <u>jus cogens</u> norm but merely diverts any breach of it to a different method of settlement.").  Further, diplomatic immunity is itself a fundamental principle of international law, <u>see supra</u> Part I.A, and there is no evidence that the international community has come to recognize a <u>jus cogens</u> exception to diplomatic immunity.  <u>See Jones v. Ministry of Interior</u>, [2006] UKHL 26, ¶ 27

---

[13] The concept of a <u>jus cogens</u> norm, also known as a peremptory norm of international law, was formalized in the Vienna Convention on the Law of Treaties as "a norm accepted and recognized by the international community of States as a whole as a norm from which no derogation is permitted and which can be modified only by a subsequent norm of general international law having the same character."  Vienna Convention on the Law of Treaties art. 53, <u>done</u> May 23, 1969, 1155 U.N.T.S. 331.  Under the Vienna Convention on the Law of Treaties — to which the United States is not a party — a "treaty is void if . . . it conflicts with a peremptory norm of general international law."  <u>Id.</u> But as the Ninth Circuit has noted, this category of norms "is of relatively recent origin in international law, and 'although the concept of <u>jus cogens</u> is now accepted, its content is not agreed.'"  <u>Alvarez-Machain v. United States</u>, 331 F.3d 604, 614 (9th Cir. 2003) (citing Restatement (Third) of Foreign Relations Law of the United States § 102 n.6 (1987)), <u>rev'd on other grounds sub nom.</u> <u>Sosa v. Alvarez-Machain</u>, 542 U.S. 692 (2004).

(U.K. House of Lords 2006) (finding "no evidence that states have recognised or given effect to an international law obligation to exercise universal jurisdiction over claims arising from alleged breaches of peremptory norms").[14]   Indeed, we not aware of any United States court that has recognized a <u>jus cogens</u> exception to a diplomat's immunity from its civil jurisdiction.   A deviation from this international consensus would create an acute risk of reciprocation by other States, potentially subjecting U.S. diplomats to controversial litigation in foreign jurisdictions.   See <u>id.</u> ¶ 63 ("[I]nternational law . . . is based on the common consent of nations.   It is not for a national court to 'develop' international law by unilaterally adopting a version of that law which, however desirable,

---

[14] Plaintiffs' reliance on the decisions of international <u>criminal</u> tribunals, or the international agreements establishing the authority of such tribunals, is misplaced.   Those decisions and agreements are not to the contrary, as international law recognizes that criminal proceedings are "categorically different" from civil suits with respect to the immunity of foreign sovereigns and their representatives. <u>Jones,</u> [2006] UKHL 26, ¶ 19; <u>see id.</u> ¶ 21; <u>Aidi v. Yaron,</u> 672 F. Supp. 516, 518-19 & n.4 (D.D.C. 1987) (declining to extend to the civil context decisions of international criminal tribunals abrogating the immunity of defendants charged with the commission of international crimes).

Moreover, in circumstances where an international criminal tribunal asserts jurisdiction over government officials pursuant to a multilateral treaty, such as the Rome Statute, which established the International Criminal Court ("ICC"), the treaty expressly sets forth, for example, that the "[i]mmunities or special procedural rules which may attach to the official capacity of a person, whether under national or international law, shall not bar the Court from exercising its jurisdiction over such a person."   Statute of the ICC, art. 27(2), <u>done</u> July 17, 1998, U.N. Doc. A/CONF.183/9. Similarly, the statute creating the International Criminal Tribunal for the former Yugoslavia ("ICTY"), which was adopted by resolution of the United Nations Security Council, provides: "The official position of any accused person, whether as Head of State or Government or as a responsible Government official, shall not relieve such person of criminal responsibility nor mitigate punishment." Statute of the ICTY, art. 7(2), U.N. Doc. S/25704, <u>adopted</u> May 25, 1993, U.N. Doc. S/RES/827. The statute establishing the International Criminal Tribunal for Rwanda ("ICTR"), which was also adopted by U.N. Security Counsel resolution, is to the same effect.   Statute of the ICTR, art. 6(2), <u>adopted</u> Nov. 8, 1994, U.N. Doc. S/RES/955.   Thus, each of these statutes speaks directly to the question of official immunity, and each provides for the abrogation of that immunity for limited purposes.

