## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MANI KUMARI SABBITHI, JOAQUINA , QUADROS, and GILA SIXTINA FERNANDES, | ) )  Case No.: 07-CV-00115-EGS ) |
| Plaintiffs, | ) ) |
| vs. | ) ) |
| MAJOR WALEED KH N. S. AL SALEH, MAYSAA KH A. O. A. AL OMAR, and STATE OF KUWAIT, | )  ORAL ARGUMENT REQUESTED ) ) |
| Defendants. | ) ) ) |

**PLAINTIFFS' MEMORANDUM OF LAW IN RESPONSE
TO THE STATEMENT OF INTEREST OF THE UNITED STATES OF AMERICA
AND IN OPPOSITION TO DEFENDANTS MAJOR WALEED KH N. S. AL SALEH
AND MAYSAA KH A.O. A. AL OMAR'S
<u>RENEWED MOTION TO DISMISS AND TO QUASH SERVICE OF PROCESS</u>**

Plaintiffs Mani Kumari Sabbithi, Joaquina Quadros and Gila Sixtina Fernandes (collectively, "Plaintiffs") respectfully submit this Response to the Statement of Interest of the United States of America ("Statement of Interest"), filed on July 22, 2008, and Opposition to Defendants' Renewed Motion to Dismiss and Quash Service of Process, filed July 31, 2008 ("Renewed Motion to Dismiss").

## INTRODUCTION

Defendants Major Waleed KH N. S. Al Saleh ("Mjr. Al Saleh") and Maysaa KH A. O. A. Al Omar ("Ms. Al Omar") (collectively, "Defendants") trafficked Plaintiffs, three women from India, from Kuwait to the United States and enslaved them in their home in McLean, Virginia. In violation of state, federal, and international law, Defendants forced Plaintiffs to work as domestic servants and childcare providers against their will for meager wages, none of which were ever paid directly to Plaintiffs. Defendants subjected Plaintiffs to physical and psychological abuse as a means of subduing Plaintiffs into working under slave-like conditions. As a result of this abusive treatment, Plaintiffs filed a complaint ("Complaint") in this Court on January 27, 2007 alleging violations of the Victims of Trafficking and Violence Protection Act of 2000 ("Trafficking Victims Protection Act" or "TVPA"), the Thirteenth Amendment to the United States Constitution, state and federal wage and hour statutes, and state tort law.

Throughout this litigation, Defendants have asserted diplomatic immunity[1] under the Diplomatic Relations Act of 1978, 22 U.S.C. §254d ("Act"), which Congress enacted to implement the Vienna Convention on Diplomatic Relations ("Vienna Convention"),

---

[1]    Mjr. Al Saleh was a military attaché to the Kuwaiti government posted at the Kuwait Embassy in Washington, D.C. Ms. Al Omar is not a diplomat and was never employed in the United States. Both Defendants have since left the United States.

23 U.S.T. 3227, T.I.A.S. 7502 (1961). Defendants first moved to Dismiss and Quash Service of

Process on grounds of diplomatic immunity on March 30, 2007. Defs' Mot. Dismiss at 1, 5.

After the parties fully briefed the Motion to Dismiss, the Court invited the United States to

"communicate its views and/or positions about this case" on March 20, 2008, noting that

Plaintiffs raised novel arguments. The Court denied Defendants' Motion to Dismiss without

prejudice to refile at a later date to afford the Court an opportunity to consider the response of the

United States Government.

On July 22, 2008, the United States filed a Statement of Interest, and on July 31, 2008,

Defendants filed a Renewed Motion to Dismiss reasserting that they are immune from suit

because they had diplomatic status during the time in question. Defs' Renewed Mot. Dismiss at

3. Plaintiffs now respond to the Government's Statement of Interest and oppose the Renewed

Motion to Dismiss.[2] For the reasons detailed in prior pleadings and set forth below, both the

Government's views on diplomatic immunity and those of the Defendants are erroneous and do

not provide a legal basis for dismissing the Complaint.

This Court need not defer to the Government's interpretation of the Vienna Convention

and should not give weight to its generic and speculative assertion that grave consequences will

result from allowing this suit to proceed. Plaintiffs' suit should be permitted to proceed because

the Defendants' conduct—human trafficking—falls within the commercial activities exception to

the immunity granted them by the Vienna Convention, and because it also violates non-

derogatable *jus cogens* norms prohibiting slavery and other slave-like practices. Moreover, if

---

[2]    Plaintiffs hereby reaffirm all arguments submitted in previous filings and incorporate them into
this pleading by reference. Plaintiffs' response is timely as the parties filed a consent motion
giving Plaintiffs until August 28, 2008 to file their response.

the Government's position were adopted, Plaintiffs would be left without a forum to hear their serious allegations of violations of the Thirteenth Amendment, the TVPA, and other federal and state laws. Were this Court to permit Defendants to hide behind the shield of diplomatic immunity in this way, it would send a harmful message to the international community that the United States does not take trafficking and other egregious human rights violations seriously.

## ARGUMENT

## I.    THE GOVERNMENT'S SUBMISSION IS NOT ENTITLED TO DEFERENCE.

Though this Court sought the input of the United States regarding issues of treaty interpretation and "to communicate its views and/or positions about this case," it need not defer to the Government's views. Rather this Court is obligated to undertake its own, independent analysis of the relevant law. *See Coplin v. United States*, 6 Cl. Ct. 115, 136 (1984), *rev'd on other grounds*, 761 F.2d 688 (Fed. Cir. 1985), *aff'd sub nom. O'Connor v. United States*, 479 U.S. 27 (1986). Indeed, the law is clear that courts must "interpret treaties for themselves," *Kolovrat v. Oregon*, 366 U.S. 187, 194 (1961), and that the construction given by government agencies is "not conclusive." *Sumitomo Shoji Am., Inc. v. Avagliano*, 457 U.S. 176, 184 (1982). Moreover, to the extent that the United States' views of the Vienna Convention implicate the United States Constitution and the prohibition against slavery and forced labor, this Court should not defer to the Executive Branch—the Court alone is tasked with determining whether affording the Defendants immunity in this case violates the Constitution.[3] *See, e.g., Younger v. Harrris*, 401 U.S. 37, 52 (1971) (explaining that it is the power and duty of the judiciary to examine the

---

[3]    Nor does the Government assert that it should be afforded deference in its interpretation of the Constitution. *See* Statement of Interest at 7.

constitutionality of statutes) (citing *Marbury v. Madison*, 5 U.S. 137 (1803)).   Should the Court

determine that the application of the Vienna Convention in this case would violate the Plaintiffs'

constitutional rights, then the Court must decline to apply the Vienna Convention, regardless of

the position of the United States. *See Colello v. S.E.C.*, 908 F. Supp. 738 (C.D. Cal. 1995)

(granting summary judgment to individuals whose Swiss bank accounts had been frozen by

Swiss authorities pursuant to a treaty and at the request of the United States Department of

Justice because the asset freeze violated the plaintiffs' constitutional rights).

## II.    DEFENDANTS ARE NOT ENTITLED TO DIPLOMATIC IMMUNITY BECAUSE TRAFFICKING IS A COMMERCIAL ACTIVITY WITHIN THE EXCEPTION TO IMMUNITY GRANTED BY THE VIENNA CONVENTION.

In its Statement of Interest, the Government fails to address the question presented to it:

whether human trafficking falls within the "commercial activity" exception to immunity granted

diplomats under the Vienna Convention.[4]   Even as narrowly interpreted by domestic courts in

*Tabion v. Mufti*, 73 F.3d 535 (4th Cir. 1996) and *Gonzales Paredes v. Vila*, 479 F. Supp. 2d 187

(D.D.C. 2007), it is clear that trafficking falls within the commercial activities exception.[5]

Further, by trafficking Plaintiffs, Defendants engaged in a course of conduct that is not entitled

---

[4]    This Court requested the Government's views on this specific issue because it noted that in previous cases concerning alleged abuses by foreign diplomats against their domestic workers, including *Tabion v. Mufti*, 73 F.3d 535 (4th Cir. 1996), and *Gonzales Paredes v. Vila*, 479 F. Supp.2d 187 (D.D.C. 2007), plaintiffs had not alleged—as Plaintiffs do here—that they had been trafficked or subjected to other such egregious human rights violations.

[5]    Plaintiffs note that they continue to contend that *Tabion* and *Gonzales Paredes* were wrongly decided. *See* Pls' Opp'n at 26-29. Further, Plaintiffs and *Amici* disagree with the Government's narrow interpretation of the commercial activities exception. *See* Pls' Opp'n at 26-29; Amicus Br. at 20-22. The Court need not adopt these conclusions, however, in order to find that diplomatic immunity does not apply here.

to diplomatic immunity because it falls outside of the scope of their diplomatic functions. Thus, Defendants are not entitled to diplomatic immunity and the Court should deny Defendants' Renewed Motion to Dismiss.

Human trafficking is modern-day slavery. Like other forms of slavery, human trafficking is a lucrative commercial activity that exploits the poor and vulnerable, and is not incidental to the daily life of a diplomat. When Defendants trafficked Plaintiffs into the United States they engaged in a trade or business activity for personal profit. *See Tabion*, 73 F.3d at 537 (interpreting the meaning of "commercial activity" in Article 31(1)(c) of the Vienna Convention as relating "only to trade or business activity engaged in for personal profit"). Congress has defined "severe forms of trafficking in persons" as "the recruitment, harboring, transportation, provision, or obtaining of a person for labor or services, through the use of force, fraud, or coercion for the purpose of subjection to involuntary servitude, peonage, debt bondage, or slavery." TVPA, 22 U.S.C. § 7102(8)(B). Trafficking in persons is regularly referred to as a "trade"[6] in slaves, a "business",[7] and an "industry."[8]

Trafficking in persons is an extremely profitable trade or business activity. Indeed, it is one of the most lucrative illicit businesses worldwide, a criminal industry second only to drug

---

[6]   *See, e.g.*, Janice Raymond, Guide to the New U.N. Trafficking Protocol 1 (2001) (stating that "[t]he Protocol promises to contest the world's organized crime networks and combat the trade in human beings and transnational prostitution"); Amnesty International, Trafficking of Persons: Amnesty International Fact Sheet (describing trafficking as "modern day slave trading").

[7]   *See, e.g.*, Amy O'Neil Richard, International Trafficking in Women to the United States: A Contemporary Manifestation of Slavery and Organized Crime 13 (1999) (stating that "[t]rafficking in women is a new business and source of strength for organized crime").

[8]   *See, e.g.*, *id.* (explaining that "the trafficking in women industry is closely intertwined with other related criminal activities, such as extortion, racketeering, money laundering, bribery of public officials, drug use, document forgery, and gambling").

trafficking in its scope. *See* Department of Health and Human Services, Human Trafficking Fact Sheet, *available at* http://www.acf.hhs.gov/trafficking/about/fact_human.html; *see* H. Res. 55, 110th Cong. (2007). In January 2007, the U.S. House of Representatives noted that "global profits from trafficked forced labor totals an estimated $31.6 billion annually." H. Res. 55, 110th Cong. (2007). According to the Congressional findings of the TVPA, "trafficking is the fastest growing source of profits for organized criminal enterprises worldwide," and "[p]rofits from the trafficking industry contribute to the expansion of organized crime in the United States and worldwide." TVPA § 7101(b)(8).

Whether accomplished through vast criminal networks or simply through an individual's acts of recruiting and procuring a person's involuntary labor, trafficking is a trade or business activity that is personally profitable to individual traffickers.[9] Similar to drug trafficking, trafficking in persons is a way for individuals to earn quick and significant amounts of money, in this instance through the illegal exploitation of a person's labor. Trafficking is profitable to individuals involved at every stage of the supply-chain, and most profitable to those individuals at the receiving end of it.[10]

In the present case, by trafficking Plaintiffs from Kuwait, Defendants were able to

---

[9]     Trafficking does not require an association with an organized syndicate; indeed traffickers often do not operate in large syndicates, but may operate as a family or individuals. For example, according to a Guide to the U.N. Trafficking Protocol, "husbands and boyfriends of women often recruit, traffic and pimp their female partners into prostitution. They may engage a small group of friends or others to assist in the crime." Janice Raymond, Guide to the New U.N. Trafficking Protocol 3 (2001).

[10]    For example, the United Nations Working Group on Slavery Practices of the U.N. Sub-Commission on the Promotion and Protection of Human Rights stated, in a resolution discussing trafficking in Eastern Europe, that women were "traded" several times on their way to Europe, with prices increasing at each "transaction." Secretary-General, *Report of the Secretary-General on Trafficking in Persons,* at 13, U.N. Doc. E/CN.4/Sub.2/AC.2/2001/4 (May 16, 2001).

enslave them in this country and to benefit from the value of their labor. By failing to pay Plaintiffs the federal minimum wage as required by law and the parties' employment contracts and by entrapping them in their homes for nearly six months, Defendants reaped a personal profit of approximately $34,911 to $42,188.[11] Defendants engaged in a calculated and deliberate business scheme to profit from Plaintiffs' exploited labor when they forced Plaintiffs to labor against their will.

The Vienna Convention does not extend diplomatic immunity to commercial activities outside the scope of a diplomat's official functions. VCDR, art. 31(1)(c). The official functions of a diplomat do not include commercial activities designed to yield a personal profit. *Id.* at art. 42 ("A diplomatic agent shall not in the receiving State practise for personal profit any professional or commercial activity."). Relying on the State Department's interpretation of the commercial activities exception, the *Tabion* court held that "day-to-day living services such as dry cleaning or domestic help" are services "incidental to daily life" and therefore not commercial activities "outside [a diplomat's] official functions" within the meaning of Article 31(1)(c). 73 F.3d at 538-39. Trafficking Plaintiffs to this country and profiting from their

---

[11]    Courts have long recognized that the money saved by not paying a sum one is obligated to pay is equivalent to a profit. *See, e.g., Jeremiah v. Richardson*, 148 F.3d 17, 20 (1st Cir. 1998) (noting that a bankruptcy trustee "earned approximately $5,000 per month '*profit*'...only by *not paying* any debt service (i.e., the mortgage), any real estate taxes, or any payments on the Center's prepetition outstanding obligations") (emphasis added); *Higgins v. Detroit Educ. Television Found.*, 4 F. Supp. 2d 701, 710 (E.D. Mich. 1998) (noting that the entity "maximized its *profits* by *not paying* any licensing or permission fees" on copyrighted materials) (emphasis added); *United States v. Veksler*, 862 F. Supp. 1337, 1340 (E.D. Pa. 1994) (describing a "daisy chain" scheme in which "the *profit* gained by *not paying* the taxes was divided among the conspirators") (emphasis added), *aff'd*, 62 F.3d 544 (3d Cir. 1995); *S. New England Tel. Co. v. Dep't of Pub. Util. Control*, 874 A.2d 776, 783 (Conn. 2005) (warning that a utility should not be permitted "reap windfall *profits*, as a result of *not paying* labor costs") (emphasis added).

undercompensated, forced labor are not acts akin to ordinary contracts for "day-to-day living services such as dry cleaning or domestic help." *Id.*

Nor are Defendants' commercial acts "'incidental to the ordinary conduct of life in the receiving State.'" *Id.* at 538 (quoting Denza, *Diplomatic Law: Commentary on the Vienna Convention on Diplomatic Relations*, 166-67 (1976)). Indeed, the procurement, transportation, and use of slave labor are far afield from the realm of "everyday transactions" that the *Tabion* court immunized as incidental to the daily life of a diplomat in the United States. It would be absurd to cloak Defendants' acts of trafficking and enslaving Plaintiffs with diplomatic immunity under the theory that such conduct falls within the daily routine of diplomats to the United States and is naturally attendant or incidental to diplomats' official functions.

