## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| MANI KUMARI SABBITHI, JOAQUINA , QUADROS, and GILA SIXTINA FERNANDES, | ) ) ) | Case No.: 07-CV-00115-EGS |
|  | ) |  |
| Plaintiffs, | ) |  |
|  | ) |  |
| vs. | ) |  |
|  | ) |  |
| MAJOR WALEED KH N. S. AL SALEH, MAYSAA KH A. O. A. AL OMAR, and STATE OF KUWAIT, | ) ) ) | ORAL ARGUMENT REQUESTED |
|  | ) |  |
| Defendants. | ) |  |
|  | ) |  |

## PLAINTIFFS' CORRECTED MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANT KUWAIT'S MOTION TO DISMISS

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ........................................................................................1

STATEMENT OF FACTS ..............................................................................................3

    A.    The Trafficking And Forced Labor Of Plaintiffs ..........................................3

    B.    Defendant Kuwait's Participation In And Culpability For The Trafficking
             And Forced Labor Of Plaintiffs ..................................................................5

PLEADING AND MOTION TO DISMISS STANDARDS ..............................................6

ARGUMENT ...............................................................................................................7

I.     THIS COURT HAS PERSONAL JURISDICTION OVER DEFENDANT KUWAIT
      BECAUSE SERVICE WAS EFFECTED ON IT PURSUANT TO THE FSIA ...................7

II.    THIS COURT HAS JURISDICTION OVER DEFENDANT KUWAIT UNDER
      THE COMMERCIAL ACTIVITY AND TORT EXCEPTIONS TO THE FSIA ...............10

    A.    Under the FSIA, Defendant Kuwait, Not Plaintiffs, Bears The Ultimate
             Burden Of Persuasion On The Question Of Immunity .............................11

    B.    This Court Has Jurisdiction Over Plaintiffs' Claims Based Upon A
             Commercial Activity Carried Out By Defendant Kuwait .........................11

    C.    The FSIA's Non-Commercial Tort Exception Applies To Plaintiffs' Claims
             Against Defendant Kuwait. ......................................................................16

          1.    Plaintiffs' Claims Come Within The Non-Commercial Tort Exception
                   Because Defendant Kuwait Aided And Abetted Individual
                   Defendants' Trafficking And Forced Labor ................................18

          2.    Defendant Kuwait Aided and Abetted Individual Defendant's State
                   Law Torts Arising From their Trafficking and Forced Labor ......................23

          3.    Defendant Kuwait Is Vicariously Liable For Individual Defendants'
                   Tortious Conduct. ...................................................................25

           4.    Defendant Kuwait's Tortious Conduct Occurred Within The United
                   States ...................................................................................34

          5.    Plaintiffs' Claims Are Not Based On A "Discretionary Function" .............36

          6.    Plaintiffs' Claims Of Trafficking, Forced Labor, False Imprisonment
                   And Civil Conspiracy Come Within The Non-Commercial Tort
                   Exception To Immunity Under The FSIA Because These Claims Do
                   Not Arise Out Of Deceit Or Misrepresentation ..........................41

CONCLUSION ..........................................................................................................45

Plaintiffs Mani Kumari Sabbithi, Joaquina Quadros and Gila Sixtina Fernandes (collectively, "Plaintiffs") respectfully submit this Opposition to Defendant Kuwait's Motion to Dismiss, filed November 21, 2008.

## PRELIMINARY STATEMENT

Plaintiffs were trafficked into the United States by a Kuwaiti diplomat and his wife and enslaved by them at their home in McLean, Virginia. Despite knowing that its diplomat would perpetrate these abuses, the State of Kuwait facilitated these acts by authorizing and otherwise supporting its diplomat's efforts to bring Plaintiffs to this country. In this case, Plaintiffs seek recovery for their injuries arising from their trafficking and forced labor by the diplomat, Waleed KH N.S. Al Saleh, and his wife, Maysaa KH A.O.A. Al Omar (collectively, the "Individual Defendants"). Plaintiffs also seek recovery from the State of Kuwait ("Defendant Kuwait"). Plaintiffs allege that Defendant Kuwait is directly responsible for their injuries because (1) Defendant Kuwait aided and abetted Individual Defendants' unlawful conduct that resulted in Plaintiffs' injuries; and (2) Individual Defendants were employed by Defendant Kuwait and their tortious conduct was committed either within the scope of that office or employment or ratified by Defendant Kuwait.

Both Individual Defendants[1] and Defendant Kuwait seek to evade liability for their abuse of Plaintiffs, but do so by adopting polar opposite views of the nature of Plaintiffs' claims. Individual Defendants have argued that Plaintiffs' claims are merely incidental to their employment as domestic workers, and that as a result the behavior complained of falls *within* Individual Defendants' official functions as diplomats; thus, Individual Defendants argue they are immune

---

[1]    Individual Defendants have also moved to dismiss Plaintiffs' Complaint. This motion is fully briefed and pending before the Court.

from suit under the Vienna Convention on Diplomatic Relations. *See* Motion to Dismiss and Quash

Service of Process, March 30, 2007 (Dkt. No. 16). Defendant Kuwait now moves to dismiss all

claims brought against it, arguing that it too is immune from suit. Ignoring Plaintiffs' well pleaded

allegations that Defendant Kuwait is liable because it aided and abetted the trafficking and forced

labor to which Individual Defendants subjected Plaintiffs and ratified Individual Defendants'

tortious conduct, Defendant Kuwait argues that because Individual Defendants' tortious conduct fell

*outside* the scope of their office or employment as diplomats, Defendant Kuwait is immune from

suit under the Foreign Sovereign Immunities Act ("FSIA").

     As detailed below, Defendant Kuwait is not immune. This Court has personal jurisdiction

over Defendant Kuwait and subject matter jurisdiction over Plaintiffs' claims against it. Personal

jurisdiction exists because Defendant Kuwait was properly served pursuant to the Hague

Convention on Service Abroad of Judicial and Extrajudicial Documents in Civil and Commercial

Matters ("Hague Service Convention") and the FSIA. Subject matter jurisdiction over Plaintiffs'

claims also exists because those claims fall within one or both of two exceptions to the immunity

granted foreign sovereigns under the FSIA.

- First, because all of Plaintiffs' claims for relief against Defendant Kuwait stem from their employment by agents of Defendant Kuwait as domestic workers – a "commercial activity" carried out by Defendant Kuwait in the United States – those claims fall within the "commercial activity" exception to foreign sovereign immunity. Individual Defendants acted in their official capacity when they employed Plaintiffs, not their personal capacity, and as such Defendant Kuwait is responsible for the trafficking and forced labor of Plaintiffs.

- Second, with the exception of their claims of fraud or constructive fraud, Plaintiffs' claims arising from their trafficking and forced labor also come within another recognized exception to foreign sovereign immunity – the non-commercial tort exception. Plaintiffs' claims under the Trafficking Victims Protection Act ("TVPA"), *codified at* 22 U.S.C. § 7101 *et seq.,* are cognizable under this exception because Defendant Kuwait aided and abetted Individual Defendants in violating the TVPA, which sounds in tort. Defendant Kuwait may also be held liable for all Plaintiffs' claims arising from their trafficking and forced labor because it aided and

abetted these torts and they were committed within the scope of Defendant Al Saleh's employment as a diplomat or ratified by Defendant Kuwait. Further, because the "gravamen" of these torts were committed within the United States and none of the conduct associated with them can be considered discretionary in nature, these claims fit squarely within this exception.

In sum, because service was properly effected on Defendant Kuwait and Plaintiffs' claims fall within one or both of the commercial activity or non-commercial tort exceptions to foreign sovereign immunity, this Court has both personal and subject matter jurisdiction over Defendant Kuwait and Plaintiffs' claims against it. Accordingly, Defendant Kuwait's Motion to Dismiss should be denied and this case should proceed.

## STATEMENT OF FACTS

### A.    The Trafficking And Forced Labor Of Plaintiffs.

This case arises out of a Kuwaiti diplomat and his wife trafficking Plaintiffs, three women from severely impoverished families in rural India, from Kuwait to the United States and enslaving them at the diplomat's home in McLean, Virginia. Compl. ¶¶ 47-94.

Individual Defendants were only able to bring Plaintiffs to the United States because Plaintiffs had previously been issued A-3 visas. Compl. ¶¶ 24, 32, 44. A-3 visas are exclusively reserved for diplomats wishing to bring their own foreign domestic staff into the United States during their assignment so that the diplomats can more effectively carry out their diplomatic functions. Compl. ¶ 105. To induce the United States government to issue the three A-3 visas, Individual Defendants, as a part of the application process, presented employment contracts signed by each of the Plaintiffs to a U.S. Embassy official and represented to those officials that Individual Defendants would provide Plaintiffs with employment terms and conditions compliant with United States law. Compl. ¶¶ 24, 32, 44. Individual Defendants, however, never intended to carry out the representations made to Plaintiffs and the United States. Compl. ¶¶ 25, 33, 45.

3

The sole basis for the United States' issuance of A-3 visas to Plaintiffs was Defendant Kuwait's employment of Defendant Al Saleh. Compl. ¶ 106. In support of Individual Defendants' application for Plaintiffs' visas, Defendant Kuwait authorized the applications and submitted documentation to the United States, including a "diplomatic note" verifying Defendant Al Saleh's status as a diplomat. Compl. ¶ 107. Defendant Kuwait assisted Individual Defendants in obtaining Plaintiffs' visas knowing of the misrepresentations made by Individual Defendants to Plaintiffs and U.S. Embassy officials. Compl. ¶ 107. Based on the signed employment contracts, Individual Defendants' representations and Defendant Kuwait's authorization and support of Individual Defendants' visa applications, the United States subsequently issued visas to Plaintiffs permitting them to travel to the United States to work as live-in domestic staff for Individual Defendants. Compl. ¶¶ 24, 32, 44.

In July and August 2005, Plaintiffs entered the United States using their A-3 visas. Compl. ¶¶ 26, 36, 46. Upon arrival, Individual Defendants and Defendant Kuwait confiscated Plaintiffs' passports and visas. Compl. ¶¶ 27, 49, 110. Individual Defendants, with the assistance of Defendant Kuwait, thereafter enslaved Plaintiffs, imprisoned them and subjected them to severe psychological and physical abuse at Individual Defendants' Virginia home, until Plaintiffs, fearing for their lives, were able to escape. Compl. ¶¶ 47-104.[2]

---

[2] All three women have subsequently been issued T-visas. T-visas, created under the TVPA are only available to individuals who are victims of "a severe form of trafficking in persons." 22 U.S.C § 7105. They permit the holder to remain in the United States for three years with work authorization and access to benefits and services offered by the U.S. Department of Health and Human Services, after which time he or she can apply for permanent residence status.

4

**B.    Defendant Kuwait's Participation In And Culpability For The Trafficking And Forced Labor Of Plaintiffs.**

Defendant Kuwait is liable for Plaintiffs' injuries because they were perpetrated by one of its diplomats, Defendant Al Saleh, while acting within the scope of his office or employment. Compl. ¶¶ 105, 106, 107. Defendant Kuwait is also liable for Plaintiffs' trafficking and forced labor because it knowingly assisted, participated in and benefited from Individual Defendants' trafficking of Plaintiffs to the United States and the subsequent enslavement of Plaintiffs. Compl. ¶¶ 107-10. Work performed by Plaintiffs inured to the benefit of Defendant Kuwait and Defendant Kuwait failed to compensate Plaintiffs for this work. Compl. ¶ 108.

