UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

```
                                    )
MANI KUMARI SABBITHI, et al.,       )
                                    )
            Plaintiffs,             )
                                    ) Civil Action No. 07-115 (EGS)
       v.                           )
                                    )
MAJOR WALEED KH N.S. AL SALEH,      )
et al.,                             )
                                    )
            Defendants.             )
                                    )
```

**MEMORANDUM OPINION**

Plaintiffs Mani Kumari Sabbithi, Joaquina Quadros, and Gila Sixtina Fernandes, domestic workers from India, bring this action against their former employers Major Waleed KH N.S. Al Saleh, his wife, Maysaa KH A.O.A. Al Omar, (together "defendants"), and the State of Kuwait.[1] Plaintiffs bring suit under the Trafficking Victims Protection Act of 2000 ("TVPA"), 18 U.S.C. § 1581, *et seq.*, the Fair Labor Standards Act, 29 U.S.C. §§ 201, *et seq.*, and assert various contract and tort claims.[2] Before this Court

---

[1] Kuwait is a foreign state as defined in 28 U.S.C. § 1602, *et seq.* (the Foreign Sovereign Immunities Act of 1976). Compl. ¶ 11. Plaintiffs assert that Kuwait is liable for materially and practically assisting the defendants in the alleged offenses. Plaintiffs also seek to hold Kuwait liable under an agency theory for the actions of its employee, Defendant Al Saleh, and his wife, Defendant Al Omar. *Id.* ¶ 3. Kuwait is not a party to defendants' motion to dismiss. *See* Mot. to Dismiss at 1.

[2] Plaintiffs claim breach of contract; quantum merit; unjust enrichment; fraud and constructive fraud; false imprisonment; intentional infliction of emotional distress; negligent infliction of emotional distress; assault; battery; and civil

is the defendants' motion to dismiss the complaint and quash service of process based on diplomatic immunity.  Upon consideration of the motion, the responses and replies thereto, the *amici curiae* brief and response thereto, the Statement of the United States and responses thereto, and the applicable law, the Court **GRANTS** defendants Al Saleh and Al Omar's motion to dismiss and quashes service of process as to those defendants.

I.   BACKGROUND

Defendant Major Waleed KH N.S. Al Saleh is a Kuwaiti diplomat.  Al Saleh and his wife, defendant Maysaa KH A.O.A. Al Omar, lived in the United States from 2005 to 2007, while Al Saleh served as Attaché to the Embassy of Kuwait.  *See* Compl. ¶ 9; *see also* Pls.' Sur-rep. 2.  Prior to moving to the United States, the defendants employed plaintiffs as domestic workers in the defendants' home in Kuwait.  The individual plaintiffs worked for the defendants in Kuwait for a period ranging from five and a half years to eight and a half months.  *See* Compl. ¶¶ 16-46.  In Kuwait, plaintiffs allegedly worked seven days a week, for long hours each day, and were paid between 35 Kuwaiti Dinar (KD) (approximately $121 U.S. dollars) and 40 KD (approximately $138 U.S. dollars) per month.  *Id.*  According to plaintiffs, however, before coming to the United States the defendants signed an

---

conspiracy.

employment contract promising to pay plaintiffs $1,314 U.S. dollars per month and agreeing to comply with United States labor laws in exchange for plaintiffs' domestic work in the defendants' home in the United States.  *Id.*  Plaintiffs assert that these employment contracts were presented to the United States Embassy in Kuwait for the purpose of obtaining plaintiffs' A-3 visas, which authorized plaintiffs to work as live-in domestic servants in defendants' home in McLean, Virginia.  *Id.*

Plaintiffs claim that once in the United States, the defendants did not comply with the terms of the employment contracts.  Allegedly, plaintiffs worked sixteen to nineteen hours per day, seven days a week, and were not paid directly, but instead defendants sent wages of 70 KD (approximately $242 U.S. dollars) to 100 KD (approximately $346 U.S. dollars) per month to plaintiffs' families overseas.  *See id.* ¶¶ 47-93.  Plaintiffs allege that the defendants deprived them of their passports, threatened plaintiffs with physical harm, and physically abused Sabbithi.  *Id.*

Plaintiffs eventually escaped the defendants' home, and, on January 18, 2007, plaintiffs filed this complaint against defendants and the State of Kuwait.  In addition to this civil action, plaintiffs pursued criminal charges against the defendants through the U.S. Department of Justice ("DOJ").  Pursuant to the DOJ's request, the U.S. Department of State

