IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MANI KUMARI SABBITHI, JOAQUINA QUADROS, and GILA SIXTINA FERNANDES,<br><br>        Plaintiffs,<br><br>   v.<br><br>MAJOR WALEED KH N. S. AL SALEH, MAYSAA KH  A. O. A. AL OMAR, and STATE OF KUWAIT,<br><br>        Defendants. | Case No. 07-CV-00115-EGS |

**PLAINTIFFS' SUPPLEMENTAL BRIEF IN OPPOSITION TO KUWAIT'S MOTION TO DISMISS FOR LACK OF PERSONAL AND SUBJECT MATTER JURISDICTION**

Pursuant to this Court's orders of February 18 and March 4, 2010, Plaintiffs Mani Kumari Sabbithi, Joaquina Quadros, and Gila Sixtina Fernandes ("Plaintiffs") file this supplemental brief in opposition to the State of Kuwait's ("Kuwait's") motion to dismiss for lack of personal and subject matter jurisdiction filed on November 21, 2008.[1]  At the Court's request, this supplemental brief focuses solely on Plaintiffs' arguments that there is subject matter jurisdiction over Kuwait under the Foreign Sovereign Immunities Act ("FSIA") because Kuwait aided and abetted its diplomat, Major Waleed KH N.S. Al Saleh, and his wife Maysaa KH A.O.A. Al Omar ("Individual Defendants") in a scheme to traffick Plaintiffs into the United States and enslave them once here.  Plaintiffs properly allege that this scheme violated the

---

[1] *See* Defendant The State of Kuwait's Rule 12(b) Motion to Dismiss ("Kuwait's MTD"), Dkt. No. 65.

Trafficking Victims Protection Act ("TVPA") and applicable state law, and thereby gives rise to subject matter jurisdiction under the FSIA's non-commercial tort exception.[2]

As set forth in Plaintiffs' Complaint, Kuwait may be held liable for aiding and abetting the Individual Defendants' scheme of trafficking and forced labor under the TVPA and Virginia state tort law.  Plaintiffs' aiding and abetting claims are cognizable under the TVPA because Kuwait knowingly provided substantial assistance to the Individual Defendants in trafficking and enslaving Plaintiffs in the United States.  Plaintiffs' aiding and abetting claims are also cognizable under applicable Virginia law because Kuwait, through its actions, encouraged and approved the Individual Defendants' tortious conduct in violation of state law.  This Court has subject-matter jurisdiction over these federal and state law claims under FSIA's non-commercial tort exception to foreign sovereign immunity because they are for "money damages … and caused by the tortious act or omission" of Kuwait. 28 U.S.C. § 1605 (a)(5).

## RELEVANT FACTS

As the Court is by now well aware, this is a case about human trafficking and forced labor.  Plaintiffs are three women, all citizens of India, who come from severely impoverished families and who were trafficked into the United States and forced to work as domestic employees in the Individual Defendants' home in Virginia for little pay and under constant threat of serious harm.  Compl. ¶¶ 1, 15, 48.  As alleged in Plaintiffs' Complaint, Kuwait knowingly participated in the scheme to traffick Plaintiffs into this country and to exploit and abuse them

---

[2] In their opposition to Kuwait's motion to dismiss, incorporated here by reference, Plaintiffs addressed at length the many other reasons that this Court has subject matter jurisdiction over Plaintiffs' claims against Kuwait under the FSIA.  *See* Plaintiffs' Corrected Memorandum of Points and Authorities in Opposition to Defendant Kuwait's Motion to Dismiss ("Ps' Opp."), Dkt. No. 71.  Pursuant to the Court's Minute Order of March 4, 2010, Plaintiffs will respond to Kuwait's "new arguments on service of process" in their responsive brief due on April 12, 2010.

once here.  *Id.* ¶ 3.  To date, Kuwait has not disputed the salient facts as alleged in the Complaint.

Plaintiffs allege that Kuwait played an instrumental role in trafficking them into the United States by ensuring that Plaintiffs received the necessary A-3 visas to travel to and work for the Individual Defendants in this country.  *See* Compl. ¶¶ 105-122.  As part of the visa application process, the Individual Defendants were required to demonstrate that Plaintiffs would be employed pursuant to terms and conditions compliant with United States law.  To that end, the Individual Defendants presented signed employment contracts to U.S. embassy officials promising to provide Plaintiffs with minimum pay and working conditions that met U.S. standards for employment.  Compl. ¶¶ 24, 32, 44.  Kuwait authorized and approved each of the A-3 visa applications for Plaintiffs (comprising the visa forms and accompanying documentation) and thereafter issued a required "diplomatic note" verifying Defendant Al Saleh's status as a diplomat and his entitlement to employ Plaintiffs as domestic workers in the United States.  *Id.* ¶ 107.  Based on Kuwait's authorization and the applications and documentation submitted, the United States approved Plaintiffs' A-3 visa applications.  *Id.* ¶¶ 24, 32, 44.  Plaintiffs were thereafter trafficked into the United States using the visas obtained with Kuwait's assistance.

