## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MANI KUMARI SABBITHI, JOAQUINA QUADROS, and GILA SIXTINA FERNANDES, )<br><br>Plaintiffs, )<br><br>v. )<br><br>MAJOR WALEED KH N. S. AL SALEH, MAYSAA KH A. O. A. AL OMAR, and STATE OF KUWAIT, )<br><br>Defendants. ) | Civil Action No. 07-00115 (EGS)<br><br>JURY TRIAL DEMANDED |

## FIRST AMENDED COMPLAINT

Plaintiffs Mani Kumari Sabbithi, Joaquina Quadros, and Gila Sixtina Fernandes ("Plaintiffs"), by and for their First Amended Complaint in the above-captioned matter, allege as follows:

## PRELIMINARY STATEMENT

1.      Plaintiffs are Indian women who were trafficked to the United States by a Kuwaiti diplomat and his wife, Defendant Major Waleed KH N. S. Al Saleh ("Al-Saleh") and Defendant Maysaa KH A. O. A. Al Omar ("Al Omar") (together, "Individual Defendants"), with the aid and assistance of the State of Kuwait ("Kuwait").  Once in the United States, Individual Defendants used physical beatings, psychological abuse, and the threat of deportation to confine Plaintiffs to Individual Defendants' home and to force Plaintiffs to perform domestic tasks and childcare for sixteen to nineteen hours a day, seven days a week, for wages of less than $400 per month.

2.     Plaintiffs effectively lived in total isolation.  Individual Defendants

refused to allow Ms. Sabbithi to leave the house even once in the course of approximately four

months, and allowed Ms. Fernandes and Ms. Quadros to leave the house only twice in the course

of their respective five- and seven-month periods of employment.  Individual Defendants rarely

permitted Plaintiffs to use the phone, effectively cutting ties between Plaintiffs and their families

abroad.  Individual Defendants threatened Plaintiffs with arrest or kidnapping if they left the

house, or even looked out the windows or opened the front door.  Despite signed employment

contracts, Individual Defendants refused to pay Plaintiffs their lawful wages, instead sending a

meager pittance to Plaintiffs' families abroad.  Individual Defendants wrongfully detained

Plaintiffs; humiliated them; and psychologically and physically abused them.  The abuse became

so violent and vicious that Plaintiffs feared for their lives.

3.     Upon learning of Individual Defendants' treatment of the Plaintiffs, the

United States Department of Justice launched a criminal investigation.  At the conclusion of that

investigation, the Department of Justice informed the United States Department of State that it

wished to prosecute Individual Defendants, but could not do so because Individual Defendants

were shielded by diplomatic immunity.  In response, the State Department sent a letter to

Kuwait, requesting that the country waive immunity for Individual Defendants.  Refusing to

waive immunity, and faced with the possibility that the United States would declare Individual

Defendants *persona non grata*, Kuwait elected to send Individual Defendants back to Kuwait.

*See* Ex. 1.   Individual Defendants returned to Kuwait in September 2007, where they no longer

serve in any diplomatic capacity.

4.     Plaintiffs seek damages from Individual Defendants for trafficking them

into the United States under false pretenses and for subjecting them to slavery-like conditions

through wrongful detention and physical and psychological abuse. They also seek compensation

for their labor at the rate they were promised in the contracts entered into with Individual

Defendants; these contracts were provided to the United States Embassy in Kuwait to secure

Plaintiffs' A-3 visas. Plaintiffs additionally seek damages for various state-law torts.

5.      Plaintiffs also seek damages from Kuwait under alternative theories.

Plaintiffs seek damages from Kuwait for knowingly providing material and practical assistance

to Individual Defendants by, among other things, providing Individual Defendants with the

paperwork needed to obtain Plaintiffs' A-3 visas and holding Plaintiffs' passports so they could

not identify themselves if they ever left Individual Defendants' home. In the alternative, if the

Court were to find that Individual Defendants are not entitled to "residual" diplomatic immunity

because their actions in trafficking Plaintiffs and subjecting them to forced labor were taken "in

the exercise of their functions as members of the mission," *see* Vienna Convention on

Diplomatic Relations, art. 39(2), then Plaintiffs would in addition seek damages from Kuwait

under *respondeat superior* liability for actions committed by Kuwait's employee, Al Saleh,

within the scope of his employment and for Kuwait's benefit.

## JURISDICTION AND VENUE

6.      This Court has subject-matter jurisdiction over this action pursuant to 28

U.S.C. §§ 1330, 1331, 1351, and 1367. In particular, this Court has exclusive subject-matter

jurisdiction pursuant to the Foreign Sovereign Immunities Act of 1976. 28 U.S.C. § 1330.

Further, this Court also has subject-matter jurisdiction pursuant to 29 U.S.C. § 216(b), which

permits employees to bring civil actions in courts of appropriate jurisdiction to recover damages

for an employer's failure to pay the minimum wage and overtime wages, and 18 U.S.C. § 1595,

which permits civil actions for violations of the forced labor and trafficking provisions of the Victims of Trafficking and Violence Protection Act of 2000.

       7.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(d) and (f)(4), because Defendants are a foreign state and citizens of a foreign state.

**PARTIES**

       8.     Plaintiff Mani Kumari Sabbithi is a citizen of India.  At the time of the events that give rise to this Complaint, Ms. Sabbithi was legally residing in the United States by virtue of a duly issued A-3 visa, given to employees of foreign diplomats.  8 U.S.C. § 1101(a)(15)(A)(iii).  Ms. Sabbithi worked for Individual Defendants in the United States from approximately July 1, 2005, to October 31, 2005.  Ms. Sabbithi currently resides in New York under a T-Visa, which is reserved for victims of "a severe form of trafficking in persons."  8 C.F.R. § 214.11(b)(1).

       9.     Plaintiff Joaquina Quadros is a citizen of India.  At the time of the events that give rise to this Complaint, Ms. Quadros was legally residing in the United States by virtue of a duly issued A-3 visa.  Plaintiff Quadros worked for Individual Defendants in the United States from approximately July 1, 2005, to January 18, 2006.  She currently resides in New York under a T-Visa.

       10.     Plaintiff Gila Sixtina Fernandes is a citizen of India.  At the time of the events that give rise to this Complaint, Ms. Fernandes was legally residing in the United States by virtue of a duly issued A-3 visa.  Ms. Fernandes worked for Individual Defendants in the United States from approximately August 26, 2005, to January 18, 2006.  She currently resides in New York.  She was issued a T-Visa but recently obtained legal permanent residence.

11.     Upon information and belief, Defendant Major Waleed KH N. S. Al Saleh is a citizen of Kuwait who currently resides in Kuwait.  At all times relevant hereto, Al Saleh was stationed in Washington, D.C., as an Attaché to the Embassy of Kuwait.  He resided, along with his wife, Al Omar, and their four children at 7027 Elizabeth Drive, McLean, Virginia 22101-2624.  Upon information and belief, Al Saleh is not currently performing diplomatic duties for Kuwait.

12.     Upon information and belief, Defendant Maysaa KH A. O. A. Al Omar is a citizen of Kuwait who currently resides in Kuwait.  At all times relevant hereto, Al Omar lived in McLean, Virginia, and resided, along with her husband, Al Saleh, and their four children at 7027 Elizabeth Drive, McLean, Virginia  22101-2624.

13.     Defendant Kuwait is a foreign state as that term is defined in 28 U.S.C. § 1602, *et seq.* (the Foreign Sovereign Immunities Act of 1976).  Kuwait maintains a diplomatic presence in the United States through its Embassy ("Kuwait Embassy") located at 2940 Tilden Street, NW, Washington, DC  20008-1149.

## INTRODUCTION

14.     Plaintiffs are survivors of forced labor and human trafficking, as defined by the Victims of Trafficking and Violence Protection Act of 2000 (TVPA), Pub. L. No. 106-386, 114 Stat. 1464 (2000), a statute that seeks to prevent modern-day slavery and human trafficking and to create remedies.  The law provides the means to protect the victims of these heinous crimes, to punish the perpetrators, and to provide compensation to survivors.

15.     As defined by the TVPA, "severe forms of trafficking in persons" include "the recruitment, harboring, transportation, provision, or obtaining of a person for labor or

services" through the use of force, fraud, or deception to perform labor exacted through physical, mental or legal coercion. 22 U.S.C. §7102(8)(b).  Traffickers coerce their victims into performing labor through a variety of means, including, *inter alia*, physical abuse, psychological abuse and threats, isolation, and confinement.