As explained in the text, in this case, by contrast, there is no binding international decision or agreement to abrogate the immunity of a diplomat from the civil jurisdiction of the receiving State where <u>jus cogens</u> violations are alleged.

21

forward-looking and reflective of values it may be, is simply not accepted by other states.").

Moreover, U.S. courts have declined to find a jus cogens exception to the application of other, related immunities.  For example, in considering the immunity of foreign heads of state, courts have deferred to the Executive's conclusion that customary international law does not recognize a jus cogens exception.  See Wei Ye v. Jiang Zemin, 383 F.3d 620, 627 (7th Cir. 2004) (court is bound by the Executive's determination, established through a suggestion of immunity, "that a foreign leader should be immune from suit even when the leader is accused of acts that violate jus cogens norms").  Such deference is appropriate here, too, in view of the Supreme Court's admonition that "serious and far-reaching consequences would flow from a judicial finding that international law standards had been met if that determination flew in the face of a State Department proclamation to the contrary."  Banco Nacional de Cuba v. Sabbatino, 376 U.S. 398, 432 (U.S. 1964); see also id. at 432-33 ("When articulating principles of international law in its relations with other states, the Executive Branch speaks not only as an interpreter of generally accepted and traditional rules, as would the courts, but also as an advocate of standards it believes desirable for the community of nations and protective of national concerns.").  Likewise, in the context of the Foreign Sovereign Immunities Act, courts have consistently declined to recognize an implied exception to the immunity of foreign States or their agencies for jus cogens violations.  See, e.g., Belhas v. Moshe Ya'Alon, 515 F.3d 1279, 1287 (D.C. Cir. 2008); Wei Ye, 383 F.3d at 627 & n.10; Smith v. Socialist People's Libyan Arab Jamahiriya, 101 F.3d 239, 244 (2d Cir. 1996).  This Court should decline to chart a different course in the diplomatic immunity context.[15]

---

[15] We are aware of one foreign court that has recognized a jus cogens exception in the state immunity context, but that decision has not been followed by other jurisdictions and, in fact, has been forcefully criticized.  In Ferrini v. Federal Republic of Germany, Cass Sez Un 5044/04 (2004), Italy's Supreme Court of Cassation entertained a civil claim against Germany based on war crimes

IV.     **The Trafficking Victims Protection Act Does Not Override Diplomatic Immunity**

Plaintiffs finally argue that diplomatic immunity cannot bar their claims under the Trafficking Victims Protection Act ("TVPA"), Pub. L. No. 106-386, 114 Stat. 1466 (2000). Specifically, they contend that the application of diplomatic immunity would irreconcilably conflict with the TVPA's civil remedy provision, 18 U.S.C. § 1595(a), and, therefore, that the Vienna Convention's diplomatic immunity provisions are void under the last-in-time rule, which generally holds that a later statute nullifies an earlier treaty to the extent the two conflict.

In the view of the United States, the TVPA does not override diplomatic immunity. First, the TVPA is silent as to whether it limits the immunity of diplomats, and courts should not read a statute to modify the United States's treaty obligations in the absence of a clear statement from Congress. See Cook v. United States, 288 U.S. 102, 120 (1933) ("A treaty will not be deemed to have been abrogated or modified by a later statute unless such purpose on the part of Congress has been clearly expressed."); Trans World Airlines v. Franklin Mint Corp., 466 U.S. 243, 252 (1984) ("Legislative silence is not sufficient to abrogate a treaty."). Cf. Roeder v. Islamic Republic of Iran, 333 F.3d 228, 232, 238 (D.C. Cir. 2003) (Algiers Accords not abrogated by subsequent statute absent a "clear statement" from Congress). Second, where a remedy-creating statute is silent on the question of immunity, it should be read in harmony with existing immunity rules. See Malley v. Briggs, 475 U.S. 335, 339 (1986) ("Although [42 U.S.C. § 1983] on its face admits of no immunities, we have read 'it in harmony with general principles of tort immunities and defenses rather than in derogation of

that took place during World War II, finding that "the principle of universal jurisdiction also applies to civil actions which trace their origins to such crimes." The U.K. House of Lords recently rejected Ferrini, stating that the Italian court's approach "is simply not accepted by other states," Jones, [2006] UKHL 26, ¶ 63, and "cannot . . . be treated as an accurate statement of international law as generally understood," id. ¶ 22.

them.'") (quoting <u>Pachtman</u>, 424 U.S. at 418); <u>see also</u> <u>The Schooner Exchange</u>, 11 U.S. (7 Cranch) at 146 (courts may not infer a rescission of foreign sovereign immunity unless expressed by the political branches "in a manner not to be misunderstood").