Moreover, trafficking and forced labor constitute the types of undiplomatic commercial activity that the Vienna Convention was intended to prohibit. The Government agrees that the negotiating and drafting history of the Vienna Convention establish that the term "commercial activity" encompassed those private commercial activities that were "inconsistent" with a diplomat's position. *See* Statement of Interest at 10-11. The commercial activities exception was understood to "'enable persons in the receiving State who have professional or business dealings of a non-diplomatic character with a diplomatic agent to have the same recourse against him in the courts as they would have against a non-diplomatic person engaging in similar activities.'" *Id*. at 11-12 (quoting U.S. Department of State, 7 Digest of Int'l Law 406 (Whiteman 1970)). The exception thus aimed to ensure that when a diplomat engaged in undiplomatic commercial activity for his or her own personal benefit, "'the client should be able to obtain a settlement of disputes arising out of the professional or commercial activities

conducted in the country. It would be quite improper if a diplomatic agent, *ignoring the restraints which his status ought to have imposed upon him*, could, by claiming immunity, force the client to go abroad in order to have the case settled by a foreign court.'" *Id.* at 10 (quoting the Diplomatic Intercourse and Immunities: Summary of Observations Received from Governments and Conclusions of the Special Rapporteur, U.N. Doc.A/CN.4.116) (emphasis added).

Human trafficking is a commercial activity that is wholly inconsistent with a diplomat's position. When a diplomat keeps a domestic servant as a slave in his house, he deliberately engages in conduct to obtain personal profit by "*ignoring the restraints which his status ought to have imposed upon him*," just as would be the case if he, for example, opened a retail business and failed to pay his staff. *Id.* Such profitable side ventures are decidedly unrelated to a diplomat's official functions and thus parties aggrieved by such ventures may seek recourse for their economic losses, as they would if the commercial actor were not a diplomat. *See id.* The commercial activities exception was specifically intended to protect those individuals that rely in good faith on the promise of fair commercial dealings in exchanges unrelated to a diplomat's diplomatic obligations. Acts of trafficking are thus within the scope of the commercial activities exception as understood in *Tabion* and at the time of the drafting and negotiation of the Vienna Convention. Accordingly, Defendants' Renewed Motion to Dismiss should be denied.

**III.    DIPLOMATIC IMMUNITY MUST YIELD TO PLAINTIFFS' CLAIMS CHALLENGING DEFENDANTS' CONDUCT IN VIOLATION OF PLAINTIFFS' THIRTEENTH AMENDMENT RIGHT TO BE FREE FROM SLAVERY.**

As explained more fully in Plaintiffs' Opposition to Defendants' Motion to Dismiss, no federal statute or treaty can be applied in a way that would contravene constitutional rights. Pls' Opp'n at 7-17. Rather, the Thirteenth Amendment supersedes the Vienna Convention and the Diplomatic Relations Act implementing the Convention. *See Reid v. Covert*, 354 U.S. 1, 18 (1957). Applying diplomatic immunity to foreclose a remedy for Defendants' violation of Plaintiffs' Thirteenth Amendment rights is constitutionally problematic because it would leave Plaintiffs no forum in which to raise their claims. Where as here, the application of foreign agreements would have the effect of violating or denying an individual's constitutional rights, Courts have a duty to decline to apply them. *See, e.g., Colello*, 908 F. Supp. 738.

Defendants', and now the Government's, interpretation of the Vienna Convention and its implementing legislation, results in an impermissible evisceration of Plaintiffs' constitutional right to be free from slavery. The Vienna Convention's mandatory dismissal of claims brought against individuals with diplomatic immunity presents a direct conflict with the Thirteenth Amendment in this case. It is impossible to reconcile the dismissal of Plaintiffs' claims on jurisdictional grounds with the protection of their constitutional right to be free from slavery. More broadly, such a dismissal would undermine this country's longstanding commitment to liberty and freedom for all. In effect, Defendants and the Government have asked this Court to sanction the establishment of a system of slavery operated in this country by Defendants and others with similar diplomatic status. This is patently unconstitutional. As the Supreme Court has held, "[t]he [Thirteenth] Amendment is not a mere prohibition of State laws establishing or

upholding slavery, but *an absolute declaration that slavery or involuntary servitude shall not exist in any part of the United States.*" *The Civil Rights Cases*, 109 U.S. 3, 20 (1883) (emphasis added). This Court should not – and cannot – permit Defendants, or other any other foreign diplomats, to establish such a system within the United States.

## IV.    DIPLOMATIC IMMUNITY DOES NOT BAR PLAINTIFFS' RIGHT TO A REMEDY FOR DEFENDANTS' VIOLATION OF *JUS COGENS* NORMS.

The right of everyone to be free from slavery and slavery-like practices is a well established *jus cogens* norm from which no derogation is permitted. *See, e.g.*, International Covenant on Civil and Political Rights ("ICCPR"), arts. 8 and 4, Dec. 19, 1996, 999 U.N.T.S. 171 (prohibiting "slavery and the slave trade in all their forms" as well as servitude and forced labor and providing that no derogation is permitted from the prohibitions against slavery, slave trade, and servitude in times of emergency). Both Congress and U.S. courts have long recognized this fundamental prohibition. *See, e.g.*, TVPA, 22 U.S.C. § 7101(23) (declaring "[t]rafficking in persons [a] modern form of slavery, and [the] largest manifestation of slavery today" and finding that "[t]he international community has repeatedly condemned slavery and involuntary servitude, violence against women, and other elements of trafficking, through declarations, treaties, and United Nations resolutions and reports."); *Doe I v. Unocal Corp.*, 395 F.3d 932, 945 (9th Cir. 2001); *Comm. of U. S. Citizens Living in Nicar. v. Reagan*, 859 F.2d 929, 941 (D.C. Cir. 1988); *The Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 244 F. Supp. 2d 289, 305-06 (S.D.N.Y. 2003).

Neither Defendants, in their Renewed Motion to Dismiss, nor the Government, in its Statement of Interest, argue that Plaintiffs' claims of involuntary servitude, forced labor, and trafficking are not *jus cogens* violations—nor can they. Rather they argue that Defendants' claims to diplomatic immunity should prevail over Plaintiffs' right to a remedy for violation of this *jus cogens* norm. In support of its position, the Government argues, first, that no U.S. court has found a "*jus cogens* exception" to a diplomat's civil immunity and, second, that doing so would create a risk that foreign jurisdictions would subject United States diplomats to "controversial litigation" abroad. Statement of Interest at 21.[12] These arguments, however, ignore the special character of *jus cogens* norms.

*Jus cogens* norms are "offenses of universal concern" and as such states can exercise universal jurisdiction over them and hold any perpetrator personally accountable for their violation. *Presbyterian Church*, 244 F. Supp. 2d at 306; *see also Sosa v. Alvarez-Machain*, 542 U.S. 692, 761-63 (2004) (Breyer J., concurring) Moreover, States have an affirmative obligation to investigate, prosecute, and punish perpetrators of certain *jus cogens* violations, including

---

[12] Plaintiffs disagree that there is an "international consensus" concerning the abrogation of diplomatic immunity for violations of *jus cogens* norms. On the contrary, there is a growing consensus among the international community that individuals must be held accountable for violation of *jus cogens* norms. *See e.g.*, Pls' Opp'n at 33 n. 25, 35 n. 26; *see also*, *Attorney Gen. of the Gov't of Isr. v. Eichmann*, 36 I.L.R. 277, 310 (S.Ct. Isr. 1962) ("international law postulates that it is impossible for a State to sanction an act that violates its severe prohibitions, and from this follow the idea which forms the core of the concept "international crime" that a party to such a crime must bear individual responsibility for it. If it were otherwise, the penal provisions would be a mockery."); *Federation Nationale des Deportes et Internes Resistants et Patriotes v. Barbie* (France), 78 I.L.R. 125 (1985); *Regina v. Bartle*, 38 I.L.M. 581 (H.L. 1991) (Pinochet case); *Prefecture of Voiotia v. F.R.G.*, No. 11/2000, May 4, 2000 (Hellenic Supreme Court) as discussed in Gavouneli and Bantekas, *International Decision*, 95 Am. J. Int'l L. 198 (2001); *Ferrini v. F.R.G.* (Italian Court of Cassation) as discussed in Bianchi, *International Decision*, 99 Am. J. Int'l L. 242 (2005); *In re Extradition of Demjanjuk*, 612 F. Supp. 544, 556 (N.D. Ohio 1985). Moreover, neither the Government nor Defendants cite to any precedent that would require this Court to recognize diplomatic immunity where as here *jus cogens* violations are alleged.

slavery and slave-like practices, and to provide redress for victims. *See, e.g.,* Universal

Declaration on Human Rights, G.A. Res. 217 A (III), U.N. GAOR, 3d Sess., U.N. Doc. A/810

(1948), art. 8 ("Everyone has the right to an effective remedy by the competent national tribunals

for acts violating…fundamental rights…."); ICCPR art. 2(3) (requiring states to develop judicial

remedies). Through enactment of the TVPA, Congress has given effect to its obligation to

exercise jurisdiction over anyone who engages in trafficking and to hold perpetrators personally

accountable. Diplomatic immunity does not outweigh Plaintiffs' right to access this

congressionally mandated remedy.


## V.    THE TRAFFICKING VICTIMS PROTECTION ACT OVERRIDES DIPLOMATIC IMMUNITY.

The Vienna Convention, which confers accredited diplomats immunity from criminal and

civil liability, conflicts with the right of victims of human trafficking to bring civil suits against

their traffickers under the Trafficking Victims Protection Act. *See* 18 U.S.C. §1595(a). As

explained in Plaintiffs' Opposition brief, Plaintiffs' right to a remedy under the TVPA prevails

over Defendants' claims of immunity under the Vienna Convention because Congress enacted

the TVPA after it ratified the Vienna Convention. Pls' Opp'n at 36-38. Holding an entire

category of defendants immune from civil liability conflicts with Congress' intent in

promulgating the TVPA —to eradicate slavery in all forms; to enable government investigation

and prosecution of perpetrators; and to deter traffickers by providing victims with an opportunity

for civil redress. In particular, for the reasons detailed in Section VI, below, holding diplomats

accountable is essential to deter future human rights abuses by diplomats who abuse their

immunity by engaging in trafficking of their domestic workers.

## VI.    ADJUDICATING PLAINTIFFS' LAWSUIT WILL HAVE A POWERFUL EFFECT IN DETERRING FUTURE HUMAN RIGHTS VIOLATIONS BY DIPLOMATS.

The Government asserts that the privileges and immunities granted diplomats by the Vienna Convention "are vital to the conduct of peaceful international relations and must be respected." Statement of Interest at 24. Without elaborating, the Government suggests that there may be "adverse consequences" if the Court refuses to recognize diplomatic immunity here and allows this suit to proceed. *Id*. at 25. However, the Government fails to specify what adverse consequences could occur in litigating this particular suit[13] and also ignores the troubling message that will be sent to the international community by dismissing the suit—that the United States does not take trafficking by diplomats seriously.

This Court should carefully consider the message that will be sent to other diplomats by dismissing this case: that they too can act with impunity when they seriously abuse their own domestic workers. The United States has publicly acknowledged that abuse of domestic workers

---

[13]    In this case, the Government requested that Kuwait waive immunity so that it could indict Defendant Al Omar for her treatment of Plaintiffs. Kuwait refused and Defendants subsequently left the country, apparently of their own accord. The Government has not described what adverse consequences will result from this Court refusing to recognize diplomatic immunity in this particular case, or in other comparable cases. To the extent that the Government's vague statement about "serious consequences" can be construed as concern over foreign nation's treatment of U.S. diplomats stationed overseas who engage in analogous conduct, Plaintiffs seriously doubt that the Government is asserting that the United States would seek to shield its own diplomats with immunity should they engage in trafficking and enslavement of domestic workers. Moreover, the Government's predictions of future disruption in the international legal order in adjudicating this suit run counter to Justice Breyer's recent views on U.S. courts exercising jurisdiction over violations of *jus cogens* norms. In his concurring opinion in *Sosa*, Justice Breyer notes that "allowing every nation's courts to adjudicate foreign conduct involving foreign parties in [cases involving *jus cogens* violations] will not significantly threaten the practical harmony that comity principles seek to protect." *Sosa*, 542 U.S. at 763 (Breyer J., concurring).

by foreign diplomats in the United States is a serious and pressing human rights concern. For example, a July 2008 report by the United States Government Accountability Office identified forty-two individual A-3 or G-5 visa holders who have claimed to have been abused by foreign diplomats in the last eight years but predicted the total number of incidents was likely higher because of victims' fear of contacting law enforcement and the difficulty the federal government faces in tracking such allegations. UNITED STATES GOVERNMENT ACCOUNTABILITY OFFICE, GAO-08-892, HUMAN RIGHTS: U.S. GOVERNMENT'S EFFORTS TO ADDRESS ALLEGED ABUSE OF HOUSEHOLD WORKERS BY FOREIGN DIPLOMATS WITH IMMUNITY COULD BE STRENGTHENED, 11, 13-15 (July 2008) (hereinafter "GAO Report"), attached as Exhibit A.

While the Government proposes to this Court that it has sufficient "formal and informal means of obtaining compliance through the diplomatic process" and suggests that bringing the matter to the Kuwaiti Mission's attention "will induce voluntary compliance," Statement of Interest at 24, the GAO Report casts doubt on these assertions. The GAO Report notes that domestic workers who enter the United States legally on A-3 and G-5 visas are extremely vulnerable because they are "poor, uneducated, and unfamiliar with their rights under U.S. law", GAO Report at 26, and that diplomats abuse this vulnerability and use their "immunity as a weapon to frighten their household workers and discourage them from escaping or taking actions to improve their situation," which "inhibits household workers from cooperating with investigations." *Id.* at 17.

The GAO Report also notes that immunity poses problems in investigating allegations of abuse when they come to light because the abuse occurs in the diplomat's residence and is often not witnessed by anyone outside the family. *Id.* Since investigators are typically prohibited

from observing working conditions in a diplomat's home absent their consent, they are often not able to gather sufficient evidence to conduct an effective investigation. *Id.* The investigation process can also be delayed several months as the Department of Justice requests the Department of State's advice on which investigative techniques are legally permissible. *Id.* at 18. These time delays increase the likelihood that diplomats will leave the United States before the government can gather sufficient evidence for a successful prosecution. *Id.*

In light of these concerns identified in the GAO Report, the Government's assurances that its formal processes for dealing with abuse of domestic workers by diplomats are insufficient. Suits such as Plaintiffs' must be permitted to proceed if Congress' intent in passing the TVPA - the deterrence of human trafficking and redress for its victims - is to be given practical effect.

## CONCLUSION

For all of the foregoing reasons, Plaintiffs respectfully request that the Court deny the Defendants' Renewed Motion To Dismiss and Quash Service Of Process.

Dated: August 28, 2008

Respectfully submitted,

 /s/ Tara Kelly
David A. Kotler*
Tara Kelly (D.C. Bar. No. 438241)
Catherine J. Rosato*
Jennifer Rellis*
DECHERT LLP
1775 I Street, N.W.
Washington, D.C. 20006

- 16 -

Lenora M. Lapidus*
Araceli Martínez-Olguín*
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION, WOMEN'S RIGHTS PROJECT
125 Broad Street, 18th Floor
New York, NY  10004

Steven Watt*
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION - HUMAN RIGHTS PROGRAM
125 Broad Street, 18th Floor
New York, NY  10004

*Attorneys for Plaintiffs*

*not admitted in this District

- 17 -

# Exhibit A

**United States Government Accountability Office**

# GAO

Report to the Subcommittee on Human Rights and the Law, Committee on the Judiciary, U.S. Senate

July 2008

# HUMAN RIGHTS

# U.S. Government's Efforts to Address Alleged Abuse of Household Workers by Foreign Diplomats with Immunity Could Be Strengthened



G A O

Accountability * Integrity * Reliability

GAO-08-892



G A O
Accountability · Integrity · Reliability

# Highlights

Highlights of GAO-08-892, a report to the Subcommittee on Human Rights and the Law, Committee on the Judiciary, U.S. Senate

July 2008

# HUMAN RIGHTS

## U.S. Government's Efforts to Address Alleged Abuse of Household Workers by Foreign Diplomats with Immunity Could Be Strengthened

## Why GAO Did This Study

In 2007, the Department of State (State) reported that some foreign diplomats may be abusing the household workers they brought to the United States on A-3 or G-5 visas. GAO was asked to (1) determine the number of A-3 or G-5 visa holders who have alleged abuse by foreign diplomats with immunity since 2000, (2) review the U.S. government's process for investigating these allegations, and (3) assess how State ensures that its policies for issuing A-3 and G-5 visas are implemented correctly and consistently. GAO analyzed documents, interviewed officials, and conducted fieldwork at four consular posts that issue large numbers of A-3 or G-5 visas.