Defendant Kuwait knew or reasonably should have known of the systemic labor exploitation of domestic workers by its diplomatic personnel. Defendant Kuwait's knowledge of the nature and extent of such abuse stems from reports by the United States Department of State and non-governmental agencies, civil lawsuits filed against its diplomats, public denouncements at its embassies and consulates and media coverage. Compl. ¶¶ 111, 119-21. Moreover, on at least two occasions, in 1996 and 2000, the United States Department of State directly alerted Defendant Kuwait to the widespread exploitation of domestic workers by diplomatic personnel and the legal obligations of Defendant Kuwait and its personnel to comply with United States laws. Compl. ¶¶ 113-16, 118. The deplorable treatment of female domestic workers within Kuwait by Kuwaiti nationals is also well-documented. Compl. ¶¶ 119-122. Instead of acknowledging and investigating these alleged abuses, Defendant Kuwait has made no inquiries into any of these allegations and, in fact, has defended the actions of its employees, including Individual Defendants in this case. Compl. ¶ 112, 117.[3]

---

[3]    In response to the Complaint, and a subsequent criminal investigation by the Department of Justice into Plaintiffs' allegations therein, Defendant Kuwait recalled Defendant Al Saleh from his

## PLEADING AND MOTION TO DISMISS STANDARDS

Federal Rule of Civil Procedure 8(a)(2) requires a short and plain statement of the claim showing that the pleader is entitled to relief. *Conley v. Gibson*, 355 U.S. 41, 47 (1957). The complaint must simply "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Id.*; *see also Aktieselskabet AF 21. Nov. 2001 v. Fame Jeans Inc.*, 525 F.3d 8, 15 (D.C. Cir. 2008) (concluding that the Supreme Court's decision in *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) did not change "the long-standing fundamentals of notice pleading"). Furthermore, Federal Rule of Civil Procedure 8(e)(2) plainly permits plaintiffs to proceed with alternative claims, and where, as here, defendants have not come forward with any facts in support of their assertions, all inferences must be drawn in plaintiffs' favor.

In evaluating a motion to dismiss for lack of jurisdiction, courts must first determine whether a defendant challenges the legal sufficiency or the factual basis of the court's jurisdiction. *Kilburn v. Socialist People's Libyan Arab Jamahiriya*, 376 F.3d 1123, 1127 (D.C. Cir. 2004). "If the defendant challenges only the legal sufficiency of the plaintiff's jurisdictional allegations, then the district court should take the plaintiff's factual allegations as true and determine whether they bring the case within any of the [FSIA] exceptions to immunity invoked by the plaintiff." *Id.* If the defendant challenges the factual basis of the court's jurisdiction, the court must "resolve any disputed issues of fact the resolution of which is necessary to a ruling upon the motion to dismiss." *Id.*; *see also Phoenix Consulting, Inc. v. Republic of Angola*, 216 F.3d 36, 40 (D.C. Cir. 2000) (stating that if a defendant challenges the factual basis of a complaint, the court "must give the

---

diplomatic post in the United States. *See* Plaintiffs' Sur-Reply in Further Opposition to Defendants' Motion to Dismiss and to Quash Service of Process, Nov. 8, 2007 (Dkt. No. 34), at 2.

plaintiff 'ample opportunity to secure and present evidence relevant to the existence of
jurisdiction'").

In its motion to dismiss, Defendant Kuwait only challenges the legal sufficiency of this
Court's jurisdiction.  Therefore, Plaintiffs' factual allegations should be assumed to be true and this
Court must only determine whether Plaintiffs have alleged facts sufficient to abrogate Defendant
Kuwait's immunity under the FSIA.[4]

## ARGUMENT

### I.   THIS COURT HAS PERSONAL JURISDICTION OVER DEFENDANT KUWAIT BECAUSE SERVICE WAS EFFECTED ON IT PURSUANT TO THE FSIA.

Defendant Kuwait has had notice of this lawsuit for almost two years and does not dispute
that its Ministry of Foreign Affairs was served with a copy of the summons and complaint, notice of
suit and diplomatic note with Arabic translations pursuant to diplomatic channels on August 17,
2008.  *See* Diplomatic Note No. 589 (Ex. A).  Nonetheless, Defendant Kuwait now makes the
remarkable assertion that service was faulty and this Court does not have jurisdiction over the
claims against it.  Defendant Kuwait bases this argument on an incomplete understanding of the
available means of service of process on a foreign state pursuant to the Hague Service Convention.
*See* Memorandum of Points and Authorities in Support of Defendant the State of Kuwait's Rule
12(b) Motion To Dismiss ("Def.'s Br.") at 3-5.  Notwithstanding Defendant Kuwait's assertions to
the contrary, service of process on a foreign state via diplomatic channels qualifies as service
pursuant to the Hague Service Convention and therefore satisfies the second prong of the FSIA's

---

[4]    To the extent that Defendant Kuwait challenges Plaintiffs' well-pleaded factual allegations, the Court
should permit Plaintiffs to secure evidence to establish the existence of jurisdiction. *Phoenix
Consulting*, 216 F.3d at 40.

service provisions. *See* Foreign Sovereign Immunities Act, 28 U.S.C § 1608(a)(2) (1976); Hague

Service Convention, art. 9, Nov. 15, 1965, 20 U.S.T. 361, T.I.A.S. No. 6638.

Federal Rule of Civil Procedure 4(j) governs service of process upon foreign states. This

Rule directs that service upon a foreign state shall be effected pursuant to the provisions of the

FSIA. The FSIA sets forth a hierarchical list of methods for service on a foreign state. The first

permits service by delivery of the summons and complaint in accordance with special arrangements

made between the plaintiff and the foreign state. *See* 28 U.S.C § 1608(a)(1). Such arrangements

were not possible in this case.[5] The second enumerated method permits service in accordance with

an applicable international convention on the service of judicial documents. *See* 28 U.S.C §

1608(a)(2). If service still proves ineffective, a plaintiff can then send a copy of the notice of the

suit, complaint and summons through "any form of mail requiring a signed receipt, to be addressed

and dispatched by the clerk of the court to the head of the ministry of foreign affairs of the foreign

state." 28 U.S.C. § 1608(a)(3). Finally, if service by mail cannot occur within 30 days, a plaintiff

may contact the United States Department of State and effect service through diplomatic channels.

28 U.S.C. § 1608(a)(4). Plaintiffs relied upon the second method, which permits service in

accordance with an applicable international convention on the service of judicial documents. *See* 28

U.S.C § 1608(a)(2).

Because both the United States and Defendant Kuwait are signatories to the Hague Service

Convention, Plaintiffs served process on Defendant Kuwait under Article 9 of the Hague Service

---

[5]    While Kuwait does not concede that there was no special arrangement between the parties for service of process, *see* Def.'s Br. at 3, its failure to provide evidence of any such arrangement to the Court is tantamount to an admission that service pursuant to U.S.C § 1608(a)(1) was not available. In fact, in March 2007 counsel for Defendant Kuwait, Thomas Wilner, informed one of Plaintiffs' counsel, Steven Watt, that he had spoken with the Ambassador to the Kuwait Embassy to the United States, and that Defendant Kuwait would not agree to make any special arrangement for service of process. *See* Affirmation of Steven Watt , Esquire, dated January 9, 2009 (Ex. B).

Convention. *See* Hague Service Convention, Nov. 15, 1965, art. 9. Article 9 specifically authorizes a plaintiff to serve process on a foreign state through "diplomatic channels" and to forward judicial documents for the purpose of service "if exceptional circumstances so require." *Id.* Service on a foreign state is within the purview of the exceptional circumstances clause under Article 9; therefore, a plaintiff can serve process on a foreign state through diplomatic channels. *Nuovo Pignone, SpA v. Storman Asia M/V*, 310 F.3d 374, 383 (5th Cir. 2002) ("Article 9 permits diplomatic agents to forward documents to designated authorities in receiving nations who, in turn, effect service on the proper parties"); *Koehler v. Dodwell*, 152 F.3d 304, 307 (4th Cir. 1998) ("Article 9 allows a state to use consular or-in exceptional circumstances-diplomatic channels to forward the judicial documents to the designated authorities"); *see also* Permanent Bureau of the Hague Conference on Private International Law, *Practical Handbook on the Operation of the Hague Convention of 15 November 1965 on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters* ¶ 193 (3rd ed. 2006) ("One example of such exceptional circumstances [under Article 9] is service of a claim on a foreign sovereign State"). Consequently, service upon Defendant Kuwait through diplomatic channels, pursuant to Article 9 of the Hague Service Convention, constitutes proper service of process on a foreign state not only pursuant to 28 U.S.C. § 1608(a)(4) when the previous three enumerated methods of services are unavailable, but also under 28 U.S.C. § 1608(a)(2).

Defendant Kuwait argues extensively in its brief that because Plaintiffs failed to serve a properly executed summons on Defendant Kuwait in its initial attempts to affect service through Article 2 of the Hague Service Convention, then subsequent service by diplomatic channels is

insufficient.[6] This is simply irrelevant. As set forth above, service by diplomatic channels on a

foreign state, which Plaintiffs effected in August 2008, constitutes service via the Hague Service

Convention and thus satisfies the second prong of the FSIA. *See* 28 U.S.C. § 1608(a)(2).

## II.   THIS COURT HAS JURISDICTION OVER DEFENDANT KUWAIT UNDER THE COMMERCIAL ACTIVITY AND TORT EXCEPTIONS TO THE FSIA.

The purpose of the FSIA is to facilitate legal actions in United States courts that arise from

the conduct of foreign sovereigns. *Transamerican S.S. Corp. v. Somali Democratic Republic,* 767

F.2d 998, 1001 (D.C. Cir. 1985). The FSIA achieves this purpose by establishing a basis for subject

matter and personal jurisdiction over foreign sovereigns. *See Republic of Arg. v. Weltover, Inc.,* 504

U.S. 607, 611 (1992). While the FSIA provides for immunity from suit for certain acts carried out

by a foreign state, the immunity it confers is not absolute. Rather, it is limited by a number of

statutory exceptions. *See* 28 U.S.C. §§ 1605-1607. The D.C. Circuit has recognized that the

primary purpose of [the FSIA] is to "restrict" the immunity of a foreign state to suits involving a

foreign state's public acts. *Kirkham v. Societe Air Fr.,* 429 F.3d 288, 293 (D.C. Cir. 2005).

In this case, Defendant Kuwait's immunity is restricted because Plaintiffs' claims, all of

which arise from their trafficking and forced labor, come within one or both of two recognized

statutory exceptions to foreign sovereign immunity:  the commercial activity exception, *see* 28

U.S.C. § 1605(A)(2), and the non-commercial tort exception, *see* 28 U.S.C. § 1605 (a)(5).[7] Under

---

[6]    On March 13, 2007 Plaintiffs attempted service through Article 2 of the Hague Service Convention and sent Kuwait's Ministry of Justice, via Federal Express, a copy of the summons and complaint with Arabic translation. *See* Form USM-94, Request for Service Abroad of Judicial or Extrajudicial Documents; (Ex. C). The summons and complaint were delivered to Kuwait's Ministry of Justice on March 25, 2007. *See* FedEx tracking report (Ex. D). Plaintiffs inadvertently sent Defendant Kuwait an unexecuted copy of the summons. However, it is undisputed that the Summons served on Kuwait in August 2008 was properly executed.

[7]    The non-commercial tort exception to foreign sovereign immunity differs from the commercial activity exception because it confers jurisdiction on U.S. courts to hear any claim for personal injury

the FSIA, the burden is placed on the foreign state to demonstrate that it is immune from suit and in this case, Defendant Kuwait has failed to meet its burden.

**A.      Under the FSIA, Defendant Kuwait, Not Plaintiffs, Bears The Ultimate Burden Of Persuasion On The Question Of Immunity.**

The FSIA places the ultimate burden on the defendant foreign state to demonstrate its immunity from suit. *Princz v. F.R.G.*, 26 F.3d 1166, 1171 (D.C. Cir. 1994). To do so, the foreign state must first establish that it is a "foreign state" for purposes of the FSIA. The plaintiff then has the opportunity to allege that an exception to the FSIA's grant of immunity exists. Thereafter, the "burden of proof in establishing the inapplicability of these exceptions is upon the party claiming immunity." *Transamerican Steamship*, 767 F.2d at 1002. In the instant case, therefore, where the Plaintiffs have alleged such exceptions, the burden rests on Defendant Kuwait to prove its entitlement to foreign sovereign immunity. When the defendant foreign state fails to prove it is entitled to immunity, the foreign state's immunity is abrogated and it is subject to suit. *Phoenix Consulting,* 216 F.3d at 40; *Allen v. Russian Fed'n*, 522 F. Supp. 2d 167, 181 (D.D.C. 2007). Defendant Kuwait has failed to meet its burden with respect to demonstrating the non-applicability of either exception to foreign sovereign immunity advanced by Plaintiffs in this case.