("State Department") asked the State of Kuwait to waive the defendants' diplomatic immunity. Pls.' Sur-rep. Ex. A. According to the State Department, Kuwait declined to waive the defendants' immunity. *Id.* As a result, the DOJ closed its investigation into defendants' alleged illegal conduct. *Id.*

On July 18, 2007, the Court granted Break the Chain Campaign, Casa of Maryland, Inc., Asian American Legal Defense and Education Fund, Global Rights, and Boat People SOS, Inc. leave to file as *amici curiae* a memorandum of law in support of plaintiffs' opposition to the defendants' Motion to Dismiss and Quash Service of Process. On March 20, 2008, this Court invited the State Department to submit its views regarding this case. The State Department responded on July 22, 2008.

## II. DISCUSSION

### A. Diplomatic Immunity

This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1351, which states that district courts "have original jurisdiction, exclusive of the courts of the States, of all civil actions and proceedings against . . . members of a mission or members of their families (as such terms are defined in section 2 of the Diplomatic Relations Act)." 28 U.S.C. § 1351(2); *see also Gonzalez Paredes v. Vila*, 479 F. Supp. 2d 187, 191 (D.D.C. 2007).

Defendants argue that they have diplomatic immunity, and that their immunity deprives this Court of jurisdiction in this case, pursuant to the Vienna Convention on Diplomatic Relations ("the Vienna Convention," "Convention" or "VCDR"), to which both Kuwait and the United States are parties.  The Vienna Convention provides that a "diplomatic agent shall . . . enjoy immunity from [the receiving state's] civil and administrative jurisdiction. . . ."  VCDR, Article 31(1).  The Convention further provides that the "members of the family of a diplomatic agent forming part of his household shall, if they are not nationals of the receiving State, enjoy the privileges and immunities specified in Articles 29 to 36."  VCDR, Article 37.  The Vienna Convention also provides that a diplomatic agent "shall not in the receiving State practice for personal profit any professional or commercial activity."  VCDR, Article 42.  Diplomatic immunity can be forfeited "in the case of . . . an action relating to any professional or commercial activity exercised by the diplomatic agent in the receiving State outside his official functions."  Id.; *see also* Article 32(3).

In accordance with the Vienna Convention, Congress enacted 22 U.S.C. § 254d, which provides that "[a]ny action or proceeding brought against an individual who is entitled to immunity with respect to such action or proceeding under the Vienna Convention on Diplomatic Relations . . . shall be dismissed."  22 U.S.C. §

5

254d.  Therefore, if the Court concludes that defendants are immune, it must dismiss the action pursuant to 22 U.S.C. § 254d. *Gonzalez Paredes*, 479 F. Supp. 2d at 191.

A defendant's diplomatic immunity "may be established upon motion or suggestion by or on behalf of the individual. . . ." 22 U.S.C. § 254d.  Defendants filed as an exhibit to their motion to dismiss a letter from the State Department dated March 15, 2007.  In that letter, the State Department confirmed that in August 2004, the Embassy of Kuwait had notified the State Department that Al Saleh was a diplomatic agent at the Embassy of Kuwait and, as of March 2007, Al Saleh continued to serve in that capacity.  Mot. to Dismiss Ex. 2.  The State Department also certified that the Embassy of Kuwait had confirmed that Al Omar was a national of Kuwait and Al Saleh's spouse residing in his household.  *Id.*  In addition, defendants filed the State Department's Diplomatic List from the summer of 2006, in which the defendants' names appear as diplomats of Kuwait.  Mot. to Dismiss Ex. 3.

In view of the State Department's determination that the defendants are diplomats and its certification that as diplomats they are immune from suit pursuant to the Vienna Convention, the Court concludes that these defendants are entitled to diplomatic immunity.  *See Gonzales Paredes*, 479 F. Supp. 2d. at 192; *see also Carrera v. Carrera*, 174 F.2d 496, 497 (D.C. Cir. 1949) ("The

6

courts are disposed to accept as conclusive of the fact of the diplomatic status of an individual claiming an exemption, the views thereon of the political department of their government." (citation and internal quotation marks omitted)).