Plaintiffs' also allege that Kuwait played a pivotal role in ensuring and perpetuating Plaintiffs' enslavement by the Individual Defendants.  Upon arrival into the United States, each of Plaintiffs' passports were confiscated and thereafter held by Kuwait for the duration of their employment with the Individual Defendants.  *Id.* ¶¶ 27, 49, 110.  At the time, Kuwait was well aware that its confiscation and holding of Plaintiffs' passports contravened U.S. law and regulations.  *Id.* ¶¶ 105-122.  As a result of Kuwait's confiscation and withholding of Plaintiffs'

passports, Plaintiffs could not travel freely or legally identify themselves to others, not even to

the police after they eventually managed to escape the Individual Defendants' home.  *Id.* ¶ 98.

## ARGUMENT

I.   **PLAINTIFFS HAVE ADEQUATELY ALLEGED AIDING AND ABETTING
     LIABILITY AGAINST KUWAIT.**

Plaintiffs' allegations are sufficient to state a claim against Kuwait for the tort of aiding

and abetting violations of the civil liability provisions of the TVPA and Virginia state tort law.

Aiding and abetting tortious conduct has long been recognized as a separate and independent

basis for liability.  *See* RESTATEMENT (SECOND) OF TORTS, § 876(b), cmt. d (explaining that

aiding and abetting a breach of duty "has the same effect upon the liability of the advisor as

participation or physical assistance" and that an aider and abettor "is himself a tortfeasor and is

responsible for the consequences of the other's act"); *Am. Family Mut. Ins. Co. v. Grim*, 440

P.2d 621, 625 (Kan. 1968) ("One who aids, abets and encourages others in the commission of an

unlawful act is guilty as a principal, and all are jointly and severally liable in a civil action for

any damages that may have resulted from their act."); *accord Halberstam v. Welch*, 705 F.2d

472, 482-83 (D.C. Cir. 1983).

A.   **Kuwait Is Liable For Aiding And Abetting Violations Of The TVPA.**

1.   **Aiding And Abetting Liability Is Available Under The TVPA.**

As a matter of law, Kuwait can be held liable under the TVPA for aiding and abetting a

scheme or plan of trafficking and forced labor.  Whether a federal statute, such as the TVPA,

provides a private right of action against those who violate its provisions is a question of

Congressional intent.  *Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511

U.S. 164, 182 (1994), *superseded by statute*, 15 U.S.C. § 78t, *as recognized in Stoneridge Inv.*

*Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148 (2008); *see also Morales v. Trans World*

*Airlines, Inc.*, 504 U.S. 374, 383 (1992) (noting that Congressional intent is discerned by looking to the language of the statute at issue, as well as its overall structure and purpose).  As set forth fully in Plaintiffs' opposition brief, the language of the TVPA, as well as its overarching purpose and legislative history, confirms Congressional intent to incorporate traditional tort principles into section 1595 and to extend civil tort liability to persons and entities that engage in "any scheme, plan or pattern" of trafficking and forced labor, including both principal perpetrators and those who aid and abet them in their unlawful activity.  *See* Ps' Opp. at 18-21.

First, the text of section 1595 confirms Congressional intent to permit civil suits against those who aid and abet a scheme of forced labor or trafficking.  Section 1595 expressly states that "[a]n individual who is a victim of a violation of [the TVPA criminal provisions on trafficking and forced labor] may bring a civil action against the perpetrator."  18 U.S.C. § 1595(a).  The criminal provisions of the TVPA, in turn, impose criminal penalties on any actor who "knowingly provides or obtains the labor or services of a person . . . by means of any *scheme, plan, or pattern* intended to cause the person to believe that, if the person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint," 18 U.S.C. § 1589(a)(4), or any actor who "knowingly recruits, harbors, transports, provides, *or obtains by any means*, any person for forced labor or services," *id.* at § 1590(a) (emphases added).[3]  Thus, because an actor may be held criminally liable either for directly violating the TVPA or for aiding and abetting a violation of the TVPA, and because the