16.     In 2003, the United States Department of State estimated that 18,000 to 20,000 individuals are trafficked into this country each year.  United States Dep't of State, *Trafficking in Persons Report 2003*, at 7, available at: http://www.state.gov/g/tip/rls/tiprpt/2003/21262.htm.  According to Congress, "traffickers primarily target women and girls, who are disproportionately affected by poverty, the lack of access to education, chronic unemployment, discrimination, and the lack of economic opportunities in countries of origin." 22 U.S.C. 7101(b)(4).  As recognized in the annual reports released by the United States Department of State and the United States Department of Justice, a significant numbers of victims are trafficked into this country to perform domestic work.  United States Dep't of State, *Trafficking in Persons Report 2009*, at 18, *available at*: http://www.state.gov/g/tip/rls/tiprpt/2009; U.S. Dep't of Justice, *Report on Activities to Combat Human Trafficking, 2001-2005*, *available at*: http://www.usdoj gov/crt/crim/trafficking _ report _2006.pdf.

17.     For at least the past ten years, the State Department, in its annual human rights reports, has documented the deplorable conditions and treatment of domestic workers in Kuwait.  For example, in 2005, the State Department reported that "foreign workers, mostly female domestics, have been abused by their employers and coerced into situations of debt bondage or involuntary servitude."  It concluded that "the principal traffickers were labor recruitment agencies and sponsors of domestic workers."  United States Dep't of State, *Country*

*Reports on Human Rights Practices 2005: Kuwait, available at:*

http://www.state.gov/g/drl/rls/hrrpt/2005/61692.htm.

18.     In the same 2005 Human Rights Report, the State Department also

documented that South Asian workers live and work "much like indentured servants" in Kuwait;

that South Asian workers frequently face poor working conditions; and that "physical or sexual

abuse of foreign women working as domestic servants" is a problem in Kuwait.  The report also

noted that, in 2005 "[there] were dozens of reports of domestic workers allegedly committing or

attempting suicide because of desperation over poor working conditions or abuse." *Id.*

19.     The State Department's 2005 *Trafficking in Persons Report* ranked

Kuwait as among the world's worst offenders with respect to human trafficking.  It concluded

that Kuwait, along with only thirteen other countries, had failed to "comply with the minimum

standards for the elimination of trafficking and [was] not making significant efforts to do so."

Dep't of State, *Trafficking in Persons Report 2005*, at 137, *available at*

http://www.state.gov/documents/organization/123357.pdf.

20.     The State Department's *2005 Trafficking in Persons Report* stated that

"[s]ome foreign women who migrate legally to Kuwait as domestic workers are subsequently

abused by their employers or coerced into situations of debt bondage or involuntary servitude. …

Victims suffer debt bondage, involuntary sexual servitude, coerced labor, verbal and physical

abuse, and the withholding of their passports or other required travel documents." *Id.*

21.     Kuwait remains classified as a "Tier 3" country today, meaning that its

government "does not fully comply with the minimum standards for the elimination of

trafficking and is not making sufficient efforts to do so." *Trafficking in Persons Report 2009*, at

179.

22.     According to the State Department, currently "[t]he majority of trafficking victims [in Kuwait] are from among the over 500,000 foreign women recruited for domestic service work in Kuwait," primarily migrants from places including India.  "Although they migrate willingly to Kuwait, upon arrival some are subjected to conditions of forced labor from their 'sponsors' and labor agents, such as withholding of passports, confinement, physical and sexual abuse and threats of such abuse or other serious harm, and non-payment of wages with the intent of compelling their continued service."  *Id.*

23.     According to the State Department, "[t]he Kuwaiti government … has demonstrated insufficient political will to address human trafficking adequately.  Much of the human trafficking found in Kuwait involves domestic workers in private residences and the government is reluctant to prosecute Kuwaiti citizens."  *Id.* at 179-80.

24.     According to the State Department, in Kuwait in 2009, the "[p]rincipal traffickers" included "host-country sponsors (employers) of foreign workers.  The primary method to obtain and transport victims was for sending-country labor recruitment agencies to offer valid contracts to workers, inflating salary figures and misrepresenting the labor conditions, and then not honor those contracts.  There were reports that employers gave workers new contracts at lower salaries than those they signed previously or deducted multiple fees from their salaries.  Some companies reportedly kept workers' debit cards and withdrew part of the salary after the paycheck had been deposited."  United States Dep't of State, 2009 Human Rights Report: Kuwait, *available at* http://www.state.gov/g/drl/rls/hrrpt/2009/nea/136072.htm.

25.     According to the State Department, in Kuwait in 2009, "[w]orkers found it difficult to leave these situations for several reasons: employers frequently withheld workers' passports or otherwise restricted their movements; employees often were in debt from their travel

to the country; and employers could file or threaten to file criminal charges against workers for absconding. Some workers also faced physical and sexual assault as a means of forcing them to work." *Id.* The State Department reported that "[t]here were frequent reports of domestic workers allegedly committing or attempting suicide because of desperation over poor working conditions or abuse." *Id.*

26.     On several occasions, Kuwaiti diplomatic personnel in the United States have been accused of engaging in severe acts of labor exploitation. Upon information and belief, Kuwait has made no effort to inquire into or address these allegations. Instead, Kuwait has launched immediate defenses for its diplomatic personnel accused of committing these crimes.

27.     Media reports in the United States have documented allegations of trafficking lodged against Kuwaiti diplomatic personnel, including a June 2005 article in *The New Standard* titled, "Some Embassy Workers Enslave Domestic Help, Enjoy Immunity." That article, available at http://newstandardnews.net/content/index.cfm/items/1985, featured the case of a Kuwaiti diplomat.

28.     The State Department has on multiple occasions alerted the State of Kuwait to the widespread exploitation of domestic workers by its diplomatic personnel in the United States and the legal obligations of Kuwait and its personnel to comply with the laws of the United States.

29.     In a Circular Diplomatic Note dated May 20, 1996, the State Department notified all foreign states with a diplomatic presence in the United States, including Kuwait, that "the Department [was] concerned to learn of problems which continue to arise in the working relationships between some members of the diplomatic and consular community and their personal household employees," including "instances where wages have been withheld from

9

personal domestics for undue periods, where the wages actually paid are substantially less than those stipulated at the time of employment, where passports have been withheld from the employee; where the actual number of working hours weekly is substantially more than those originally contemplated and with no additional pay, and where the employee has been forbidden from leaving the employer's premises even though off duty."

30.    In the same May 20, 1996 Circular Diplomatic Note concerning the treatment of domestic workers by diplomats, the State Department informed the Kuwaiti government that the United States government would "*hold the Chief of Mission and the sending government responsible* for the conduct of persons sent to the United States as diplomatic representatives or of others entitled to immunity" (emphasis added).

31.    The State Department also informed Kuwait that it should take affirmative steps to monitor its employees, including "review[ing] each employment contract…[and] keep[ing] a copy on file at the mission and ensure that mission members respect their obligations as employers."

32.    On June 19, 2000, the State Department sent a second Circular Diplomatic Note to foreign missions, including Kuwait, reiterating the legal obligations of diplomats to their domestic workers. This Circular also communicated the State Department's new requirement that diplomatic employers execute and include an employment contract in full compliance with United States law in all A-3 visa applications.

## FACTUAL ALLEGATIONS

### RECRUITMENT INTO FORCED LABOR

33.    Plaintiffs are all women from severely impoverished families in rural India.  During the period Plaintiffs were employed by Individual Defendants, they each bore significant financial responsibilities to provide necessary support to their children, husbands, parents, and/or extended families.

34.    Individual Defendants brought Plaintiffs into the United States after obtaining A-3 visas.  An A-3 visa allows representatives of foreign governments to bring private servants into the United States for employment in their homes during the diplomatic assignment.

35.    The United States extended Individual Defendants the privilege of bringing Plaintiffs into the United States on the basis of Al Saleh's employment by Kuwait.

36.    In order for Individual Defendants to obtain Plaintiffs' A-3 visas, Kuwait had to authorize the visa application and submit documentation to the United States, including a "diplomatic note" verifying the applicant's status as a diplomat.

37.    Upon information and belief, Kuwait agreed to and did in fact practically assist Individual Defendants in obtaining Plaintiffs' A-3 visas with knowledge of the misrepresentations made by Individual Defendants to Plaintiffs and officials at the United States Embassy in Kuwait.

### Ms. Sabbithi

38.    Ms. Sabbithi was born in Chinchinada, Andhra Pradesh, India.  Ms. Sabbithi was educated in India in the Telegu language through the seventh grade.  During the

11

period of her employment by Individual Defendants, Ms. Sabbithi spoke only a few words of English and no Arabic. Ms. Sabbithi could not read or write in English.

39.     On or about October 18, 2004, Ms. Sabbithi began working as a domestic servant for Individual Defendants in Kuwait.

40.     Ms. Sabbithi worked in Kuwait for Individual Defendants for approximately eight and a half months. During this time, Individual Defendants paid Ms. Sabbithi a monthly salary of 40 Kuwaiti Dinars ("KD") (about $138) and required her to work extremely long hours, seven days a week.