At bottom, there is no reason to believe that Congress, in enacting the TVPA, meant to alter existing immunity practices. Accordingly, Plaintiffs' last-in-time argument should be rejected.

## V.   Failure of the United States to Respect Diplomatic Immunities Could Have Serious Consequences in the International Community

It bears repeating that the Vienna Convention provides in no uncertain terms that, despite their immunities, diplomats are obligated to respect the laws of the receiving State. <u>See</u> <u>Tabion</u>, 877 F. Supp. at 293 (citing VCDR art. 41). Although this obligation cannot be judicially enforced, the Executive Branch takes allegations of the abuse of diplomatic privileges very seriously, and has various formal and informal means of obtaining compliance through the diplomatic process. For example, as a formal matter, the Department of State can request that the sending State waive the diplomat's immunity, <u>see</u> VCDR art. 32(1), or it can formally declare a diplomat <u>persona non grata</u> and expel him from the country, <u>see</u> <u>Tabion</u>, 877 F. Supp. at 293 (citing VCDR art. 9(1)). Short of formal measures, which are not always appropriate, the Department of State can attempt to informally mediate disputes with the diplomat's mission. Indeed, in some instances, bringing a matter to the mission's attention will induce voluntary compliance. <u>See, e.g.,</u> <u>767 Third Ave. Assocs. v. Perm. Mission of Zaire to United Nations</u>, 988 F.2d 295, 303 (2d Cir. 1993) (noting that "diplomatic efforts and pressure" had proven "extraordinarily successful" in getting Zaire to pay back rent owed by its mission).

The privileges and immunities accorded to diplomats under the Vienna Convention are vital to the conduct of peaceful international relations and must be respected. If the United States is

prevented from carrying out its international obligations to protect the immunities of foreign diplomats, adverse consequences may well obtain.  At a minimum, the United States may hear objections for failing to honor its obligations not only from the Kuwait Mission, but also from the missions of other States with immunities guaranteed by the Vienna Convention.  Moreover, a ruling by this Court that accepts Plaintiffs' arguments to limit the immunities traditionally accorded to diplomatic agents would inevitably lead to erosion of these essential safeguards, and potentially put our diplomats at increased risk abroad.  As the Second Circuit has observed, "Recent history is unfortunately replete with examples demonstrating how fragile is the security for American diplomats and personnel in foreign countries; their safety is a matter of real and continuing concern."  767 Third Avenue, 988 F.2d at 301.

## CONCLUSION

For the foregoing reasons, the Court should conclude that a diplomat's employment of a domestic worker is not a "commercial activity" under Article 31(1)(c) of the Vienna Convention but, rather, an activity incidental to the diplomatic assignment, to which immunity attaches notwithstanding the characterization of Defendants' alleged conduct as constituting human trafficking.  The Court should further conclude that diplomatic immunity bars its jurisdiction over constitutional claims, including those that may arise under the Thirteenth Amendment, as well as over alleged violations of jus cogens norms and the TVPA.

Dated: July 22, 2008                              Respectfully submitted,

                                                               GREGORY G. KATSAS
                                                               Assistant Attorney General

                                                               JEFFREY A. TAYLOR
                                                               United States Attorney

VINCENT M. GARVEY
Deputy Director, Federal Programs Branch

/s/ *Eric B. Beckenhauer*
ERIC B. BECKENHAUER
Cal. Bar No. 237526
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC  20530
Telephone: (202) 514-3338
Facsimile: (202) 616-8470
E-mail: eric.beckenhauer@usdoj.gov

*Counsel for the United States of America*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 22nd day of July 2008, I caused the foregoing document to be served on all counsel of record electronically by means of the Court's CM/ECF system.

 /s/ *Eric Beckenhauer*
ERIC B. BECKENHAUER