## What GAO Recommends

GAO recommends that the Secretary of State (1) collect and main records on allegations of household worker abuse by foreign diplomats, (2) establish a system alerting consular officers to seek guidance before issuing an A-3 or G-5 visa to an individual applying to work for a foreign diplomat who may have abused workers, and (3) spot-check compliance with A-3 and G-5 visa policies and procedures. GAO also recommends that the Secretaries of State and Homeland Security and the Attorney General outline a process for determining which specific techniques can be used when investigating foreign diplomats. State and the Departments of Justice and Homeland Security concurred with the recommendations addressed to them.

To view the full product, including the scope and methodology, click on GAO-08-892. For more information, contact Thomas Melito at (202) 512-9601 or melitot@gao.gov.

## What GAO Found

GAO identified 42 household workers with A-3 or G-5 visas who alleged that they were abused by foreign diplomats with immunity from 2000 through 2008, but the total number is likely higher. The total number of alleged incidents since 2000 is likely higher for four reasons: household workers' fear of contacting law enforcement, nongovernmental organizations' protection of victim confidentiality, limited information on some cases handled by the U.S. government, and federal agencies' challenges identifying cases. For example, State has several offices that receive allegations of abuse by foreign diplomats, but no single office maintains information on all allegations.

The U.S. government's process for investigating alleged abuse of household workers by foreign diplomats is complicated by three factors. First, immunity can pose constraints for law enforcement in collecting evidence. Second, the status of foreign diplomats can heighten their workers' sense of vulnerability, causing the workers to fear cooperating with investigators. Third, the length of time it takes to obtain a legal opinion from State on the permissibility of using certain investigative techniques can hamper investigations. According to State, although some techniques are clearly prohibited by international law (such as searching certain diplomats' residences), the permissibility of others under international law is less clear. In advising on the use of investigative techniques, State considers legal and policy issues, such as reciprocity—assessing how U.S. diplomats abroad might be affected by actions taken toward a foreign diplomat on U.S. soil. State may ask Justice to provide information to help determine the permissibility of certain techniques, but the process of obtaining this information can be difficult and time consuming for Justice. Although both State and Justice have discussed creating a process to avoid delays, no formal actions have, thus far, been taken to establish one.

Weaknesses exist in State's process for ensuring correct and consistent implementation of policies and procedures for issuing A-3 and G-5 visas. GAO's review of employment contracts submitted at four consular posts by A-3 and G-5 visa applicants showed that they often did not include State's required components, such as a guarantee of the minimum or prevailing wage. GAO also found that officers at the four posts were unclear about or unfamiliar with certain aspects of State's guidance. Few of the officers were aware that they should inform A-3 and G-5 visa applicants of their rights under U.S. law during their interview. Some officers at the four posts also were uncertain about the reasons for refusing A-3 or G-5 visas. State is considering adding provisions to its guidance that would more clearly stipulate reasons for refusing these visas, such as if an A-3 or G-5 applicant seeks to work for a foreign diplomat who is linked to a pattern of employee disappearance, abuse allegations, or other irregularities. However, State has not reached internal agreement on these provisions and has set no timetable for doing so. State headquarters officials said they rely on individual posts to monitor implementation of A-3 and G-5 visa policies and procedures and do not routinely assess posts' compliance.

_____ **United States Government Accountability Office**

# Contents

**Letter**                                                                                          1

                      Results in Brief                                                3
                      Background                                                      7
                      42 A-3 and G-5 Visa Holders Have Alleged Abuse Since 2000; Total
                            Number of Alleged Incidents Is Likely Higher                   11
                      Three Factors Complicate Investigations of Abuse by Foreign
                            Diplomats                                                      16
                      Weaknesses Exist in Implementation and Oversight of A-3 and G-5
                            Visa Policies and Procedures                                   20
                      Conclusions                                                    26
                      Recommendations for Executive Action                           27
                      Agency Comments and Our Evaluation                             28

**Appendix I**            **Objectives, Scope, and Methodology**                                    30

**Appendix II**           **U.S. Government Agencies' Primary
                          Responsibilities Related to Foreign Diplomats
                          and A-3 and G-5 Visa Holders**                                            35

**Appendix III**          **Diplomatic and Consular Privileges and
                          Immunities from Criminal and Civil Jurisdiction**                         37

**Appendix IV**           **Comments from the Department of State**                                 39

**Appendix V**            **Comments from the Department of Justice**                               43

**Appendix VI**           **GAO Contact and Staff Acknowledgments**                                 45

**Tables**

Table 1: Relevant Responsibilities of State Department Bureaus
and Offices                                                    35
Table 2: Federal Departments with Primary Investigative and
Prosecutorial Responsibilities                                36
Table 3: Diplomatic and Consular Privileges and Immunities from
Criminal and Civil Jurisdiction                               37

**Figures**

Figure 1: Number of A3 and G-5 Visas Issued Abroad, Fiscal Years
2000 to 2007                                                    8
Figure 2: Overseas Posts that Issued the Most A-3 and G-5 Visas,
Fiscal Years 2000 to 2007                                      9

### Abbreviations

| | |
|---|---|
| AUSA | Assistant United States Attorney |
| CIS | Citizenship and Immigration Services |
| CRT/CS | Civil Rights Division/Criminal Section |
| FBI | Federal Bureau of Investigation |
| Homeland Security | Department of Homeland Security |
| ICE | Immigration and Customs Enforcement |
| Justice | Department of Justice |
| Labor | Department of Labor |
| NGO | nongovernmental organization |
| State | Department of State |
| TOMIS | The Office of Foreign Missions Information System |
| USUN | U.S. Mission to the United Nations |

This is a work of the U.S. government and is not subject to copyright protection in the United States. The published product may be reproduced and distributed in its entirety without further permission from GAO. However, because this work may contain copyrighted images or other material, permission from the copyright holder may be necessary if you wish to reproduce this material separately.



**United States Government Accountability Office**
**Washington, DC 20548**

July 29, 2008

The Honorable Richard Durbin
Chairman
The Honorable Tom Coburn, MD
Ranking Member
Subcommittee on Human Rights and the Law
Committee on Judiciary
United States Senate

In June 2007, the Department of State (State) noted in its annual Trafficking in Persons report that some foreign diplomats[1] may have abused individuals they had brought to the United States to work in their households. State again highlighted this problem in a July 2007 note to all Chiefs of Diplomatic Missions in the United States, stating that it had recently learned of a number of allegations of trafficking in persons[2] with respect to household workers, including allegations of involuntary servitude and physical abuse. A few of these cases have garnered congressional and media attention, particularly because the accused foreign diplomats held full diplomatic immunity[3] and thus could not be prosecuted in U.S. courts. For example, in 2002, a household worker accused her employers, a high-ranking diplomat and his wife, of verbally, physically, and sexually abusing her. She also alleged that they required

---

[1]For the purposes of this report, the term "foreign diplomats" is defined to include members of diplomatic missions (diplomatic agents, administrative and technical staff, and service staff), individuals assigned to consular posts (consular officers, consular employees, and honorary consuls), and employees of international organizations or members of national missions to such international organizations.

[2]Under the Trafficking Victims Protection Act, victims of severe forms of trafficking are defined, in part, as persons subject to the recruitment, harboring, transportation, provision, or obtaining of persons for labor or services, through the use of force, fraud, or coercion, for the purpose of subjection to involuntary servitude, peonage, debt bondage, or slavery. Congress enacted the Trafficking Victims Protection Act (Public L. No. 106-386) in 2000 and reauthorized and amended this act in 2003 and again in 2005 (Public L. Nos. 108-193 and 109-164).

[3]Foreign diplomats may be entitled to some degree of immunity (full or partial) or may have no immunity at all. Foreign diplomats' property also may be inviolable, meaning that it cannot be entered or searched without the diplomats' consent. See app. III for more information on the respective privileges and immunities to which various categories of foreign diplomats are entitled.

GAO-08-892 Human Rights

her to work 16 to 17-hour days without any payment and prohibited her from leaving the home unaccompanied. She filed a civil lawsuit against her employers, but because they held full diplomatic immunity, the case was dismissed. The diplomat and his wife have since left the United States.[4] While this alleged incident involved a potential violation of U.S. antitrafficking laws, abuse allegations by household workers against foreign diplomats have ranged from potential wage and hour violations to involuntary servitude. For the purposes of this report, we will use the term abuse to include all such allegations.

Most of the household workers brought to the United States by foreign diplomats arrive with A-3 visas—as employees of officials from foreign embassies, consulates, or governments—or with G-5 visas—as employees of foreign officials for international organizations, such as the United Nations or the World Bank.[5] On average, almost 3,500 individuals enter the United States each year on A-3 and G-5 visas. Several U.S. government agencies are involved in efforts to respond to alleged abuse of these visa holders. State grants A-3 and G-5 visas, issues guidance on diplomatic law, and maintains official records regarding the status and immunity level of foreign diplomats in the United States, among other things. The Department of Justice (Justice) investigates trafficking allegations and prosecutes violations of criminal statutes. The Department of Homeland Security (Homeland Security) investigates trafficking allegations and grants T visas to some trafficking victims. These visas allow victims to remain in the United States for up to 4 years, file for permanent residence, and receive certain government services through the Department of Health and Human Services. The Department of Labor (Labor) investigates allegations of wage and hour violations.

In response to your request, we (1) sought to determine how many A-3 and G-5 visa holders have alleged abuse by foreign diplomats with immunity since 2000, (2) reviewed the U.S. government's process for investigating abuse allegations involving foreign diplomats with immunity, and

---

[4]In 2006, the woman's lawyers filed a new lawsuit on her behalf, arguing that because the diplomat and his wife have left the United States, they no longer hold criminal and civil immunity for activities unrelated to their official acts. That litigation is pending.

[5]Foreign officials for international organizations may be employees of these organizations or members of diplomatic missions to the organizations. In addition, if a foreign diplomat is traveling to the United States on unofficial business, his or her household workers may receive B-1 visas.

(3) described and assessed how State ensures correct and consistent implementation of A-3 and G-5 visa policies and procedures.

To determine how many A-3 and G-5 visa holders have alleged abuse by foreign diplomats with immunity, we interviewed U.S. government officials and analyzed data provided by these officials on alleged incidents that they have handled. We requested data on alleged incidents that occurred from calendar years 2000 through 2008. We also met with representatives of 10 nongovernmental organizations (NGOs) that provide services to alleged victims of abuse by foreign diplomats and analyzed data they provided on allegations. In addition, we conducted legal research to identify relevant civil lawsuits. To review the U.S. government's process for investigating allegations, we analyzed State's policies for handling allegations of criminal activity by foreign diplomats and interviewed U.S. government officials. To describe and assess how State ensures correct and consistent implementation of A-3 and G-5 visa policies and procedures, we analyzed State's guidance and requirements for adjudicating these visas, and interviewed State officials. We also met with consular officers and reviewed A-3 and G-5 visa files at the U.S. embassies in Peru, the Philippines, Qatar, and Saudi Arabia. We assessed the reliability of data analyzed and found them to be sufficiently reliable for purposes of this report. We conducted this performance audit between October 2007 and July 2008 in accordance with generally accepted government auditing standards. Those standards require that we plan and perform the audit to obtain sufficient, appropriate evidence to provide a reasonable basis for our findings and conclusions based on our audit objectives. We believe that the evidence obtained provides a reasonable basis for our findings and conclusions based on our audit objectives. (App. I provides a detailed discussion of our objectives, scope, and methodology.)

## Results in Brief

We identified 42 distinct A-3 and G-5 visa holders who alleged that they were abused by foreign diplomats with some level of immunity from 2000 through 2008, but the total number of alleged incidents is likely higher. The 42 alleged incidents we confirmed include those identified through federal agencies, NGOs, and legal sources, such as Westlaw. Ten of these alleged incidents resulted in federal human trafficking investigations, most of which remain open. In one instance, Justice determined through its investigation that, absent immunity, it would indict the foreign diplomat's wife. However, the diplomat's home government declined to waive the wife's immunity; thus, Justice could not indict. The diplomat and his wife subsequently left the United States. The total number of alleged incidents

of household worker abuse by foreign diplomats with some level of immunity is likely higher than the 42 distinct alleged incidents we have identified for four reasons: household workers' fear of contacting law enforcement authorities, NGOs' need to maintain client confidentiality, limited information on some allegations handled by the U.S. government, and federal agencies' difficulties in tracking household worker abuse allegations and investigations involving foreign diplomats. For example, the *Foreign Affairs Manual* [6] states that several offices and bureaus within State will provide the Office of Protocol and the Office of the Legal Adviser with reports on all cases that come to their attention, but we found that these offices were not aware of all cases that had been handled by the department. In addition, law enforcement agencies were unable to search their case management databases for investigations involving foreign diplomats because these databases are not designed to track investigations in this manner.

The U.S. government's process for investigating allegations of abuse by foreign diplomats is complicated by three factors: (1) constraints imposed by immunity, (2) household workers' heightened vulnerabilities due to their employers' status, and (3) the length of time it takes for Justice to obtain State's opinion on the use of certain investigative techniques in trafficking investigations involving individuals with varying degrees of immunity and inviolability. Law enforcement's ability to investigate foreign diplomats is limited, particularly if the subject has full immunity or inviolable premises are involved. Diplomats with full immunity have the highest degree of privileges and immunities. They are considered "personally inviolable" and cannot be detained. In addition, their residences are inviolable and cannot be entered or searched without their consent. These limitations are particularly challenging because abuse of household workers typically takes place in the employer's residence and often is not witnessed by individuals outside the employer's family. Furthermore, the victims may not cooperate out of fear that the employers will use their political status and connections to harm them or their families or that they will be deported if they leave their employment situations. Finally, while Justice consults with State to identify investigative techniques that can be used when foreign diplomats have immunity, some recent consultations have taken several months because, according to State and Justice officials, they raised unprecedented

---

[6] The *Foreign Affairs Manual* is a State publication that outlines guidance and requirements for State Department employees.

questions. Law enforcement officials told us that these lengthy consultations can hamper investigations. Justice would like for State to clarify which techniques are not legally permissible when the subject of the investigation has full or partial immunity but, according to State officials, State prefers to handle these investigations on a case-by-case basis so that it can consider fully the legal and policy implications of each case. State considers the extent to which its opinion on the permissibility of a given technique could be defended legally. State also reviews each case through the lens of reciprocity—assessing how U.S. diplomats abroad might be affected by actions taken toward a foreign diplomat on U.S. soil. While Justice and State agree that it would be helpful to outline an interagency process for communicating in a timely manner about the use of investigative techniques in these cases, they have, thus far, not taken any formal steps to create one.