**B.      This Court Has Jurisdiction Over Plaintiffs' Claims Based Upon A Commercial Activity Carried Out By Defendant Kuwait.**

Pursuant to the FSIA, Defendant Kuwait is not immune from suits "based on a commercial activity carried on in the United States." 28 U.S.C. § 1605(a)(2).[8] To determine whether a

---

arising from federal or state law torts regardless of whether these tort claims are based on a "commercial activity".

[8]   Section 1605(a)(2) is "probably the most important instance in which foreign states are denied immunity." *See* House Judiciary Committee, Jurisdiction of United States Courts in Suits Against Foreign States, H.R. Republic No. 1487, 94th Cong., 2d Sess. 18, reprinted in (1976) U.S. Code Cong. & Admin. News 6604, 6617 ("House Report").

plaintiff's cause of action is based upon a commercial activity, a court must focus on "those elements of a claim that, if proven, would entitle a plaintiff to relief under his theory of the case." *Nelson*, 507 U.S. at 357. The D.C. Circuit has explained "so long as the alleged commercial activity establishes a fact without which the plaintiff will lose, the commercial activity exception applies, regardless of whether the plaintiff has either alleged or provided sufficient evidence of the additional facts necessary to prevail on the merits." *Kirkham*, 429 F.3d at 292. In other words, the commercial activity exception applies if the alleged commercial activity is a factual matter necessary to establish plaintiff's claim. *Id.* Here, Plaintiffs allege that Defendant Kuwait committed a series of torts in the course of violating the TVPA and the Thirteenth Amendment. *See* Compl. ¶¶ 123-143, 169-178-216. All of Plaintiffs' causes of action arise from Defendant Kuwait's involvement with Plaintiffs' employment in the United States. Consequently, Plaintiffs' causes of action are based upon a commercial activity carried on by Defendant Kuwait. *See El-Hadad v. U.A.E.*, 496 F.3d 658, 664 (D.C. Cir. 2007) (explaining that employment is the properly analyzed "commercial activity" in a defamation and wrongful termination case because both claims were founded on plaintiff's employment).

Defendant Kuwait attempts to escape liability for Plaintiffs' claims with the conclusory assertion that Defendant Kuwait did not engage in any commercial activity vis-à-vis Plaintiffs because Individual Defendants "personally hired Plaintiffs." Def.'s Br. at 7. This contention ignores that the FSIA defines "foreign state" to include agencies and instrumentalities of the foreign state for the purposes of abrogating immunity. 28 U.S.C. § 1603. Moreover, liability for the acts of a foreign state's agencies and instrumentalities is readily imputed to the foreign state. *Transamerican Steamship*, 767 F.2d 998 at 1002 (determining that jurisdiction lies against a foreign state because the foreign state's instrumentality engaged in commercial activity). When acting in

12

the course of their official duties, individuals employed by a foreign state are considered to be an

agencies or instrumentalities of a foreign state. *See Park v. Shin*, 313 F.3d 1138, 1144 (9th Cir.

2002) (stating that the FSIA applies to a diplomat when acts are undertaken pursuant to his official

capacity). Thus, this Court possesses jurisdiction over Plaintiffs' claims against Defendant Kuwait

so long as Defendant Al Saleh acted in his official capacity in violating Plaintiffs' rights.

To determine whether an individual acts in an official capacity, a court must focus on the

nature of the individual's alleged actions, rather than the alleged motives underlying them, as well

as whether the individual purports to act as an individual and whether the individual's actions were

authorized by the state. *Jungquist v. Sheikh Sultan Bin Khalifa Al Nahyan*, 115 F.3d 1020, 1028

(D.C. Cir. 1997) (*citing Chuidian v. Philippine Nat'l Bank*, 912 F.2d 1095, 1106-07 (9th Cir.

1990)). In this case, Individual Defendants brought Plaintiffs to the United States pursuant to A-3

visas that allow representatives of foreign governments to bring private servants for employment in

their homes during their diplomatic assignments. Compl. ¶ 105. Diplomats are provided this

privilege to facilitate the performance of their diplomatic functions. *Id.* Individual Defendants

were able to bring Plaintiffs into the United States solely on the basis of Defendant Al Saleh's

employment by Defendant Kuwait. *Id.* at 106. Moreover, Defendant Kuwait authorized Defendant

Al Saleh's employment of Plaintiffs when it authorized the visa applications and submitted

documentation to the United States in support of those applications. *Id.* at 107. Additionally,

Individual Defendants have held themselves out as having acted in their official capacity with

regards to Plaintiffs' hiring. *See* Motion to Dismiss and to Quash Service of Process, March 30,

2007 (Dkt. No. 16), at 5; Reply In Support of Defendants' Motion to Dismiss and to Quash Service

of Process, June 6, 2007 (Dkt. No. 20), at 14. Even the United States has asserted that Individual

Defendants' hiring of domestic workers and any issues arising from their employ were part and

parcel of Individual Defendants' official duties representing Defendant Kuwait in the United States. *See* Statement of Interest of the United States, January 1, 2007 (Dkt. No. 23), at 5. Indeed, U.S. courts have recognized that hiring domestic workers is incidental to the daily life of diplomats and their households. *See e.g., Tabion v. Mufti*, 73 F.3d 535 (4th Cir. 1996); *Gonzalez Paredes v. Vila*, 479 F. Supp. 2d 187 (D.D.C. 2007).

Regardless of Individual Defendants' motive for employing Plaintiffs, Defendant Al Saleh's employment of Plaintiffs as domestic workers in the United States was an act he could perform only as a Kuwaiti official and only because Defendant Kuwait explicitly and specifically authorized Plaintiffs' employment. *See Jungquist*, 115 F.3d at 1028; *Chuidian*, 912 F.2d at 1106-07. Thus, Defendant Al-Saleh, at all times material, was acting in his official capacity as an agent of Defendant Kuwait in employing Plaintiffs.[9] Consequently, the commercial activity exception to foreign sovereign immunity applies and this Court has jurisdiction over Plaintiffs' claims because they are all based on a commercial activity engaged in by an agent of Defendant Kuwait acting in his official capacity as a Kuwaiti diplomat.

---

[9]    Plaintiffs do not plead Individual Defendants' and Defendant Kuwait's liability in the alternative. Instead, Plaintiffs maintain that Individual Defendants hired Plaintiffs in their official capacity (and thus their acts are imputable to Defendant Kuwait), but that their conduct toward Plaintiffs was not incidental to being diplomats (and thus they are not entitled to diplomatic immunity). As *Jungquist*, 115 F.3d at 1028 and *Chuidian*, 912 F.2d at 1106-07, make clear, because a diplomat employs a domestic worker in his official capacity for purposes of the FSIA does not mean that the employment relationship is an official function for purposes of the Vienna Convention, because distinct analyses are required. While the Ninth Circuit has reached a seemingly contrary conclusion, its approach is fundamentally inconsistent with this Circuit's precedent. In *Park*, the Ninth Circuit considered whether a consular officer had employed a domestic worker in his official capacity as defined by the FSIA, as well as whether that employment relationship was "performed in exercise of consular functions" such that the consular officer would be entitled to diplomatic immunity under the Vienna Convention on Consular Relations. 313 F.3d at 1141-1144. The *Park* court, without engaging in the analyses required by *Chuidian*, concluded that employing a domestic worker was not an exercise of a consular function, and that the consular officer was not entitled to diplomatic immunity. *Park* at 1142-43. It incorrectly concluded that the particulars of the employment relationship factor into whether an officer acts in his official capacity for purposes of the FSIA. *Id.* at 1144. This approach has been rejected by the D.C. Circuit. See *Junquist*, 115 F.3d at 1028.

Nor is there any doubt that the hiring of a domestic worker is a commercial activity within the meaning of the FSIA. To determine if an activity is commercial, the FSIA instructs courts to examine the "nature of the course of conduct or particular transaction or act, rather than by reference to its purpose." 28 U.S.C. § 1603(d). As noted, the FSIA adopts a restrictive, rather than an absolute, theory of sovereign immunity, which allows a state to avail itself of immunity from suits based on its sovereign or public acts (*jure imperii*), but not for those acts that are private or commercial in nature (*jure gestionis*). *Nelson*, 507 U.S. at 359-60. The touchstone of "commercial activity" is whether a foreign state has acted "in the manner of a private player within the market," rather than as a foreign sovereign exercising powers "peculiar to sovereigns." *Id.* at 360; *see also Malewicz v. City of Amsterdam*, 362 F. Supp. 2d 298, 314 (D.D.C. 2005) (finding that a foreign sovereign engaged in commercial activity when it loaned art to museums in United States because a loan is the type of activity a private person can perform). Suits based on employment contracts fall within the commercial activity exception if, at the time of their employment, the employee *was not* a civil servant and the work performed by the employee *did not* involve the exercise of powers peculiar to foreign sovereigns. *See El-Hadad*, 496 F.3d at 668 (noting that hiring an accountant constituted commercial activity because the accountant's work did not involve any creation of governmental policy).

Defendant Kuwait is not immune from this suit because its employment of Plaintiffs as domestic servants in the United States was not an inherently sovereign act. *See Nelson,* 507 U.S. at 360; *Park*, 313 F. 3d at 1445 ("[H]iring a domestic servant is not an inherently public act that only a government could perform."). Once they arrived in the United States, Plaintiffs were compelled to work through physical, mental and legal coercion, including physical abuse, threats of physical harm, psychological abuse and deprivation of their legal documents. Compl. ¶ 48. Individual

15

Defendants forced Plaintiffs to perform back-breaking work almost every hour of the day, including

caring for a nine-year-old boy and approximately one-year-old triplets, doing laundry and ironing,

cleaning Individual Defendants' home, cooking for the family and cooking for and serving frequent

guests. Compl. ¶¶ 50-56. As is evident from the tasks they performed, Plaintiffs were not civil

servants and their labor did not involve the exercise of power unique to a sovereign or the creation

of governmental policy. *See Nelson,* 507 U.S. at 360; *El-Hadad*, 496 F.3d at 668. Indeed, given the

nature of their work, it is unambiguous that the FSIA intended to abrogate a foreign state's

immunity from suits like Plaintiffs'. *See* H.R. Republic 94-1487, at 16 (1976) ("employment . . . of

laborers . . . would be among those included within the definition [of commercial activity].") For

these reasons, it is clear that Plaintiffs' employment was a commercial activity and, accordingly,

Defendant Kuwait does not enjoy immunity from this suit as all of the claims against Defendant

Kuwait arise out of this employment.

### C. The FSIA's Non-Commercial Tort Exception Applies To Plaintiffs' Claims Against Defendant Kuwait.

With the exception of fraud and constructive fraud, this Court also has jurisdiction over

Plaintiffs' claims because all of them constitute torts that were committed either by Defendant

Kuwait or by Individual Defendants while they were acting within the scope of their office or

employment. *See* 28 U.S.C. §1605(a)(5). The FSIA's non-commercial tort exception to foreign

sovereign immunity allows jurisdiction over a foreign state in any case "in which money damages

are sought against a foreign state for personal injury . . . occurring in the United States and caused

by the tortious act or omission of that foreign state or any official or omission of that foreign state

while acting in the scope of his office or employment." 28 U.S.C. §1605 (a)(5). As Defendant

Kuwait correctly notes, foreign state immunity remains intact under this exception if the foreign

state's tortious conduct occurred outside the United States, if a plaintiff's claim is based upon a

"discretionary function" on the part of the foreign state, 28 U.S.C. §1605 (a)(5)(A), or if plaintiff's claim arises out of "misrepresentation [or] deceit." 28 U.S.C. §1605 (a)(5)(B).