### B. Proposed Liability Despite Diplomatic Immunity

Despite defendants' status as diplomats, plaintiffs contend that diplomatic immunity should not shield the defendants from liability in this case. In support of this position, plaintiffs argue that: (1) defendants' alleged trafficking of plaintiffs falls within the commercial activities exception to immunity under the Vienna Convention; (2) diplomatic immunity cannot bar plaintiffs' claims challenging defendants' conduct in violation of the Thirteenth Amendment; (3) diplomatic immunity cannot bar plaintiffs' claims because defendants' actions were so egregious they violate *jus cogens* norms prohibiting slavery and slavery-like practices; and (4) plaintiffs' claims under the TVPA prevail over defendants' conflicting claims of diplomatic immunity according to the "subsequent-in-time" rule. *Amici curiae* filed a brief in support of plaintiffs' arguments, specifically with respect to plaintiffs' assertion that the defendants' conduct constituted human trafficking and that the alleged trafficking constitutes "commercial activity" within the meaning of the Vienna Convention. *See Amici* Brief at 8-14.

### 1. The "Commercial Activity" Exception to Diplomatic Immunity

The purpose of diplomatic immunity is "to 'contribute to the development of friendly relations among nations' and to 'ensure the efficient performance of the functions of diplomatic missions'". *Hellenic Lines, Ltd v. Moore*, 345 F.2d 978, 980 (D.C. Cir. 1965) (citing the Vienna Convention preamble). Consistent with that purpose, the Vienna Convention provides that a diplomatic agent "shall not in the receiving State practice for personal profit any professional or commercial activity." VCDR, Article 42. Because diplomats are not to engage in professional or commercial activity outside of their duties as diplomats, the Vienna Convention includes an exception to diplomatic immunity "in the case of . . . an action relating to any professional or commercial activity exercised by the diplomatic agent in the receiving State outside his official functions." *Id.; see also* VCDR, Article 32(3).

Plaintiffs allege that defendants' conduct in bringing plaintiffs from Kuwait to the United States to work as domestic servants constituted human trafficking, and was therefore a "commercial activity exercised by the diplomatic agent . . . outside his official functions" within the meaning of the Vienna Convention. Plaintiffs, and *amici*, argue at length that human trafficking is a profitable commercial activity that results in severe human rights violations. "But such a literal manner of interpretation is superficial and incomplete, and, [this Court]

8

believe[s], yields an incorrect rendering of the meaning of 'commercial activity' as used in the Vienna Convention." *Tabion v. Mufti*, 73 F.3d 535, 537 (4th Cir. 1996).

Hiring household help is incidental to the daily life of a diplomat and therefore not commercial for purposes of the exception to the Vienna Convention.  This Court agrees with the Fourth Circuit in *Tabion*:

> When examined in context, the term "commercial activity" does not have so broad a meaning as to include occasional service contracts as Tabion contends, but rather relates only to trade or business activity engaged in for personal profit. Accepting the broader meaning fails to take into account the treaty's background and negotiating history, as well as its subsequent interpretation. It also ignores the relevance of the remainder of the phrase-"outside his official functions."

*Id.; see also Gonzales Paredas*, 479 F. Supp. 2d at 193. According to the Statement of Interest filed by the United States, "[t]he 'commercial activity' exception focuses on the pursuit of trade or business activity that is unrelated to the diplomatic assignment; it does not encompass contractual relationships for goods and services that are incidental to the daily life of the diplomat and his family in the receiving State."  Statement of Interest of the United States of America ("Statement"), at 5.  The United States also stated that "[w]hen diplomats enter into contractual relationships for personal goods or services incidental to residing in the host country, including

9

the employment of domestic workers, they are not engaging in 'commercial activity' as that term is used in the Diplomatic Relations Convention." *Id.* at 14. "Although not conclusive, the meaning attributed to treaty provisions by the Government agencies charged with their negotiation and enforcement is entitled to great weight." *United States v. Stuart*, 489 U.S. 353, 369 (1989) (quoting *Sumitomo Shoji Am., Inc. v. Avagliano*, 457 U.S. 176, 184-85 (1982)). Furthermore, the facts in this case support a conclusion that the defendants' conduct in bringing plaintiffs from Kuwait to the United States and employing plaintiffs as domestic servants, albeit for marginal wages, was not commercial activity outside of the defendants' official functions.[3]