_____

[3] It is, of course, axiomatic that any person who assists a criminal perpetrator in violating a federal law may be held liable for criminal aiding and abetting unless the federal law at issue "specifically carves out an exception that precludes aiding and abetting liability."  *U.S. v. Yakou*, 428 F.3d 241, 251-52 (D.C. Cir. 2005).  The TVPA contains no such carve-out, and, to the contrary, expressly contemplates that criminal liability will extend to secondary actors who engage in any "scheme, pattern, or plan" of trafficking or forced labor.  18 U.S.C. §§ 1589(a)(4), 1590.

private right of action provision expressly authorizes civil claims against any "perpetrator" of a TVPA criminal violation, it necessarily follows that a victim of the criminal TVPA provisions may pursue a civil suit against any person who violates the criminal provisions, including any aider and abettor.

Other provisions of the TVPA similarly manifest Congressional intent to permit civil suit against anyone who participates in an unlawful scheme of trafficking and forced labor.  For example, section 102 of the statute explains that the purpose of the TVPA is to establish a comprehensive framework "to combat trafficking in persons" and "to ensure just and effective punishment of traffickers" by compensating victims and imposing penalties on any persons or entities involved in trafficking, regardless of the nature of such involvement.  H.R. 3244, 106th Cong. (2000), reprinted in 22 U.S.C. § 7101(a) (2009).  The Act also specifically recognizes, and aims to eliminate, "official corruption in the countries of origin" that often "aid[s]" trafficking in persons.  *Id.* at § 7101(b)(8); *see also id.* at § 7101(b)(21) ("Trafficking in persons is an evil requiring concerted and vigorous action by countries of origin, transit or destination, and by international organizations.").  In addition, section 111 of the TVPA authorizes sanctions against any actor "that plays a significant role in a severe form of trafficking in persons, directly *or indirectly* in the United States" or "materially assist[s] in, or provide[s] financial or technological support for or to, or provide[s] goods or services in support of, activities of a significant foreign trafficker in persons."  *Id.* at § 7108(a)(1)(A)-(B) (emphasis added).  These provisions demonstrate Congress's expansive view of civil liability under the TVPA and Congressional intent to impose civil aiding and abetting liability on any actor who substantially assists in any scheme, plan or pattern of trafficking and forced labor.

Recognition of civil aiding and abetting liability under the TVPA also comports with courts' uniform recognition of civil aiding and abetting liability under similar federal statutes, including the Alien Tort Claims Act ("ATCA"), the Anti-Terrorism Act ("ATA"), and the Torture Victim Protection Act ("Torture Act").  *See, e.g., Khulumani v. Barclay Nat'l Bank Ltd.*, 504 F.3d 254, 260 (2d Cir. 2007) (per curiam) (vacating the district court's dismissal of plaintiff's ACTA claims brought under an aiding and abetting theory of liability); *In re Chiquita Brands Int'l, Inc. Alien Tort Statute & S'holder Derivative Litig.*, __ F. Supp. 2d __, 2010 WL 432426, at *10-11, (S.D. Fla. Feb. 4, 2010) (holding that plaintiffs sufficiently pled claims for aiding and abetting liability under the ATA); *Almog v. Arab Bank, PLC*, 471 F. Supp. 2d 257, 268 (E.D.N.Y. 2007) ("Civil aiding and abetting liability, as well as conspiracy liability, is available under the ATA."); *Arar v. Ashcroft*, 414 F. Supp. 2d 250, 262 (E.D.N.Y. 2006), *aff'd*, 532 F.3d 157 (2d Cir. 2008), *abrogated on other grounds*, *Chowdhury v. Worldtel Bangladesh Holding, Ltd.*, 588 F. Supp. 2d 375, 387 (E.D.N.Y. 2008) (recognizing that "allegations of conspiracy or aiding and abetting liability are sufficient" under the Torture Act); *Mujica v. Occidental Petroleum Corp.*, 381 F.Supp.2d 1164, 1174 (C.D. Cal. 2005) (aiding and abetting liability under Torture Act was properly alleged).  Significantly, these courts have recognized the availability of civil aiding and abetting liability under these statutes despite the absence of language in those statutes expressly providing for such liability.  *See, e.g., Khulumani*, 504 F.3d at 259-60; *In re Chiquita Brands Int'l, Inc.*, 2010 WL 432426, at *10.

Consistent with the text of the statute itself, the intent of Congress in enacting the statute, and overwhelming federal authority recognizing aiding and abetting liability in similar contexts, this Court should similarly recognize civil aiding and abetting liability under the TVPA.