41.     In Kuwait, Al Omar physically assaulted, verbally abused, and threatened Ms. Sabbithi. Al Omar also restricted Ms. Sabbithi's contact with the external world, only allowing her to leave the home to attend church once a month.

42.     Ms. Sabbithi feared both Individual Defendants and felt compelled to work in their home. Al Omar told Ms. Sabbithi, and Ms. Sabbithi believed that, if she ran away or sought help, Individual Defendants would harm her.

43.     In or about April 2005, Al Omar directed Ms. Sabbithi to accompany her to an office. Al Omar did not inform Ms. Sabbithi of the destination or the purpose of the visit, but merely instructed Ms. Sabbithi not to wear her uniform and to tell anyone at the office, if asked, that she was paid "320" for her labor. She also instructed her to say that Individual Defendants treated her well. Al Omar wrote the figure "320" on a piece of paper for Ms. Sabbithi so that she would remember it.

44.     Upon information and belief, Al Omar then took Ms. Sabbithi to the United States Embassy in Kuwait. Ms. Sabbithi understood only that she was inside the building

of the United States Embassy once an agent took her fingerprints.  Al Omar never told Ms.

Sabbithi that the family was moving to the United States and that they planned to take her with

them.  Only after this visit to the Embassy did Ms. Sabbithi understand that Individual

Defendants intended to take her to the United States.

45.     Al Omar accompanied Ms. Sabbithi at all times in the United States

Embassy.  An official at the United States Embassy spoke almost exclusively with Al Omar.

The only time he spoke to Ms. Sabbithi was when he asked her where her husband lived.

46.     Upon information and belief, Al Omar sought an A-3 visa for Ms. Sabbithi

at the United States Embassy.  Upon information and belief, to encourage the United States

government to issue an A-3 visa to Ms. Sabbithi, Al Omar represented to the Embassy official

that Individual Defendants would provide Ms. Sabbithi with employment compliant with United

States law.  Upon information and belief, Al Omar produced and submitted to the United States

Embassy an employment contract for Ms. Sabbithi's labor, which is a document required by the

United States government for A-3 visa applications.

47.     On the basis of Al Omar's representations, the United States Embassy

issued Ms. Sabbithi an A-3 visa authorizing her to work as a live-in domestic worker for

Individual Defendants.

48.     Upon information and belief, Al Omar never intended to carry out the

verbal or contractual representations she made to the United States government.

49.     On or about July 1, 2005, Ms. Sabbithi traveled to Washington, D.C., with

Individual Defendants, their four children, and Plaintiff Ms. Quadros.  Ms. Sabbithi remained

under Individual Defendants' control until on or about October 31, 2005, when she escaped their home.

50.     Upon landing in the United States and passing through immigration, Al Saleh seized Ms. Sabbithi's passport.  Upon information and belief, Al Saleh then gave Ms. Sabbithi's passport to Kuwait, which held it for the duration of Ms. Sabbithi's time in Individual Defendants' home.  After Ms. Sabbithi escaped, Ms. Sabbithi's counsel requested that Individual Defendants return her passport.  In response, they received a letter from Al Saleh on official letterhead of the Embassy of the State of Kuwait explaining that he had arranged for the passport to be sent from the Kuwaiti Embassy to the Indian Embassy.  *See* Exhibit 2.

**Ms. Quadros**

51.     Plaintiff Joaquina Quadros was born in Goa, India, on July 5, 1966.  Ms. Quadros was educated through the tenth grade in India.  During the time of her employment by Individual Defendants, she spoke basic English and understood a small amount of Arabic.

52.     On or about May 16, 2003, Ms. Quadros began working as a domestic servant for Individual Defendants in Kuwait.  While working for Individual Defendants in Kuwait for approximately one year and ten months, Ms. Quadros was paid about 40 KD (about $138) per month.  During that time, Al Omar limited Ms. Quadros' contact with the external world and psychologically abused her.

53.     In or about January or February 2005, Al Omar told Ms. Quadros that the family was moving to the United States.  On February 7, 2005, Defendant Al Omar directed Ms. Quadros to sign an employment contract that was entitled "Domestic Servant Contract" and

subject to the laws of the United States.  The contract stated that Individual Defendants agreed to pay her $1,280 per month for an eight-hour workday.

54.     In or about February 2005, Al Omar took Ms. Quadros to the United States Embassy in Kuwait.  Prior to taking Ms. Quadros to the United States Embassy, Al Omar instructed Ms. Quadros to tell the Embassy officials, if asked, that she was treated well.

55.     During an interview of Ms. Quadros, an American official secretly gave her a document containing the details of her employment contract and other personal information.  He told her that she could use that document, along with her passport, if she needed to escape from Individual Defendants' home in the United States.

56.     Upon information and belief, Al Omar sought an A-3 visa for Ms. Quadros at the United States Embassy.  Upon information and belief, to induce the United States government to issue an A-3 visa to Ms. Quadros, Al Omar presented the signed employment contract, representing to the Embassy official that Individual Defendants would pay Ms. Quadros $1,280 per month and provide her with employment compliant with United States law.

57.     On the basis of Al Omar's representations, the United States Embassy issued Ms. Quadros an A-3 visa authorizing her to work as a live-in domestic servant for Individual Defendants.

58.     Upon information and belief, Al Omar never intended to carry out the representations she made to Ms. Quadros and to the United States government.

59.     Al Omar repeatedly promised improved pay and working conditions to Ms. Quadros if she agreed to work for Individual Defendants in the United States.

60.     Ms. Quadros agreed to go to work for Individual Defendants in reliance on Al Omar's promises of improved work conditions and better pay.  Ms. Quadros also believed her work conditions would improve because she understood that United States law would protect her from any abuse or mistreatment by Individual Defendants.

61.     On July 1, 2005, Ms. Quadros traveled to Washington, D.C. with Individual Defendants, their four children, and Ms. Sabbithi.  She remained under Individual Defendants' control until January 18, 2006, when she escaped their home.  During this time, Individual Defendants humiliated Ms. Quadros, disparaged her and the services they forced her to perform, verbally and psychologically abused her, and wrongfully detained her.

62.     Upon landing in the United States and passing through immigration, Al Saleh seized Ms. Quadros' passport.  Upon information and belief, Al Saleh then gave Ms. Quadros' passport to Kuwait, which held it for the duration of Ms. Quadros' time in Individual Defendants' home.   Ms. Quadros' counsel requested that Individual Defendants return her passport.  In response, they received a letter from Al Saleh on official letterhead of the Embassy of the State of Kuwait explaining that he had arranged for the passport to be sent from the Kuwaiti Embassy to the Indian Embassy.  *See* Exhibit 2.

**Ms. Fernandes**

63.     Plaintiff Gila Sixtina Fernandes was born in Goa, India, on September 1, 1967.  Ms. Fernandes was educated through the tenth grade in India.  During the time of her employment by Individual Defendants, she spoke functional English and no Arabic.

64.     On or about July 11, 1997, Ms. Fernandes began working for Individual Defendants in Kuwait as a caregiver for Khalid, Individual Defendants' then-ten-month-old son.

16

65.    Individual Defendants paid Ms. Fernandes between 35 KD (approximately $121) and 40 KD (approximately $138) per month.

66.    Ms. Fernandes worked for Individual Defendants for about five and a half years in Kuwait.  She was required to work long hours each day, seven days a week.  On December 9, 2002, Ms Fernandes returned to India.

67.    In or about May 2005, Al Omar contacted Ms. Fernandes to request that she relocate to the United States to work for Individual Defendants.  Al Omar promised Ms. Fernandes improved working conditions and a better salary.

68.    In reliance on Individual Defendants' promises of better pay and decent working conditions, Ms. Fernandes agreed to work for Individual Defendants in the United States.  On or about August 1, 2005, Ms. Fernandes returned to Kuwait to obtain her travel documents to the United States.

69.    Upon arrival in Kuwait, relatives of Al Omar instructed Ms. Fernandes to sign a contract that obligated Individual Defendants to pay Ms. Fernandes 380 KD (approximately $1,314) per month for an eight-hour workday and to provide her one day of rest per week.  Al Omar's relatives gave Ms. Fernandes an envelope of documents and instructed her to present the envelope to an official at the United States Embassy.  Upon information and belief, the envelope contained Ms. Fernandes' employment contract.  A friend of Individual Defendants then took Ms. Fernandes to the United States Embassy in Kuwait.

70.    Upon information and belief, to induce the United States government to issue Ms. Fernandes an A-3 visa, Individual Defendants represented to the United States

Embassy that they would pay Ms. Fernandes $1,314 per month and provide her with conditions of employment compliant with United States law.

71.     On the basis of Individual Defendants' representations, the United States Embassy issued Ms. Fernandes an A-3 visa authorizing her to work as a live-in domestic servant for Individual Defendants.