At the four consular posts we visited, we found weaknesses in State's process for ensuring that its policies for issuing A-3 and G-5 visas are implemented correctly and consistently, and some consular officers were unfamiliar with or unclear about aspects of guidance relating to these visas. Our review of employment contracts submitted by A-3 and G-5 visa applicants at the posts we visited showed that, in many cases, they did not include some or all of the criteria required in the *Foreign Affairs Manual*, such as a guarantee that the employee will receive the minimum or prevailing wage (whichever is greater).[7] Some consular officers we spoke with also were unaware of or unclear about aspects of State's general guidance on A-3 and G-5 visas. For example, several consular officers did not know that, according to State guidance, they should keep electronically scanned copies of the employment contracts on file. Consular officers also were uncertain about the reasons for refusing A-3 or G-5 visas. State's guidance directs consular officers to determine that A-3 and G-5 visa applicants are entering into true employer-employee relationships, in accordance with required terms of their personal employment contracts, but does not explicitly state whether concerns about abuse or mistreatment are sufficient grounds on which to refuse an A-3 or G-5 visa. At one post, officers told us that they can refuse an A-3 or G-5 visa if they believe that the worker may not be treated well. However,

---

[7]The federal minimum wage was recently increased to $6.55 per hour. Many states also have minimum wage laws. In cases where an employee is subject to both the state and federal minimum wage laws, the employee is entitled to the higher of the two minimum wages. The prevailing wage rate is defined as the average wage paid to similarly employed workers in the requested occupation in the area of intended employment.

officers at two other posts said that it can be very difficult to refuse an A-3 or G-5 visa, even if they believe that the worker will be underpaid or treated poorly, particularly if they lack hard evidence that an applicant has been or could be mistreated. State headquarters officials currently do not alert consular officers if they have information linking a particular foreign diplomat to a pattern of abuse allegations. State is considering steps to clarify its guidance, such as directing consular officers to refuse A-3 or G-5 visas if there is a pattern of past alleged abuse by a particular diplomat, but has not set a time frame for doing so. In addition, State headquarters does not exercise oversight by periodically assessing compliance with A-3 and G-5 visa policies and procedures, but instead relies on individual posts to do so.

In this report, we recommend that the Secretary of State (1) emphasize to the relevant bureaus and offices the importance of the *Foreign Affairs Manual* requirement to report all cases that come to their attention and create a system for collecting and maintaining records on these cases, (2) work with the Attorney General of the United States and the Secretary of Homeland Security to establish an interagency process outlining agreed-upon policies and time frames for determining which investigative techniques can be used in trafficking investigations involving foreign diplomats, (3) establish a system alerting consular officers to seek guidance from State headquarters before issuing A-3 or G-5 visas to applicants whose prospective employers may have abused their household workers in the past, and (4) enhance oversight by establishing a monitoring system to spot-check compliance with A-3 and G-5 visa policies and procedures.

The Departments of State and Justice provided written comments on a draft of our report, which are reprinted in appendixes IV and V, respectively.

State concurred with all four of our recommendations. Regarding the first recommendation, State indicated that it will emphasize to the relevant bureaus and offices the importance of reporting promptly and fully all cases of alleged abuse. State also noted that the Office of Protocol has begun creating a system for collecting and maintaining centralized records on these cases. With regard to our second recommendation, State noted that it will be useful to establish a process to address novel and difficult questions regarding investigative techniques. In response to our third recommendation, State said that it will proactively "watch-list" known abusers in its Consular Lookout and Support System and will soon provide consular officers improved information regarding A-3 and

G-5 cases. Finally, State acknowledged the need for better compliance with A-3 and G-5 visa policies and procedures and agreed to consider our fourth recommendation to spot-check compliance from headquarters.

Justice agreed with our findings and concurred with our second recommendation, noting that agreeing upon time frames for deciding on the use of investigative techniques is particularly important.

In addition, State, Justice, and Homeland Security provided technical comments on a draft of our report, which we incorporated as appropriate. For example, Homeland Security asked to be included in our second recommendation, which initially was directed to the Secretary of State and the Attorney General. We agreed to amend the recommendation accordingly.

The Departments of Labor and Health and Human Services chose not to comment on the draft report.

## Background

Each year, State issues A-3 and G-5 visas to individuals whose employers are foreign diplomats on official purposes in the United States.[8] Most of these individuals are hired to work for foreign diplomats in the District of Columbia, Maryland, New York, or Virginia.  For fiscal years 2000 through 2007, 207 U.S. embassies and consular posts overseas issued 10,386 A-3 visas and 7,522 G-5 visas. The number of A-3 visas decreased[9] during this period by about 56 percent—from 1,780 in fiscal year 2000 to 999 in fiscal year 2007—and the number of G-5 visas issued increased by 21 percent—from 877 in fiscal year 2000 to 1,057 in fiscal year 2007 (see fig. 1).

---

[8]An employer must be entitled to an A-1 or A-2 nonimmigrant visa classification in order to bring individuals under A-3 visa status to the United States to work in his or her home. An employer must be entitled to a G-1, G-2, G-3, or G-4 nonimmigrant visa classification in order to bring individuals under G-5 visa status to the United States to work in his or her home. (See Immigration and Nationality Act, as amended, §101(a)(15)(A)(iii) and §101(a)(15)(G)(v)). As a matter of policy, A-3 and G-5 visas are issued for a maximum period of 24 months, or less, if called for by the reciprocity schedule of the country concerned. In addition, the validity of an A-3 or G-5 visa may not exceed the validity of the employer's visa.

[9]The number of A-3 visa applications also declined during this period. State officials told us they could not attribute any policy changes, procedural reasons, or particular events to the decline in A-3 visa issuances.

**Figure 1: Number of A3 and G-5 Visas Issued Abroad, Fiscal Years 2000 to 2007**



Number of A-3 visas issued



Number of G-5 visas issued

Source: GAO analysis of State data.

Figure 2 shows the 10 posts that issued the most A-3 and G-5 visas, combined, for fiscal years 2000 through 2007. These 10 posts issued 40 percent of the total number of A-3 and G-5 visas issued during this period. Manila issued the most A-3 and G-5 visas, accounting for almost 10 percent of the total number of these visas issued overseas during this period.

GAO-08-892  Human Rights

**Figure 2: Overseas Posts that Issued the Most A-3 and G-5 Visas, Fiscal Years 2000 to 2007**

A-3 and G-5 visas issued



| | Manila, Philippines | Lima, Peru | Jakarta, Indonesia | Bogota, Colombia | Casablanca, Morocco | Abu Dhabi, United Arab Emirates | Riyadh, Saudi Arabia | Doha, Qatar | Mexico City, Mexico | Colombo, Sri Lanka | Total for these posts |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Percentage of total at overseas posts | 9.9% | 5.3% | 5.1% | 4.3% | 3.0% | 2.9% | 2.8% | 2.0% | 2.0% | 2.0% | 40.3% |
| A-3 and G-5 total visas issued | 1,775 | 956 | 910 | 778 | 531 | 528 | 509 | 502 | 367 | 355 | 7,211 |
| G-5 visas issued | 904 | 675 | 173 | 36 | 322 | 206 | 22 | 38 | 108 | 211 | 2,695 |
| A-3 visas issued | 871 | 281 | 737 | 742 | 209 | 322 | 487 | 464 | 259 | 144 | 4,516 |

Source: GAO analysis of State data.

U.S. laws provide certain protections for household workers, including individuals brought to the United States on A-3 or G-5 visas, and State, Justice, Homeland Security, and Labor work to respond to allegations of abuse, exploitation, or trafficking of household workers by foreign diplomats. (App. II lists the relevant offices within these departments and their respective responsibilities.) The U.S. government considers involuntary servitude of household workers, as defined under the Trafficking Victims Protection Act of 2000, to be a severe form of trafficking in persons and a serious criminal offense. Specifically, the act defines severe forms of trafficking in persons, in part, as the recruitment, harboring, transportation, provision, or maintaining of a person for labor or services through the use of force, fraud, or coercion for the purpose of

subjection to involuntary servitude, peonage, debt bondage, or slavery. Victims of severe forms of trafficking are offered certain accommodations under the act. Household workers also are subject to U.S. laws and covered by the Fair Labor Standards Act, which is the law governing minimum wages and overtime pay. Homeland Security can provide special accommodations to individuals who show that their employers have abused, exploited, or trafficked them, allowing the workers to legally remain in the United States. These accommodations are continued presence[10]—which permits an alien to be present legally in the United States and to seek work during the investigation—and T nonimmigrant status[11]—which permits a visa holder to remain in the United States for up to 4 years, file for adjustment of status to lawful permanent residence, and apply for benefits from the U.S. government such as food stamps and medical assistance. If they leave their employment situation without either of these accommodations, A-3 and G-5 visa holders lose their legal immigration status and could be deported.

Under international and domestic law, the U.S. government, including its law enforcement authorities, extends privileges and immunities to certain foreign diplomats.[12] Employers of A-3 and G-5 visa holders may be entitled to some degree of immunity (full or partial) or may have no immunity at all. An employer with full diplomatic immunity is generally immune from

---

[10]Continued presence is granted to trafficking victims in accordance with Section 107(c)(3) of the Trafficking Victims Protection Act. Pursuant to 28 C.F.R. Part 1100.35, Homeland Security has the authority to grant continued presence to victims of severe forms of trafficking who are potential witnesses to such trafficking in order to ensure prosecution of those responsible.

[11]T nonimmigrant status is granted for victims of trafficking under INA Sec. 101(a)(15)(T). To qualify for a T visa, a victim must be present in the United States, American Samoa, or the Commonwealth of the Northern Mariana Islands as a result of trafficking. The individual also must be a victim of a severe form of trafficking who would suffer extreme hardship upon removal and has complied with any reasonable request for assistance in the investigation and prosecution of human trafficking. The victim does not need to comply with requests for assistance in investigations and prosecutions if he or she is less than 18 years old.

[12]The United States has entered into a number of treaties that afford immunities. These treaties include the Vienna Convention on Consular Relations, 21 U.S.T. 77, T.I.A.S., 6820, the Vienna Convention on Diplomatic Relations, 23 U.S.T. 3227, T.I.A.S. 7502, and the Agreement between the United Nations and the United States of America Regarding the Headquarters of the United Nations, 21 U.S.T. 1418, as well as bilateral agreements with certain countries. The U.S. Congress also enacted legislation, the International Organizations Immunities Act (22 U.S.C. §§ 288 et seq.), to extend certain privileges, exemptions, and immunities to international organizations and their employees.

civil or criminal jurisdiction of U.S. courts. Certain employers with partial or "official acts" immunity, such as most individuals employed by international organizations, are immune from civil or criminal jurisdiction of U.S. courts for conduct performed under their official duties or functions. State and the United Nations publish lists of current foreign diplomats who hold diplomatic rank[13] on their Web sites. Appendix III identifies the respective privileges and immunities to which various categories of foreign diplomats are entitled.

## 42 A-3 and G-5 Visa Holders Have Alleged Abuse Since 2000; Total Number of Alleged Incidents Is Likely Higher

We identified 42 individual A-3 and G-5 visa holders who have alleged abuse by foreign diplomats with some level of immunity in the United States from 2000 through June 2008. However, the total number of alleged incidents is likely to be higher for four reasons: household workers' fear of contacting law enforcement authorities, NGOs' protection of victim confidentiality, limited information on some allegations handled by the U.S. government, and federal departments' difficulties in tracking household worker abuse allegations and investigations involving foreign diplomats.

---

[13]State's Office of Protocol makes available the following online publications: *Diplomatic List* (http://www.state.gov/s/cpr/rls/dpl/), which lists members of the diplomatic staff who have diplomatic rank and their spouses, and *Foreign Consular Offices* (http://www.state.gov/s/cpr/rls/fco/), which lists recognized consular officers in the United States. The United Nations publishes lists of diplomatic members and their spouses through an online publication known as the *Blue Book* (http://missions.un.int/protocol/bluebook.html).

## GAO Identified 42 A-3 and G-5 Visa Holders Who Have Alleged Abuse Since 2000

We identified 42 distinct A-3 or G-5 visa holders who, since 2000, have alleged that foreign diplomats[14] with some level of immunity abused them.[15] We confirmed that 17 of the incidents alleged by these A-3 or G-5 visa holders were handled by federal agencies.[16] These 17 incidents[17] can be categorized as follows:

- 10 alleged incidents of human trafficking, which resulted in eight human trafficking investigations;[18]

- one investigation of alleged visa fraud;[19]

- one investigation of an alleged wage and hour violation; and

- five alleged incidents identified by State, some of which may have resulted in investigations, including

  - one human trafficking allegation;

---

[14]32.5 percent of these foreign diplomats came from Africa, 30 percent from the Near East, 20 percent from the Western Hemisphere, 15 percent from Asia, and 2.5 percent from Europe.

[15]We only counted cases if we could determine the name of the diplomat involved and confirm that he or she held immunity, or if we received enough information from a law enforcement source to ensure that a diplomat with immunity was involved and that the case was not duplicative with any other case. Because GAO is not a law enforcement agency, we did not independently assess the credibility of these alleged incidents.

[16]Some allegations may be handled by both the U.S. government and an NGO. To avoid double counting the total number of allegations, we report each allegation under only one source. For example, if the U.S. government opened an investigation after receiving an allegation from an NGO, we included the case in our count of allegations handled by federal agencies, rather than in our count of allegations handled by NGOs.

[17]Each alleged incident may involve several instances of alleged abuse. For example, one alleged incident may involve different forms of abuse (such as verbal and physical abuse), as well as multiple instances of the same type of abuse.

[18]One of these investigations was opened in response to three separate allegations against the same foreign diplomat. In addition, civil suits were filed in three of these eight investigations. Justice officials told us that they have opened 19 trafficking investigations involving foreign diplomats with immunity since 2005. We confirmed that 8 of them were included in our count of 42 distinct alleged incidents.

[19]In this incident, a foreign diplomat brought an individual to the United States on an A-3 visa and then transferred her to his relatives, who allegedly abused her.

- two allegations of physical or verbal abuse; and

- two alleged wage and hour violations.

Most of the human trafficking investigations remain open. However, in one of the human trafficking investigations, Justice determined that, absent immunity, it would indict the foreign diplomat's wife. State requested that the diplomat's home government waive immunity, which would allow Justice to indict her. However, the diplomat's home government declined to waive immunity; thus, Justice could not indict. The diplomat and his wife subsequently left the United States, and Justice has since closed this case.

We identified the remaining 25 distinct alleged incidents through legal sources, such as Westlaw, and interviews with NGOs who provided services to the alleged victims, such as assistance in applying for T visas and filing lawsuits against their employers. According to NGOs, 4 of these 25 alleged victims applied for and received T visas. In addition, we determined that civil suits were filed in 9 of these 25 alleged incidents. In most of these lawsuits, household workers sought, in part, to recoup unpaid wages. According to NGOs, the courts dismissed three of the nine lawsuits on the basis that the foreign diplomats had immunity.[20] Of the remaining six lawsuits, NGOs indicated that five were settled out of court, and one resulted in a default judgment because the defendants failed to respond. Although we could not confirm that any of these 25 alleged incidents were investigated or handled by the U.S. government, NGOs told us that they reported 12 of them to federal agencies. They did not report the other 13 alleged incidents.

## Number of Alleged Incidents Likely Higher Than the 42 We Identified

The total number of alleged incidents of household employee abuse by foreign diplomats with some level of immunity is likely to exceed the total we have identified for four reasons. First, as we have previously reported, trafficking victims are a hidden population because trafficking is a

---

[20]In one of these cases, the judgment was later reversed on appeal, when the appellate court, in part, determined that the diplomat's employment of a household worker was not an act performed in the exercise of his consular functions and therefore he was not entitled to claim immunity under the Vienna Convention on Consular Relations.

clandestine activity.[21] Trafficking victims often are in a precarious position and may be unwilling or unable to report to, or seek help from, relevant authorities. Moreover, the Department of Health and Human Services reported that victims live daily with inhumane treatment, physical and mental abuse, and threats to themselves or their families back home. Victims of human trafficking may fear or distrust the government and police because they are afraid of being deported or because they come from countries where law enforcement is corrupt and feared. In such circumstances, reporting to the police or seeking help elsewhere requires courage and knowledge of local conditions, which the victims might not have. In addition, some victims may not be permitted to leave their employers' residences, which makes it much more difficult to report their abuse to authorities.