In their Complaint, Plaintiffs articulate both specific tortious acts committed by Defendant Kuwait directly and tortious acts committed by Individual Defendants while they were acting within the scope of their office or employment for which Defendant Kuwait is vicariously liable. Plaintiffs also allege that Defendant Kuwait subsequently ratified any of Individual Defendants' tortious conduct that may fall outside the scope of their office or employment. As such, Plaintiffs' claims, save for fraud and constructive fraud, come within the non-commercial tort exception to foreign sovereign immunity and this Court has jurisdiction.

In an attempt to convince this Court otherwise, Defendant Kuwait makes five principal arguments. Def.'s Br. at 12-20. First, Defendant Kuwait argues that Plaintiffs have failed to allege that Defendant Kuwait directly engaged in any acts that would bring Plaintiffs' claims within the purview of this exception; second, that Plaintiffs' claims are based upon acts committed by Individual Defendants, for which Defendant Kuwait is not vicariously liable; third, that Defendant Kuwait's tortious acts occurred outside the United States; fourth, that the direct acts Plaintiffs allege on the part of Defendant Kuwait are wholly discretionary in nature; and finally, that Plaintiffs' claims of false imprisonment, forced labor and civil conspiracy are based upon allegations of deceit and misrepresentation. In making these arguments, Defendant Kuwait misunderstands, mischaracterizes or ignores Plaintiffs' allegations. Most importantly, Defendant Kuwait attempts to minimize the crucial role it played in Plaintiffs' trafficking and forced labor by framing its authorization of their visas and confiscation of their passports as isolated administrative acts. Instead, Defendant Kuwait's acts were central to a larger scheme to subject Plaintiffs to trafficking

17

and forced labor.  All Plaintiffs' claims arise out of this unlawful scheme and can be brought under

the non-commercial tort exception.

> **1.    Plaintiffs' Claims Come Within The Non-Commercial Tort Exception Because Defendant Kuwait Aided And Abetted Individual Defendants' Trafficking And Forced Labor.**

Defendant Kuwait argues that Plaintiffs have failed to allege that it directly engaged in any

acts that would bring Plaintiffs' claims within the purview of the non-commercial tort exception.

Def.'s Br. at 12.  Defendant Kuwait's argument, however, stems from a fundamental

misunderstanding of Plaintiffs' allegations regarding the nature and extent of Defendant Kuwait's

direct participation in and responsibility for Plaintiffs' trafficking and forced labor  and,

specifically, Plaintiffs' well pleaded allegations that Defendant Kuwait aided and abetted Individual

Defendants' trafficking and forced labor of Plaintiffs by knowingly providing Individual

Defendants with substantial, practical assistance to carry out these unlawful acts.  *See* Compl. ¶¶

127, 134.

> **a.    Aiding And Abetting Liability Is Available Under The TVPA.**

Aiding and abetting tortious conduct, a form of direct tort liability,[10] is a separate and

independent basis for liability under the TVPA.  In this case, because Defendant Kuwait aided and

abetted Individual Defendants' violations of the TVPA, Defendant Kuwait is itself a tortfeasor

directly liable for Plaintiffs' trafficking and forced labor.  Whether a federal statute sounding in tort

provides a private right of action for aiding and abetting is a question of Congressional intent.  *Cent.*

---

[10]    The Restatement (Second) of Torts, for example, makes this clear, noting that aiding and abetting a breach of duty "has the same effect upon the liability of the advisor as participation or physical assistance . . . the one [who aids and abets] . . . is himself a tortfeasor and is responsible for the consequences of the other's act."  *Id.* § 876(b) cmt. d.  *See e.g., Am. Family Mut. Ins. Co. v. Grim*, 440 P.2d 621, 625 (Kan. 1968) ("One who aids, abets and encourages others in the commission of an unlawful act is guilty as a principal, and all are jointly and severally liable in a civil action for any damages that may have resulted from their act."); *accord, Halbertsam v. Welch*, 705 F.2d 472, 482-3 (D.C. Cir. 1983).

*Bank of Denver, N.A., v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 182 (1994), *see also Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 383 (1992) (noting that Congressional intent is determined by reference to the language of the provision at issue, as well as the overall structure and purpose of the statute). In relevant part, 18 U.S.C. § 1595 provides that: "[a]n individual who is a victim of a violation of TVPA criminal provisions on trafficking and forced labor] may bring a civil action against the perpetrator in an appropriate district court of the United States and may recover damages and reasonable attorneys fees." A close reading of this provision together with other provisions of the TVPA confirms that Congress intended to incorporate traditional tort principles into Section 1595 and to extend tort liability to those persons or entities that knowingly provide substantial practical assistance to traffickers, including, in particular, those who aid and abet the principal tortfeasor.

Through its explicit incorporation of the TVPA's criminal definitions of forced labor and trafficking, the text of Section 1595 confirms that Congress intended that the cause of action under this provision be governed by standard tort law principles and that civil liability extend to those persons or entities that knowingly provide substantial practical assistance to those involved in these unlawful acts. Specifically, the TVPA's criminal counterparts, *see* §§ 1589, 1590, and 1590, hold criminally responsible those who: " knowingly provide[] or obtain[] the labor or services of a person ... by means of any *scheme*, *plan*, or *pattern* intended to cause the person to believe that, if the person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint ...", § 1589 (a)(4), and those who " knowingly recruit[], harbor[], transport[], provide[], or obtain[] by any means, any person for labor or services ...." 18 U.S.C. § 1590(a).

The explicit incorporation of the TVPA's criminal counterparts in Section 1595, the Act's civil liability provision, demonstrates Congressional intent to bring within its ambit all possible defendants that knowingly participate in any "scheme, plan, or pattern" of forced labor or trafficking, including all those persons or entities that engage in a concerted effort to subject anyone to these criminal acts. Thus, Section 1595 provides a civil cause of action against all defendants – such as Defendant Kuwait here – that knowingly aid and abet forced labor and trafficking through, for example, the authorization of necessary visas, or retention of passports and other legal documents. Compl. ¶¶ 105-107, 110.

Other provisions of the TVPA support this construction of Section 1595. Section 102, for example, which sets forth the TVPA's overall objects and purpose, provides that Congress' intent in passing the TVPA was to establish a comprehensive framework for the worldwide eradication of forced labor and trafficking through effective criminal punishment and deterrence of those persons or entities involved - regardless of the nature of such involvement - and compensation for victims.[11] In Section 102, Congress recognized that in carrying out their plans, traffickers do not work in isolation and that those directly involved can only achieve their unlawful ends through the concerted participation of many actors – among them foreign governments.[12] Thus, Section 102 manifests Congressional intent in passing the TVPA to permit criminal prosecutions of all persons or entities involved – in whatever capacity – in the planning and implementation of forced labor and trafficking schemes, and to enable victims of such schemes to seek civil redress against those exact

---

[11]  *See e.g.*, 22 U.S.C. 7101 § 102 (14), (17), (21), (24).

[12]  *See e.g.*, 22 U.S.C. § 102 (8) ("Trafficking in persons is often aided by official corruption in the countries of origin, transit, and destination."); *id* § (21)("Trafficking in persons is an evil requiring concerted and vigorous action by counties of origin, transit or destination, and by international organizations.").

same persons. If secondary forms of direct liability are not recognized under Section 1595, Congressional intent to eradicate forced labor and trafficking through a comprehensive legislative framework affording victims redress against all those persons and entities responsible for these acts would be undermined.

Properly construed, the cause of action provided by Section 1595 incorporates traditional principles governing tort liability, including aiding and abetting liability, and extends its reach to defendants directly involved in forced labor and trafficking schemes, including those persons and entities, such as Defendant Kuwait, that aid and abet their commission.[13]

---

[13] Such a construction of the TVPA is consistent with courts' typical construction of analogous federal statutes to incorporate standard tort principles, including civil aiding and abetting liability, even in the absence of explicit Congressional language imposing secondary forms of civil liability. *See e.g.*, *Vietnam Ass'n for Victims of Agent Orange v. Dow Chem. Co.*, 517 F.3d 104, 123 n.5 (2d Cir. 2008) (recognizing aiding and abetting as a cause of action under the Alien Tort Claims Act ); *Khulumani v. Barclay Nat'l Bank Ltd.*, 504 F.3d 254, 260 (2d Cir. 2007) (*per curiam*) (same); *Sarei v. Rio Tinto, PLC*, 487 F.3d 1193, 1202 (9th Cir. 2007) (finding that "courts applying the ATCA draw on federal common law, and there are well-settled theories of vicarious liability under federal common law."); *Cabello v. Fernandez-Larios*, 402 F.3d 1148, 1157-1158 (11th Cir. 2005) (permitting vicarious liability claims under both the ATCA and Torture Victim Protection Act); *Gonzalez-Vera v. Kissinger*, No. 02-02240, 2004 WL 5584378, *8 n.17 (D.D.C. Sept. 17, 2004), *aff'd*, 449 F.3d 1260 (D.C. Cir. 2006) (noting that the Torture Victim Protection Act provides for aiding and abetting liability); S.Rep. No. 102-249, 102d Cong., 1st Sess., 1991 WL 258662 (Nov. 26, 1991) (discussing Congressional concern that officers and high level officials should be liable under TVPA); *Kadic v. Karadzic*, 70 F.3d 232 (2nd Cir. 1995); *Burnett v. Al Baraka Inv. & Dev. Corp.*, 274 F. Supp. 2d 86, 100 (D.D.C. 2003) (finding civil aiding and abetting liability under the ATCA); *Almog v. Arab Bank, PLC*, 471 F.Supp.2d 257 (E.D.N.Y. 2007) (finding civil aiding and abetting liability, as well as conspiracy liability, available under § 2333 of the Anti-Terrorism Act, 18 U.S.C. ("ATA"); *But see Boim v. Holyland Foundation for Relief and Development et. al.*, 2008 WL 5071758 (7th Cir. Dec. 3, 2008) where the majority in a sharply divided *en banc* panel of the Seventh Circuit Court of Appeals held that absent explicit Congressional language imposing secondary forms of tort liability, Section 2333 of the ATA, which provides a civil cause of action for those injured by an act of "international terrorism", did not incorporate civil aiding and abetting liability. The majority's opinion in *Boim* can be readily distinguished from the case at hand. As explained in detail, *supra*, at 19-21, the text of Section 1595, unlike Section 2333, explicitly incorporates the criminal definitions of forced labor and trafficking under the TVPA, which in turn bring within their reach those who "knowingly" participate in a "scheme" or "plan" to subject anyone to forced labor or trafficking. Thus, persons or entities that knowingly provide substantial practical assistance to forced labor and trafficking schemes are necessarily included within the list of defendants that may be held civil liability under the TVPA. By contrast, Section 2333 of the ATA does not specifically incorporate the criminal

b.      **The TVPA Holds Civilly Liable Defendants Who Knowingly Provide Substantial Practical Assistance To Trafficking And Forced Labor.**

In *Halberstam v. Welch*, applying and expounding upon traditional tort principles, the D.C. Circuit held that aiding and abetting liability is established when: "(1) the party whom the defendant aids [...] performs a wrongful act that causes an injury; (2) the defendant must be generally aware of his role as part of an overall illegal or tortious activity at the time that he provides the assistance; (3) the defendant [...] knowingly and substantially assists the principal violation."[14] 705 F.2d at 477.

Applying this three part test to the facts alleged here, Defendant Kuwait's assistance to Individual Defendants' torts of trafficking and forced labor clearly constitutes aiding and abetting sufficient to subject Defendant Kuwait to liability under the TVPA. As is required by the first part of the *Halberstam* test, Plaintiffs allege that Individual Defendants committed wrongful and tortious acts that caused Plaintiffs injury: trafficking and forced labor. Compl. ¶¶ 106-107. Plaintiffs satisfy *Halberstam*'s second requirement that Defendant Kuwait was generally aware of its role as part of an overall illegal or tortious activity at the time that it provided the assistance, because Defendant Kuwait: (1) knew that its personnel had engaged in severe acts of labor exploitation and turned a blind eye to such allegations, Compl. ¶¶ 109, 111, 112, 117; (2) was in the possession of at least two communications from the United States Department of State detailing the widespread abuse of

---

liability provision of that Act, and civil liability does not extend beyond those who actually commit acts of international terrorism against an identified individual.