---

[3] Plaintiffs urge the Court to give "commercial activity" as used in the Vienna Convention similar meaning as is given for consular and foreign sovereign immunities. Under the Foreign Sovereign Immunity Act (FSIA), a foreign state is not immune for actions "based upon a commercial activity carried on in the United States by a foreign state," 28 U.S.C. § 1605(a)(2), but there is no similar language in FSIA that the commercial activity be outside the foreign state's official functions. Cases interpreting the Vienna Convention on Consular Relations are equally inapplicable because consular immunity is narrower in scope than diplomatic immunity, in that consular immunity *only* exists for "acts performed in the exercise of consular functions," Vienna Convention on Consular Relations, Apr. 24, 1963, art. 43(1), 21 U.S.T. 77, 104, as opposed to diplomatic immunity which exists for all acts performed by the diplomat, with limited exceptions. The Vienna Convention is a multilateral treaty, and the Court's analysis must begin with the language of the Treaty itself. *See Rainbow Nav., Inc. v. Dep't of Navy*, 911 F.2d 797, 801 (D.C. Cir. 1990). "The clear import of treaty language controls unless application of the words of the treaty according to their obvious meaning effects a result inconsistent

This Court finds the reasoning in *Gonzales Paredas*, a case with very similar facts, persuasive. In *Gonzales Paredas*, the plaintiff, a citizen of Paraguay, was hired by defendants in Argentina to work as a domestic servant for defendants while they served on a diplomatic mission to the United States. *Gonzales Paredas*, 479 F. Supp. 2d at 189. Plaintiff alleged that the defendant signed an employment contract agreeing to pay plaintiff $6.72 per hour, plus overtime, and that the contract was presented to the United States Embassy in Argentina for the purposes of obtaining an A-3 visa. *Id.* at 190. Plaintiff claimed that, contrary to the promises made in the contract, she worked seventy-seven hours per week, and was paid only $500 per month. Plaintiff filed suit for violations of federal and local wage laws, breach of contract, and unjust enrichment. *Id.* The defendants moved to dismiss the complaint and quash service of process based on diplomatic immunity. *Id.*

In determining whether the hiring of domestic help was a commercial activity outside a diplomat's official functions, the *Gonzales Paredas* court considered Statements of Interest filed by the State Department. Those statements mirror the statements the

---

with the intent or expectations of its signatories." *Id.* (citation and internal quotations omitted). Thus, the Court will not consider as determinative cases interpreting the FSIA nor the Vienna Convention on Consular Relations. *See also Gonzales Paredas*, 479 F. Supp. 2d at 193 n.5 (citing *Tabion*, 73 F.3d at 539 n.7).

United States provided to the Court in this case. *See id.* at 193. Finding no reason to disagree with the conclusion of the State Department, the *Gonzales Paredas* court found that a contract for domestic services was not itself "commercial activity" within the meaning of the Vienna Convention.

Similarly, this Court concludes that hiring domestic employees is an activity incidental to the daily life of a diplomat and his or her family, and does not constitute commercial activity outside a diplomat's official function. *See* VCDR, Article 31(1)©.

### 2. Constitutional Claims and Diplomatic Immunity

Plaintiffs argue that the defendants' actions in this case violated the Thirteenth Amendment of the United States Constitution prohibiting slavery, and that diplomatic immunity does not apply against a constitutional challenge. Plaintiffs do not cite a single case, however, in which diplomatic immunity was withheld in order to provide redress for a constitutional violation. Instead, case law suggests that diplomatic immunity can shield a diplomat from liability for alleged constitutional violations. *See, e.g., FDIC v. Meyers,* 510 U.S. 471, 474-75 (1994); *Pierson v. Ray*, 386 U.S. 547, 554-55 (1967); *Tuck v. Pan Am. Health Org.,* 668 F.2d 547, 549-50 (D.C. Cir. 1981); *Persinger v. Islamic Republic of Iran,* 729 F.2d 835 (D.C. Cir. 1984) (vacating earlier opinion and affirming the district court's

dismissal of actions alleging violations of treaties and of international, constitutional, and common law); *Weinstock v. Asian Dev. Bank*, 2005 WL 1902858 (D.D.C. July 13, 2005) (dismissing action seeking redress for constitutional violations based on defendants' immunity under the International Organizations Immunity Act of 1945); *Ahmed v. Hoque*, 2002 WL 1964806 (S.D.N.Y. August 23, 2002) (holding that plaintiff's Thirteenth Amendment claim did not trump defendants' diplomatic immunity). Plaintiffs constitutional claims must also give way to defendants' diplomatic immunity.

### 3.   *Jus cogen* norms and Diplomatic Immunity

*Jus cogen* norms are peremptory norms of international law which enjoy the highest status in international law and prevail over both customary international law and treaties. *Comm. of U.S. Citizens Living in Nicar. v. Reagan*, 859 F.2d 929, 935 (D.C. Cir. 1988). Plaintiffs argue that the defendants' human trafficking conduct violated *jus cogen norms*, and as such defendants diplomatic immunity pursuant to the Vienna Convention should be denied.