**2.     Plaintiffs' Allegations Are Sufficient To Allege Aiding And Abetting Liability Against Kuwait Under The TVPA.**

To state a claim for aiding and abetting liability under the TVPA, Plaintiffs need to allege: (1) a wrongful act causing injury perpetrated by a principal tortfeasor; (2) that Kuwait was "generally aware of its role as part of an overall illegal or tortious activity" at the time it provided assistance; and (3) that Kuwait "knowingly and substantially assist[ed] the principal violation." *Halberstam*, 705 F.2d at 477.  Plaintiffs have sufficiently pled each of these required elements.

First, Plaintiffs' Complaint amply alleges that the Individual Defendants perpetrated wrongful acts causing injury to Plaintiffs, including trafficking, forced labor, and physical and verbal abuse. *See* Compl. ¶¶ 47-94.  Second, Plaintiffs' allegations also sufficiently demonstrate that Kuwait was, at the very least, "generally aware" of its role in the Individual Defendants' wrongful actions at the time it provided assistance.  Indeed, Kuwait's knowledge of the abuses suffered by Plaintiffs is well documented.  As set forth in Plaintiffs' Complaint, prior to Plaintiffs' arrival in the United States, the U.S. Department of State repeatedly admonished Kuwait to better monitor its diplomatic employees for precisely the types of abuses perpetrated on Plaintiffs, by (among other things) "review[ing] each employment contract . . . [and] keep[ing] a copy on file at the mission and ensur[ing] that members respect their obligations as employers." *Id*. ¶ 116.  Further, the State Department specifically notified Kuwait of "instances where wages have been withheld from personal domestics for undue periods, where the wages actually paid are substantially less than those stipulated at the time of employment, where passports have been withheld from the employee, where the actual number of working hours weekly is substantially more than those originally contemplated and with no additional pay, and where the employee has been forbidden from leaving the employer's premises even though off

duty." *Id.* ¶ 114.  Because of reports of wage and employment abuse by Kuwaiti diplomats, the State Department emphasized that it would "*hold the Chief of Mission and the sending government responsible* for the conduct of persons sent to the United States as diplomatic representatives." *Id.* ¶ 115.  Thus, Kuwait not only knew generally that its diplomats frequently abused their employment relationships with domestic workers, but Kuwait was specifically charged with the responsibility of obtaining the requisite knowledge of its diplomats' employment relationships with their domestic workers to enable the state to monitor those employment relationships to ensure that future abuses did not occur.

Finally, Plaintiffs' Complaint adequately alleges that Kuwait "knowingly and substantially assisted the principal violation[s]" of federal law perpetrated in this case.  Indeed, it would not have been possible for the Individual Defendants to traffick Plaintiffs into the United States without Kuwait's assistance in obtaining A-3 visas for Plaintiffs.  Compl. ¶¶ 24, 32, 44.  Kuwait specifically authorized and approved each of the A-3 visa applications for Plaintiffs (comprising the visa forms and accompanying documentation) and thereafter issued the required "diplomatic note" to enable the Individual Defendants to bring Plaintiffs into the country.  *Id.* ¶ 107.  Kuwait also ensured and perpetuated Plaintiffs' enslavement by the Individual Defendants by confiscating and holding Plaintiffs' passports for the duration of their employment with the Individual Defendants.  Compl., ¶¶ 27, 49, 110.  At the time, Kuwait was well aware that its confiscation and holding of Plaintiffs' passports contravened U.S. regulations and law.  *Id.*, ¶¶ 105-122; *see also* U.S. GOV'T ACCOUNTABILITY OFFICE, REPORT TO THE SUBCOMMITTEE ON HUMAN RIGHTS AND THE LAW, GAO-08-892, at 20-21 (July 2008), http:// www.gao.gov/new.items/d08892.pdf ("GAO Report") ("State requires that A-3 and G-5 visa applicants submit employment contracts signed by the employer that include . . . a statement by

the employer that he or she will not withhold the passport of the employee . . . ."); 18 U.S.C. §

1592(a)(3) (providing criminal penalties for anyone who knowingly "conceals, removes,

confiscates, or possesses any actual or purported passport . . . of another person . . . to prevent or

restrict or attempt to prevent or restrict, without lawful authority, the person's liberty to move or

travel . . . .").[4]  Kuwait's actions prevented Plaintiffs from travelling freely, obtaining any help or

benefits, or even legally identifying themselves to others.