72.     Upon information and belief, Individual Defendants never intended to carry out the representations they made to Ms. Fernandes and to the United States government.

73.     On or about August 26, 2005, Ms. Fernandes traveled to Washington, D.C., alone.  Ms. Fernandes remained under Individual Defendants' control until January 18, 2006, when she escaped their home.  During this time, Individual Defendants humiliated Ms. Fernandes, disparaged her and the services they forced her to perform, verbally and psychologically abused her, and wrongfully detained her.

74.     Upon landing in the United States and passing through immigration, Al Saleh seized Ms. Fernandes' passport.  Upon information and belief, Al Saleh then gave Ms. Fernandes' passport to Kuwait, which held it for the duration of Ms. Fernandes' time in Individual Defendants' home.

FORCED LABOR AND EXPLOITATION IN THE UNITED STATES

75.     At all relevant times, Plaintiffs resided in Individual Defendants' home at 7027 Elizabeth Drive in McLean, Virginia.

76.     Individual Defendants forced Plaintiffs to work for little pay in violation of United States law and compelled their work through physical, mental, and legal coercion, including physical abuse, threats of physical harm and criminal prosecution, humiliation, and

verbal and psychological abuse.  Individual Defendants also confiscated Plaintiffs' passports immediately after they arrived in the United States.  Individual Defendants imprisoned the Plaintiffs in their home.

77.     Kuwait held Plaintiffs' passports after they had been confiscated at the airport by Al Saleh.  After Ms. Sabbithi escaped, and her counsel requested her passport from Individual Defendants, her counsel received a letter from Al Saleh.  The letter, written on the letterhead of the Embassy of the State of Kuwait, indicated that all the passports had been sent to the Indian Embassy.  Because Ms. Quadros and Ms. Fernandes' passports were confiscated and returned in similar fashion, upon information and belief, Kuwait held and controlled their passports as well.

### Work Responsibilities

78.     Individual Defendants forced Plaintiffs to perform arduous and demanding work virtually every waking hour of the day.  Al Saleh at all times ratified and supported Al Omar's treatment of Plaintiffs.  Al Saleh participated in the refusal and failure to pay Plaintiffs their wages.  Al Saleh also participated in the physical abuse that made the Plaintiffs feel that they had no alternative but to remain in the house and continue working for Individual Defendants.

79.     Al Saleh participated in violent acts to enforce Al Omar's operation of the household and approved of the manner in which his wife, Al Omar, managed Plaintiffs day-to-day.   Individual Defendants required Plaintiffs to work sixteen to nineteen hours per day, seven days per week.  Every day of the week, Individual Defendants required Plaintiffs to begin work between 6:30 a.m. and 7:00 a.m.  Their work days ended anywhere between 10:30 p.m. and 1:30 a.m.

80.    Al Omar determined, monitored, and regulated Plaintiffs' daily work schedules and chores.  As dictated by Al Omar, Plaintiffs each had different primary responsibilities, including, *inter alia*, caring for a nine-year-old boy and approximately one-year-old triplets, doing the laundry and ironing, cleaning the home, cooking for the family, and cooking for and serving frequent guests.

81.    Plaintiffs' childcare responsibilities were numerous and constant.  In addition to other tasks, Plaintiffs needed to wake the four children, change the diapers of the three babies, prepare formula for the three babies, feed and dress the three babies, prepare the older son for school, and feed him breakfast.

82.    After feeding and dressing the three babies and preparing the older son for school, Plaintiffs began their elaborate and lengthy cleaning routines.  Because Plaintiffs were responsible for the care of the three babies, one of the Plaintiffs cleaned while the others cared for the triplet babies.

83.    Throughout the day, Al Omar required Plaintiffs to change the diapers of the babies every two hours, whether soiled or not, and feed the babies every two hours.

84.    Al Omar required Plaintiffs to launder multiple loads of clothing every day and then to iron virtually every piece of clothing that was laundered, including underwear. Individual Defendants also required Plaintiffs to launder and iron all of the household's bedding and linens on a weekly basis.

85.    Once or twice a month, Individual Defendants gave large parties at their home.  Many of the guests were Kuwaiti government officials, and on one occasion, the Kuwaiti Ambassador to the United States attended.  Plaintiffs prepared for these parties, served the guests

during the parties, and cleaned up afterwards. Al Omar would frequently yell at and psychologically abuse Plaintiffs during the parties, but made sure to do so out of the sight of the guests. Plaintiffs workload during these parties was so heavy that they did not even have adequate time to use the bathroom.

### Physical Threats, Humiliation, Disparagement, and Abuse

86.     Individual Defendants physically abused Ms. Sabbithi. Al Omar's unending cruel treatment of Ms. Sabbithi included pushing and slapping her, and hitting her with heavy objects. Al Omar also pulled her hair, and poked and pushed Ms. Sabbithi on the chest so regularly that Ms. Sabbithi often bore bruise marks. Al Saleh also physically abused Ms. Sabbithi by pushing and kicking her.

87.     Individual Defendants humiliated Ms. Sabbithi, disparaged her and the services they forced her to provide, verbally and psychologically abused her, and wrongfully detained her.

88.     Because Ms. Sabbithi spoke little English or Arabic, Al Omar had trouble communicating with her. Al Omar would frequently take out her frustrations by striking Ms. Sabbithi or hitting her with objects.

89.     On one occasion, Al Omar bent Ms. Sabbithi's fingers and pushed them back towards Ms. Sabbithi's chest, and then struck Ms. Sabbithi's head against a wall several times.

90.     On another occasion, Al Omar hurled a soup spoon at Ms. Sabbithi and then struck Ms. Sabbithi's head with a heavy wooden box. As a result, Ms. Sabbithi had a large lump and a painful and swollen forehead for several days.

21

91.     On another occasion, Al Omar pushed Ms. Sabbithi against a wall and slammed Ms. Sabbithi's head against the wall.  Ms. Sabbithi's head hurt for days afterwards.

92.     On another occasion, Al Omar struck Ms. Sabbithi's head several times with a package of frozen chicken.  Ms. Sabbithi had a headache for several days afterwards.

93.     On numerous other occasions, Al Omar threatened to kill Ms. Sabbithi and send her defiled body back to India.  Ms. Sabbithi, who was aware of stories of domestic workers who were killed by their employers, believed these threats.

94.     On at least one occasion, Al Omar told Ms. Quadros that she would kill Ms. Sabbithi.

95.     Repeatedly, Ms. Quadros and Ms. Fernandes found Ms. Sabbithi injured and crying as a result of the physical violence and humiliation inflicted upon her by Al Omar.

96.     By physically abusing and threatening Ms. Sabbithi, Individual Defendants created a work environment filled with violence and implicitly threatened Ms. Quadros and Ms. Fernandes with physical harm.  Ms. Quadros and Ms. Fernandes lived in a constant state of fear.

97.     As a result, Ms. Quadros and Ms. Fernandes feared that Individual Defendants would subject them to the same physical abused Ms. Sabbithi received if they requested adequate sleep or food or informed anyone in the outside world about their situation.

98.     Individual Defendants humiliated Ms. Fernandes and Ms. Quadros, disparaged them and the services they forced them to provide, verbally abused and threatened them, and wrongfully detained them.

99.     Plaintiffs came to believe that Individual Defendants would kill them if they attempted to leave the house on their own accord or if Plaintiffs made a mistake in their work.  Al Omar threatened to kill Ms. Quadros in Kuwait when she contemplated leaving Individual Defendants' employ.

100.     As Individual Defendants' physical abuse of Ms. Sabbithi worsened, Ms. Sabbithi began to contemplate suicide.

101.     On or about October 31, 2005 -- the day that Ms. Sabbithi finally escaped -- Al Omar became enraged with Ms. Sabbithi for incorrectly preparing a meal for the babies.  Al Omar pulled Ms. Sabbithi's hair and threatened to "cut off" Ms. Sabbithi's tongue.

102.     Hearing the commotion, Al Saleh then entered the kitchen, yelled and berated Ms. Sabbithi, and violently pushed Ms. Sabbithi to the floor, causing Ms. Sabbithi to strike her head on the corner of a table and lose consciousness.

103.     Individual Defendants roused Ms. Sabbithi by pouring cold water over her, soaking her clothing.  When Ms. Sabbithi finally regained consciousness, Al Omar yelled at Ms. Sabbithi for having wet clothes and mocked and insulted her for having lost consciousness.

104.     Individual Defendants failed to provide Ms. Sabbithi with any medicine or medical care to treat or examine her head injury.  For many days, Ms. Sabbithi had a large lump on the back of her head from the fall and a headache.  Ms. Sabbithi continued to suffer from persistent headaches long after the head injury.