Second, NGOs have provided services to alleged victims who did not want to be identified or who did not want to identify their employers. NGOs we contacted told us that, since 2000, they have received allegations from 66 A-3 or G-5 visa holders stating that they were abused by their employers. However, in 31 of these alleged incidents, the worker and the diplomat involved were not identified either because the worker was too afraid to reveal his or her identity or because the organization agreed to protect the client's confidentiality.

Third, because of federal agencies' need to protect sensitive information, we received limited data on some alleged incidents handled by the U.S. government, and thus did not include those incidents in our total count. In most instances, federal agencies did not reveal the names or countries of origin of the worker and foreign diplomat involved in alleged incidents they had investigated or otherwise handled. It is law enforcement policy not to disclose details of ongoing criminal investigations. Without this information, however, we could not fully reflect federal agencies' data in our overall count of alleged incidents without potentially double counting ones that had already been reported to us by NGOs. For example, although Justice told us of 19 human trafficking investigations involving foreign diplomats with immunity, we could only confirm that 8 of them were included in our count of 42 distinct alleged incidents. Justice officials also

---

[21]GAO, *Human Trafficking: Better Data, Strategy, and Reporting Needed to Enhance U.S. Antitrafficking Efforts Abroad*, GAO-06-825 (Washington, D.C.: July 18, 2006). See also GAO, *Human Trafficking: Monitoring and Evaluation of International Projects Are Limited, but Experts Suggest Improvements*, GAO-07-1034 (Washington, D.C.: July 26, 2007).

told us that there are likely multiple victims in some of the 19 trafficking investigations they reported to us. Furthermore, while Homeland Security identified nine A-3 and G-5 visa holders who received T visas from Homeland Security's Citizenship and Immigration Services, we did not learn the names of their employers, and therefore could not confirm if they held immunity.

Fourth, federal officials said they could not determine definitively the total number of alleged incidents they had handled and could only estimate that number by reviewing specific case files and consulting with knowledgeable staff. Officials had difficulty identifying all alleged incidents or investigations in their records or databases for several reasons as explained below:

- Justice, Immigration and Customs Enforcement, and Diplomatic Security officials could not identify all investigations because their databases are not designed or meant to facilitate searches based on characteristics of the alleged perpetrators, such as whether they are foreign diplomats.

- Justice officials told us that the ongoing investigations they identified, primarily by canvassing knowledgeable staff, only went back as far as May 2005.

- In addition, Immigration and Customs Enforcement could not identify investigations before 2003, because it had difficulties capturing trafficking-in-persons data prior to its creation as part of Homeland Security in that year.[22]

- State has several offices that receive allegations of abuse by foreign diplomats, but no single office maintains information on all allegations. According to the *Foreign Affairs Manual*, the Office of Protocol establishes and maintains complete records of each reported case that comes to its attention in which a foreign diplomat with immunity from criminal jurisdiction has been accused of a crime in the United States. State defines "accused of a crime" to mean cases in which Justice has determined that, absent immunity, it would seek to indict. Therefore, although the Office of Protocol receives reports of allegations from other

---

[22]GAO, *Human Trafficking: A Strategic Framework Could Help Enhance the Interagency Collaboration Needed to Effectively Combat Trafficking Crimes*, GAO-07-915 (Washington, D.C.: July 26, 2007).

federal agencies,[23] other State bureaus and offices, and some NGOs, it does not systematically maintain records on other ongoing criminal investigations, civil lawsuits that have been filed, or any other allegations. Moreover, the *Foreign Affairs Manual* indicates that State's Bureau of International Organizations, the U.S. Mission to the United Nations (USUN), each regional bureau, and Diplomatic Security will provide the Office of Protocol and the Office of the Legal Adviser with reports on all cases that come to their attention. However, there is no mechanism to ensure that these reports are referred to and recorded by the Office of Protocol and the Office of the Legal Adviser. We found that the Office of Protocol was unaware of cases that USUN had handled, and the Office of Protocol and the Office of the Legal Adviser were unaware of all cases that Diplomatic Security had handled.

- While Labor's system tracks the 30,000 to 40,000 investigations of alleged wage and hour violations it conducts each year, it does not specifically identify those involving foreign diplomats. In addition, although Justice and Homeland Security officials told us they have referred allegations of wage and hour violations to Labor, they could not identify the specific allegations. Labor officials told us that they were aware only of one investigation of an alleged wage and hour violation, but that policy is for field offices to inform headquarters of any allegations of wage and hour violations received involving foreign diplomats.

## Three Factors Complicate Investigations of Abuse by Foreign Diplomats

The U.S. government's process of investigating foreign diplomats for alleged abuse is complicated by three factors—(1) constraints posed by immunity, (2) household workers' heightened vulnerabilities due to their employers' status, and (3) the length of time it takes for Justice to obtain State's opinion on the use of specific investigative techniques in trafficking investigations.

## Immunity Poses Constraints for Investigations

When investigating foreign diplomats with immunity, law enforcement agents face constraints that become particularly pronounced when the alleged crime has taken place in the diplomat's residence. Investigators' options are most limited when a diplomat has full immunity and is

---

[23]Justice officials routinely report human trafficking investigations involving foreign diplomats to State's Office of the Legal Adviser. According to an official with the Office of the Legal Adviser, these reports are passed on to the Office of Protocol.

considered to have personal inviolability or when the diplomat's residence is considered inviolable. Diplomats who are personally inviolable cannot be detained, and property that is considered inviolable (including vehicles and residences) cannot be entered or searched without the diplomats' consent. Although the residences of foreign diplomats with partial immunity may be searched, these diplomats cannot be obliged to give evidence concerning matters related to their official duties.

Officials at Justice, Homeland Security, and the Federal Bureau of Investigation (FBI) told us that these limitations pose particular problems when the allegation involves abuse of a household employee because the worker's mistreatment often occurs in the employer's residence and is not witnessed by individuals outside the employer's family. For example, a Justice official told us that these allegations can be among the most difficult to investigate and prosecute because it is hard for investigators to gather enough corroborating evidence. Investigators are prohibited from observing working and living conditions in the home absent the diplomat's consent, and possible witnesses often include the diplomat's family, who also may have immunity. Instead, investigators often have to rely primarily on interviewing the victim and talking to neighbors who may have observed interactions between the diplomat and the household employee. In some instances, the evidence collected through these methods is considered insufficient to pursue prosecution. These constraints resulted in at least one instance in which law enforcement officials closed an investigation for lack of sufficient evidence after they determined that constraints posed by immunity prevented investigators from talking to witnesses inside a foreign diplomat's home.

## Diplomats' Status Heightens Workers' Vulnerabilities

The status of foreign diplomats under investigation can heighten their household workers' sense of vulnerability. For example, household workers may be intimidated by their employers' wealth, political connections, or prominent positions in society. One Justice official told us that abusive situations involving foreign diplomats' household workers have a striking power imbalance because workers often are poor, uneducated, and fear retaliation, not only against themselves but also against family members in their home country. This fear can inhibit household workers from cooperating with investigations, further limiting the investigators' options for collecting evidence. NGOs told us that foreign diplomats have used immunity as a weapon to frighten their household workers and discourage them from escaping or taking actions to improve their situation. Workers have alleged that their employers threatened their family members back home, told them they would be

deported if they did not do as they were instructed, and stated they could treat them as they chose because immunity allows them to do so with impunity. As reported above, we also learned from some NGOs of a number of allegations of household worker abuse by foreign diplomats that were not reported to the U.S. government because the workers were too afraid of potential consequences. In these instances, an investigation could not even be initiated.

## Lengthy Process for Determining the Permissibility of Using Investigative Techniques Can Hamper Trafficking Investigations

Justice requests State's advice on how diplomatic immunity impacts the legal permissibility of using certain investigative techniques, but the time-consuming process of obtaining State's opinion can hamper investigations. When Justice receives an allegation that a foreign diplomat has abused a household worker, it reviews the facts and determines if they merit opening a trafficking investigation. If Justice decides to open an investigation (or learns that Immigration and Customs Enforcement or the FBI has opened a new investigation), it contacts State to (1) confirm the diplomat's identity and level of immunity; (2) determine how State wants to be kept informed of the investigation; and (3) obtain State's opinion, if necessary, on the use of certain investigative techniques. State officials said that there is no formal requirement for Justice to consult with them on whether certain investigative techniques are permissible, but that it is appropriate and they welcome Justice to do so. According to Justice, because U.S. courts take into account State's interpretation of international treaties and conventions, Justice requests State's legal interpretation on these matters. Although certain techniques, such as searching the residence of a diplomat who has full immunity and inviolability without the diplomat's consent, are clearly prohibited, other techniques may touch the diplomat's "sphere of privacy." According to State officials, the permissibility of these techniques under international law is less clear.[24]

While State can readily confirm a diplomat's identity, State's process of advising on which investigative techniques are legally permissible has, in some instances involving unprecedented circumstances, taken several months. In one instance, a victim agreed to a specific investigative technique that could have allowed Justice to collect important evidence. The victim's lawyers postponed filing a civil suit on her behalf to avoid

---

[24]We do not identify these techniques in this report because Justice and Homeland Security consider this information to be law-enforcement sensitive.

alerting the diplomat involved that he was under investigation. State spent 6 months deliberating the issue, but did not advise Justice on whether use of this technique was legally permissible. Justice did not use the technique, the victim's lawyers eventually filed suit, and the criminal investigation remains open. In other instances, State has asked Justice to provide specific information that it believes could help it formulate an opinion on whether use of the technique is legally permissible. According to a Justice official, obtaining some of this information can be difficult and time-consuming. Both Justice and State officials agreed that when the issue at hand is relatively straightforward, they reach agreement quickly.

According to State, its internal process of reaching an opinion on the legal advisability of investigative techniques can be time-consuming because State takes both legal and policy considerations into account when considering the advisability of using investigative techniques that fall into the "gray area." For example, the involvement of foreign diplomats can raise sensitivities for the U.S. government. State may need to consider reciprocity, such as how use of a specific technique might affect treatment of U.S. diplomats abroad. Similarly, if the foreign diplomat's country is a close ally of the United States, State also will assess how relations with that country might be affected by use of the investigative technique. The process of addressing these questions through State's supervisory chain of command, which can go above the Assistant Secretary level, if necessary, is lengthy, according to State officials. Once State makes a final determination, a State official conveys to a Justice official the department's opinion on use of the investigative technique in the specific case. This opinion covers both State's legal determination and any policy concerns the department may have. For example, a State official might say that the department could probably defend the use of a technique legally, but it would raise serious reciprocity concerns.

According to Justice, State's policy considerations do not affect its trafficking investigations, but the length of State's deliberative process in determining what is legally permissible can hamper them. The investigative techniques in question are, according to Justice officials, among the most useful for gathering corroborating evidence, but they are unlikely to succeed unless they are implemented quickly. As one Justice official explained, "time is the enemy of successful investigations," meaning that the longer it takes to get approval from State, the greater the likelihood that the investigation will be compromised. For example, the subjects might learn that they are under investigation or they might leave the United States for their next assignment, further limiting the opportunity to collect evidence. Homeland Security officials also told us

that any delays are detrimental to the preservation and collection of physical and testimonial evidence.

To expedite the investigative process, Justice officials said that it would be helpful for State to provide them with a list of investigative techniques that, in State's view, are not legally permissible when the subject of the investigation has full or partial immunity. However, State prefers to continue handling these investigations on a case-by-case basis. State officials explained that, while they could make a list of techniques that are clearly acceptable (such as asking the diplomat to agree to an interview) or prohibited (such as searching the residence of a diplomat with full immunity and inviolability), they would rather not indicate the legal permissibility of other, less clear-cut techniques because they want to be able to consider both the legal and policy implications of each case. However, these officials added that they are aware of the need to provide a more timely response to Justice. Officials from both agencies told us they are considering developing an interagency process that would outline time frames for discussing the use of investigative techniques, but they have, thus far, not taken any formal actions toward creating one.

## Weaknesses Exist in Implementation and Oversight of A-3 and G-5 Visa Policies and Procedures

At the four consular posts we visited, we found weaknesses in State's process for ensuring that its policies for issuing A-3 and G-5 visas are implemented correctly and consistently, and some consular officers were unfamiliar with or unclear about aspects of guidance relating to these visas. Although State headquarters issues A-3 and G-5 policies and procedures, it relies on individual posts to ensure they are implemented correctly and consistently and has not instituted a process to spot-check compliance.

## GAO Found Weaknesses in the Implementation of A-3 and G-5 Visa Policies

Through our fieldwork, we identified instances in which A-3 and G-5 policies were not implemented correctly and consistently. State requires that A-3 and G-5 visa applicants submit employment contracts signed by both the employer and employee that include

- a guarantee that the employee will be compensated at the state or federal minimum wage or prevailing wage, whichever is greater;

- a statement by the employee that he or she will not accept any other employment while working for the employer;

- a statement by the employer that he or she will not withhold the passport of the employee; and

- a statement indicating that both parties understand that the employee cannot be required to remain on the premises after working hours without compensation.

  However, the contracts we reviewed[25] did not include at least one of State's requirements 71 percent of the time at one post, 35 percent at the second, 23 percent at the third, and 6 percent at the fourth.[26]

- In some cases, the contracts were clearly deficient in one or more areas. For example, one contract we reviewed showed that the employee would receive $5 per hour (below the minimum wage) and that the employee would reimburse her employer for items received. This particular contract also did not include a statement that the employee could not be required to remain on the premises after working hours without compensation.

- In other cases, the contracts included statements that appeared to comply with State's requirements, but also contained information that contradicted these statements. For example, some contracts stated that "the normal working hours of the second party [employee] shall be at the prevailing wage for a 40 hours [sic] week." However, these contracts also showed that the employees would be paid well below the prevailing wage for their occupation and intended destination.

  Our review of employment contracts revealed other shortcomings and raised questions about whether the employee would be paid fairly.

- A-3 and G-5 visa applicants must submit contracts in English and a language understood by the applicants to demonstrate they understand their duties and rights regarding salary and working conditions. However, at one post where consular officers told us that A-3 and G-5 visa applicants

---

[25]We requested to review all employment contracts submitted by A-3 and G-5 visa applicants since March 2007 at the four consular posts we visited. We chose this date because State issued updated guidance to posts on A-3 and G-5 visas at that time. However, for reasons outlined in app. I, we were unable to review all relevant contracts at three of the four posts. For these three posts, we reviewed a random sample of cases to minimize any biases in selection of cases for review. We reviewed 45 contracts at the first post, 20 at the second, 57 at the third, and 16 at the fourth.

[26]This post has created a template employment contract for A-3 and G-5 visa applicants that meets State's requirements and is available on its Web site.

rarely speak or read English, none of the contracts we reviewed was in a language other than English.[27]

- We identified some contracts where the employee would be paid overtime "in accordance with [the foreign diplomat's home] embassy regulations."

- In another contract, the employee's overtime hourly rate was lower than her wage for normal working hours.

## Some Consular Officers Unfamiliar with or Unclear about Aspects of A-3 and G-5 Policies and Procedures

At the four posts we visited, we also found that some consular officers were unfamiliar with or unclear about certain aspects of State's guidance on A-3 and G-5 visas.

### Requiring a Diplomatic Note

According to State's guidance, A-3 and G-5 visa applications must be accompanied by a diplomatic note from the appropriate foreign mission or international organization that identifies the applicant's employer and confirms the employer's official A or G status. Some consular officers overseas told us that they believed a note was not required if they could identify the employer and confirm his or her status through The Office of Foreign Missions Information System (TOMIS), a database of foreign diplomats posted to the United States, which, according to the *Foreign Affairs Manual*, can be a useful tool for consular officers to confirm a diplomat's status. However, senior consular officials at State headquarters told us that TOMIS may contain inaccurate or outdated information and confirmed that a diplomatic note was in fact required.