[14]      In analyzing the third prong of this test a court may consider a number of factors in assessing whether the assistance rendered is sufficiently substantial to find aiding and abetting liability, including: the nature of the act assisted; extent and duration of the assistance; the presence of defendant at the time the wrongful act occurred; the defendant's relation to tortious actor; and the defendant's state of mind. *Halbertsam*, 705 F.2d. at 483-84.

domestic workers by diplomatic personnel, Compl. ¶¶ 113-116, 118; and (3) knew that domestic workers, and South Asian women in particular, are treated much like indentured servants in Kuwait and that their principal traffickers are those who sponsor domestic workers. Compl. ¶¶ 119-22. Finally, Plaintiffs' allegations fulfill *Halberstam*'s third prong because Plaintiffs allege that Kuwait knowingly facilitated Plaintiffs' trafficking and forced labor by confiscating and retaining Plaintiffs' passports in violation of United States law, Compl. ¶¶ 98, 107, 110,[15] and by authorizing Plaintiffs' A-3 visa applications. Indeed, absent Defendant Kuwait's authorization and support, the United States would not have issued A-3 visas to Plaintiffs and Plaintiffs would have been unable to enter the United States. Compl. ¶¶ 24, 32, 44, 107, 109, 110.

Because Defendant Kuwait knowingly provided substantial practical assistance to Individual Defendants in subjecting Plaintiffs to trafficking and forced labor, Defendant Kuwait aided and abetted Individual Defendants' trafficking and forced labor violations under the TVPA. And, because these claims come within the non-commercial tort exception, this Court has jurisdiction over Plaintiffs' claims against Defendant Kuwait.

### 2. Defendant Kuwait Aided and Abetted Individual Defendant's State Law Torts Arising From their Trafficking and Forced Labor

Defendant Kuwait also ignores Plaintiffs' well-pleaded allegations that it is directly responsible for Plaintiffs' injuries caused by their false imprisonment, intentional and negligent infliction of emotional harm and assault and battery, by aiding and abetting Individual Defendants

---

[15] Because a migrant worker is rendered unable to prove identity or nationality, the employer's withholding of a worker's passport "often creates sufficient fear that the workers feel they are obligated to submit to the employer." International Labour Organization, Human Trafficking and Forced Labour Exploitation – Guidance for Legislation and Law Enforcement (2005), at 21, *available at* http://www.ilo.org/wcmsp5/groups/public/---ed_norm/---declaration/documents/publication/wcms_081999.pdf.

The TVPA recognizes this vulnerability, and criminalizes the confiscation of a workers' passport. *See* 18 U.S.C. § 1592.

23

to commit these state law torts.  As all were committed in Virginia, under the FSIA, Virginia state law governs the nature and extent of a defendant's liability therefor. *First Nat'l City Bank v. Banco Para El Camerio Exterior de Cuba*, 462 U.S. 611, 622 n.11 (1983) ("[W]here state law provides a rule of liability governing private individuals, the FSIA requires the application of that rule to foreign states in like circumstances.").  Although Virginia law is unclear on whether it recognizes aiding and abetting as a basis for civil liability, s*ee Sherry Wilson & Co., Inc. v. Generals Court, L.C., et al.*, No. 21696, 2002 WL 32136374, at *1 (Va. Cir. Ct. Sept. 27, 2002) (recognizing aiding and abetting liability);*compare, Priester v. Small*, Nos. 26541, 26520, 2003 WL 21729900, at *4 (Va. Cir. Ct. April 14, 2003) (noting a difference of opinion as to the existence of the cause of action for aiding and abetting in Virginia), most authorities favor its recognition, and impose liability where a defendant knowingly provides substantial practical assistance to the tortfeasor. *See e.g., Sherry Wilson and Co., Inc.*, WL 32136374 at *1 (stating that liability exists when one encourages or assists the tortfeasor); *Daingerfield v. Thompson*, 1880 WL 6148, *7, 74 Va. 136 (Va. 1880) (noting that liability existed when the defendant either "actively and forcibly aided and participated in the injury done to the plaintiff" or encouraged and incited the action). Plaintiffs' allegations meet this standard, yet Defendant Kuwait simply fails to address aiding and abetting as an alternative bases for its liability for Plaintiffs' state law tort claims. See, Compl. ¶¶ 105, 107, 110-111, 119-20.

**3.      Defendant Kuwait Is Vicariously Liable For Individual Defendants' Tortious Conduct.**

As well as arguing that it is not directly liable for Plaintiffs' injuries because they were caused by Individual Defendants, Defendant Kuwait also argues that it is immune from suit because it is not vicariously liable for Defendant Al-Saleh's tortious acts because when he committed them he acted outside the scope of his office or employment and, since it does not employ Defendant Al Omar, it cannot be held responsible for her actions. *See* Def's Br. at 16-19. Defendant Kuwait's conclusory assertions aside, Kuwait may be held vicariously liable for Individual Defendants' tortious acts, including their trafficking and forced labor in violation of the TVPA; involuntary servitude in violation of the Thirteenth Amendment; false imprisonment; intentional and negligent infliction of emotional distress; assault and battery; and civil conspiracy. Defendant Kuwait is responsible for Individual Defendants' tortious acts because when Defendant Al-Saleh committed them, he was acting as an officer or employee of Defendant Kuwait. Alternatively, even if this Court were to find that Al Saleh was acting outside the scope of his employment at the time he committed the alleged torts, Defendant Kuwait remains liable because of its subsequent ratification of his unlawful conduct. Defendant Kuwait is also responsible for Defendant Al Omar's participation in these tortious acts because its employee, Defendant Al Saleh, approved of and directed her actions, and because Individual Defendants acted in concert in perpetrating them.

**a.      Virginia, Not District Of Columbia Law, Governs Plaintiffs' Tort Claims.**

In assessing whether Defendant Kuwait may be held vicariously liable for Individual Defendants' tortious conduct, Kuwait assumes District of Columbia law applies without conducting a choice of law analysis. Def.'s Br. at 16-19. However, it is Virginia state law that governs.

The FSIA non-commercial tort exception provides that a foreign state shall not be immune as to claims "caused by the tortious act or omission . . . of any official or employee of that foreign

state while acting within the scope of his office or employment."  28 U.S.C. § 1605 (a)(5).  To

determine whether an employee is acting within the scope of his employment to fall within the non-

commercial tort exception, a Court must look to the applicable state law on *respondeat superior*.[16]

*First Nat'l City Bank*, 462 U.S. at 622 n.11; *Youming Jin v. Ministry of State Sec.*, 475 F. Supp. 2d

54, 63 (D.D.C. 2007); *Guzel v. State of Kuwait*, 818 F. Supp. 6, 10 (D.D.C. 1993); *Skeen v.*

*Federative Republic of Brazil*, 566 F. Supp. 1414, 1417 (D.D.C. 1983).

As this Court sits in the District of Columbia, it must apply District of Columbia choice of

law provisions to determine which state law to apply.  *Steele v. Isikoff*, 130 F. Supp. 2d 23, 30

(D.D.C. 2000).  The District of Columbia employs a "modified governmental interests analysis

which seeks to identify the jurisdiction with the most significant relationship to the dispute."  *Id.*;

*see also Blais v. Islamic Republic of Iran*, 459 F. Supp. 2d 40, 54 (D.D.C. 2006); *Hercules & Co. v.*

*Shama Rest. Corp.*, 566 A.2d 31, 41 (D.C. 1989).  As part of this analysis, a court must consider the

four factors enumerated in the Restatement (Second) of Conflict of Laws §145: "a) the place where

the injury occurred; b) the place where the conduct causing the injury occurred; c) the domicile,

residence, nationality, place of incorporation and place of business of the parties; and d) the place

where the relationship is centered."  *District of Columbia v. Coleman*, 667 A.2d 811, 816 (D.C.

1995).  Applying these four factors, Virginia, not D.C., is the place with the most significant

relationship to the dispute.  The injuries at the center of Plaintiffs' Complaint occurred in Virginia.

Plaintiffs were residing in the home of Individual Defendants in McLean, Virginia, when they were

forced to work against their will.  All of Plaintiffs' claims are based on injuries that occurred while

Plaintiffs and Individual Defendants were residing in Virginia.  While Defendant Kuwait maintains

---

[16]     This Court should also apply state law to determine whether Individual Defendants were acting
within the scope of their employment and if Kuwait is therefore vicariously liable for Plaintiffs'
TVPA and 13th Amendment claims.  *See First Nat'l City Bank*, 462 U.S. at 622 n.11.

a diplomatic presence in the United States through its embassy in Washington D.C., this is the only

factor in favor of the application of District of Columbia law to govern liability for these torts.  As

all the other factors require the application of Virginia law, Virginia law governs the vicarious

liability analysis.

>           **b.      Defendant Kuwait Is Vicariously Liable For Individual**
>                      **Defendants' Tortious Conduct Because This Conduct Came**
>                      **Within The Scope Of Defendant Al Saleh's Employment.**

Defendant Kuwait argues that it cannot be held vicariously liable for Individual Defendants'

tortious acts because they did not further Defendant Kuwait's "business" and because Individual

Defendants' unlawful acts were not foreseeable.  Neither of these arguments, however, is supported

under the applicable law of *respondeat superior* or by the facts Plaintiffs have alleged.

"Virginia courts generally take a broad view of the employment relationship, and have held

that even intentional torts may be within the scope of employment." *Gutierrez de Martinez v. DEA*,

111 F.3d 1148, 1158 (4th Cir. 1997); *see also Plummer v. Center Psychiatrists, Ltd.*, 476 S.E.2d

172 (Va. 1996) (finding sexual assault of a patient by her psychologist to be within the scope of

employment).  Furthermore, once a party has established that an employment relationship exists

between the tortfeasor and the employer—as Plaintiffs have alleged here—this creates a *prima facie*

presumption of the employer's *respondeat superior* liability and the burden of persuasion shifts to

the party opposing liability "to prove that the employee was *not* acting within the scope of his

employment when he committed the act complained of, and if the evidence leaves the question in

doubt it becomes an issue to be determined by the jury." *Gina Chin & Assoc. v. First Union Bank*,

537 S.E.2d 573, 577-79 (Va. 2000) (internal quotations omitted, emphasis in original) (reversing

trial court's grant of summary judgment because defendant bore the burden of proving its employee

had acted outside the scope of employment); *Plummer*, 476 S.E.2d at 174.  Defendant Kuwait's

simple assertion that it cannot be held liable for Individual Defendants' tortious actions because this

conduct did not further Kuwait's business interests fails to satisfy its burden of persuasion regarding the Court's jurisdiction. *See Phoenix Consulting,*, 216 F.3d at 40 (finding that when a foreign state fails to prove it is entitled to immunity, the foreign state's immunity is abrogated and it is subject to suit); *Allen v. Russian Fed'n*, 522 F.Supp.2d 167, 181 (D.D.C. 2007).

It is clear that Individual Defendants acted within the scope of their employment under Virginia law. *See Kensington Assocs. v. West*, 362 S.E.2d 900 (Va. 1987). As the *Kensington* Court explained:

> [A]n act is within the scope of the employment if (1) it was expressly or impliedly directed by the employer, or is naturally incident to the business, and (2) it was performed, although mistakenly or ill-advisedly, with the intent to further the employer's interest, or from some impulse or emotion that was the natural consequence of an attempt to do the employer's business, and did not arise wholly from some external, independent, and personal motive on the part of the employee to do the act upon his own account.

*Id.* at 901 (internal quotation omitted); *see also Gina Chin*, 537 S.E.2d at 577.