The Court is not persuaded that defendants' conduct constituted human trafficking, and thus no *jus cogen* norm was at issue. *See supra* II.B.1. *See also Gonzales Paredas*, 479 F. Supp. 2d 187 (enforcing diplomatic immunity over plaintiff's claim that defendants violated *jus cogen* norms). Furthermore,

"[i]n the view of the United States, there is no *jus cogens* exception to diplomatic immunity" and "there is not evidence that the international community has come to recognize a *jus cogens* exception to diplomatic immunity." Statement, at 20 (citing *Jones v. Ministry of Interior*, [2006] UKHL 26, ¶ 27 (U.K. House of Lords 2006).

### 4. "Subsequent-in-Time" Rule

Finally, plaintiffs' argument that the TVPA overrides the Vienna Convention pursuant to the subsequent-in-time rule is wholly unavailing. The subsequent-in-time rule applies "[w]here a treaty and a statute 'relate to the same subject,'" and the two cannot be harmonized. *Kappus v. CIR*, 337 F.3d 1053, 1056 (D.C. Cir. 2003) (quoting *Whitney v. Robertson*, 124 U.S. 190, 194 (1888)). The TVPA concerns peonage, slavery, and trafficking in persons, whereas the Vienna Convention provides immunity from criminal prosecution and civil actions to foreign diplomats. Because the treaty and statute do not relate to the same subject, the subsequent in time rule is inapplicable. "A treaty will not be deemed to have been abrogated or modified by a later statute, unless such purpose on the part of Congress has been clearly expressed." *Cook v. United States*, 288 U.S. 102, 120 (1933) (citation omitted). There has been no such action on the part of Congress, and inaction is not sufficient to abrogate a treaty. *See Trans World Airlines v. Franklin Mint Corp.*, 466 U.S. 243,

14

252 (1984). Morever, "[i]n the view of the United States, the TVPA does not override diplomatic immunity. First, the TVPA is silent as to whether it limits the immunity of diplomats, and courts should not read a statute to modify the United States's treaty obligations in the absence of a clear statement from Congress." Statement, at 23 (citation omitted).

### C.  Residual Immunity

In light of defendants leaving their diplomatic post in 2007 and returning to Kuwait, plaintiffs ask the Court to find that defendants no longer have diplomatic immunity. Although Article 39 of the Vienna Convention states that an official's privileges and immunities end when his diplomatic functions cease, Article 39 provides that a residual immunity subsists with respect to "acts performed by such a person in the exercise of his functions as a member of the mission." Therefore, defendant's immunity remains intact for acts performed in the exercise of his duties as a diplomatic officer of the State of Kuwait. *See Knab v. Republic of Geor.*, 1998 WL 34067108, *4 (D.D.C. May 29, 1998). As the Court previously concluded, defendants' conduct in employing plaintiffs was not performed outside the exercise of defendants' diplomatic functions. *See supra* II.B.1. For this reason, defendants' current status does not affect their immunity from civil jurisdiction.

The Court recognizes that foreclosing plaintiffs' access to

the courts may have harsh implications, including even the denial of legal or monetary relief. The application of the doctrine of diplomatic immunity inevitably "deprives others of remedies for harm they have suffered." *Hellenic Lines*, 345 F.2d at 980. Congress, however, is the appropriate body for plaintiffs to present their concerns that the effectiveness of enforcing fair labor practices in the United States is compromised by diplomatic immunity. *See Tabion*, 73 F.3d at 539. This court will not create new exceptions to the longstanding policy of diplomatic immunity. *See Belhas v. Ya'alon*, 515 F.3d 1279 (D.C. Cir. 2008)(refusing to create a new exception under the FSIA when no such exception had been created by Congress). "And the law that binds this Court states that '[a]ny action or proceeding brought against an individual who is entitled to immunity with respect to such action or proceeding under the Vienna Convention on Diplomatic Relations . . . *shall be dismissed*.'" *Gonzales Paredas*, 479 F. Supp. 2d at 195 (quoting 22 U.S.C. § 254d).

### III.  CONCLUSION

Accordingly, for the reasons set forth above, the Court **GRANTS** defendants' Motion to Dismiss and Motion to Quash Service. An appropriate order accompanies this Memorandum Opinion.

**SO ORDERED.**

**Signed:    Emmet G. Sullivan**

**United States District Judge**
**March 20, 2009**