Importantly, Kuwait's acts should not, as Kuwait argues, be viewed in isolation, but

should instead be examined in light of the overall scheme, pattern and plan to traffick Plaintiffs

into the United States and force them to work in the Individual Defendants home for little pay

and under abusive and threatening conditions.  Kuwait's role in this scheme was knowing and

substantial, and should subject Kuwait to aiding and abetting liability under the TVPA.

**B.      Kuwait Is Liable For Aiding And Abetting The Individual Defendants'
          Violations Of State Law.**

Plaintiffs also adequately allege that Kuwait aided and abetted the Individual Defendants'

violations of Virginia state tort law by engaging in a scheme to traffick and enslave Plaintiffs.

Each of the state law torts alleged – including false imprisonment, assault and battery, and

intentional infliction of emotional harm – were committed in the course of the defendants'

trafficking and forced labor scheme and are incidents of that scheme.

Kuwait may be held liable for aiding and abetting these torts under applicable Virginia

law.[5]  The weight of authority in Virginia favors imposition of aiding and abetting liability

---

[4] Because Kuwait authorized and approved Plaintiffs' A-3 visa applications, it necessarily would
have been aware that Plaintiffs' employment contracts (documentation accompanying those
applications) contained the required language prohibiting the Individual Defendants from
withholding Plaintiffs' passports.

[5] As all acts relevant to Plaintiffs' claims against Kuwait were committed in Virginia, the laws of
the state of Virginia govern those claims.  *First Nat'l City Bank v. Banco Para El Camerio*

where, as here, a defendant knowingly provides substantial practical assistance to a tortfeasor. *See, e.g.*, *Sherry Wilson & Co., Inc. v. Gens. Court, L.C.*, 2002 WL 32136374, at *1 (Va. Cir. Ct. Sept. 27, 2002) ("the Commonwealth [of Virginia] has looked with favor upon recovery in tort against those who aid and abet others in the commission of [a] civil wrong"); *accord Daingerfield v. Thompson*, 74 Va. 136, at 151 (1880) ("There seems, indeed, to be no principle of law better settled, and for which numerous authorities may be cited if necessary, than this: that all persons who wrongfully contribute in any manner to the commission of a trespass, are responsible as principles, and each one is liable to the extent of the injury done."); *see also Selph v. Elbourn*, 2009 Va. Cir. LEXIS 139, at *2 (Va. Cir. Ct. Nov. 25, 2009) (refusing to dismiss tort claims against two defendants that encouraged and incited a third defendant to commit a battery); *Meurer v. Custom Log Builders LLC*, 2005 WL 3276348, at *1 (Va. Cir. Ct. Dec. 5, 2005) (holding that plaintiffs' allegation that defendant "aided and abetted" fraud stated a sufficient claim for fraud); *Thomas Somerville Co. v. World of Golf, Inc.*, 27 Va. Cir. 421, 422 (Va. Cir. Ct. 1992) (holding defendant company liable for enabling its patrons to damage a nearby warehouse). Thus, Virginia tort law imposes civil liability not only principal tortfeasors, but also on those that aid and abet those tortfeasors, as Kuwait did in this case.

To state a claim for aiding and abetting under Virginia law, Plaintiffs only need to allege that Kuwait "encourag[ed] or incited" or "in any way or by any means, countenance[d] or approve[d]" the Individual Defendants' actions in perpetrating the trafficking and forced labor scheme at issue. *Daingerfield*, 74 Va. at 151; *accord Selph*, 2009 Va. Cir. LEXIS 139, at *2. Indeed, Virginia law permits expansive imposition of aiding and abetting liability on actors who

---

*Exterior de Cuba*, 462 U.S. 611, 622 n.11 (1983), *superseded by statute on other grounds by* 28 U.SC. § 1610 ("[W]here state law provides a rule of liability governing private individuals, the FSIA requires the application of that rule to foreign states in like circumstances.").

assist in the perpetration of a wrong, "whether they were present when the wrongful act was done or not, and whether their motive was malicious or not." *Pike v. Eubank*, 90 S.E.2d 821, 826 (Va. 1956) (internal quotation omitted) (reversing judgment for defendant where jury could reasonably have inferred that defendant aided and abetted an assault and battery on plaintiff). Plaintiffs' allegations are plainly sufficient under this standard.