105.     Shortly after the incident in the kitchen, Ms. Sabbithi was bathing the young children when Al Omar entered the bathroom and instructed her to prepare the children's food.  When Ms. Sabbithi reminded Al Omar that Al Omar had previously said that Ms. Sabbithi

was too stupid to prepare the children's food correctly, Al Omar became incensed and began hitting, pushing, and violently kicking Ms. Sabbithi in the bathroom. Al Saleh then pushed Ms. Sabbithi in the kitchen until she fell down and kicked her even more violently, until she lost consciousness.

106.   After this incident, Ms. Sabbithi believed that Individual Defendants would kill her. Her fears were heightened when Al Omar's mother, who was often friendly to her on the phone, hung up when Ms. Sabbithi answered the phone. Ms. Sabbithi believed that Individual Defendants had told Al Omar's mother of their plan to kill her. She thought that even if she might be arrested or kidnapped if she left the house, it would be better than staying and being killed.

**Psychological Abuse and Enforced Isolation**

107.   In addition to inflicting physical harm on Ms. Sabbithi and physical threats on all Plaintiffs, Individual Defendants coerced Plaintiffs' labor through a pattern and practice of psychological abuse, humiliation, isolation, wrongful detention, and exploitation.

108.   Individual Defendants required Plaintiffs to work at a strenuous pace for extremely long hours, without adequate sleep or food. This pace harmed Plaintiffs' health. For example, on one particularly busy day, Ms. Sabbithi was required by Al Omar to work at such a difficult pace that she became dizzy and fainted on the stairs.

109.   Al Omar often timed how long a particular chore took and screamed at Plaintiffs if she thought they were taking too long.

110.   Al Omar treated Plaintiffs in a demeaning and abusive manner. Al Omar screamed at Plaintiffs when they made mistakes, had accidents (such as breaking a glass), or

slightly deviated from her instructions. Plaintiffs were very fearful that Al Omar would find an error or shortcoming in their work.

111.   Individual Defendants restricted and sometimes punished and berated Plaintiffs for attending to their own personal needs, such as eating or using the bathroom. For example, Al Omar often berated Plaintiffs for wasting time when they sat down to eat a meal and demanded that they return to work.

112.   Moreover, Individual Defendants overburdened Plaintiffs with so much work that Plaintiffs frequently had no time to eat or use the bathroom during the day. Individual Defendants also limited Plaintiffs in the amount they could eat and what they were allowed to eat. Similarly, Al Omar prevented Plaintiffs from using the bathroom at will.

113.   Al Omar forbade Plaintiffs to speak with each other unless they spoke in English about work. Al Omar screamed at Ms. Quadros and Ms. Fernandes if she heard them speaking their native language. Plaintiffs were able to speak only when Al Omar was not present.

114.   Individual Defendants controlled Plaintiffs' use of the telephone. Plaintiffs were permitted approximately one telephone call per month to their families abroad. Al Omar would calculate the cost of the international call and deduct that amount from the meager wages she had delivered to Plaintiffs' families.

115.   Ms. Sabbithi's husband occasionally called Individual Defendants' home and asked to speak to Ms. Sabbithi. Whenever he called, Al Omar hung up the phone and told Ms. Sabbithi it was someone dialing the wrong number.

116.   In one of her rare phone calls with her husband, Ms. Sabbithi told her husband that she might try and leave Individual Defendants' home because they were treating her so badly.  Her husband called his sister, who knew Al Omar, and asked his sister to call Al Omar and request that she improve her treatment of Ms. Sabbithi.  When Ms. Sabbithi's sister-in-law conveyed this request to Al Omar, Al Omar told Ms. Sabbithi that if she ever left, she would be arrested.

117.   Individual Defendants failed adequately to provide for Plaintiffs' most basic needs.  Individual Defendants required Plaintiffs to sleep in spare, overcrowded conditions.  All three Plaintiffs were required to share a room.  Individual Defendants failed to provide Plaintiffs with access to medical care.

118.   Individual Defendants did not afford Plaintiffs any privacy.  Al Omar would frequently ransack the Plaintiffs' room to look for any signs that they were planning an escape.  Ms. Quadros had to hide the document with personal information she received from the American official under a section of the room's carpeting to make sure that it was not found.

119.   Individual Defendants also isolated Plaintiffs from the outside world for the purpose of keeping them in a situation of forced labor, servitude, and wrongful detention.

120.   Ms. Sabbithi was not permitted to leave the house once during her four months in the United States.  Al Omar denied Ms. Sabbithi's requests to visit a local church, saying that Ms. Sabbithi would not understand the language.

121.   Individual Defendants only allowed Ms. Quadros and Ms. Fernandes to leave the house twice.  Both times, Al Saleh drove Ms. Quadros and Ms. Fernandes to a local

church and let them stay inside for one hour.  Al Saleh waited outside in the car for the whole time.

122.    Individual Defendants even forbade Plaintiffs from approaching the windows, looking outside, or opening the door.  They told Plaintiffs that they would be arrested or kidnapped if someone saw them.

123.    Al Omar forbade Plaintiffs from speaking to anyone outside the family, including guests that Individual Defendants invited to the home.

124.    Individual Defendants threatened Plaintiffs, reiterating that they or others might suffer physical harm if they escaped or attempted to escape.

125.    Plaintiffs believed that Individual Defendants would seriously harm or kill them if they left the confines of Individual Defendants' home without permission.  They also believed that they might be arrested or kidnapped if they were discovered by any outsider.

Wages

126.    Plaintiffs received no wages directly.  Individual Defendants sent the tiny fraction of their promised wages that they did pay abroad to Plaintiffs' families.

127.    Individual Defendants paid Ms. Sabbithi's family only approximately 70 KD (approximately $242) per month.  Individual Defendants often failed to send these payments on a timely basis and altogether failed to pay for Ms. Sabbithi's final two weeks of work. Individual Defendants deducted the cost of Ms. Sabbithi's monthly call to her husband abroad from the money they sent to her family.

128.    Contrary to their representations to the United States Embassy and to Ms. Quadros, Individual Defendants paid Ms. Quadros' family only between 70 and 75 KD (approximately $242 to $260) per month, instead of the agreed-upon $1,280.

129.    Contrary to their representations to the United States Embassy and to Ms. Fernandes, Individual Defendants paid Ms. Fernandes' family only 100 KD (approximately $346) per month, instead of the agreed-upon $1,314.

130.    Individual Defendants never gave Plaintiffs any spending or other money or allowance during the period they resided in Individual Defendants' Virginia home.  Plaintiffs were completely dependent upon Individual Defendants for food, clothing, shelter, and any other necessities.  Even when Ms. Quadros and Ms. Fernandes asked for a dollar or two to put into the donation box at church, Individual Defendants refused.

**Escape from Individual Defendants' Home**

131.    In the late summer of 2005, at a time when Individual Defendants were away from the house, Ms. Quadros opened the door of the home and saw Individual Defendants' neighbor, Hector Rodriguez, in front of his house, which was located across the street from Individual Defendants' home.  Afraid to approach Mr. Rodriguez, but desperate to get help, Ms. Quadros stood in front of Individual Defendants' house.  After a few minutes, Mr. Rodriguez called her over and asked her if she wanted to speak with him.  Seizing this brief opportunity, Ms. Quadros approached him and told him of the physical abuse that Individual Defendants inflicted upon Ms. Sabbithi as well as their general mistreatment.  Mr. Rodriguez promised to try to help Plaintiffs as soon as they could safely escape.

132.    On or about October 31, 2005, following the incident in which Al Saleh knocked her unconscious, Ms. Sabbithi decided she had to escape Individual Defendants' house. She had heard about Mr. Rodriguez from Ms. Quadros and Ms. Fernandes and decided to try and run to his house.  He took her in and called the police.

133.    The police arrived and spoke with Ms. Sabbithi.  Upon information and belief, they also went to Individual Defendants' house and asked for Ms. Sabbithi's passport. Upon information and belief, Individual Defendants responded that they had diplomatic immunity and that Ms. Sabbithi's passport was at the Embassy of Kuwait.

134.    After Ms. Sabbithi escaped, Al Omar called Ms. Sabbithi's sister-in-law and told her that Al Omar would catch Ms. Sabbithi and inflict severe physical punishments on her.  She told Ms. Sabbithi's sister-in-law that "we are not even going to tell you what we are planning on doing to her."

135.    After Ms. Sabbithi escaped, Al Omar also threatened Ms. Quadros and Ms. Fernandes that if they attempted to escape, they would be harmed.  Al Omar told Ms. Quadros and Ms. Fernandes that Ms. Sabbithi was "rotting in jail" and could never return to India because she had escaped.  Al Omar warned Ms. Quadros and Ms. Fernandes that she was prepared to "hunt down" Ms. Sabbithi.