### Informing A-3 and G-5 Visa Applicants of Their Rights

State's guidance also includes provisions encouraging consular officers to help educate A-3 and G-5 visa applicants about their rights under U.S. laws, but some officers we spoke with were unaware of these provisions. Consular officers are required to interview all A-3 and G-5 visa applicants. State recommends that officers use the interview to advise applicants in a language they understand that the U.S. government considers involuntary

[27]It is possible that a contract in a language familiar to the applicant was presented at the interview, but was not maintained on file at the consular post. However, consular officers at this post did not express familiarity with the requirement that A-3 and G-5 visa applicants present contracts in a language that they understand and one officer told us that A-3 and G-5 contracts are always in English.

servitude of household workers to be a severe form of trafficking in persons and a serious criminal offense and that victims of involuntary servitude are offered protection under the Trafficking Victims Protection Act. Officers are encouraged to make A-3 and G-5 applicants aware that the telephone number for police and emergency services is 911, and that there is a telephone hotline for reporting abuse of household workers and other trafficking-related crimes.[28] State also reminds consular posts that an antitrafficking brochure titled "Be Smart, Be Safe" is available as a handout to household worker applicants. However, while several officers said they try to explain to A-3 and G-5 visa applicants that they have rights under U.S. laws, the officers also were unaware of the telephone hotline, State's advice to refer workers to 911, or the brochure. None of the posts we visited made copies of the "Be Smart, Be Safe" brochure available to visa applicants, although two of them had created one-page informational handouts for A-3 and G-5 visa applicants.[29] At one of these posts, officers generally did not speak with applicants about their rights but instead relied on giving them the one-page handout. NGOs and alleged victims we spoke with told us that measures to educate A-3 and G-5 visa applicants are important. For example, one alleged victim said that U.S. embassies abroad should tell domestic workers coming to the United States that they have rights because, in her experience, one of the ways that employers abuse their workers is to tell them that they are still under the laws of their home country. She added that, specifically, embassies should give A-3 and G-5 visa applicants information about whom to contact if they experience physical or psychological abuse. Another worker, whose employer was investigated and sent home for allegedly trafficking household workers, told her attorneys that she knew to seek help because a consular officer had told her about her rights under U.S. law when she applied for her A-3 visa.

**Scanning Employment Contracts**

Another area of the guidance that posts we visited were largely unaware of was the March 2007 direction from State headquarters to electronically scan copies of A-3 and G-5 employment contracts into the Consular

---

[28] The guidance refers consular officers to the trafficking hotline operated by the Department of Health and Human Services—1 (888) 373-7888. Justice also operates a trafficking hotline, which some NGOs have called on behalf of foreign diplomats' household workers. This toll-free hotline is 1 (888) 428-7581.

[29] One of the handouts directs applicants to the "Be Smart, Be Safe" brochure on State's Web site. However, neither of the handouts is as thorough as State's brochure in explaining what trafficking is, how to avoid becoming a trafficking victim, and how to get help if needed.

without hard evidence that an applicant has been or could be mistreated, it is difficult to deny an A-3 or G-5 visa. For example, a consular officer at one post we visited told us that, in one case, she was concerned that the applicant had never met her employer, but her supervisors told her that as long as the applicant had a valid employment contract, she had to issue the visa.

State is considering steps to address confusion about refusing A-3 and G-5 visas, but has not taken actions to implement them. Consular officials in Washington told us that, while it is appropriate and even expected for consular officers to refuse A-3 and G-5 visas if they believe that visa applicants may be abused by their prospective employers, the officers have "little to go on beyond the contract" and it is impossible to refuse a visa based on something that has not happened or will not happen for another 6 months. State is considering adding specific provisions to the *Foreign Affairs Manual* outlining certain circumstances in which these visas should be denied. These provisions might place a heavier burden on lower-ranking foreign diplomats to document sufficient means to employ household staff under the contractual requirements stipulated for A-3 and G-5 visas. The provisions also might result in refusal of an A-3 or G-5 visa if a particular diplomat is linked to a pattern of employee disappearance, abuse allegations, or other irregularities. A State official told us the department is drafting possible language for these additional provisions to the *Foreign Affairs Manual*, but officials have not reached internal agreement on final language and have no timetable for doing so. In addition, officials in State headquarters do not currently alert consular officers if they have information that could help in the adjudication of an A-3 or G-5 visa based on a pattern of employee disappearance, abuse allegations, or other irregularities because that information is not included in State's databases. For example, headquarters does not alert consular officers to seek guidance if a foreign diplomat is under investigation for trafficking or if a foreign diplomat has employed anyone who subsequently received a T visa.

## State Headquarters Does Not Routinely Assess Compliance with A-3 and G-5 Visa Policies and Procedures

Consular officials in Washington told us they rely on individual posts to ensure correct and consistent implementation of A-3 and G-5 policies and procedures and do not independently monitor compliance on a routine basis. Supervisory officials at consular posts abroad review a selection of visas that were issued or refused at that post each day. The reviews these officials conduct may cover some of the A-3 and G-5 visas that were adjudicated, but not all of them. Furthermore, officials conduct these reviews through the Consular Consolidated Database, so they are unlikely

to review supporting documents for A-3 and G-5 visas, such as employment contracts and diplomatic notes, which we found were usually not scanned into the database. Consular officials at State headquarters told us they provide advice to individual posts on an as-needed basis, but generally rely on supervisory reviews to ensure compliance with State policies and procedures because it is not their role or responsibility to oversee the consular posts in this regard.[32] As such, they do not routinely and independently monitor compliance with A-3 and G-5 policies and procedures.

## Conclusions

The people who come to the United States on A-3 and G-5 visas are among the most vulnerable who enter our borders legally. They are often poor, uneducated, and unfamiliar with their rights under U.S. law. If they find themselves in an abusive situation, their ability to hold their employers accountable can be limited, particularly if their employers hold full diplomatic immunity and inviolability. Although State has expressed concerns that some foreign diplomats may be abusing their household workers, it has not systematically collected and maintained information on cases of alleged abuse that have come to its attention. In addition, State has not always ensured that the visa policies and procedures in place to provide protections for these most vulnerable individuals have been correctly and consistently implemented, such as the policy requiring certain elements within these workers' employment contracts. Furthermore, if officials at State headquarters have information linking a particular diplomat to a pattern of employee disappearance, abuse allegations, or other irregularities, they do not routinely alert consular officers to seek guidance. Finally, the U.S. government's process for investigating trafficking of household workers by foreign diplomats has, in some instances, been hampered by delays in coordination between State and Justice on the use of investigative techniques. In addressing these problems, the U.S. government can strengthen its commitment to combating human trafficking within the United States.

---

[32]Although State has instituted Consular Management Assessment Teams to review select consular posts for, among other things, training and knowledge of consular functions, supervisory reviews of daily adjudications, and other visa issues, these teams are focused primarily on preventing visa malfeasance and are, therefore, unlikely to assess posts' compliance with A-3 and G-5 visa policies and procedures.

GAO-08-892  Human Rights

# Recommendations for Executive Action

To improve the U.S. government's process for preventing and responding to allegations of household employee abuse by foreign diplomats, we are making four recommendations.

1. To ensure that the Office of Protocol and the Office of the Legal Adviser are aware of all cases involving alleged abuse of household workers by foreign diplomats that have come to the attention of the department, we recommend that the Secretary of State (1) emphasize to the relevant bureaus and offices the importance of the *Foreign Affairs Manual* requirement to report all cases that come to their attention and (2) direct the Office of Protocol and the Office of the Legal Adviser to create a system for collecting and maintaining records on these cases.

2. To assist in timely handling of future investigations, we recommend that the Secretary of State, the Attorney General, and the Secretary of Homeland Security establish an interagency process outlining agreed-upon policies and time frames for determining which investigative techniques can be used in trafficking investigations involving foreign diplomats.

3. We recommend that the Secretary of State direct the Bureau of Consular Affairs, in coordination with the Office of Protocol and the Office of the Legal Adviser, to establish a system alerting consular officers to seek guidance from State headquarters before issuing A-3 or G-5 visas to applicants whose prospective employers may have abused their household workers in the past. For example, if State headquarters is aware that a foreign diplomat is under investigation for alleged human trafficking, it could place an alert in the system advising consular officers to request guidance should an individual apply for an A-3 or G-5 visa to work for that diplomat.

4. To better ensure correct and consistent implementation of A-3 and G-5 visa policies and procedures, particularly those that outline requirements for employment contracts, we recommend that the Secretary of State enhance oversight by establishing a system to spot-check compliance with these policies and procedures. This spot-check system would allow headquarters to assess compliance without dedicating the resources needed to review all A-3 and G-5 visas issued in a given year and could be targeted at posts that issue high numbers of A-3 or G-5 visas or that have identified difficulties interpreting guidance on these visas classes.

# Agency Comments and Our Evaluation

We provided a draft of this report to the Departments of State, Justice, Homeland Security, Labor, and Health and Human Services for their comments. State and Justice provided written comments on the draft, which we have reprinted in appendixes IV and V, respectively.

State agreed with all four of our recommendations. Regarding the first recommendation, State indicated that it will emphasize to the relevant bureaus and offices the importance of reporting promptly and fully all cases of alleged abuse of household workers by foreign diplomats. State also noted that the Office of Protocol is now creating a system for collecting and maintaining centralized records on these cases that would allow for ready access to records of cases that involve individuals with immunity. Regarding our second recommendation, State said that, while most investigations go forward without consultations on investigative techniques, it will be useful to establish a process to address novel and difficult questions regarding investigative techniques.  In response to our third recommendation, State said that it will place known abusers of household workers in the Consular Lookout and Support System, a database designed to screen visa applicants and maintain watch lists. State will also upgrade consular officers' access to TOMIS to provide improved information regarding A-3 and G-5 cases. State responded to our last recommendation by acknowledging the need for better compliance with policies and procedures to ensure that A-3 and G-5 employment contracts contain all required elements and are electronically scanned for future reference in case of alleged abuse. State reiterated that it is primarily the responsibility of senior consular managers at posts for compliance with visa adjudication procedures and practices in their consular sections, but added that it will consider and review whether spot-checking compliance from headquarters is appropriate and consistent with judicious use of limited resources. As indicated in our fourth recommendation, we believe that spot-checking is important for enhancing oversight and could be targeted in such a way as to minimize use of resources.

Justice generally agreed with our findings, particularly our finding that obstacles to investigating allegations of household worker abuse are compounded when employers have diplomatic immunity. Justice also concurred with our second recommendation, highlighting the importance of agreeing upon time frames for determining which investigative techniques can be used, so that criminal investigations are not compromised.

State, Justice, and Homeland Security provided technical comments, which we incorporated as appropriate. For example, Homeland Security asked to be included in the second recommendation, which was initially directed to the Secretary of State and the Attorney General. Specifically, Homeland Security officials stated that Immigration and Customs Enforcement should participate in the recommended interagency process because the introduction of persons into the United States for the purpose of exploitation is a primary law enforcement responsibility and area of expertise of Immigration and Customs Enforcement. We agreed to include the Secretary of Homeland Security in the second recommendation.

The Departments of Labor and Health and Human Services did not provide comments on the draft report.

We are sending copies of this report to other interested Members of Congress. We are also sending copies to the Secretary of State, the Attorney General, the Secretary of Homeland Security, the Secretary of Labor, and the Secretary of Health and Human Services. In addition, the report will be available at no charge on the GAO Web site at http://www.gao.gov.

If you or your staffs have any questions about this report, please contact me at (202) 512-9601 or melitot@gao.gov. Contact points for our offices of Congressional Relations and Public Affairs may be found on the last page of this report. GAO staff who made significant contributions to this report are listed in appendix VI.

Thomas Melito
Director, International Affairs and Trade

# Appendix I: Objectives, Scope, and Methodology

Our objectives were to (1) seek to determine how many A-3 and G-5 visa holders have alleged abuse by foreign diplomats with immunity since 2000, (2) review the U.S. government's process for investigating abuse allegations involving foreign diplomats with immunity, and (3) describe and assess how State ensures correct and consistent implementation of A-3 and G-5 visa polices and procedures. In this report, we define abuse to include illegal activities ranging from wage and hour violations to human trafficking.

To determine how many A-3 and G-5 visa holders have alleged abuse by foreign diplomats from 2000 (when the U.S. government enacted the Trafficking Victims Protection Act) through June 2008, we collected data, interviewed officials from four U.S. government agencies and 10 nongovernmental organizations (NGO), and searched legal databases, such as Westlaw, to identify civil lawsuits.

- At the Department of State (State), we met with officials from the Office of the Legal Adviser, Office of the Chief of Protocol, Diplomatic Security Service, Office of Foreign Missions, Bureau of International Organizations Affairs, United States Mission to the United Nations (USUN), Office to Monitor and Combat Trafficking in Persons, and Bureau of African Affairs.

- At the Department of Justice (Justice), we met with officials from the Human Smuggling and Trafficking Prosecution Unit within the Civil Rights Division/Criminal Section (CRT/CS), Executive Office for United States Attorneys, headquarters and field offices of the Federal Bureau of Investigation (FBI), and one local Assistant United States Attorney's (AUSA) Office.

- At the Department of Homeland Security (Homeland Security), we met with officials from Immigration and Customs Enforcement's (ICE) Human Smuggling and Trafficking Unit and Citizenship and Immigration Services (CIS).

- At the Department of Labor (Labor) we met with officials from the Employment Standard Administration's Wage and Hour Division headquarters office and its New York City district office.

- We identified and met with 10 NGOs that have provided legal services to A-3 and G-5 visa holders through analysis of civil lawsuits filed on behalf of A-3 and G-5 visa holders, referrals from NGOs, and a review of past and recent media reports. These 10 NGOs have a broad range of experience and expertise on cases involving victims of household worker abuse and are all located in the Washington, D.C., and New York regions.

State, Justice, Homeland Security, and Labor provided data on the number
of incidents they have handled by canvassing current staff and reviewing
specific case files. To avoid double-counting the number of these alleged
incidents, we asked the departments to verify with each other the number
of investigations in which they had participated. Homeland Security also
provided us with the number of individuals who had received T visas and
identified themselves as A-3 or G-5 visa holders on their T visa
applications. We counted NGO-alleged incidents if we could determine the
name of the diplomat involved and confirm that he or she held immunity
or if we received enough information from a law enforcement source to
ensure that a diplomat with immunity was involved and that the alleged
incident was not duplicative with any other incident. Therefore, we believe
that the data we obtained from federal agencies and the NGOs are
sufficiently reliable for reporting the minimum number of incidents of
alleged abuse of A-3 and G-5 visa holders by their employers since 2000.

To review the U.S. government's process for investigating abuse
allegations involving foreign diplomats with immunity, we reviewed State
documents including the *Foreign Affairs Manual*, cables sent to consular
officers on A-3 and G-5 visas, "Diplomatic and Consular Immunity
Guidance for Law Enforcement and Judicial Authorities," diplomatic notes
to Chiefs of Diplomatic Missions in the United States regarding conduct of
diplomatic agents in the United States, USUN's diplomatic notes to
Permanent Missions and Permanent Observer Offices, and State's 2007
document to the Senate Committee on Foreign Relations entitled "State's
Initiatives to Promote Fair Treatment of Domestic Workers by Diplomatic
Personnel." We also interviewed officials from State's Office of the Chief
of Protocol, Office of the Legal Adviser, Diplomatic Security Service,
USUN, and Office to Monitor and Combat Trafficking in Persons. Because
federal law enforcement agencies have no written policies or procedures
specifically regarding abuse of household workers by foreign diplomats,
we relied on testimonial evidence to determine their processes for
handling alleged abuse of household workers by foreign diplomats. We
interviewed law enforcement officials from Justice including the FBI, the
Human Smuggling and Trafficking Prosecution Unit within CRT/CS, and
one AUSA Office. We also met with officials at the Human Smuggling and
Trafficking Unit within ICE. We interviewed one of the two U.S. Attorneys
assigned to prosecute two relevant cases. The second prosecutor did not
comment about the case, given the early stage of the review. At Labor we
reviewed a document describing the agency's policy regarding household
workers employed by foreign nationals titled "Domestic Service Workers
Employed by Foreign Nationals," and interviewed officials at the Wage and
Hour Division headquarters office and the Office of Enforcement Policy

and the New York City District Office. We also analyzed key sections of
international conventions, acts, and agreements on immunity to describe
in general terms the different levels of immunity and the protections
accorded under each one, specifically with regard to investigations of
alleged abuse or trafficking of household workers by foreign diplomats.
Finally, we interviewed NGOs and three alleged victims of abuse by
foreign diplomats.