Plaintiffs satisfy the first prong of the *Kensington* test because Individual Defendants' employment of Plaintiffs was "expressly or impliedly directed by" Defendant Kuwait and "naturally incident to the business" of diplomacy. *Kensington Assocs.*, 362 S.E. 2d at 901. Defendant Kuwait authorized Plaintiffs' A-3 visas by verifying Defendant Al Saleh's diplomatic status and issuing a diplomatic note in support of the visa applications. Without A-3 visas, Plaintiffs would not have been permitted to enter the United States and work for Individual Defendants. Moreover, Individual Defendants' employment of Plaintiffs was also naturally incident to and essential to the business of diplomacy. The sole purpose of an A-3 visa is to permit diplomats to employ private housekeepers during their assignments so that they can more effectively carry out their official functions. Compl. ¶ 105.

The second element of the *Kensington* test requires that the course of conduct in which the tortious act was committed must be performed "with the intent to further the employer's interest, or

from some impulse or emotion that was the natural consequence of an attempt to do the employer's business...." *Id.* at 901. Virginia law takes an expansive approach as to what acts are performed with the intent to serve the master. For instance, in *Davis v. Merrill*, 112 S.E. 628 (Va. 1992), the Virginia Supreme Court held that a railway crossing attendant who shot a person who asked him to lift the gate had acted within the scope of employment because the railway employed the attendant to open the gate and the attendant fired on the car passengers after being asked to open the gate. 112 S.E. at 631; *see also Brittingham v. United States,* 972 F. Supp. 1014, 1018 (E.D. Va. 1997) (holding that an inter-employee assault was within the scope of employment because it occurred during the process of disciplining the co-worker). More recently, the Supreme Court of Virginia, overturning a trial court's decision that a psychiatrist who had had a sexual relationship with his patient acted outside his scope of employment, held that an employer can even be held liable for a sexual assault. *Plummer*, 476 S.E.2d at 175. The court reasoned that the psychiatrist committed the assault and battery while performing the duties for which he was employed. *Id.* Furthermore, the court emphasized that at such an early stage in the proceedings "there are simply not sufficient facts which would permit us to hold, as a matter of law, that the defendant has met its burden of showing that its employee was *not* acting within the scope of his employment." *Id.* (emphasis in original).

Defendant Al Saleh intended to serve the purpose of his employer, Defendant Kuwait, when he committed and/or authorized his wife Defendant Al Omar, to commit the torts Plaintiffs have alleged. Individual Defendants and Defendant Kuwait employed Plaintiffs as domestic workers in order to assist Defendant Al Saleh in running his diplomatic household and, after Plaintiffs entered the United States, subjugated them by taking their passports, imprisoning them in their workplace and compelling them to work through threats. Plaintiffs' work inured to Defendant Kuwait's benefit. Defendant Al Saleh was serving his employer Defendant Kuwait when he and his wife

committed the tortious acts alleged by Plaintiffs, and therefore, Defendant Kuwait is vicariously liable for their commission.

The focus of the second-prong of the *Kensington* test is on whether the employee's broader course of conduct—and not the specific tortious act itself—was committed within the scope of employment. *Commercial Bus. Sys. v. Bellsouth Servs.*, 453 S.E.2d 261, 266 (Va. 1995). Defendant Kuwait, however, reverses this analysis arguing that "alleged tortious conduct cannot be considered to further the employer's business...." Def's Br. at 18. The Court must evaluate whether Defendant Al Saleh was acting within the ordinary scope of business when he committed and/or authorized the tortious conduct—not, as Defendant Kuwait suggests, whether the torts furthered Defendant Kuwait's interest. Plaintiffs have alleged sufficient facts to show that Individual Defendants were acting within the scope of their employment, and Defendant Kuwait has failed to rebut these facts or indeed even to attempt to meet its burden of persuasion by presenting facts to the contrary.

Moreover, this Court should give no consideration to Defendant Kuwait's assertion that it is not liable for Individual Defendants' tortious conduct because their conduct was not foreseeable. Plaintiffs have alleged otherwise, averring that Defendant Kuwait was well aware of the pattern of mistreatment of domestic workers in Kuwait and, more specifically, of abuse of domestic workers by diplomatic personnel in the United States. Moreover, the United States government warned Defendant Kuwait that it was aware of instances where Kuwaiti diplomats had underpaid domestic workers; forced them to work substantially longer than agreed; withheld passports and forbid domestic staff to leave their home. Compl. ¶ 114. The United States also advised Defendant Kuwait that the United States would hold Defendant Kuwait responsible for its diplomats' mistreatment of domestic workers and urged Kuwait to take affirmative steps to monitor its

diplomats to prevent this conduct. Compl. ¶¶ 115-16. In refusing to do so, Defendant Kuwait

failed to protect Plaintiffs from foreseeable harm.

Defendant Kuwait may also be held responsible for Defendant Al Omar's tortious conduct

because her acts formed part of Individual Defendants' overall plan to traffick, subjugate, and

otherwise exploit Plaintiffs.[17]  Defendant Kuwait ignores Plaintiffs' allegations that Al Saleh

approved of and ratified Al Omar's day-to-day management of the household, including her abuse

of Plaintiffs. Compl. ¶ 3. Moreover, as Plaintiffs have not yet taken any discovery, it is impossible

to ascertain the degree of Defendant Al Saleh's direction of and involvement in management of the

household, and thus it is premature at this juncture for this Court to conclude that Defendant Al

Omar's actions did not support Defendant Al Saleh's diplomatic activities on behalf of Defendant

Kuwait. *See Phoenix Consulting*, 216 F.3d at 40 (stating that if a defendant challenges the factual

basis of a complaint, the court "must give the plaintiff ample opportunity to secure and present

evidence relevant to the existence of jurisdiction"). Defendant Kuwait has not met its burden of

persuasion that Defendant Al Saleh acted outside the scope of his employment and that it may not

be held vicariously liable for the actions of Defendant Al Omar. Accordingly, Plaintiffs' tort claims

---

[17]     It is well established under Virginia law that two people, such as Defendant Al Saleh and his wife
here, engaged in a common scheme or enterprise are jointly liable for the wrongful acts they commit
in furtherance of the joint venture. *See, e.g., Ratcliffe v. Walker*, 85 S.E. 575 (Va. 1915) (explaining
that individuals who act under a common understanding and operate with a common design to
commit a wrong are held jointly liable); *Wright v. Eli Lilly & Co.*, 66 Va. Cir. 195, 212 (2004)
(noting that Virginia law has evolved to take the broader approach that where two or more people
cause an injury without intending to act in concert, they will be held jointly liable.). Therefore,
although not strictly speaking an officer or employee of the State of Kuwait, Defendant Kuwait may
be held vicariously liable for Defendant Al Omar's tortious conduct because she committed them in
pursuance of a common scheme with Defendant Al Saleh to subjugate and abuse Plaintiffs.

come within the non-commercial tort exception to foreign sovereign immunity and this Court has

jurisdiction over them.[18]

      c.    **Defendant Kuwait Is Liable For Individual Defendants' Tortious Conduct Because Defendant Kuwait Ratified Their Acts.**

Even if Individual Defendants' tortious conduct is found to fall outside the scope of their

office or employment, Defendant Kuwait can still be held liable because of its subsequent

ratification of that conduct.  Ratification is defined as "the affirmance by a person (the Principal) of

a prior act which did not bind him but which was done or professedly done on his account, whereby

---

[18]    Even if the Court were to apply District of Columbia law, as Defendant Kuwait urges, Individual Defendants' tortious conduct nonetheless comes within the scope of employment.  Both Virginia and the District of Columbia derive their scope of employment test from the RESTATEMENT (SECOND) OF AGENCY.  *Compare In re Iraq & Afg. Detainees Litig.*, 479 F.Supp.2d 85, 113 (D.D.C. 2007) (stating that District of Columbia law on scope of employment is governed by the RESTATEMENT (SECOND) OF AGENCY with *Webb v. United States*, 24 F.Supp.2d 608, 616 (W.D. Va. 1998) (noting that Virginia's *Kensington* test for scope of employment has its roots in the Restatement test).  Under the Restatement, an employee's conduct is within the scope of employment if "(1) it is the kind of conduct the employee is employed to perform, (2) the conduct occurs substantially within the authorized time and space limits, (3) the conduct is actuated, at least in part, by a purpose to serve the master, and (4) the intentional use of force is not unexpected by the master."  *In re Iraq & Afg. Detainees Litig.*, 479 F.Supp.2d at 113 (*citing* RESTATEMENT (SECOND) OF AGENCY § 228); *see also Moseley v. Second New St. Paul Baptist Church*, 534 A.2d 346, 348 n.4 (D.C. 1987).  D.C. courts take an expansive view of this test, categorizing any conduct as falling within the scope of employment "so long as the action has some nexus" to the work the employee is authorized to do.  *Rasul v. Rumsfeld*, 414 F.Supp.2d 26, 33, 35 (D.D.C. 2006).  As under Virginia law, D.C. courts have found intentional torts to be within the scope of employment.  *See, e.g., Weinberg v. Johnson*, 518 A.2d 985, 988-92 (D.C. 1978) (holding that a laundromat employee acted within the scope of employment when he shot a customer); *Lyon v. Carey*, 533 F.2d 649 (D.C. Cir. 1976) (holding employer liable for sexual assault).  Courts applying D.C. law therefore have held employers liable for an intentional torts even where the employee partially commits the tort for a personal motive "as long as the employee is actuated, at least in part, by a desire to serve his principal's interest."  *Weinberg v. Johnson*, 518 A.2d 985, 988 (D.C. 1978).  The cases Kuwait cites in its brief for the proposition that the D.C. doctrine of *respondeat superior* does not encompass intentional torts are not factually analogous.  Def's Br. at 16-18.  *Skeen v. Fed. Rep. of Brazil*, 566 F.Supp. 1414 (D.D.C. 1983) concerned Brazil's liability for a shooting at a nightclub by the grandson of a diplomat; in contrast, Plaintiffs sue a Kuwaiti diplomat and his wife who committed torts against Plaintiffs' while they were employed by the diplomats and Kuwait to assist in maintaining the diplomatic household.  *Guzel v. State of Kuwait*, 818 F.Supp. 6 (D.D.C. 1993) focused on Kuwait's liability for a sexual assault by one of its employees; in this case, Plaintiffs' have not alleged a sexual assault.  Thus, Defendant Kuwait is vicariously liable for the tortious acts of Individual Defendants regardless of whether this Court applies Virginia or District of Columbia law.

the act, as to some or all persons, is given effect as if originally authorized by him."[19]

RESTATEMENT (THIRD) OF AGENCY § 82 (2006); *see also Cobbs v. Commonwealth*, 55 Va. Cir. 1, 8

(2001) (recognizing ratification as a form of *respondeat superior* liability); *Virginia Pocahontas*

*Coal Co. v. Lambert*, 58 S.E. 561, 562 (Va. 1907) (defining ratification as "'an agreement to adopt

an act performed by another for us'") (quoting 1 AM. & ENG. ENCY. L. (2D Ed.)); *Forbes &*

*Allers v. Hagman*, 75 Va. 168, 178 (1881) (applying ratification principle to a tort case). "A

principal is bound by his agent's previously unauthorized act if he ratifies the act by accepting its

benefits with full knowledge of the relevant facts, or, if upon learning of the act, he fails promptly to

disavow it." *Kilby v. Pickurel*, 396 S.E.2d 666, 668 (Va. 1990) (internal citations removed); *see also*

*Grace Sec. Corp. v. Roberts*, 164 S.E. 700, 702 (Va. 1932) ("[A] principal who neglects promptly to

disavow an act of his agent...makes the act his own...").