As set forth above, Kuwait was a key player in the scheme to traffic Plaintiffs into the United States and to subject them to forced labor. Kuwait's acts of approving Plaintiffs' A-3 visas and confiscating and holding Plaintiffs' passports undeniably enabled and encouraged the torts ultimately perpetrated on Plaintiffs by the Individual Defendants. For example, Kuwait's withholding of Plaintiffs' passports enabled the Individual Defendants to falsely imprison Plaintiffs in their Virginia home and also facilitated and encouraged the Individual Defendants to assault, batter, verbally abuse, and threaten Plaintiffs with impunity, knowing Plaintiffs would not be able to travel, obtain public assistance, or even to identify themselves to police were they to escape. Kuwait was charged with knowing and monitoring the employment relationship between Defendant Al Saleh and Plaintiffs and ensuring that these types of abuses did not occur. *See* Compl., ¶¶ 114-116. Instead, Kuwait participated in and sanctioned these abuses by itself ignoring United States laws and regulations and ensuring that Plaintiffs had nowhere to turn for help. Indeed, if Kuwait was ignorant of the abuses being perpetrated by the Individual Defendants (as it now claims), that ignorance can only be described as willful in light of the State Department's repeated admonitions to Kuwait to monitor its diplomats for these types of abuses and to be aware of the terms and conditions upon which their diplomats are employing domestic workers. Under Virginia law, Kuwait's knowing participation in the scheme of trafficking and forced labor, as well as its willful failure to prevent the torts committed by the Individual

Defendants, subjects Kuwait to aiding and abetting liability under Virginia law.  *See Pike*, 90

S.E.2d at 826 (defendant's willful failure to prevent battery held actionable).

## II.   THE FSIA'S NON-COMMERCIAL TORT EXCEPTION APPLIES TO ABROGATE KUWAIT'S IMMUNITY FROM SUIT FOR ITS ACTS OF AIDING AND ABETTING UNDER BOTH THE TVPA AND APPLICABLE STATE LAW.

As this Court is aware, the FSIA is the sole basis for jurisdiction against Kuwait in this

action.  *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 439 (1989).

Contrary to Kuwait's characterization of the FSIA as a "broad grant of immunity," *see* Kuwait's

MTD at 5, the "primary purpose" of the FSIA is actually "to 'restrict' the immunity of a foreign

state to suits involving a foreign state's public acts."  *Tex. Trading & Milling Corp. v. Fed.*

*Republic of Nig.*, 647 F.2d 300, 308 (2d Cir. 1981); *accord Kirkham v. Société Air Fr.*, 429 F.3d

288, 293 (D.C. Cir. 2005).  Consistent with this restrictive purpose, the FSIA places the burden

of persuasion on the foreign sovereign to demonstrate its immunity from suit.  *Princz v. F.R.G.*,

26 F.3d 1166, 1171 (D.C. Cir. 1994).  Once a plaintiff has alleged the applicability of one of the

exceptions to immunity under the FSIA, the burden then shifts to the foreign sovereign to prove,

by a preponderance of the evidence, that the alleged FSIA exception is *inapplicable*.

*Transamerican S.S. Corp. v. Somali Democratic Republic*, 767 F.2d 998, 1001 (D.C. Cir. 1985).

Here, Plaintiffs' allegations are more than sufficient to allege the applicability of the

FSIA's non-commercial tort exception.  Under that exception, a foreign state "shall not be

immune" from jurisdiction in any case "in which money damages are sought against a foreign

state for personal injury or death . . . occurring in the United States and *caused by the tortious act*

*or omission of that foreign state . . . .*"  28 U.S.C. § 1605(a)(5) (emphasis added).  As set forth

above, in this case Plaintiffs seek money damages against Kuwait for personal injury occurring

in the United States caused by Kuwait's tortious act of aiding and abetting violations of the

TVPA and applicable state law.  *See* section A, *supra*.  Where, as here, Kuwait only challenges

the *legal* sufficiency of Plaintiffs' complaint, this Court is required to accept all of Plaintiffs' well-pled factual allegations as true and draw all reasonable inferences in their favor. *Kilburn v. Socialist People's Libyan Arab Jamahiriya*, 376 F.3d 1123, 1127 (D.C. Cir. 2004); *see also Foremost-McKesson, Inc. v. Islamic Republic of Iran*, 905 F.2d 438, 440 n.3 (D.C. Cir. 1990) (remanding for further consideration of plaintiff's principal-agent allegations and explaining that the court must base it judgment "on the facts as alleged by the plaintiff and generously construed in the plaintiff's favor"); *Estate of Lieman v. Palestinian Auth.*, 424 F. Supp. 2d 153, 157 (D.D.C. 2006) (finding plaintiff's complaint against foreign state adequate to allege tort claims and denying motion to dismiss). Because Plaintiffs' aiding and abetting allegations under the TVPA and Virginia law are sufficient to set forth a claim for damages against Kuwait, those same allegations also sufficiently allege the applicability of the FSIA's non-commercial tort exception, and the Court's subject matter jurisdiction over Kuwait.