136.    Al Omar became increasingly controlling of and continued to abuse Ms. Quadros and Ms. Fernandes.  When Al Omar was in a different room, she constantly yelled for them or called them on the intercoms through the house to confirm they were working and that they had not also escaped.

137.    As the conditions in Individual Defendants' house worsened, Ms. Fernandes and Ms. Quadros realized that they also had to escape. Ms. Fernandes suffered fear, nervousness and anxiety as a result of the unbearable working conditions. Her health began deteriorating at an accelerated rate. She also experienced substantial weight loss. Ms. Fernandes believed that she would die in the house unless she escaped. She considered running away at this time, but she feared that without her passport she would be arrested or kidnapped.

138.    Finally, on or about January 18, 2006, Ms. Fernandes and Ms. Quadros found an opportunity to escape. Ms. Fernandes gathered their belongings into a dirty laundry basket and pretended to take the laundry to the washing machine on the second floor. Individual Defendants were in the basement. When the opportunity presented itself, Ms. Fernandes and Ms. Quadros grabbed their belongings and fled. They ran to the home of Mr. Rodriguez who helped them to safety.

139.    Later that same night, Al Omar telephoned Ms. Fernandes' husband, who was working in Kuwait. Al Omar screamed at and berated Ms. Fernandes' husband for approximately twenty minutes and threatened to have him and Ms. Fernandes killed because Ms. Fernandes had escaped.

140.    Afraid Al Omar's family would harm her husband, Ms. Fernandes insisted that her husband leave Kuwait immediately and return to India where he would be safe. Ms. Fernandes' husband returned to India within ten days.

141.    When Plaintiffs, through counsel, sent a letter to Al Saleh requesting that he return their passports, Al Saleh responded on letterhead of the Embassy of the State of Kuwait and claimed that Plaintiffs' passports had been sent by certified mail to the Indian Embassy in Washington, D.C. "immediately after [Plaintiffs] abandoned their duties." *See* Ex. 2.

142.    The abuses inflicted on Plaintiffs by Individual Defendants were foreseeable by Kuwait.

143.    Upon information and belief, Kuwait was aware that a pattern of rape, physical assault, involuntary servitude, and mistreatment of Asian domestic workers exists in the State of Kuwait and takes place largely with impunity.  *See* Human Rights Watch, *Global Report on Women's Human Rights*, *available at*: http://www.hrw.org/about/projects/womrep/.

144.    Upon information and belief, Kuwait was made aware of previous accusations that its diplomatic personnel in the United States had engaged in severe acts of labor exploitation, through civil lawsuits filed against it, public denouncements at its embassies and consulates, and newspaper reports, among other channels of information.

145.    Upon information and belief, Kuwait, in response to allegations that its personnel exploited their domestic workers, made no effort to inquire into or address these allegations, but rather has defended its diplomatic personnel without regard to the veracity of the claims.

146.    Upon information and belief, Kuwait was in the possession of at least two communications from the United States Department of State that alerted the State of Kuwait to the widespread exploitation of domestic workers by diplomatic personnel and the legal obligations of Kuwait and its personnel to comply with laws in the United States.

147.    Upon information and belief, Kuwait failed to take affirmative steps, as requested by the Department of State, to monitor its employees, including "review[ing] each employment contract…[and] keep[ing] a copy on file at the mission and ensure that mission members respect their obligations as employers."

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### TRAFFICKING IN PERSONS VIOLATION OF THE TRAFFICKING VICTIMS PROTECTION ACT OF 2000
### (AGAINST ALL DEFENDANTS)

148.    Plaintiffs reallege and incorporate the averments of the foregoing paragraphs as though set forth fully herein.

149.    Individual Defendants knowingly recruited, transported, and harbored the Plaintiffs so as to obtain their labor and services by threats of serious harm, scheme or pattern of behavior and/or abuse of legal process within the meaning of the Trafficking provisions of the Trafficking Victims Protection Act, 18 U.S.C. § 1590.

150.    Plaintiffs are authorized to bring these civil claims against Defendants pursuant to the civil remedies provision of the Trafficking Victims Protection Reauthorization Act of 2003, 18 U.S.C. § 1595.

151.    As a proximate result of Individual Defendants' conduct, Plaintiffs have suffered damages.

152.    Kuwait knowingly played a significant role in and practically and materially assisted Individual Defendants' trafficking of Plaintiffs.

153.    In the alternative, if the Court were to find that Individual Defendants are entitled to "residual" diplomatic immunity because their actions in the United States were taken "in the exercise of their functions as members of the mission," *see* Vienna Convention on Diplomatic Relations, art. 39(2), then Kuwait is liable for actions committed by its employee, Al Saleh, within the scope of his employment and for Kuwait's benefit.

154.    Plaintiffs are entitled to recover damages in an amount to be proven at trial, including attorneys' fees.

## SECOND CLAIM FOR RELIEF
## FORCED LABOR VIOLATION OF THE TRAFFICKING
## VICTIMS PROTECTION ACT OF 2000
## (AGAINST ALL DEFENDANTS)

155.    Plaintiffs reallege and incorporate the averments of the foregoing paragraphs as though set forth fully herein.

156.    Individual Defendants knowingly obtained Plaintiffs' labor and services by threats of serious harm, scheme or pattern of behavior and/or abuse of legal process within the meaning of the Forced Labor provision of the Trafficking Victims Protection Act, 18 U.S.C. § 1589.

157.    Plaintiffs are authorized to bring these civil claims against Defendants pursuant to the civil remedies provision of the Trafficking Victims Protection Reauthorization Act of 2003, 18 U.S.C. § 1595.

158.    As a proximate result of Individual Defendants' conduct, Plaintiffs have suffered damages.

159.    Kuwait knowingly played a significant role in and practically and materially assisted Individual Defendants in subjecting Plaintiffs to conditions of forced labor.

160.    In the alternative, if the Court were to find that Individual Defendants are entitled to "residual" diplomatic immunity because their actions in the United States were taken "in the exercise of their functions as members of the mission," *see* Vienna Convention on Diplomatic Relations, art. 39(2), then Kuwait is liable for actions committed by its employee, Al Saleh, within the scope of his employment and for Kuwait's benefit.

161.   Plaintiffs are entitled to recover damages in an amount to be proven at trial, including attorneys' fees.

### THIRD CLAIM FOR RELIEF
### INVOLUNTARY SERVITUDE (PURSUANT TO THE THIRTEENTH AMENDMENT OF THE UNITED STATES CONSTITUTION AND 18 U.S.C. § 1584) (AGAINST ALL DEFENDANTS)

162.   Plaintiffs reallege and incorporate the averments of the foregoing paragraphs as though set forth fully herein.

163.   The Thirteenth Amendment of the United States Constitution and its enforcing statute, 18 U.S.C. § 1584, prohibit involuntary servitude in private conduct.

164.   Individual Defendants knowingly forced Plaintiffs to work through threats of physical force and legal coercion.  Individual Defendants forced Plaintiffs to work for them under the threat of physical harm and through legal coercion manifested in the confiscation of their passports and threats of harm that would result should Plaintiffs leave Individual Defendants' residence.

165.   Through the conduct of Individual Defendants alleged herein, acting individually and in concert, Individual Defendants caused Plaintiffs to have and to believe they had no way of avoiding continued service or confinement in violation of the Thirteenth Amendment's prohibition on involuntary servitude.

166.   As a proximate result of Individual Defendants' conduct, Plaintiffs have suffered damages.

167.   Kuwait knowingly played a significant role in and practically and materially assisted Individual Defendants in subjecting Plaintiffs to conditions of involuntary servitude.

168.     In the alternative, if the Court were to find that Individual Defendants are entitled to "residual" diplomatic immunity because their actions in the United States were taken "in the exercise of their functions as members of the mission," *see* Vienna Convention on Diplomatic Relations, art. 39(2), then Kuwait is liable for actions committed by its employee, Al Saleh, within the scope of his employment and for Kuwait's benefit.

169.     Plaintiffs are entitled to recover damages in an amount to be proven at trial, including attorneys' fees.

**FOURTH CLAIM FOR RELIEF**
**VIOLATION OF THE FAIR LABOR STANDARDS ACT**
**(AGAINST DEFENDANTS AL SALEH AND AL OMAR)**

170.     Plaintiffs reallege and incorporate the averments of the foregoing paragraphs as though set forth fully herein.

171.     Individual Defendants employed Plaintiffs within the meaning of the Fair Labor Standards Act, 29 U.S.C. § 203(d).

172.     Pursuant to the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201, *et seq.* and United States Department of Labor regulations, Individual Defendants were obligated to pay Plaintiffs at least the minimum wage of $5.15 for every hour in which Plaintiffs were not free to leave employers' premises.

173.     Individual Defendants willfully refused to pay Plaintiffs minimum wage, in violation of 29 U.S.C. §§ 206(a), (f) and Department of Labor regulations.