To describe and assess how State ensures correct and consistent
implementation of A-3 and G-5 visa polices and procedures, we reviewed
documents, analyzed data provided to us by State, and interviewed State
officials in Washington, D.C.; New York; Lima, Peru; Manila, Philippines;
Doha, Qatar; and Riyadh, Saudi Arabia. We reviewed the *Foreign Affairs
Manual*, State's circular notes, training and guidance materials for
consular officers, and guidance for visa applicants on State's public Web
site and consular posts' Web sites. We interviewed officials from State's
headquarters, including Consular Affairs and the Office of the Chief of
Protocol. We also interviewed consular officers and reviewed A-3 and G-5
applications at four consular posts: Lima, Peru; Manila, Philippines; Doha,
Qatar; and Riyadh, Saudi Arabia. In selecting these four consular posts, we
analyzed data provided to us by Consular Affairs on A-3 and G-5 visas
issued for fiscal years 2000 through 2007. Each of the 4 posts is among the
10 that issued the most A-3 and G-5 visas, combined, during this time
period. Together these four posts account for about 22 percent of all A-3
and G-5 visas issued abroad since 2000. The U.S. embassy in Manila issued
more A-3 and G-5 visas from fiscal year 2000 through 2007 than any other
overseas post. The total number of A-3 and G-5 visas issued in Manila
accounts for almost 10 percent of all A-3 and G-5 visas issued during this
period. The U.S. embassy in Lima issued the second highest number of A-3
and G-5 visas, about 5 percent of the total, and the U.S. embassies in
Riyadh and Qatar followed closely behind Lima, with about 4 percent and
3 percent, respectively, of all A-3 and G-5 visas issued during this period.

As part of our site visits or through telephone interviews, we interviewed
consular officers to determine the steps State's Bureau of Consular Affairs
has taken to ensure that State's policies and procedures for issuing A-3
and G-5 visas are implemented correctly and consistently. To examine the
procedures for issuing A-3 and G-5 visas, we reviewed documents
describing the requirements that household workers and U.S. consular
officers should meet during the visa application process. We did not
review or evaluate consular officers' decisions to refuse or issue visas. We
worked with State officials to identify documentation that we could
review both at consular posts and in Washington, D.C.

To determine the extent to which A-3 and G-5 applications met documentation requirements, we developed a checklist of State's requirements for A-3 and G-5 visa applicants and then assessed applications at each post against this checklist, reconciling any differences in our assessments. For one of the four posts, we were able to review all available documentation for A-3 and G-5 visas adjudicated since March 1, 2007. (We selected this date because State issued updated guidance to posts on the A-3 and G-5 visa class in March 2007.) For the other three posts, we were able to review only a sample of available files and documentation. Although the cases we reviewed from these posts are not generalizable, we reviewed a randomly selected set of cases to minimize any selection bias. Below is a more detailed explanation of our methodology for selecting and reviewing files from each post:

- In Lima, Peru, we reviewed 87 A-3 and G-5 visa files that had been adjudicated between March 1, 2007, and February 26, 2008, and that had a paper copy of the employment contract, the diplomatic note, or both. While 53 additional A-3 and G-5 application files were not available for our review in Lima, Consular Affairs in Washington, D.C., later agreed to search the Consular Consolidated Database to determine whether any documents for these 53 files had been scanned into it. These officials also searched the database for scans of accompanying documents for any of the 87 files in Lima for which we had seen only one of the required documents. (For example, if we saw only a diplomatic note in a given file, we asked if the related employment contract had been scanned into the database.) The officials determined that documents that we had not reviewed, related to 2 of the 87 files in Lima, had been scanned into the database. They also determined that one or both of the required documents for 5 of the 53 files that were not available for review at post had been scanned into the database. We did not review these seven files.

- In Manila, Philippines, we reviewed 61 A-3 and G-5 visa application files from December 1, 2007, to March 15, 2008, including all available documentation. Due to physical space constraints, this post only maintains 3 months of visa applications on file. In addition, the post had not been scanning employment contracts or diplomatic notes into the Consular Consolidated Database, so we were unable to review any files earlier than December 2007.

- For Riyadh, Saudi Arabia, we reviewed a total of 25 A-3 or G-5 visa files. At post, we reviewed two application files, including all documentation available for these A-3 or G-5 visa applications. Although we had requested to review all files available since March 1, 2007, consular officials in Washington, D.C., instructed the post to allow us to review files only if the

Appendix I: Objectives, Scope, and
Methodology

particular case was mentioned in the course of interviews at posts. These officials later agreed to provide us redacted copies of 25 percent (or 23) of the A-3 and G-5 visa files from the U.S. Embassy in Riyadh between March 1, 2007 and February 29, 2008. We randomly selected these 23 files and reviewed them in Washington.

- In Doha, Qatar, we reviewed all 56 A-3 and G-5 visa application files that were adjudicated between March 1, 2007, and February 28, 2008, including all documentation available.

Although we were unable to review all requested A-3 and G-5 visa files at the posts we visited, the information we obtained was sufficient for addressing our third objective.

We conducted this performance audit between October 2007 and July 2008 in accordance with generally accepted government auditing standards. Those standards require that we plan and perform the audit to obtain sufficient, appropriate evidence to provide a reasonable basis for our findings and conclusions based on our audit objectives. We believe that the evidence obtained provides a reasonable basis for our findings and conclusions based on our audit objectives.

# Appendix II: U.S. Government Agencies' Primary Responsibilities Related to Foreign Diplomats and A-3 and G-5 Visa Holders

We analyzed State's roles and responsibilities related to A-3 and G-5 visa holders, as well as foreign diplomats, and identified key State offices and bureaus involved in these matters. Table 1 summarizes our analysis.

**Table 1: Relevant Responsibilities of State Department Bureaus and Offices**

| Office | Responsibility |
|---|---|
| Office of the Chief of Protocol, Diplomatic Affairs Division | • Accredits diplomatic agents and consular officers of foreign governments in the United States |
| | • Maintains the official records regarding the status and immunity level of all diplomatic and consular officers |
| | • Makes available to the public the *Diplomatic List* and *Foreign Consular Offices in the United States* |
| | • Submits State's annual report to the Secretary of State and Congress entitled *Report on Criminal [and Civil] Cases Involving Immunity* |
| Bureau of Consular Affairs | • Issues policy, guidance, and training to consular officers on the adjudication of A-3 and G-5 visas |
| U.S. embassies and consulates | • Adjudicates A-3 and G-5 nonimmigrant visa applications (reviews documents and interviews visa applicant and, possibly, employer) |
| Office of the Legal Adviser, Consular Affairs | • Provides legal advice and representation in relation to the performance of consular functions by State (including adjudication and revocation of visas and passports) |
| Office of the Legal Adviser, Diplomatic Law and Litigation | • Advises law enforcement authorities on diplomatic and consular immunity |
| Office to Monitor and Combat Trafficking in Persons | • Encourages partnerships and leads the coordination of antitrafficking efforts both worldwide and domestically |
| | • Consults with nongovernmental organizations and affected victims of trafficking |
| United States Mission to the United Nations (USUN) | • Facilitates and evaluates registration and accreditation of individuals accredited by the United Nations |
| | • Communicates with the UN Protocol and Liaison Service for full listing in the publicly available *Blue Book* of the missions' diplomatic personnel and their spouses |
| Bureau of International Organizations | • Receives allegations of abuse by UN diplomats from USUN |
| | • Works in cooperation with the USUN and Office of the Legal Adviser, Diplomatic Law on allegations of abuse by UN diplomats |

Source: GAO analysis of State documents and interviews.

Appendix II: U.S. Government Agencies'
Primary Responsibilities Related to Foreign
Diplomats and A-3 and G-5 Visa Holders

We also analyzed various federal agencies' role in investigating and
prosecuting federal law violations related to abuse of household workers
by foreign diplomats with some level of immunity. Table 2 summarizes our
analysis.

**Table 2: Federal Departments with Primary Investigative and Prosecutorial Responsibilities**

| Investigative and prosecutorial departments | Office | Responsibility |
|---|---|---|
| Justice | Civil Rights Division/Criminal Section, Human Trafficking Prosecution Unit | • Receives allegations that a crime has occurred<br>• Refers cases to lead investigative agency, if the agency has not already begun an investigation<br>• Prosecutes trafficking crimes in conjunction with the U.S. attorney for the relevant jurisdiction |
| | Federal Bureau of Investigation | • Investigates trafficking crimes |
| | U.S. Attorneys | • Prosecutes trafficking cases in their geographic jurisdiction in conjunction with the Human Trafficking Prosecution Unit |
| Homeland Security | Immigration and Customs Enforcement (ICE), Human Smuggling and Trafficking Unit | • Investigates human trafficking crimes and provides short-term immigration relief to alien victims (continued presence) |
| State | Bureau of Diplomatic Security Service, Criminal Investigation Division | • Investigates passport violations and visa fraud, which may be in connection with other serious crimes such as trafficking |
| Labor | Employment Standards Administration, Wage and Hour Division | • Maintains policy on wage and hour investigations involving foreign nationals attached to a foreign embassy, consulate, or international organization<br>• Notifies State of these investigations |
| **Supporting departments** | | |
| State | Office of the Legal Adviser, Diplomatic Law and Litigation | • Advises law enforcement authorities on diplomatic and consular immunity |
| | Office of the Chief of Protocol | • Refers alleged criminal violations to law enforcement authorities |
| Homeland Security | Citizenship and Immigration Services | • Processes and approves T nonimmigrant status for alien victims of trafficking<br>• Processes short-term immigration relief for alien victims (continued presence) |
| Health and Human Services | | • Oversees administration of benefits to T nonimmigrant status visa recipients |

Source: GAO analysis of Justice, Homeland Security, State, Labor, and Health and Human Services documents and interviews.

# Appendix III: Diplomatic and Consular Privileges and Immunities from Criminal and Civil Jurisdiction

We analyzed key sections of international conventions, acts, and agreements on immunity to describe in general terms the different levels of immunity and the protections accorded under each one, specifically as they relate to investigations of alleged abuse of household workers by foreign diplomats. We also consulted with the Department of State on our analysis, which is summarized in table 3. This table represents only a general description of these privileges and immunities and, as indicated in the notes following the table, exceptions may apply for each general category.

**Table 3: Diplomatic and Consular Privileges and Immunities from Criminal and Civil Jurisdiction**

| Category | May be arrested or detained | Residence may be entered subject to law enforcement procedures generally applicable to U.S. residences | May be prosecuted | Immunity from civil jurisdiction | Recognized family member |
|---|---|---|---|---|---|
| Diplomatic agent[a] (e.g., ambassadors and other diplomatic officers) | No[b] | No | No | Yes[c] | Same as sponsor (full immunity and inviolability). |
| Member of administrative and technical staff[c] (e.g., secretaries, certain clerical managers, office managers, and certain security personnel) | No[b] | No | No | Yes, for acts performed in the course of their official duties. Otherwise, no. | Same as sponsor. Since family members have no official duties to perform, they enjoy no immunity from civil jurisdiction. |
| Service staff[d] (e.g., drivers, cleaners, and building and maintenance workers) | Yes | Yes | No, for official acts. Otherwise yes. | Yes, for acts performed in course of their duties. Otherwise, no. | No immunity or inviolability. |
| Career consular officers[a,d] | No, except for a felony and pursuant to a warrant. | Yes[e] | No, for official acts. Otherwise, yes. | Yes, for acts performed in the exercise of consular functions.[f] Otherwise, no. | No immunity or inviolability. |
| Honorary consular officers (e.g., American citizens or permanent resident aliens who perform consular services on a part-time basis.) | Yes | Yes | No, for official acts. Otherwise, yes. | Yes, for acts performed in the exercise of consular functions.[f] Otherwise, no. | No immunity or inviolability. |

Appendix III: Diplomatic and Consular
Privileges and Immunities from Criminal and
Civil Jurisdiction

| Category | May be arrested or detained | Residence may be entered subject to law enforcement procedures generally applicable to U.S. residences | May be prosecuted | Immunity from civil jurisdiction | Recognized family member |
|---|---|---|---|---|---|
| **Consular employees**[d] (e.g., those who perform the administrative and technical support services for the consular post) | Yes | Yes | No, for official acts. Otherwise, yes. | Yes, for acts performed in the exercise of consular functions.[f] Otherwise, no. | No immunity or inviolability. |
| International organizations staff[g] | Yes[g] | Yes[g] | No, for official acts. Otherwise, yes.[g] | Yes, for acts performed in the exercise of their official duties. Otherwise, no.[g] | No immunity or inviolability.[g] |
| Diplomatic-level staff of missions to international organizations | No[b] | No | No | Yes[c] | Same as sponsor (full immunity and inviolability). |
| Support staff of missions to international organizations | Yes | Yes | No, for official acts. Otherwise, yes. | Yes, for acts performed in the exercise of their official duties. Otherwise, no. | No immunity or inviolability. |

Source: GAO.

[a]The Department of State, as a matter of policy, does not normally accept as bilateral diplomatic agents or as career consular officers U.S. nationals or legal permanent residents of the United States. Family members of diplomatic agents enjoy no privileges and immunities if they are U.S. nationals. Members of the administrative and technical staff (including their families) and members of the service staff enjoy no privileges and immunities if they are U.S. nationals, legal permanent residents, or foreign nationals permanently residing in the United States.

[b]Reasonable constraints, however, may be applied in emergency circumstances,e.g., self-defense, public safety, or the prevention of serious, violent criminal acts.

[c]Certain exceptions apply under Article 31 of the Vienna Convention on Diplomatic Relations. Immunity from civil and administrative jurisdiction does not apply in the following circumstances: (1) a real action relating to private immovable property situated in the territory of the receiving state unless the diplomatic agent holds it on behalf of the sending state for the purpose of the mission; (2) an action relating to succession in which the diplomatic agent is involved as executor, administrator, heir, or legatee as a private person and not on behalf of the sending state; (3) an action relating to any professional or commercial activity exercised by the diplomatic agent in the receiving state outside his official functions.

[d]This table presents general rules. Employees of certain foreign countries may enjoy higher levels of privileges and immunities on the basis of special bilateral agreements.

[e]Note that consular residences are sometimes located within the official consular premises. In such cases, only the official office space is protected from police entry unless a bilateral agreement provides additional protection for consular residences.

[f]This immunity does not apply in respect of a civil action either (1) arising out of a contract concluded by a consular officer or employee in which he did not contract expressly or impliedly as an agent of the sending state; or (2) by a third party for damage arising from an accident in the receiving state caused by a vehicle, vessel, or aircraft. See Article 43 of the Vienna Convention on Consular Relations.

[g]A small number of senior officers are entitled to be treated identically to "diplomatic agents."