    In this case, Plaintiffs allege that Defendant Kuwait was fully aware of Individual

Defendants' involvement in Plaintiffs' trafficking and forced labor and indeed that it knowingly

facilitated both. Compl. ¶¶ 11-122. Plaintiffs further allege that Defendant Kuwait benefited from

this unlawful conduct and that even after being fully apprised of the extent of Individual

Defendants' mistreatment of Plaintiffs, failed to repudiate those acts. Compl. ¶¶ 108, 112.[20]

---

[19]    Again, the analysis does not change if this Court applies District of Columbia law to this case as ratification is also a viable theory of liability under this law as well. District of Columbia law follows the RESTATEMENT (SECOND) OF AGENCY, which defines ratification as "the affirmance by a person of a prior act which did not bind him but which was done or professedly done on his account, whereby the act is given effect as if originally authorized by him." *Lewis v. Wash. Metro. Area Transit Auth.*, 463 A.2d 666, 672 n.12 (D.C. 1983) (quoting RESTATEMENT (SECOND) OF AGENCY § 82 (1958)). Even if the agent is not authorized to do the act, the principal ratifies the act if it acquiesces to the agent's conduct or retains the benefits of the agents' act while the agent was in its service. *Id.* at 672; *see also Rwanda v. Rwanda Working Group*, 227 F. Supp. 2d 45, 59-62, 69-72 (D.D.C. 2002) (recognizing that a foreign nation can ratify improper conduct by its ambassador).

[20]    Even if, as it now argues, Defendant Kuwait was not aware of Individual Defendants' unlawful conduct while Plaintiffs were employed by them, Defendant Kuwait was made fully aware of all the material facts when this suit was filed. Yet, since that time, to Plaintiffs' knowledge, Defendant

4.      **Defendant Kuwait's Tortious Conduct Occurred Within The United States.**

Defendant Kuwait asserts that this Court lacks jurisdiction over Plaintiffs' claims brought under the non-commercial tort exception because its alleged tortious acts – characterized as the authorization and other support it provided Individual Defendants' in securing Plaintiffs' visas – occurred in Kuwait, not the United States. *See* Def.'s Br. at 15-16. This assertion, however, ignores Plaintiffs' allegations that their injuries from their trafficking and forced labor were sustained while they resided in McLean, Virginia and that Kuwait confiscated and retained Plaintiffs' passports— acts central to their claims—while they were in the United States.

Plaintiffs agree that for their claims to be brought under the non-commercial tort exception their injuries must have occurred in the United States. *See* 28 U.S.C. § 1606(a)(5); *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 439 (1989). Moreover, the tortious activity itself must have a "required nexus" with the United States. *Asociacion de Reclamantes v. United Mexican States*, 735 F.2d 1517, 1524 (D.C. Cir. 1984); *see also Persinger v. Islamic Republic of Iran*, 729 F.2d 835, 842 (D.C. Cir. 1984).[21] This "required nexus" is present "as long as plaintiff alleges facts sufficient to show both the injury and the conduct (action or inaction) giving rise to the tort occurred in the United States." *Doe v. Holy See*, 434 F. Supp. 2d 925, 952 (D. Or. 2006). Thus, Plaintiffs need not show that *all* of a defendant's conduct occurred within the

---

Kuwait has failed to conduct its own investigation into Plaintiffs' allegations; failed to cooperate in the U.S. Department of Justice investigation into them; and continues to employ Defendant Al Saleh outside the United States. Defendant Kuwait's failure to repudiate Individual Defendants' trafficking and forced labor constitutes ratification of this unlawful conduct, and accordingly, Defendant Kuwait may be held vicariously liable for it.

[21]     The Supreme Court has not addressed the issue of whether the non-commercial tort exception requires the tort to occur within the United States. At least one D.C. district court has disagreed that the noncommercial tort exception requires more than an injury occurring in the United States. *See Burnett v. Al Baraka Inv. and Dev. Corp.*, 292 F. Supp. 2d 9, 19 n.4 (D.D.C. 2003).

34

jurisdictional confines of the United States because "requiring every aspect of the tortious conduct to occur in the United States... would encourage foreign states to allege that some tortious conduct occurred outside the United States." *Id.* This would subsequently render the non-commercial tort exception useless. Here, Plaintiffs' complaint alleges tortious conduct and personal injuries – e.g., trafficking and forced labor – that occurred in the United States.

The D.C. Circuit's principal concern with this aspect of its interpretation of the noncommercial tort exception was to prevent torts that only "bear some relationship to the United States" from being litigated in the United States under § 1605(a)(5). *Reclamantes*, 735 F.2d at 1525. Describing the intention of the FSIA's non-commercial tort exception, the D.C. Circuit has relied on a State Department official's statement that "[W]e would like to afford *our* local citizens and entities who deal with foreign governments *in the United States* effective redress through the instrumentality of our courts. If a dispute arises as a result of an activity which a government carries on *in this country,* the most appropriate place to resolve such a dispute would be through the courts . . ." *Persinger*, 729 F.2d at 840 (citing *Immunities of Foreign States: Hearings on H.R. 3493 Before the Subcomm. on Claims and Governmental Relations of the House Comm. on the Judiciary,* 93d Cong., 1st Sess. 29 (1973) (testimony of Bruno Ristau) (emphasis added)).

Plaintiffs' claims are cognizable under this exception because the "essential locus" of their torts occurred in the United States. *See Asociacion de Reclamentes*, 735 F.2d at 1524-1525. (finding that the "gravamen" of the alleged tort needs to have occurred in the United States). Here, the gravamen of Plaintiffs' torts – that they were transported and harbored for the purpose of providing labor and services – occurred within the United States. Thus, that Defendant Kuwait issued Plaintiffs' visas in Kuwait does not defeat jurisdiction. Consequently, Plaintiffs' tort claims

have the "required nexus" to the United States as all their essential elements and the resultant injuries occurred in the United States.

Moreover, contrary to the arguments advanced by Defendant Kuwait, all Plaintiffs' claims based on their employment by Individual Defendants occurred wholly within the United States. *See, e.g.,* Compl. ¶¶ 17, 18, 20, 29, 36, 39, 40, 46, 47-49, 50-72. The forced labor violations of TVPA, the Thirteenth Amendment violation, false imprisonment, intentional inflection of emotional distress, negligent infliction of emotional distress, assault and battery of Plaintiffs all occurred within the United States and all Plaintiffs' resultant injuries were also sustained within the United States. Compl. ¶ 47 (stating that Plaintiffs resided at all relevant times at their place of employment, which was Individual Defendants' private home *in Virginia*). Thus, the non-commercial tort exception's requirement that the tortious action and injury occur in the United States is met.

### 5.     Plaintiffs' Claims Are Not Based On A "Discretionary Function."

Defendant Kuwait characterizes alleged tortious acts that it knowingly performed and that were crucial in facilitating Plaintiffs' trafficking and forced labor by Individual Defendants as merely "the implementation of policy decisions by a foreign government." Def.'s Br. at 13. Defendant Kuwait actively engaged in Plaintiffs' trafficking and forced labor by supporting Individual Defendants' application for Plaintiffs' visas and confiscating and retaining their passports with the knowledge of Individual Defendants' scheme to traffic Plaintiffs into the United States and subject them to forced labor. Defendant Kuwait's participation in these torts cannot remotely be termed a "discretionary function."

The discretionary function exception to § 1605(a)(5) dictates that a court does not have jurisdiction over a foreign sovereign for "any claim based upon the exercise or performance or the failure to exercise or perform a discretionary function regardless of whether the discretion be

36

abused." 28 U.S.C. § 1605(a)(5)(A). The FSIA's "discretionary function" exception is analyzed

under FTCA's discretionary function exception jurisprudence. *Olson v. Republic of Sing.*, 636 F.

Supp. 885 (D.D.C. 1986) (citing *Olsen by Sheldon v. Gov't of Mex.*, 729 F.2d 641 (9th Cir. 1984)).

As an initial matter, under the FSIA, the foreign state, not the plaintiff, bears the burden of

proving by a preponderance of the evidence that the discretionary function exception applies.

*Maalouf v. Swiss Confederation*, 208 F. Supp. 2d 31, 35 (D.D.C. 2002). To avail itself of the

immunity afforded by this provision, a foreign state must establish two elements. *See United States*

*v. Gaubert*, 499 U.S. 315, 322 (1991) (interpreting FTCA's discretionary function exception). First,

the challenged action must be "discretionary in nature" or, in other words, "involve[s] an element of

judgment or choice" on the part of the foreign state. *Id.* at 322. Second, even if the challenged

action involves such discretion, the judgment must be "of the kind that the discretionary function

exception was designed to shield." *Id.* at 322-323. (internal citations and quotations omitted).

a.   **Defendant Kuwait's Acts Were Not Discretionary, As They Did Not Involve An Element Of Judgment Or Choice.**

Defendant Kuwait again mischaracterizes the bases for Plaintiffs' claims: it contends that

Plaintiffs' claims target Kuwait's discretionary policy choice to routinely support and issue A-3

visas for its diplomats. In fact, Plaintiffs' allegations and associated claims against Defendant

Kuwait are premised not on this broad policy but rather on how the specific acts by which

Defendant Kuwait knowingly facilitated Individual Defendant's scheme to subject Plaintiffs to

trafficking and forced labor. Absent Defendant Kuwait's active support of Individual Defendants'

visa applications for Plaintiffs and Defendant Kuwait's confiscation and retention of Plaintiffs'

passports, Individual Defendants would not have been able to carry out their scheme.[22] Because of

---

[22]   Defendant Kuwait asserts that Plaintiffs only plead the confiscation of Plaintiffs' passports to support their fraud claims. This is incorrect as Plaintiffs incorporate the allegations concerning the

the circumstances under which Defendant Kuwait acted, none of its acts in support of Individual

Defendants' trafficking and forced labor can be classified as discretionary because such acts are

absolutely prohibited by United States law.

A foreign state's challenged conduct can only be considered discretionary when it involves

"an element of judgment or choice." *Gaubert*, 499 U.S. at 322. An act is not discretionary where a

"federal statute, regulation, or policy specifically prescribes a course of action for an employee [of a

foreign state] to follow," because there is "no rightful option but to adhere to the directive." *Id.* at

322 (internal citations and quotation marks omitted) (interpreting the FTCA's analogous

discretionary function exception). If such a statute or policy exists, the employee has no choice but

to follow the directive and the act is not discretionary. *Macharia v. United States*, 334 F. 3d 61, 65

(D.C. Cir. 2003).

This court has explicitly held that "there is no discretion to commit, or to have one's officers

or agents commit, an illegal act." *Letelier v. Republic of Chile*, 488 F. Supp. 665, 673 (D.D.C.

1980) (finding that there is no "discretion" within the meaning of § 1605(a)(5)(A) to order an

assassination). Moreover, "[w]hatever policy options may exist for a foreign country, it has no

'discretion' to perpetrate . . . action that is clearly contrary to the precepts of humanity as

recognized in both national and international law." *Id.*

---

confiscation and retention of their passports by reference in all their claims. Compl. ¶¶ 123, 130, 137, 169, 179, 186, 193, 200, 206, 212.

Kuwait contends that "safekeeping" the passport of a diplomat and members of the diplomat's household, including domestic servants, is discretionary in nature. However, the case Kuwait cites for this proposition, *Alicog v. Kingdom of Saudia Arabia*, 860 F. Supp. 379 (S.D. Tex. 1994), was decided six years before the enactment of the TVPA, which clearly prohibits the confiscations of domestic workers' passport in order to secure their labor, as it is a means of legal coercion. *See* 18 U.S.C. § 1592. Because no discretion exists to violate the law, *see Letelier v. Republic of Chile*, 488 F. Supp. 665, 673 (D.D.C. 1980), passage of the TVPA implicitly overturned *Alicog*.