Kuwait nevertheless has argued that the non-commercial tort exception is inapplicable in this case because Kuwait's acts of aiding and abetting were discretionary acts that fall outside the reach of the tort exception. Kuwait's MTD at 12-15. Under the FSIA, the tort exception does not apply to "any claim based upon the exercise or performance or the failure to exercise or perform a discretionary function regardless of whether the discretion be abused." 28 U.S.C. § 1605(a)(5)(A). The United States Supreme Court has set forth a two-part test for determining whether an activity is discretionary in nature. *See U.S. v. Gaubert*, 499 U.S. 315 (1991) (interpreting the analogous discretionary function exception under the Federal Tort Claims Act). First, the challenged conduct must involve "an element of judgment or choice." *Id.* at 322. An act is not discretionary where a "federal statute, regulation or policy specifically prescribes a course of action" to follow because there is "no rightful option but to adhere to the directive."

*Id.* (internal citations and quotations omitted).  Second, even if the challenged activity involves discretion, the activity must also be of "the kind the discretionary function exception was designed to shield."  *Id.* at 322-23 (internal citations and quotations omitted).  Specifically, the activity must be "grounded in social, economic and political policy" to come within the discretionary function exception.  *Id.* at 323.  Under *Gaubert*'s two-part definition, Kuwait's acts of aiding and abetting violations of the TVPA and Virginia law cannot remotely be characterized as "discretionary" in nature.

First, Kuwait's actions were not discretionary because those actions contravened United States laws, regulations, and policies.  *Gaubert*, 499 U.S. at 322.  Plainly, a foreign sovereign has no discretion to perpetrate or "to aid in" conduct that is "clearly contrary to the precepts of humanity as recognized in both national and international law."  *De Letelier v. Republic of Chile*, 488 F. Supp. 665, 673 (D.D.C. 1980); *Liu v. Republic of China*, 892 F.2d 1419, 1431 (9th Cir. 1989).  As Plaintiffs have alleged, Kuwait's actions aided and abetted the Individual Defendants' scheme of trafficking and enslaving Plaintiffs, conduct that plainly contravenes the provisions of the TVPA as well as national and international law prohibiting involuntary servitude, slavery, and slavery-like practices.  *See*, *e.g.*, 18 U.S.C. §§ 1595, 1598; Slavery, Servitude, Forced Labour and Similar Institutions and Practices Convention of 1926, Mar. 9, 1927, 60 L.N.T.S. 253, 212 U.N.T.S. 17 ("Slavery Convention"); Int'l Covenant on Civil and Political Rights art. 8, Dec. 16, 1966, 999 U.N.T.S. 17; Universal Decl. of Human Rights art. 4, Dec. 10, 1948, G.A. res. 217(A)(II), U.N. Doc. 1/8107; U.S. CONST. amend. XIII.  Moreover, Kuwait's specific act of confiscating and withholding Plaintiffs' passports violated both the TVPA and U.S. State Department regulations.  *See* 18 U.S.C. § 1592 (prohibiting confiscation of domestic workers' passports); GAO Report at 20 (outlining State Department regulations prohibiting the

confiscation or withholding of a domestic worker's passport).[6]   Accordingly, Kuwait's actions

were not discretionary, and Kuwait is not entitled to immunity for any of its actions that

furthered defendants' scheme of trafficking and forced labor.  *Letelier*, 488 F. Supp. at 673.

Even if Kuwait's actions of aiding and abetting trafficking and forced labor were not non-

discretionary acts prohibited by U.S. law, the discretionary function exception still would not

apply because Kuwait's actions cannot fairly be characterized as "grounded in the social,

economic, or political policies" of Kuwait.  *See Gaubert*, 499 U.S. at 323; *accord Maalouf v.

Swiss Confederation*, 208 F. Supp. 2d 31, 35-36 (D.D.C. 2002) (noting that the discretionary

function exception applies only to "broader considerations of budgetary constraints, security

concerns, [or] political concerns regarding the image the foreign government wishes to project").