174.     As a proximate result of Individual Defendants' conduct, Plaintiffs have suffered damages.

175.    Plaintiffs are entitled to recover the amount of unpaid minimum wages due and an equal amount as liquidated damages, a total amount no less than $116,431.20 for all three Plaintiffs.  Plaintiffs are also entitled to recover attorneys' fees and costs of the action, pursuant to 29 U.S.C. § 216 (b) and Department of Labor regulations, in addition to declaratory relief.

**FIFTH CLAIM FOR RELIEF**
**BREACH OF CONTRACT**
**(AGAINST DEFENDANTS AL SALEH AND AL OMAR)**

176.    Plaintiffs reallege and incorporate the averments of the foregoing paragraphs as though set forth fully herein.

177.    On or about February 7, 2005, Plaintiff Quadros and Individual Defendants entered into a written contract providing, *inter alia*, that Plaintiff Quadros would work for Individual Defendants as a domestic worker in their home for $1,280 per month.  The contract also provided that Plaintiff Quadros would work only eight hours per day.

178.    On or about August 13, 2005, Plaintiff Fernandes and Individual Defendants entered into a written contract, providing, *inter alia,* that Plaintiff Fernandes would work for Individual Defendants as a domestic worker in their home for 380 KD (approximately $1,314) per month.  The contract also provided that Plaintiff Fernandes would work only eight hours per day, would be granted one day of rest per week and would not be deprived of her passport.

179.    Upon information and belief, Plaintiff Sabbithi and Individual Defendants entered into a written contract, providing, *inter alia*, that Plaintiff Sabbithi would work for Individual Defendants as a domestic worker in their home.  Upon information and belief, the written contract set forth wages and employment conditions in accordance with United States law.

180.   Plaintiffs fully performed under their respective contracts by working as domestic workers in the Al Saleh-Al Omar household.

181.   Individual Defendants breached the contracts by failing to pay Plaintiffs for all of the work they performed and by forcing Plaintiffs to work more than eight hours per day, seven days per week.  Individual Defendants also breached their contract with Ms. Fernandes by depriving her of her passport.

182.   As a proximate result of Individual Defendants' conduct, Plaintiffs have suffered damages.

183.   Plaintiffs are entitled to recover damages in an amount to be proven at trial, including attorneys' fees and the cost of this action.

**SIXTH CLAIM FOR RELIEF**
**QUANTUM MERUIT**
**(AGAINST DEFENDANTS AL SALEH AND AL OMAR)**

184.   Plaintiffs reallege and incorporate the averments of the foregoing paragraphs as though set forth fully herein.

185.   Plaintiffs have conferred significant benefits upon Individual Defendants by performing the above-mentioned labor for them.

186.   Individual Defendants have not tendered appropriate payment to Plaintiffs for these services.

187.   Individual Defendants are liable under quantum meruit for the services that Plaintiffs provided.

188.   As a proximate result of Individual Defendants' conduct, Plaintiffs have suffered damages.

189.    Plaintiffs are entitled to recover damages in an amount to be proven at trial, including attorneys' fees and the cost of this action.

## SEVENTH CLAIM FOR RELIEF
## UNJUST ENRICHMENT
## (AGAINST DEFENDANTS AL SALEH AND AL OMAR)

190.    Plaintiffs reallege and incorporate the averments of the foregoing paragraphs as though set forth fully herein.

191.    Individual Defendants have been unjustly enriched because they failed to pay Plaintiffs the value of their labor.

192.    As a proximate result of Individual Defendants' conduct, Plaintiffs have suffered damages.

193.    It would be inequitable for Individual Defendants to be permitted to retain such benefits without paying Plaintiffs the value of the benefits conferred.

194.    Plaintiffs are entitled to restitution and judgment against Individual Defendants in an amount to be proven at trial, including attorneys' fees and the cost of this action.

## EIGHTH CLAIM FOR RELIEF
## FRAUD AND CONSTRUCTIVE FRAUD
## (AGAINST ALL DEFENDANTS)

195.    Plaintiffs reallege and incorporate the averments of the foregoing paragraphs as though set forth fully herein.

196.    Individual Defendants intentionally, knowingly, negligently, or innocently misrepresented to Plaintiffs the conditions of Plaintiffs' employment in the United States in order to induce them to come to the United States.

197.    Individual Defendants deceived Plaintiffs with the above-mentioned misrepresentations, including the promise of specified wages and proper working conditions in order to entice Plaintiffs to come to the United States and to force them to work as domestic workers in their household.

198.    Individual Defendants induced Plaintiffs to come to the United States knowing of and intending that their misrepresentations would induce Plaintiffs to travel to the United States in order to receive the promised employment.

199.    Plaintiffs did in fact rely on Individual Defendants' misrepresentations to their detriment and as a result were forced to work as domestic workers for Individual Defendants, thereby enduring physical and psychological abuse that accompanied this employment at great economic, physical and financial detriment.

200.    At the time that Individual Defendants made the foregoing representations and promises to Plaintiffs, they had no intention of carrying out such representations and promises.

201.    As a direct and proximate result of these actions, Plaintiffs have sustained damages.

202.    Kuwait knowingly played a significant role in and practically and materially assisted Individual Defendants in making their misrepresentations to the Plaintiffs.

203.    Plaintiffs are entitled to recover damages in an amount to be proven at trial, including attorneys' fees and the cost of this action.

## NINTH CLAIM FOR RELIEF
## FALSE IMPRISONMENT
## (AGAINST ALL DEFENDANTS)

204.     Plaintiffs reallege and incorporate the averments of the foregoing paragraphs as though set forth fully herein.

205.     Individual Defendants knowingly and intentionally restrained Plaintiffs through threats and coercion so as to deprive Plaintiffs of their liberty and force Plaintiffs to continue laboring for them.

206.     Plaintiffs reasonably believed that they were confined within the boundary of Individual Defendants' home as a result of Individual Defendants' coercion, use of force, and threats of force.

207.     As a proximate result of Individual Defendants' conduct, Plaintiffs have suffered damages in an amount to be proven at trial.

208.     Individual Defendants committed these acts maliciously, with the wrongful intention of causing harm to Plaintiffs and in conscious disregard of their rights.

209.     Kuwait knowingly played a significant role in and practically and materially assisted Individual Defendants in falsely imprisoning the Plaintiffs.

210.     In the alternative, if the Court were to find that Individual Defendants are entitled to "residual" diplomatic immunity because their actions in the United States were taken "in the exercise of their functions as members of the mission," *see* Vienna Convention on Diplomatic Relations, art. 39(2), then Kuwait is liable for actions committed by its employee, Al Saleh, within the scope of his employment and for Kuwait's benefit.

211.    Plaintiffs are entitled to recover damages in an amount to be proven at trial, including punitive damages, attorneys' fees and the cost of this action.

## TENTH CLAIM FOR RELIEF
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
## (AGAINST ALL DEFENDANTS)

212.    Plaintiffs reallege and incorporate the averments of the foregoing paragraphs as though set forth fully herein.

213.    Individual Defendants acted with an intent to humiliate, cause Plaintiffs emotional distress and/or a reckless disregard for the high probability that emotional distress would occur by, among other things, refusing Plaintiffs contact with the world outside Individual Defendants' home, telling Plaintiffs that they would be harmed if they left the home, regularly screaming at them and berating them, depriving them of liberty and wages and subjecting them to abhorrent working conditions.

214.    Individual Defendants' conduct was extreme and outrageous in nature and intolerable in a civilized society.

215.    As a proximate result of Individual Defendants' conduct, Plaintiffs have suffered and continue to suffer severe mental distress, emotional injuries, and economic loss.

216.    Individual Defendants committed these acts maliciously and oppressively, with the wrongful intention of causing harm to Plaintiffs, with the motive amounting to malice and in conscious disregard of Plaintiffs' rights.

217.    Kuwait knowingly played a significant role in, and practically and materially assisted Individual Defendants in, intentionally inflicting humiliation and emotional distress on the Plaintiffs.

218.    In the alternative, if the Court were to find that Individual Defendants are entitled to "residual" diplomatic immunity because their actions in the United States were taken "in the exercise of their functions as members of the mission," *see* Vienna Convention on Diplomatic Relations, art. 39(2), then Kuwait is liable for actions committed by its employee, Al Saleh, within the scope of his employment and for Kuwait's benefit.

219.    Plaintiffs are entitled to recover damages in an amount to be proven at trial, including punitive damages, attorneys' fees and the costs of this action.

### ELEVENTH CLAIM FOR RELIEF
### NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS
### (AGAINST ALL DEFENDANTS)

220.    Plaintiffs reallege and incorporate the averments of the foregoing paragraphs as though set forth fully herein.

221.    Individual Defendants negligently engaged in outrageous conduct toward Plaintiffs and caused Plaintiffs to suffer severe emotional distress.