# Appendix IV: Comments from the Department of State



**United States Department of State**

*Assistant Secretary for Resource Management and Chief Financial Officer*

*Washington, D.C. 20520*

Ms. Jacquelyn Williams-Bridgers
Managing Director
International Affairs and Trade
Government Accountability Office
441 G Street, N.W.
Washington, D.C. 20548-0001

JUL 1 1 2008

Dear Ms. Williams-Bridgers:

We appreciate the opportunity to review your draft report, "HUMAN RIGHTS: U.S. Government's Efforts to Address Alleged Abuse of Household Workers by Foreign Diplomats with Immunity Could Be Strengthened," GAO Job Code 320533.

The enclosed Department of State comments are provided for incorporation with this letter as an appendix to the final report.

If you have any questions concerning this response, please contact Chenobia Calhoun, Office of Protocol at 202-647-1727, David Tyler, Bureau of Consular Affairs at 202-663-1155 and Susan Benda, Office of the Legal Adviser at 202-647-1074.

Sincerely,

Bradford R. Higgins

cc:    GAO – Al Huntington
       S/OPR, CA/FO and L
       State/OIG – Mark Duda

**Department of State Comments on GAO Draft Report**

**HUMAN RIGHTS:  U.S. Government's Efforts to Address Alleged Abuse of
Household Workers by Foreign Diplomats with Immunity Could Be
Strengthened
(GAO-08-892, GAO Code 320533)**

The Department of State appreciates the opportunity to comment on GAO's draft
report entitled *"Human Rights:  U.S. Government's Efforts to Address Alleged
Abuse of Household Workers by Foreign Diplomats with Immunity Could Be
Strengthened."*

The GAO report recommends the following to the Secretary of State:

**Recommendation 1**:  To ensure that the Office of Protocol and the Office of the
Legal Advisor are aware of all cases involving alleged abuse of household workers
by foreign diplomats that have come to the attention of the department, we
recommend that the Secretary of State (1) emphasize to the relevant bureaus and
offices the importance of the Foreign Affairs Manual's requirement to report all
cases that come to their attention and (2) direct the Office of Protocol and the
Office of the Legal Advisor to create a system for collecting and maintaining
records on these cases.

**Response**:  The Department will emphasize to the relevant bureaus and offices the
importance of reporting promptly and fully all cases of alleged abuse of household
workers by foreign diplomats.  The Office of Protocol is creating a system for
collecting and maintaining centralized records on these cases that would allow for
ready access to records of cases that involve individuals with immunity.  The
records would include the name of the employer and the employee, the nature of
the allegation and the lever of immunity of the employer.

**Recommendation 2**:  To assist in timely handling of future investigations, we
recommend that the Secretary of State and the Attorney General establish an
interagency process, outlining agreed upon policies, including timeframes, for
determining which investigative techniques can be used in trafficking
investigations involving foreign diplomats.

**Response**:  The Department acknowledges that it would be useful to establish an
agreed-upon interagency process to address trafficking and other investigations

2

involving foreign diplomats, including a manner for timely communicating about the use of investigative techniques in these cases. While most investigations go forward without consultations on investigative techniques and, the Department generally answers promptly, the Department believes it will be useful to work with the Department of Justice to establish such a process to address novel and difficult questions regarding investigative techniques.

**Recommendation 3**: We recommend that the Secretary of State direct the Bureau of Consular Affairs, in coordination with the Office of Protocol and the Office of the Legal Adviser, to establish a system alerting consular officers to seek guidance from State headquarters before issuing A-3 or G-5 visas to applicants whose prospective employers may have abused their household workers in the past. For example, if State headquarters is aware that a foreign diplomat is under investigation for alleged human trafficking, it could place an alert in the system advising consular officers to request guidance should an individual apply for an A-3 or G-5 visa to work for that diplomat.

**Response**: The State Department's Bureau of Consular Affairs current visa name-check systems, including the Consular Lookout and Support System (CLASS) and Consular Consolidated Database (CCD), are designed to effectively screen applicants and maintain complete watch lists, and we will proactively watch-list known abusers in CLASS. With the deployment of the electronic visa application under the Consular Electronic Application Center (CEAC), the Visa Office will look for further opportunities to evaluate employers with the help of automation. The Department's Office of Foreign Missions (OFM) has a separate database system known as "The Office of Foreign Missions Information System" (TOMIS), which is used to track diplomats and international organization staff duly accredited in the United States. Currently, consular officers in the field and Washington have access to TOMIS. OFM will soon upgrade consular access to TOMIS to provide improved information regarding A-3 and G-5 cases, including sponsor's status in the United States. TOMIS provides an excellent vehicle for thorough checks of A-3 and G-5 visa applicants.

**Recommendation 4**: To better ensure correct and consistent implementation of A-3 and G-5 visa policies and procedures, particularly those that outline requirement for employment contracts, we recommend that the Secretary of State enhance oversight by establishing a system to spot-check compliance with these policies and procedures. This spot-check system would allow headquarters to assess compliance without dedicating the resources needed to review all A-3 and G-5 visas issued in a given year and could be targeted at posts that issue high

3

numbers of A-3 or G-5 visas or that have identified difficulties interpreting guidance on these visa classes.

**Response**: We acknowledge the need for better compliance with policies and procedures to ensure that employment contracts contain all required elements and that all contracts are scanned into our system for future reference in case of alleged abuse. We are developing additional guidance on this issue for inclusion in the Foreign Affairs Manual (FAM), and as soon as this guidance is available for publication, we will remind posts of all requirements with regard to A-3 and G-5 visa adjudication. The amended FAM notes containing this guidance will also provide a clearer description of the circumstances establishing reason for a consular officer to believe that the employer is not in a position to pay the prevailing wage or may be otherwise abusing an employee such that the officer should refuse an A-3 or G-5visa to the employee.

Under current policies and controls, it is primarily the responsibility of senior consular managers at posts to ensure compliance with visa adjudication procedures and practices in their consular sections, and we will remind consular managers of the need to pay particular attention to A-3 and G-5 visa processes. As far as spot-checking from headquarters, the Bureau of Consular Affairs will take this under consideration and review whether such an approach is appropriate and consistent with judicious use of limited resources. As we move ahead towards an all-electronic visa application process, development of which is well underway, there will be greater opportunities to review and screen visa applications from our domestic operations facilities prior to the visa interview at post. This type of review is already occurring for temporary worker visas, and the concept may eventually be extended to reviewing other visa categories and prerequisite documents such as employment contracts. This approach promises to increase standardization and consistency worldwide for all types of visas, including the specific categories addressed in this report.

# Appendix V: Comments from the Department of Justice



**U.S. Department of Justice**

Civil Rights Division

_Office of the Assistant Attorney General_        _Washington, D.C. 20530_

JUL 1 1 2008

Thomas Melito
Director, International Affairs and Trade
U.S. Government Accountability Office
441 G Street, N.W.
Washington, D.C. 20548

Dear Mr. Melito:

Thank you for the opportunity to review the final draft of the Government Accountability Office (GAO) report entitled "_HUMAN RIGHTS: U.S. Government's Efforts to Address Alleged Abuse of Household Workers by Foreign Diplomats with Immunity Could Be Strengthened, GAO-08-892._" This draft report was reviewed by the Department of Justice's components that participated in the review. This letter constitutes the Department's formal comments. I request that the GAO include this letter in the final report. The Department's technical comments were provided under separate cover.

The report defines "alleged abuse" of household workers broadly, to include not only allegations of human trafficking, but also allegations of wage and hour violations and other misconduct. The Department of Justice takes allegations of human trafficking very seriously, and these prosecutions are a priority of the Department. In the last seven fiscal years, the Civil Rights Division, in conjunction with the U.S. Attorneys' Offices, has increased by nearly seven-fold the number of human trafficking cases filed in court as compared to the previous seven fiscal years. In FY 2007, the Department obtained a record number of convictions in human trafficking prosecutions. Since 2005, the Department has investigated 19 alleged cases of human trafficking by persons with diplomatic immunity, with many of these cases involving multiple subjects and victims. Many of these investigations are ongoing, and one of these investigations has resulted in the Department of Justice notifying the Department of State that, but for the subject's immunity, the Department of Justice would seek an indictment of the subject.

As this report notes, human trafficking investigations and prosecutions are very complex in general, and investigations of forced household labor are particularly challenging because the victims are isolated in private homes, are fearful of retaliation in their home country, and are often members of vulnerable populations who are unfamiliar with our legal system or the rights and services available to them. As the report finds, these obstacles to investigating allegations of

Appendix V: Comments from the Department
of Justice

Mr. Thomas Melito                                                    Page Two

forced household labor are compounded when subjects have diplomatic immunity, which
impacts our ability to conduct certain valuable investigative techniques that, in other cases, have
served to corroborate allegations of forced labor. Nevertheless, the Department of Justice is
committed to conducting complete and thorough investigations of all allegations.

Recommendation that the Attorney General and the Secretary of State Establish an Interagency
Process Outlining Agreed Upon Policies, Including Timeframes, For Determining Which
Investigative Techniques Can Be Used In Trafficking Investigations Involving Foreign
Diplomats

   The Department of Justice does not object to this recommendation. As the report notes,
the Department of Justice and the Department of State are already engaging in regular
collaborative meetings in an effort to address the impact of diplomatic immunity on human
trafficking investigations on a case-by-case basis. Further meetings should assist both
Departments in understanding the legal framework for analyzing the impact of diplomatic
immunity on certain investigative techniques and improve our ability to expediently determine
which investigative techniques are legally permissible. The Department of Justice also supports
the report's recommendation that any agreed upon policies for resolving these issues include
timeframes that ensure deliberations and decisions on these investigative issues are resolved
expediently so as not to compromise the criminal investigation.

   The Department of Justice notes, however, that despite the significant increase in the
trafficking caseload since 2001 using existing resources, additional resources are needed if we
are to continue our successful investigation and prosecution of human trafficking crimes and to
further our collaborative efforts with the Department of State and our other partners.

   The extensive effort that your staff has put into this report and the opportunity to work
with them on this important issue are appreciated.

                                                Sincerely,

                                                Grace Chung Becker
                                                Acting Assistant Attorney General

cc:     Ms. Cheryl Goodman
        Assistant Director, International Affairs
          and Trade
        U.S. Government Accountability Office

# Appendix VI: GAO Contact and Staff Acknowledgments

| | |
|---|---|
| **GAO Contact** | Thomas Melito, (202) 512-9601, or melitot@gao.gov |
| **Staff Acknowledgments** | In addition to the individual named above, Cheryl Goodman, Assistant Director; Elizabeth Singer; Sylvia Bascopé; Mary Moutsos; Debbie Chung; Terry Richardson; Ray Rodriguez; Jim Strus; and Mattias Fenton made key contributions to this report. |

| | |
|---|---|
| **GAO's Mission** | The Government Accountability Office, the audit, evaluation, and investigative arm of Congress, exists to support Congress in meeting its constitutional responsibilities and to help improve the performance and accountability of the federal government for the American people. GAO examines the use of public funds; evaluates federal programs and policies; and provides analyses, recommendations, and other assistance to help Congress make informed oversight, policy, and funding decisions. GAO's commitment to good government is reflected in its core values of accountability, integrity, and reliability. |
| **Obtaining Copies of GAO Reports and Testimony** | The fastest and easiest way to obtain copies of GAO documents at no cost is through GAO's Web site (www.gao.gov). Each weekday, GAO posts newly released reports, testimony, and correspondence on its Web site. To have GAO e-mail you a list of newly posted products every afternoon, go to www.gao.gov and select "E-mail Updates." |
| **Order by Mail or Phone** | The first copy of each printed report is free. Additional copies are $2 each. A check or money order should be made out to the Superintendent of Documents. GAO also accepts VISA and Mastercard. Orders for 100 or more copies mailed to a single address are discounted 25 percent. Orders should be sent to:<br><br>U.S. Government Accountability Office<br>441 G Street NW, Room LM<br>Washington, DC 20548<br><br>To order by Phone:  Voice:  (202) 512-6000<br>TDD:  (202) 512-2537<br>Fax:  (202) 512-6061 |
| **To Report Fraud, Waste, and Abuse in Federal Programs** | Contact:<br><br>Web site: www.gao.gov/fraudnet/fraudnet.htm<br>E-mail: fraudnet@gao.gov<br>Automated answering system: (800) 424-5454 or (202) 512-7470 |
| **Congressional Relations** | Ralph Dawn, Managing Director, dawnr@gao.gov, (202) 512-4400<br>U.S. Government Accountability Office, 441 G Street NW, Room 7125<br>Washington, DC 20548 |
| **Public Affairs** | Chuck Young, Managing Director, youngc1@gao.gov, (202) 512-4800<br>U.S. Government Accountability Office, 441 G Street NW, Room 7149<br>Washington, DC 20548 |

 PRINTED ON RECYCLED PAPER

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| MANI KUMARI SABBITHI, JOAQUINA , QUADROS, and GILA SIXTINA FERNANDES, | ) ) ) |
| | ) |
| Plaintiffs, | ) ) |
| | ) |
| vs. | ) ) |
| | ) |
| MAJOR WALEED KH N. S. AL SALEH, MAYSAA KH A. O. A. AL OMAR, and STATE OF KUWAIT, | ) ) ) |
| | ) |
| Defendants. | ) ) |

Case No.: 07-CV-00115-EGS

## <u>O R D E R</u>

AND NOW, this _____ day of _____ 2008, upon consideration of the

Renewed Motion of Defendants Major Waleed Kh. N. Al Saleh and Maysaa Kh. A. O. A. Al

Omar's to Dismiss and Quash Service ("Motion"), and the responses thereto, it is hereby

ORDERED and DECREED that the Motion is DENIED.

_____
Hon. Emmet G. Sullivan

## CERTIFICATE OF SERVICE

I, Tara R. Kelly, hereby certify that on August 28, 2008, I caused to be served via first class mail a true and correct copy of the foregoing Plaintiffs' Response to the Statement of Interest of the United States of America and In Opposition to Defendants Major Waleed KH N. S. Al Saleh and Maysaa Kh A. O. A. Al Omar's Renewed Motion to Dismiss and to Quash Service of Process:

       Thomas B. Wilner, Esquire
       Amanda E. Shafer, Esquire
       Justin Harrison, Esquire
       Shearman & Sterling LLP
       801 Pennsylvania Avenue, N.W.
       Suite 900
       Washington, D.C. 20004-2634

                           */s/ Tara R. Kelly*
                           Tara R. Kelly
                           D.C. Bar No. 438241
                           1775 I Street, N.W.
                           Washington, D.C.  20006
                           Telephone:    202.261.3300

## NAMES OF PERSONS TO BE SERVED

*Attorneys for Defendants*

Thomas B. Wilner
SHEARMAN & STERLING LLP
801 Pennsylvania Avenue, N.W.
Suite 900
Washington, D.C. 20004-2634

Amanda E. Shafer
SHEARMAN & STERLING LLP
801 Pennsylvania Avenue, N.W.
Suite 900
Washington, D.C. 20004-2634

Justin Harrison
SHEARMAN & STERLING LLP
801 Pennsylvania Avenue, N.W.
Suite 900
Washington, D.C. 20004-2634

*Attorneys for Plaintiffs*

Tara Kelly
DECHERT LLP
1775 I Street, N.W.
Washington, D.C.  20006

David A. Kotler
DECHERT LLP
P.O. Box 5218
Princeton Pike Corporate Center
Princeton, NJ 08542

Catherine J. Rosato
DECHERT LLP
Cira Centre, 2929 Arch St.
Philadelphia, PA 19104

Jennifer Rellis
DECHERT LLP
Cira Centre, 2929 Arch St.
Philadelphia, PA 19104

Lenora M. Lapidus
ACLU WOMEN'S RIGHTS PROJECT
125 Broad Street, 18th Floor
New York, NY  10004

Araceli Martínez-Olguín
ACLU WOMEN'S RIGHTS PROJECT
125 Broad Street, 18th Floor
New York, NY  10004

Steven Watt
ACLU HUMAN RIGHTS PROGRAM
125 Broad Street, 18th Floor
New York, NY  10004