United States and international law clearly prohibit trafficking, forced labor, involuntary servitude and false imprisonment,[23] the claims at issue here. International law, both treaty-based and customary, also prohibits slavery and other slave-like practices including trafficking, forced labor and involuntary servitude. *See, e.g.,* International Covenant on Civil and Political Rights, art. 8, Dec. 16, 1966, G.A. res. 2200A (XXI), U.N. Doc. A/6316, 999 U.N.T.S. 17, *entered into force for the United States*, June 8, 1992 ("(1) no one shall be held in slavery; slavery and slave-trade in all their forms shall be prohibited. (2) no one shall be held in servitude."); Slavery, Security, Forced Labor and Similar Institutions and Practices Convention of 1926, preamble, Sept. 25, 1926, 60 L.N.T.S. 253, *entered into force for the United States* Mar. 21, 1929 ("[abolishing] slavery in all its forms"); Universal Declaration of Human Rights, art. 4, Dec. 10, 1948, G.A. re. 217A(II), U.N. Doc. 1/810 ("no one shall be held in slavery or servitude"); Protocol to Prevent, Suppress and Punish Trafficking in Persons Especially Women and Children, supplementing the United Nations Convention against Transnational Organized Crime, Nov. 15, 2000, G.A. Res. 25, annex II, UN Doc. A/45/49, *entered into force for the United States* Dec. 3, 2005; TVPA, 22 U.S.C. s. 7107(23) (In passing the TVPA, Congress declared "[t]rafficking in persons [a] modern form of slavery, and [the] largest manifestation of slavery today" and found that "[t]he international community has repeatedly condemned slavery and involuntary servitude, violence against women, and other elements of trafficking, through declaration, treaties, and United Nations resolutions and reports."). United States courts have also consistently held that slavery is a violation of international law. *See, e.g., Tel-Oren v. Libyan Arab Republic*, 726 F.2d 774, 781 (D.C. Cir. 1984) (Edwards, J.,

---

[23]     Likewise, Article 185 of Kuwait's criminal code prohibits international trafficking. *See* The State Department, *Trafficking in Persons Report* 2007, 107 (2007). The Ninth Circuit has held that the discretionary function exception is inapplicable when an employee of a foreign government violates its own internal law. *Liu v. Republic of China*, 892 F.2d 1419, 1431 (9th Cir. 1989) (citations omitted).

concurring).  These national and international laws specifically prescribe conduct for the State of

Kuwait and its diplomats to follow when in the United States, and neither, therefore, has

"discretion" to break these laws.

        **b.**        **Defendant Kuwait's Actions Are Not The Type That The
Discretionary Function Exception Is Designed To Shield.**

       Even if Defendant Kuwait's alleged acts facilitating Individual Defendants' trafficking and

forced labor of Plaintiffs were not violations of United States law – which they clearly are – none of

Defendants' tortious acts constitute the type conduct that the discretionary function exception was

designed to shield because they were not carried out to advance any lawful policy concern of

Defendant Kuwait.

       Under the discretionary function exception, where there is no rule or regulation governing a

foreign state's course of conduct, immunity extends only if "the discretionary acts of a government

employee are of the nature and quality that Congress intended to shield from tort liability."

*Maalouf*, 208 F. Supp. 2d at 35-36 (internal citations and quotes omitted).  Because the

discretionary function exception was designed to "prevent judicial 'second guessing' of legislative

and administrative decisions grounded in social, economic and political policy through the medium

of an action in tort," it "protects only governmental actions and decisions based on considerations of

public policy."  *Gaubert*, 499 U.S. at 323.

       The conduct alleged in the present case was not based on any "policy-making duties of a

governmental body."  *Maalouf*, 208 F. Supp. 2d at 36-37 (noting that the discretionary function

exception applies to "broader considerations of budgetary constraints, security concerns, [or]

political concerns regarding the image the foreign government wishes to project").  In *Maalouf*, a

twelve-year-old boy sued Switzerland for severe injuries sustained after sledding into a wire

attached to a tree located on the Swiss Embassy's property in Washington D.C.  Switzerland argued

that its decision to install a guide wire on Embassy grounds and not warn sledders of its existence

was of the type that Congress intended to protect under the FSIA, as it involved  financial

considerations and policy decisions about the nature and character of Embassy grounds. *Id.* at 36.

This court held that the discretionary function did not apply. *Id.* at 31.  The Court reasoned that the

attachment of a retaining wire to a tree on Embassy property is "the type of minor grounds

maintenance that a private landowner would undertake," rather than the type that would implicate

"broader considerations of budgetary constraints, security concerns, [or] political concerns

regarding the image the foreign government wishes to project." *Id.* at 37.

Likewise here, the coercion of Plaintiffs through physical and psychological abuse, threats

and deprivation of Plaintiffs' passports and other legal documents were "not a result of any policy-

making duties of a governmental body." *Id.* at 36.  Nor did the decision not to pay Plaintiffs

implicate any social, economic, or political policies.  Rather, as the Court in *Maalouf* found,

Defendants' actions were wholly independent decisions of the type private individuals would make,

and did not turn on how Defendant Kuwait conducts its foreign relations.

Defendant Kuwait engaged in conduct clearly illegal under U.S. and international law, for

which there was no policy rationale.  Accordingly, the actions that Plaintiffs have alleged Defendant

Kuwait to have undertaken were not discretionary in nature.

> **6.      Plaintiffs' Claims Of Trafficking, Forced Labor, False Imprisonment
>          And Civil Conspiracy Come Within The Non-Commercial Tort
>          Exception To Immunity Under The FSIA Because These Claims Do Not
>          Arise Out Of Deceit Or Misrepresentation.**

As indicated above, Plaintiffs agree that the non-commercial tort exception does not allow

this Court jurisdiction over claims arising out of misrepresentation or deceit, *see* 28 U.S.C. §

1605(a)(5)(B), and, accordingly, their claims for fraud or constructive fraud are not cognizable

under this exception.[24]  However, it is clear that the non-commercial tort exception abrogates

Defendant Kuwait's immunity for Plaintiffs' trafficking, forced labor, false imprisonment and civil

conspiracy claims, as they do not arise out of deceit or misrepresentation.  The essential elements of

Plaintiffs' trafficking and forced labor claims are the obtaining of labor through the use of fraud,

force, *or* coercion.  *See* 18 U.S.C. §§ 1589, 1590 (emphasis added).  The essential elements of

Plaintiffs' false imprisonment claims are Defendants' confinement of Plaintiffs in their home

against Plaintiffs' will.  *Montgomery Ward & Co. v. Wickline*, 188 Va. 485, 489 (1948) ("False

imprisonment is restraint of one's liberty without any sufficient legal excuse therefor by word or

acts which he fears to disregard.").  The essential elements of Plaintiffs' civil conspiracy claim are

"two or more persons combined to accomplish, by some concerted action, some criminal or

unlawful purpose or some lawful purpose by a criminal or unlawful means."  *Commercial Bus. Sys.*,

453 S.E.2d at 266  (citations omitted) (reversing lower court's grant of summary judgment to

defendant employer in case asserting, among other things, claim for civil conspiracy against

defendant employer on the basis of *respondeat superior*).  Thus, misstatements are not essential for

Plaintiffs to prevail on any of these claims and accordingly, this Court has jurisdiction over these

claims.  *Travel Assoc., Inc. v. Kingdom of Swaz.*, Civil Action No. 89-1235, 1990 U.S. Dist. LEXIS

11455, at *6 (D.D.C. Aug. 29, 1990) (*citing Block v. Neal*, 460 U.S. 289, 296-98 (1983)); *see also*

*Kohn v. United States*, 680 F.2d 922, 926 (2d Cir. 1982) (holding that the exceptions for

misrepresentation and deceit "have generally been applied only to actions for damages due to

commercial decisions that were predicated on incorrect or incomplete information").  Indeed, the

Ninth Circuit has noted that the FSIA's non-commercial tort exception allows claims against

---

[24]      Plaintiffs bring their claims for fraud or constructive fraud against Defendant Kuwait under the
commercial activity exception to foreign sovereign immunity, as these claims are based on a
"commercial activity" -- Plaintiffs' employment. *See supra* at 12-16.

foreign states for false imprisonment. *See Blaxland v. Commw. Dir. of Public Prosecutions*, 323

F.3d 1198, 1203 (9th Cir. 2003) ("Section 1605(a)(5)(B) does not, however, exclude claims for

false imprisonment from the 1605(a)(5) tort exemption").

In an attempt to repackage Plaintiffs' false imprisonment claim as a claim based upon

"deceit and misrepresentation," Defendant Kuwait argues that "the core allegation supporting that

claim is that Individual Defendants used threats and coercion to make them "believe[] that they

were confined within the boundary of Individual Defendants' home." Def.'s Br. at 11. This not

only mischaracterizes Plaintiffs' allegations it also cherry-picks language from the very paragraph it

purports to quote. The relevant paragraph states: "Plaintiffs reasonably believed that they were

confined within the boundary of Individual Defendants' home *as a result of Individual*

*Defendants' coercion, use of force and threats of force*." Compl. ¶ 181. Clearly, there is no

mention of deceit or misrepresentation. Rather, the Complaint alleges that Plaintiffs believed that

they were confined in Individual Defendants' home, not because they were lied to, but because they

were physically assaulted, threatened with death and severe bodily injury, kept penniless, deprived

of their passports and other legal papers and completely isolated from the outside world. Compl. ¶¶

47-49, 57-93. Plaintiffs' imprisonment was not the result of deceit and misrepresentation, but rather

real physical and psychological abuse on the part of Individual Defendants.

Defendant Kuwait's contention that deceit and misrepresentation are "at the core of"

Plaintiffs' claims for trafficking, forced labor and civil conspiracy are equally unavailing.

Defendant Kuwait asserts that the only role it is alleged to have played in Plaintiffs' trafficking and

forced labor was the "processing and approval of visa applications, which Plaintiffs claim

43

Defendant Kuwait knew contained misrepresentations." Def.'s Br. at 11.[25]  This argument ignores the allegations in Plaintiffs' Complaint.  Plaintiffs allege that Defendant Kuwait is directly liable for aiding and abetting Individual Defendants' trafficking and forced labor of Plaintiffs and that it is also vicariously liable for these unlawful acts because Individual Defendants were acting within the scope of their employment when they trafficked Plaintiffs and forced them to work against their will through physical and other types of coercion.  None of these actions were the result of deceit or misrepresentation.  Thus, with the exception of their claims of fraud or constructive fraud, all of Plaintiffs claims fall within the commercial tort exception to the FSIA.

---

[25]  Defendant Kuwait cites *Blaxland* and the Second Circuit's decision in *Cabiri v. Gov't of the Republic of Ghana*, 165 F.3d 193 (2d Cir. 1999), to support its contention that the trafficking and forced labor claims are based upon deceit and misrepresentations.  A closer reading of these cases makes clear that they are inapposite.  The emotional distress and loss of consortium claims in *Blaxland* were derivative of underlying misrepresentation claims.  *Blaxland*, 323 F.3d at 1203 (citing *Leipart v. Guardian Indus.*, 234 F.3d 1063, 1071 (9th Cir. 2000)).  These claims would not have existed but for the underlying misrepresentation.  Similarly, plaintiff's emotional distress claim in *Cabiri* was based upon the Ghanaian government's misrepresentations to plaintiff regarding the whereabouts of her husband.  165 F.3d at 200.  Here, Plaintiffs' trafficking and forced labor claims, however, are not derivative of any underlying misrepresentation claim.

### CONCLUSION

For all of the foregoing reasons, plaintiffs respectfully request that this Court deny

Defendant Kuwait's Motion To Dismiss.

Dated:  January 12, 2009                    Respectfully submitted,


                                   _____/s/ Craig G. Falls_____
                                   David A. Kotler*
                                   Craig G. Falls (D.C. Bar No. 502368)
                                   Catherine J. Rosato*
                                   Jennifer L. Rellis*
                                   Allison V. Hawley*
                                   Matthew J. Sheehan*
                                   DECHERT LLP
                                   1775 I Street, N.W.
                                   Washington, D.C.  20006
                                   (202) 261-3300

                                   Lenora M. Lapidus*
                                   Araceli Martinez Olguin*
                                   AMERICAN CIVIL LIBERTIES UNION
                                   FOUNDATION - WOMEN'S RIGHTS PROJECT
                                   125 Broad Street, 18th Floor
                                   New York, NY  10004
                                   (212) 549-2644

                                   Steven Macpherson Watt*
                                   AMERICAN CIVIL LIBERTIES UNION
                                   FOUNDATION - HUMAN RIGHTS PROGRAM
                                   125 Broad Street, 18th Floor
                                   New York, NY  10004
                                   (212) 519-7870

                                   *Attorneys for Plaintiffs*
                                   *not admitted in this District