Here, Kuwait substantially assisted the Individual Defendants in trafficking Plaintiffs into the

United States and thereafter enslaving them in the Individual Defendants' home, where Plaintiffs

were forced to work for little pay and routinely subjected to physical and psychological abuse

and threats of serious bodily harm.  The United States government instructed Kuwait to monitor

its diplomats, including Defendant Al Saleh, for precisely the types of abuses perpetrated on

Plaintiffs in this case, but Kuwait either chose to ignore this instruction and remain deliberately

ignorant of the abuses perpetrated or specifically knew of the abuses but chose to do nothing to

prevent them.  Under either scenario, it is difficult to envision what, if any, "social, economic or

political policy" Kuwait's actions could have served.  Its actions certainly did not promote

---

[6] Kuwait characterizes its withholding of Plaintiffs' passports as mere "safekeeping," contending that its decision to safekeep the passports of members of Defendant Al Saleh's household was discretionary in nature.  Kuwait MTD at 14 n. 13.  But Kuwait's only authority for this proposition is its citation to *Alicog v. Kingdom of Saudi Arabia*, 860 F. Supp. 379 (S.D. Tex. 1994), a case that predates the TVPA by six years.  Kuwait does not dispute that the TVPA, which was in force at all times relevant to Plaintiffs' claims, expressly prohibits the withholding of domestic workers' passports, even under the guise of alleged "safekeeping."  18 U.S.C. § 1592.

"considerations of budgetary constraints, security concerns, [or] political concerns regarding the image" it wished to project.  *See Maalouf*, 208 F. Supp. 2d at 36-37.  Accordingly, Kuwait cannot claim the protections of the discretionary function exception in this case.

In the end, in light of Plaintiffs' well-pled allegations, the burden is on Kuwait to prove by a preponderance of the evidence that those exceptions to sovereign immunity are *inapplicable*.  *Transamerican S.S. Corp. v. Somali Democratic Republic*, 767 F.2d 998, 1001 (D.C. Cir. 1985).  Here, Kuwait failed to submit *any* evidence demonstrating the inapplicability of this alleged exceptions to immunity, or otherwise supporting application of the discretionary function exception, relying instead on the bare arguments of its counsel.  Those arguments, however, are insufficient to carry Kuwait's burden of persuasion, and the Court's exercise of subject matter jurisdiction is therefore appropriate.  *See id.* at 1003 (holding that district court had subject matter jurisdiction where foreign state failed to sustain burden of proving inapplicability of alleged FSIA exception).

Kuwait's acts of aiding and abetting violations of the TVPA and Virginia law, which served to further the scheme of trafficking and forced labor, fall squarely within the ambit of the non-commercial tort exception and thus give rise to subject matter jurisdiction under the FSIA.

## **CONCLUSION**

For all the foregoing reasons, Plaintiffs respectfully request that the Court deny Kuwait's

motion to dismiss.

March 15, 2010                             Respectfully submitted,


                                          /s/ Craig G. Falls_____
                                          David A. Kotler (admitted *pro hac vice*)
                                          Amy L. Rudd (admitted *pro hac vice*)
                                          Craig G. Falls (D.C. Bar No. 502368)
                                          DECHERT LLP
                                          1775 I Street, N.W.
                                          Washington, D.C.  20006
                                          (202) 261-3300

                                          Lenora M. Lapidus*
                                          Araceli Martínez-Olguín*
                                          AMERICAN CIVIL LIBERTIES UNION FOUNDATION
                                          – WOMEN'S RIGHTS PROJECT
                                          125 Broad Street, 18th Floor
                                          New York, NY  10004
                                          (212) 549-2644

                                          Stephen Macpherson Watt*
                                          AMERICAN CIVIL LIBERTIES UNION FOUNDATION
                                          – HUMAN RIGHTS PROGRAM
                                          125 Broad Street, 18th Floor
                                          New York, NY 10004
                                          (212) 519-7870

                                          *Counsel for Plaintiffs Mani Kumari Sabbithi, Joaquina
                                          Quadros, and Gila Sixtina Fernandes*

                                          *not admitted in this District

## <u>CERTIFICATE OF SERVICE</u>

I, Craig G. Falls, hereby certify that on March 15, 2010, I caused to be served via

e-mail per the parties' written agreement, a true and correct copy of the foregoing **Plaintiffs'**

**Supplemental Brief in Opposition to Kuwait's Motion to Dismiss for Lack of Personal and**

**Subject Matter Jurisdiction** and proposed order on the following:

Thomas B. Wilner, Esq.
Neil H. Koslowe, Esq.
Justin Harrison, Esq.
Shearman & Sterling LLP
801 Pennsylvania Avenue, N.W.
Suite 900
Washington, D.C. 20004-2634

/s/ *Craig G. Falls*
Craig G. Falls, Esq.
D.C. Bar No. 502368
1775 I Street, N.W.
Washington, D.C.  20006
Telephone:  (202) 261-3373
Fax:  (202) 261-3034

13740951.4.LITIGATION 3/15/2010 5:00 PM