222.    Individual Defendants owed a duty to Plaintiffs because it was foreseeable that forcing domestic workers to work up to nineteen hours per day, failing to pay them any wages directly, isolating them from the outside world, and subjecting to threats of physical harm would cause Plaintiffs to suffer severe emotional distress.

223.    Individual Defendants breached their duty to the Plaintiffs by negligently engaging in the conduct described herein.

224.    As a proximate result of said conduct, Plaintiffs have suffered and continue to suffer extreme mental distress, humiliation and emotional injuries. As a direct and natural result, Plaintiffs have suffered physical injuries.

225.   Kuwait knowingly played a significant role in and practically and materially assisted Individual Defendants in negligently inflicting emotional distress on the Plaintiffs.

226.   In the alternative, if the Court were to find that Individual Defendants are entitled to "residual" diplomatic immunity because their actions in the United States were taken "in the exercise of their functions as members of the mission," *see* Vienna Convention on Diplomatic Relations, art. 39(2), then Kuwait is liable for actions committed by its employee, Al Saleh, within the scope of his employment and for Kuwait's benefit.

227.   Plaintiffs are entitled to recover damages in an amount to be proven at trial, including punitive damages, attorneys' fees and the cost of this action.

## TWELFTH CLAIM FOR RELIEF
### ASSAULT
### (PLAINTIFF SABBITHI AGAINST ALL DEFENDANTS)

228.   Plaintiff Sabbithi realleges and incorporates the averments of the foregoing paragraphs as though set forth fully herein.

229.   Individual Defendants' actions and/or words set forth above were intended to cause harmful and/or offensive contact with Plaintiff Sabbithi and/or the apprehension of imminent harmful and/or offensive contact with Plaintiff Sabbithi.

230.   As a direct and proximate result of the actions and/or words of Individual Defendants, Individual Defendants placed Plaintiff Sabbithi in apprehension of imminent harmful and/or offensive physical contact.

231.   As a direct and proximate result of the actions and/or words of Individual Defendants, Plaintiff Sabbithi has endured continuing pain and suffering, in addition to severe emotional distress and loss of income.

232.   Kuwait knowingly played a significant role in and practically and materially assisted Individual Defendants in assaulting Ms. Sabbithi.

233.   In the alternative, if the Court were to find that Individual Defendants are entitled to "residual" diplomatic immunity because their actions in the United States were taken "in the exercise of their functions as members of the mission," *see* Vienna Convention on Diplomatic Relations, art. 39(2), then Kuwait is liable for actions committed by its employee, Al Saleh, within the scope of his employment and for Kuwait's benefit.

234.   Sabbithi is entitled to recover damages in an amount to be proven at trial, including punitive damages, attorneys' fees and the cost of this action.

### THIRTEENTH CLAIM FOR RELIEF
### BATTERY
### (PLAINTIFF SABBITHI AGAINST ALL DEFENDANTS)

235.   Plaintiff Sabbithi realleges and incorporates the averments of the foregoing paragraphs as though set forth fully herein.

236.   Individual Defendants engaged in continuous harmful and/or offensive physical contact with Sabbithi, including hitting, pushing, poking, kicking, and beating Sabbithi on multiple occasions.

237.   At no time did Sabbithi consent to the above harmful and/or offensive physical contact by Individual Defendants.

238.   Individual Defendants' physical contact with Sabbithi was inexcusable and unjustified.

239.   As a direct and proximate result of Individual Defendants' physical contact with Sabbithi, Sabbithi has endured continuing pain and suffering, in addition to humiliation and severe emotional distress and loss of income.

240.   Kuwait knowingly played a significant role in and practically and materially assisted Individual Defendants in the battery they committed against Ms. Sabbithi.

241.   In the alternative, if the Court were to find that Individual Defendants are entitled to "residual" diplomatic immunity because their actions in the United States were taken "in the exercise of their functions as members of the mission," *see* Vienna Convention on Diplomatic Relations, art. 39(2), then Kuwait is liable for actions committed by its employee, Al Saleh, within the scope of his employment and for Kuwait's benefit.

### FOURTEENTH CLAIM FOR RELIEF
### CIVIL CONSPIRACY
### (AGAINST ALL DEFENDANTS)

242.   Plaintiffs reallege and incorporate the averments of the foregoing paragraphs as though set forth fully herein.

243.   Defendants agreed to engage in the acts detailed above to accomplish an unlawful purpose and/or accomplish acts by unlawful means.

244.   Through their concerted action, Defendants assisted one another in the execution of those acts that resulted in the unlawful treatment of Plaintiffs, described above.

245.    As a proximate result of Defendants' agreement to engage in the unlawful acts described above, Plaintiffs have suffered and continue to suffer severe mental distress, emotional injuries and economic loss.

246.    Plaintiffs are entitled to recover damages in an amount to be proven at trial, including attorneys' fees and the cost of this action.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a jury trial on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that this Court grant them the following relief on each count above:

1) Compensatory damages in the amount to be determined at trial;

2) Punitive damages in the amount to be determined at trial;

3) Attorneys' fees and costs; and

4) Such other and further relief as this Court deems just and proper.

Dated:      May 26, 2010
            Washington, D.C.

/s/ Lorelie S. Masters
Lorelie S. Masters (D.C. Bar No. 358686)
Martina E. Vandenberg (D.C. Bar No. 476685)
JENNER & BLOCK LLP
1099 New York Avenue, N.W.
Suite 900
Washington, DC  20001

-- and --

46

Lenora M. Lapidus*
Risha K. Foulkes*
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
WOMEN'S RIGHTS PROJECT
125 Broad Street, 18th Floor
New York, NY 10004

Steven M. Watt*
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
HUMAN RIGHTS PROGRAM
125 Broad Street, 18th Floor
New York, NY 10004

*Admitted pro hac vice

*Counsel for Plaintiffs Mani Kumari Sabbithi,
Joaquina Quadros, and Gila Sixtina
Fernandes*

# EXHIBIT 1



**U.S. Department of Justice**

Civil Rights Division

RM:JER:km
DJ 50-79-93

*Criminal Section - PHB*
*950 Pennsylvania Avenue, NW*
*Washington, DC 20530*

October 31, 2007

Ms. Claudia Flores
Staff Attorney
Women's Rights Project
American Civil Liberties Union
125 Broad Street, 18th floor
New York, NY  10004

Dear Ms. Flores:

    This letter is in response to your recent inquiry regarding
the criminal investigation of subjects Major Waleed KH N.S. Al
Saleh, former Military Attache to the Embassy of Kuwait, and
Maysaa KH A.O. Al Omar for alleged violations of Title 18, United
States Code, section 1589 (forced labor).  Based on the evidence
developed during this investigation, the Civil Rights Division of
the Department of Justice asked the Department of State to
request a waiver by Kuwait of Al Omar's diplomatic immunity to
prosecution.  The Department of State recently informed the Civil
Rights Division that Kuwait has declined to waive immunity and
that Al Saleh and Al Omar voluntarily left the U.S.  Moreover,
according to the Department of State, Al Saleh and Al Omar are
now ineligible for entry into the United States.  Accordingly,
and for the purposes described in 18 U.S.C. § 1595, this
investigation is now closed.

                              Sincerely,

                              Robert Moossy by Evan Price

                              Robert Moossy
                              Director
                     Human Trafficking Prosecution Unit
                              Criminal Section
                            Civil Rights Division

# EXHIBIT 2

March 22, 2006


<u>CERTIFIED MAIL</u>

Waleed Al-Salah
7027 Elizabeth Drive
Mclean, VA 22101-2624


To Whom It May Concern:

Please return the passports belonging to Gila Fernandes, Joaquina Quadros, and Mani
Kumari Sabbithi, to the following address within the next two weeks:

Attn: Barbara Rodriguez
NYC Bar Association
42 West 44th Street
New York, NY 10036.

Thank you for your prompt attention to this matter.



Sincerely,

Barbara Rodriguez



## EMBASSY OF THE STATE OF KUWAIT
## KUWAIT LIAISON OFFICE
3500 INTERNATIONAL DRIVE, N.W., WASHINGTON, D.C. 20008
TEL: (202) 364-2215/6 • FAX: (202) 364-2241

March 27, 2006

Ms. Barbara Rodriguez
NYC Bar Association
42 West 44th Street
New York, NY 10036

Dear Ms. Rodriguez:

Please be informed that the passports for Ms. Gila Fernandes, Joaquina Quadros, and Mani Kumari Sabbithi were sent by certified mail to the Embassy of India, Washington, DC immediately after they abandoned their duties and left my house.

You may want to contact Embassy of India to obtain passports of these three individuals.

Sincerely,

MAJOR WALEED AL-SALEH
Administrative Officer